UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA *ex rel.* JOHN
DOE and THE STATE OF NEW YORK *ex rel.*
JOHN DOE,

                  Plaintiffs,

     v.

STRUCTURED EMPLOYMENT ECONOMIC
DEVELOPMENT CORPORATION,

                  Defendant.

UNITED STATES OF AMERICA,

                  Plaintiff-Intervenor,

     v.

ALEX SAAVEDRA, SHOMARI GREENE,
ALAN KATZ, TAGEWATEE CHANDARPAUL,
and MITCHELL MCCLINTON,

                  Defendants.

11 Civ. 6425 (AKH)

**MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA
IN OPPOSITION TO DEFENDANT ALEX SAAVEDRA'S MOTION TO DISMISS
THE FIRST AMENDED COMPLAINT IN INTERVENTION**

PREET BHARARA
United States Attorney for the
Southern District of New York
86 Chambers Street, 3rd Floor
New York, New York 10007
Telephone:  (212) 637-2639
Facsimile:  (212) 637-2717
Email:  Sarah.North@usdoj.gov

SARAH J. NORTH
Assistant United States Attorney
– Of Counsel –

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...........................................................................................1

PROCEDURAL HISTORY.................................................................................................2

FACTUAL ALLEGATIONS ...............................................................................................3

    1.      Background .................................................................................................3

    2.      The Fraudulent Scheme to Report False Job Placement Information......................5

          a.      Saavedra's Role in the Fraudulent Scheme .................................................6

          b.      Saavedra's Concealment of the Fraud .......................................................9

ARGUMENT ..................................................................................................................11

POINT I.  APPLICABLE LEGAL STANDARDS .................................................................11

POINT II.  THE MOTION TO DISMISS SHOULD BE DENIED ...........................................12

    A.      THE AMENDED COMPLAINT PLEADS SAAVEDRA'S ROLE IN
           THE FRAUDULENT SCHEME WITH PARTICULARITY ..............................12

    B.      THE AMENDED COMPLAINT STATES CLAIMS AGAINST
           SAAVEDRA FOR VIOLATIONS OF THE FALSE CLAIMS ACT.................17

          1.      The Amended Complaint Sufficiently Pleads that Saavedra
              Caused the Submission of False Claims and False Statements
              Material to False Claims ........................................................................18

          2.      The Amended Complaint Sufficiently Pleads Knowledge ......................22

          3.      The Amended Complaint Sufficiently Pleads Falsity...............................23

    C.      THE AMENDED COMPLAINT STATES COMMON LAW CLAIMS ............24

CONCLUSION................................................................................................................25

## TABLE OF AUTHORITIES

**Cases**                                                                                                                                    **Page**

*A1 Procurement, LLC v. Hendry Corp.*,
    No. 11 Civ. 23582, 2012 WL 6214546 (S.D. Fla. Dec. 13, 2012) ....................................15

*Adelphia Recovery Trust v. Bank of America, N.A.*,
    624 F. Supp. 2d 292 (S.D.N.Y. 2009)............................................................................16

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)........................................................................................................11

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007)........................................................................................................11

*In re Canon Cameras,*
    No. 05 Civ. 7233 (JSR), 2006 WL 1751245 (S.D.N.Y. Jun. 23, 2006) ..........................24

*In re Cardiac Devices Qui Tam Litigation*,
    221 F.R.D. 318 (D. Conn. 2004).....................................................................................22

*Dunahoo v. Hewlett-Packard Co.*,
    No. 11 Civ. 05588 (BSJ)(HBP), 2012 WL 178332 (S.D.N.Y. Jan. 20, 2012) ................25

*Gelles v. TDA Indus., Inc.*,
    No. 90 Civ. 5133 (MBM), 1991 WL 39673 (S.D.N.Y. Mar. 18, 1991).....................14, 15

*Goldin Associates, L.L.C. v. Donaldson, Lufkin & Jenrette Sec. Corp.*,
    No. 00 Civ. 8688(WHP), 2003 WL 22218643 (S.D.N.Y. Sept. 25, 2003) ......................14

*Haas v. Gutierrez*,
    No. 07 Civ. 3623 (GBD), 2008 WL 2566634 (S.D.N.Y. Jun. 26, 2008) .........................21

*Mazzaro de Abreu v. Bank of America Corp.*,
    525 F. Supp. 2d 381 (S.D.N.Y. 2007)............................................................................25

*Reading International, Inc. v. Oaktree Capital Management LLC*,
    317 F. Supp. 2d 301 (S.D.N.Y. 2003)............................................................................25

*In re Refco Inc. Sec. Litigation*,
    826 F. Supp. 2d 478 (S.D.N.Y. 2011)............................................................................16

*T.D. Bank, N.A. v. JP Morgan Chase Bank, N.A.*,
    No. 10 Civ. 2843 (JG)(ARL), 2010 WL 4038826 (E.D.N.Y. Oct. 14, 2010) ..................25

*United Savers Acceptance Corp. v. Kelton*,
    775 F. Supp. 141 (D. Vt. 1991).........................................................................19

*United States v. Bornstein*,
    423 U.S. 303 (1976)....................................................................................19, 20

*United States v. Countrywide Fin. Corp.*,
    __ F. Supp. 2d __, 2013 WL 4437232 (S.D.N.Y. Aug. 16, 2013) ...................16

*United States v. Corinthian Colleges*,
    655 F.3d 984 (9th Cir. 2011) .........................................................................20

*United States v. Hawley*,
    619 F.3d 886 (8th Cir. 2010) .........................................................................22

*United States v. Huron Consulting Grp., Inc.*,
    No. 09 Civ. 1800 (JSR), 2011 WL 253259 (S.D.N.Y. Jan. 24, 2011).............12

*United States v. Murphy*,
    937 F.2d 1032 (6th Cir. 1991) .......................................................................20

*United States v. Neifert-White Co.*,
    390 U.S. 228 (1968).......................................................................................17

*United States v.  Raymond & Whitcomb Co.*,
    53 F. Supp. 2d 436 (S.D.N.Y. 1999)...............................................................18

*United States v. Sforza*,
    No. 00 Civ. 1307 (AGS), 2000 WL 1818686 (S.D.N.Y. Dec. 12, 2000).........24

*United States v. St. Luke's Subacute Hospital and Nursing Centre, Inc.*,
    No. 00 Civ. 1976 (MHP), 2004 WL 2905237 (N.D. Cal. Dec. 16, 2004).......23

*United States v. Tomicic*,
    No. 3:09 Cr. 210 (WWE), 2012 WL 2116143 (D. Conn. June 2, 2012) .........16

*U.S. Bank Nat'l Ass'n v. PHL Variable Ins. Co.*,
    No. 12 Civ. 6811 (CM)(JCF), 2013 WL 791462 (S.D.N.Y. Mar. 5, 2013) .....14

*U.S. ex rel. Atkinson v. Penn. Shipbuilding Co.*,
    2000 WL 1207162 (E.D. Pa. Aug. 24, 2000) ..................................................20

*U.S. ex rel. Bledsoe v. Community Health System*,
    501 F.3d 493 (6th Cir. 2007) .........................................................................21

*U.S. ex rel. Camillo v. Ancilla Sys., Inc.*,
  03 Civ. 0024 (DRH), 2005 WL 1669833 (S.D. Ill. Jul. 18, 2005) ...................................20

*U.S. ex rel. Carter v. Halliburton Co.*,
  08 Civ. 1162 (JCC), 2009 WL 90134 (S.D.N.Y. Jan. 13, 2009) ..................................21

*U.S. ex rel. DeCesare v. Americare In Home Nursing*,
  757 F. Supp. 2d 573 (E.D. Va. 2010) ...............................................................21

*U.S. ex rel. Feldman v. City of New York*,
  808 F. Supp. 2d 641 (S.D.N.Y. 2011)........................................................18, 21

*U.S. ex rel. Finney v. Nextwave Telecom, Inc.*,
  337 B.R. 479 (Bk. S.D.N.Y. 2006) ...................................................................21

*U.S. ex rel. Franklin v. Parke-Davis*,
  147 F. Supp. 2d 39 (D. Mass.2001) ..................................................................21

*U.S. ex rel. Grubbs v. Kanneganti*,
  565 F.3d 180 (5th Cir. 2009) .............................................................12, 13, 18

*U.S. ex rel. Hood v. Satory Global, Inc.*,
  __ F. Supp. 2d __, 2013 WL 2274798 (D.D.C. May 23, 2013) ................................15, 23

*U.S. ex rel. Kirk v. Schindler Elevator Corp.*,
  601 F.3d 94 (2d Cir. 2010).............................................................................23, 24

*U.S. ex rel. Marcus v. Hess*,
  317 U.S. 537 (1943)........................................................................................18

*U.S. ex rel. Mikes v. Straus*,
  274 F.3d 687 (2d Cir. 2001).............................................................................23

*U.S. ex rel. Piacentile v. Wolk*,
  No. 93 Civ. 5773, 1995 WL 20833 (E.D. Pa. Jan. 17, 1995) ...........................................20

*U.S. ex rel. Ryan v. Staten Island University Hosp.*,
  No. 04 Civ. 2483 (JG)(CLP), 2011 WL 1841795 (E.D.N.Y. May 13, 2011) .............24, 25

*U.S. ex rel. Schmidt v. Zimmer*,
  386 F.3d 235 (3d Cir. 2004)........................................................................19, 20

*U.S. ex rel. Schwedt v. Planning Research Corp.*,
  59 F.3d 196 (D.C. Cir. 1995) ............................................................23

*U.S. ex rel. Shaver v. Lucas Western Corp.*,
  237 F.3d 932 (8th Cir. 2001) ............................................................20

*U.S. ex rel. Taylor v. Gabelli*,
  345 F. Supp. 2d 313 (S.D.N.Y. 2004) .........................................15, 16

*U.S. S.E.C. v. Gold*,
  No. 05 Civ. 4713, 2006 WL 3462103 (E.D.N.Y. Aug. 18, 2006) ...................15

*U.S. S.E.C. v. Pentagon Capital Management PLC*,
  612 F. Supp. 2d 241 (S.D.N.Y. 2009) ................................................17

*U.S. S.E.C. v. Savino*,
  No. 01 Civ. 2438 (GBD), 2006 WL 375074 (S.D.N.Y. Feb. 16, 2006) ............17

## Statutes

American Recovery and Reinvestment Act of 2009,
  Pub. L. No. 111-5, 123 Stat. 115 (Feb. 17, 2009) .............................3

Workforce Investment Act of 1998,
  29 U.S.C. § 2801, *et seq.* ...............................................................3

False Claims Act,
  31 U.S.C. § 3729 ..........................................................2, 3, 17, 18, 22

## Rules & Regulations

Fed. R. Civ. P. 9(b) ............................................................... *passim*

Fed. R. Civ. P. 12(b)(6) ..................................................................2, 11

Plaintiff the United States of America (the "Government") respectfully submits this memorandum of law in opposition to the motion by defendant Alex Saavedra ("Saavedra") to dismiss the First Amended Complaint in Intervention ("Amended Complaint" or "FAC").[1]

## PRELIMINARY STATEMENT

Through his motion papers, Alex Saavedra, formerly the Director of SEEDCO's Workforce1 Career Centers, seeks to paint himself as something of a Mr. Magoo – one utterly oblivious to the fraudulent scheme that became the standard mode of operation at the federally funded career centers that he ran.  However, to accept that caricature, one would have to believe that Saavedra was unaware of the meaning of *his own* fraudulent instructions to report fabricated job placement data – in order to beef up those centers' performance numbers and advance his own career – and the lies *he* told, and instructed others to tell, to conceal the fraudulent scheme. This tactic to avoid a reckoning for his misconduct may be the best he has, but it is unavailing.

Saavedra, along with his management staff, was responsible for hundreds if not thousands of false job placement reports made in connection with the federally funded New York City Workforce1 Career Centers that he ran as Director on behalf of his employer, Structured Employment Economic Development Corporation ("SEEDCO"), which false reports caused false claims and false statements to be made in connection with those Government contracts. Then, when a whistleblower revealed the scheme, Saavedra lied: first, to his company's investigation counsel, resulting in false audit results to the Government's subgrantee, the City of New York; and, second, to the City directly – "finess[ing] the art of bulls--t," in his own words – regarding the fraud allegations.  But while SEEDCO and five of Saavedra's individual co-defendants have entered into Consent Decrees with the Government, admitting and

---

[1] Saavedra's memorandum of law in support of his motion is cited herein as "Def. Mem."

acknowledging their involvement in the false reporting scheme, Saavedra refuses to accept such responsibility. Instead, he argues that his involvement in the fraudulent scheme alleged under the False Claims Act, 31 U.S.C. § 3729, *et seq.* ("FCA"), is insufficiently particularized under Fed. R. Civ. P. 9(b), and that the Government has not stated FCA and common law claims under Fed. R. Civ. P. 12(b)(6). None of his arguments have merit. His motion should be denied.

## PROCEDURAL HISTORY

This civil fraud action began with the filing by relator William Harper (the "Relator"), of a *qui tam* complaint on September 14, 2011, under the False Claims Act, 31 U.S.C. §§ 3729, *et seq.* Therein, the Relator alleged, among other things, that SEEDCO was falsifying job placement data that it reported to the City of New York in connection with its compensation under the federally-funded contracts it held to operate two New York City job placement centers. After investigation, the United States intervened and filed its Complaint in Intervention on May 22, 2012, asserting causes of action against SEEDCO and seven former SEEDCO managers, Alex Saavedra, Tagewatee Chandarpaul, Shomari Greene, Alan Katz, Mitchell McClinton, Shandell Santiago-Velez, and Monique Tarry.

On December 18, 2012, the Court entered a Consent Decree and Order of Settlement and Dismissal between the Government, Relator, and SEEDCO ("SEEDCO Consent Decree"). In resolving its civil liability, SEEDCO agreed to, *inter alia*, (i) pay the Government $1.725 million, (ii) admit that "beginning in at least 2009 and ending in 2011, its Workforce1 Career Centers submitted reports to the City of New York representing that job candidates had been placed in jobs by or with the assistance of SEEDCO when they had not, including by falsely reporting that current or prior employment had been obtained by or with the involvement of SEEDCO[,]" and (iii) implement a detailed Compliance Plan, including a Code of Conduct and Whistleblower Policy, in an effort to prevent future fraud. Dkt. No. 27. Likewise, on

January 23, 2013, the Court entered Consent Decrees between the Government and defendants Santiago-Velez and Tarry, respectively, wherein each agreed to a monetary payment and admitted, acknowledged, and accepted responsibility for their involvement, while in managerial roles at SEEDCO's federally funded Workforce1 Career Centers, in SEEDCO's submission of reports to the City of New York falsely representing that job candidates had been placed in jobs by or with the assistance of SEEDCO (the "Admissions of False Reporting").  Dkt. Nos. 51-52.

On February 11, 2013, the Government filed the instant Amended Complaint, asserting claims under the False Claims Act, 31 U.S.C. §§ 3729(a)(1)(A) and (a)(1)(B), as well as common law claims of fraud, unjust enrichment, and payment under mistake of fact, against the remaining five individual defendants, including Alex Saavedra.  On August 16, 2013, the Court entered Consent Decrees between the Government and defendants Shomari Greene, Alan Katz, and Tagewatee Chandarpaul Gross, respectively, wherein each agreed to pay a monetary penalty and made Admissions of False Reporting.[2]  Dkt. Nos. 63-65.

## FACTUAL ALLEGATIONS

### 1.     Background

From at least April 1, 2004 through at least April 25, 2012, SEEDCO operated Workforce1 Career Centers in New York City, pursuant to contracts entered into by and between SEEDCO and New York City's Small Business Services Division.  SEEDCO Consent Decree at 1, Dkt. No. 27.  SEEDCO's Workforce1 Career Centers were funded by federal money provided through the Workforce Investment Act of 1998, 29 U.S.C. § 2801 *et seq.*, and the American Recovery and Reinvestment Act of 2009, Pub. L. 111-5, which provided stimulus funds for job placement assistance (collectively, "WIA").  FAC ¶14.  New York City's Division of Small

---

[2] SEEDCO and the five individual defendants who have entered into Consent Decrees with the Government are referred to herein, collectively, as the "Settling Defendants."

3

Business Services ("SBS") is responsible for administering the WIA program in New York City and for making WIA-required reports to the New York State Department of Labor ("NYSDOL"), including reporting the number of job candidates who gain "entry into unsubsidized employment" through participation in the program. *Id.* ¶¶15-21. SBS contracts with vendors to operate the career centers, known in New York City as Workforce1 Career Centers. SBS also determines the annual job placement goals for its center operators. *Id.* ¶21.

SBS initially contracted with SEEDCO to operate the Upper Manhattan Workforce1 Career Center from April 2004 through December 2010, which contract was renewed until it was terminated by SBS in mid-2012. *Id.* ¶¶22, 89. SEEDCO and SBS also entered into a contract for the operation of a Bronx Workforce1 Career Center, beginning in January 2011 until SBS also terminated that contract in 2012 (the Upper Manhattan and Bronx contracts are referred to herein, collectively, as the "Contracts"). *Id.* Among other payment terms, SEEDCO received compensation under the Contracts related to its success in placing candidates in jobs. SEEDCO was eligible to receive 30% of its expenses paid via "Performance Payments . . . upon its achievement of certain service levels, exit levels, and outcome goals[.]" The "Outcome Goals" upon which "performance payments" were based include the achievement of job placement goals, termed by the contract as the "entered employment" rate goals. *Id.* ¶23.

SEEDCO reported its Workforce1 job placements, as well as its other data required under the Contracts, to SBS through a New York City database maintained and controlled by SBS, called WorkSource1. *Id.* ¶25. Each week, WorkSource1 automatically transmitted to NYSDOL the information entered therein, including job placement information. *Id.* ¶28. That information was then relayed to the United States by NYSDOL, as required, and was relied upon by the Government in determining grant recipients and terms, including grant

amounts, along with performance incentives or sanctions.  *Id.*  Further, all of the performance payments SBS made to SEEDCO under the Contracts were based on the data SEEDCO reported through the Worksource1 system.  *Id.*

SEEDCO also provided a financial report of its expenditures to SBS on a monthly basis.  On each report, SEEDCO certified that "the expenditures reported were made solely for the purposes specified in the contract for this project."  *Id.*  ¶24.  Using WIA funds, SBS would then pay SEEDCO, among other payments, the performance payments made as a result of SEEDCO's achievement of job placement goals.  *Id.*  For example, for the period April 1 through December 31, 2010 alone, SBS paid SEEDCO more than $2.1 million in connection with SEEDCO's operation of the Upper Manhattan center, $378,554.91 of which related specifically to SEEDCO's attainment of "placement" goals.  *Id.*  ¶24.

## 2.    The Fraudulent Scheme to Report False Job Placement Information

Saavedra and others at SEEDCO instructed Workforce1 staff to report false placements to create the appearance that SEEDCO was achieving placement goals set by SBS. *Id.* ¶34.  The fraudulent scheme operated in various ways, the most common of which was entering a job candidate's current or prior employment as if it were a job placement for which SEEDCO could take credit.  *Id.* ¶35.  In the normal course, upon a job candidate's first interaction with a Workforce1 center, whether at an orientation or a recruitment event, the candidate would fill out an intake, or Customer Information Form ("CIF").  *Id.* ¶26.  Then, the intake department staff member would enter the job candidate's background information into the WorkSource1 system, including identifying information such as name and contact information. *Id.*  The CIF also included a field for "work history," which could include both past and current

employment information.  *Id.*  The CIF included no field to record a job obtained after the candidate's initial intake and, thus, lacked the information needed to report a "placement."  *Id.*

As part of the fraud, instead of reporting a job candidate's current or prior employment provided on the CIF as "work history" in Worksource1, SEEDCO – typically through Operations Assistants in the Recruitment and Placement department – would enter that information into the database as a "placement" using false employment dates.  *See id.*  ¶¶26, 35-38.  The Amended Complaint details examples of false job placements that were reported through Worksource1 to SBS in this manner.  *Id.* ¶¶61-72.  As discussed below, Saavedra had a key role in carrying out the fraudulent scheme.  *Id.* ¶¶33-37, 41-46, 49-53, 80, 86-88.

### a) Saavedra's Role in the Fraudulent Scheme

For the duration of the fraudulent scheme, Saavedra held, in succession, the positions of Director of the Upper Manhattan and Bronx Workforce1 Career Centers - the most senior managerial position at the Workforce1 Career Centers - and as such, was at the helm of the fraud.  FAC ¶9.  Saavedra, along with managers under his control, directed the staff to enter false information about job placements into the Worksource1 system.  *Id.* ¶31-58.  He did this in an effort to maintain and renew SEEDCO's contract for the Upper Manhattan center, to acquire the Bronx center contract, to maintain and increase SEEDCO's compensation in connection with both centers, and to secure and advance his own career.  *Id.* ¶¶3, 23, 32, 91.

In particular, between at least 2009 and 2011, Saavedra either led or attended the weekly staff meetings held on Fridays at the Upper Manhattan center.  *Id.* ¶36.  During those meetings, managers that worked under Saavedra's direction regularly instructed his center's staff to falsely record and report a job candidate's "work history" as a placement.  *Id.*  In addition, Saavedra himself gave that same instruction – to report a job candidate's current or past

6

employment as a job placement credited to SEEDCO – to lower level staff.   *Id.* ¶37.  At those weekly Friday staff meetings, Saavedra also regularly told staff that if they did not meet job placement targets "no one will have a job," pressuring staff to meet job placements goals "by any means necessary."  FAC ¶33.  In addition, Saavedra – along with his subordinate managers – instructed staff to carry out regular "re-engagement calls" in which former job candidates were called and asked whether they were employed, and if so, staff reported the employment as a job placement regardless of when or how that employment had been acquired.  *Id.* ¶¶41-42.

      The false placements that were entered into the Worksource1 system based on new job candidates' current jobs or prior work history, but using a false employment start date, were reported in a category of placements termed "indirect placements."  *Id.* ¶43.  At SEEDCO, "indirect placements" were supposed to be placements obtained by the candidate after he or she received an orientation or job training at a Workforce1 center.  *Id.*  During the fraudulent scheme, "indirect placement" became a euphemism for false placement.  *See id.* ¶¶43-51, 59-60.

      Saavedra's subordinate managers repeatedly gave e-mail instructions, often via all staff e-mails (of which Saavedra was a recipient), to make false "indirect placements."  *Id.* ¶¶ 44-49.  The widespread scheme of using job candidates' past or current employment to report a false placement was explained clearly in an April 13, 2010 e-mail from the Recruitment and Placement department manager Alan Katz, to Upper Manhattan center's intake department manager, in which Katz advised that a new job candidate's current employment should not be entered as "work history" into the Worksource1 system, so that it could instead be falsely reported as a placement.  In an e-mail titled "Indirect Placements - CIF[,]" he gave the "reminder to let the team know that if they see anyone that is currently [*sic*] working they can give the CIF

to [an Operations Assistant] to enter as an indirect placement. We shouldn't enter the CIF into [Worksource1] as we cannot capture the placement once the work history is inputted." *Id.* ¶44.

Accordingly, in a May 17, 2010 e-mail to the entire Workforce1 center (including Saavedra), Katz instructed staff members to report current employment of new job candidates as an "indirect placement." FAC ¶45. He then referred to the "green lights" SBS used to indicate achievement of placement goals, stating "We've been hitting the green light on a weekly basis due to your assistance . . . ,". *Id.* Likewise, Saavedra's deputy director Shomari Greene – in a January 29, 2010 e-mail to all staff – instructed Workforce1 staff members, to gather "indirect placements" from those who had come to the Upper Manhattan center, not as job candidates but seeking assistance with "taxes, benefits, etc." *Id.* ¶51. Saavedra thus oversaw Katz and Greene's instructions to staff members to unlawfully report current employment as "indirect placements."

Saavedra also sent emails encouraging the fraudulent practice. For example, on January 19, 2011, an Operations Assistant who was responsible for entering job placement information into WorkSource1, including false placements using CIFs wrongfully provided to him, sent all Workforce1 center staff (including Saavedra) an email instructing them to provide him with information about the current employment of job candidates. *Id.* ¶¶44, 46. The Operations Assistant stated that SEEDCO needed these additional "placements" to "achieve a green light for January. Due to all our hard work, we spent the entire 2010 in green." *Id.* ¶46. Saavedra replied to the entire staff, thanking the employee, and reiterating the instruction, stating: "I would like to emphasize that it is important to be at par with the rest of the system. We are also digging in here in the Bronx to capture as many placements as possible." *Id.*

After Saavedra became Director of the Bronx center in 2011, the fraud flourished there under his supervision. For example, on April 7, 2011, Saavedra's Deputy Director in the

Bronx, Chandarpaul, forwarded an e-mail containing a placement status report to Katz and a subordinate, with a copy to Saavedra, asking "what is our plan for this week to ensure we do not get a red light?  We are behind everyone."  *Id.* ¶49.  Katz – the Recruitment and Placement department manager, referencing the method by which the fraud was most commonly carried out – replied to them all that, "Intake is giving all CIFs to us."  *Id.* ¶49.

### b) Saavedra's Concealment of the Fraud

Despite being a key participant in the fraud, after the Relator blew the whistle to SEEDCO executives, Saavedra (along with the Settling Defendants) engaged in a cover-up.  *Id.* ¶¶78-88.  First, SEEDCO created a "task force" which was led by Saavedra, who used the position to conduct a sham internal audit and conceal the fraud.  *Id.* ¶80.  Saavedra was the primary Workforce1 center manager advising SEEDCO executives during the audit.  *Id.*  When SEEDCO's counsel questioned Saavedra regarding evidence that supported relator's allegations, namely discrepancies between information on job candidates' CIF forms and the employment data entered in Worksource1, Saavedra lied.  *Id.*  Taking advantage of SEEDCO counsel's lack of familiarity with the Workforce1 procedures, Saavedra stated that the discrepancy in dates – as between the CIF forms and the Worksource1 data entries – was because of a change in SBS's document retention policy in March 2011, in that SBS had asked Workforce1 centers to cease shredding CIF forms.  *Id.*  He claimed that, following SBS's change to the document retention policy, the Workforce1 Career Centers had succeeded in asking myriad job candidates to return to the centers to re-do their intake forms so that the forms could be "filed" as replacements.  *Id.*  This explanation was false.  *Id.*  Saavedra not only knew of and participated in the false reporting scheme, but his phony explanation did not explain the repeated falsification of employment dates as between those found on the CIF forms and those entered into Worksource1.  *Id.*

9

As a result of Saavedra's concealment of the fraud, in April 2011, SEEDCO reported false audit results to SBS.  *Id.* ¶86.  SEEDCO misrepresented to SBS that "[i]n total, there are just under 60 placements across the two centers that should not have been logged as placements. . . . [T]his was a training issue that we have already begun to resolve."  *Id.*  In its false report, SEEDCO also referred to the false placements as the result of a "misunderstanding," whereas they were in fact the result of Saavedra and his subordinates' fraudulent scheme.  *Id.*

Accordingly, the fraud was not revealed, and instead continued.  Then, in the early Fall of 2011, *The New York Times* published an article based upon relator's allegations of fraud at SEEDCO.  *Id.* ¶87.  Saavedra, McClinton and a third Workforce1 manager met to discuss the allegations of false reporting that had appeared in *The New York Times* and to prepare for a meeting with SBS about those allegations that was to occur the following day.  *Id.* ¶¶87-88.  At their meeting, Saavedra encouraged McClinton to join with himself and Katz and lie to SBS regarding the fraud.  *Id.* ¶88.  In particular, Saavedra instructed McClinton that, "Alan [Katz] and me, we are [expletive] gab artists, we know how to [expletive] bulls--t. . . .You're gonna do it Mitchell because tomorrow, you're gonna' sing.  You're gonna' be operatic. . . .  It's gonna' be high art.  Because you need to be lock in-step with us.  And you are gonna' have to find somewhere to take an acting class, but you gotta', you gotta' finesse the art of bulls--t. . . . 'Cause that's the art of bulls--t. 'Cause that's the name of the game."  *Id.*  In accordance with the plan to lie to SBS about the false job placement reporting, Saavedra, McClinton, and Katz did not inform SBS of the fraud at the meeting that followed.  *Id.*  Later, SEEDCO renewed its internal investigation regarding the job placement fraud allegations.  *Id.* ¶89.  Saavedra's employment, along with the employment of each of the individual defendants, was terminated.  *Id.*  SBS also terminated SEEDCO contracts to operate the Workforce1 Career Centers.  *Id.*

In addition to the investigation by the United States, the New York City Department of Investigation – as a result of relator's tip to *The New York Times* – conducted its own investigation into the fraudulent job placement reporting at SEEDCO.  In March 2012, DOI published an 89-page report entitled "Investigation of Seedco's Workforce Center Contracts with the New York City Department of Small Business Services" (the "DOI report").  FAC ¶90 (citing and providing the public link to the DOI Report).  The DOI report detailed the agency's findings and concluded, among other things, that "Seedco developed systematic practices to report false placements to [SBS].  DOI determined that Seedco employed various methods by which to collect information from individuals' previously obtained employment, and report this employment information as Seedco job placements to [SBS]." *Id.*; DOI Report at 86.  Further, DOI's investigation resulted in the finding that "Alex Saavedra," along with several of his subordinates, "processed and/or directed and/or had knowledge of, for example from emails or testimony, the reporting to [SBS] of placements that were not legitimate."  DOI Report at 65.

## ARGUMENT

### I.   APPLICABLE LEGAL STANDARDS

Saavedra moves to dismiss the Amended Complaint pursuant to Rule 12(b)(6).  A complaint will survive a motion to dismiss, where it contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

Saavedra's motion also invokes Rule 9(b).  In stating False Claims Act ("FCA") claims, Rule 9(b) "requires only 'simple, concise, and direct' allegations of the 'circumstances constituting fraud,' which after *Twombly* must make relief plausible, not merely conceivable, when taken as true." *U.S. ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 186 (5th Cir. 2009). Indeed, in pleading FCA causes of action, "the 'time, place, contents, and identity' standard is not a straitjacket for Rule 9(b).  Rather, the rule is context specific and flexible and must remain so to achieve the remedial purpose of the False Claims Act." *Id*. at 190 (internal citation omitted) (FCA complaint may comply with Rule 9(b) "by alleging particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted.").  This Court has recognized that FCA claims only need to meet a relaxed particularity standard – a standard not "on the same plane" as the particularity required for a common law or securities fraud claim.  *See United States v. Huron Consulting Grp., Inc.*, No. 09 Civ. 1800 (JSR), 2011 WL 253259, at *2 (S.D.N.Y. Jan. 24, 2011) ("*Huron II*") (quoting *Kanneganti*, 565 F.3d at 189) (internal quotation marks omitted).

## II.     THE MOTION TO DISMISS SHOULD BE DENIED

### A.     THE AMENDED COMPLAINT PLEADS SAAVEDRA'S ROLE IN THE FRAUDULENT SCHEME WITH PARTICULARITY

Saavedra's motion based on Rule 9(b) should be denied, because the Government has sufficiently detailed his role in the false job placement reporting scheme at SEEDCO. Saavedra, as Center Director, was perhaps the most crucial participant in the fraudulent scheme. His position allowed him not only to foster and encourage the scheme, but also to conceal the fraud, and prolong it, after the Relator blew the whistle.  *Id.* ¶¶ 9, 33-37, 41-46, 49-53, 80, 86-88.

In particular, the Amended Complaint alleges that Saavedra instructed his staff to falsify job placement data reported to the Government by falsifying the dates of job candidates' past jobs, or current jobs at the time of intake, *id.* ¶37 ("Saavedra and Chandarpaul each gave oral instructions to SEEDCO staff at the Upper Manhattan Workforce1 Career Center that job placements should be made using a new job candidate's current or past employment. As one former SEEDCO employee explained, "[i]t was definitely said by Alex [Saavedra], Tage [Chandarpaul], out loud that placements need to be made - current or past jobs."), and held weekly staff meetings at which his subordinate managers regularly gave that same instruction, *id.* ¶36 ("Between at least 2009 and 2011, at weekly staff meetings held on Fridays at the Upper Manhattan center, both Greene and Katz regularly instructed staff to falsely record and report a job candidate's work history as a placement. These meetings were held or attended by Saavedra."). Further, at those same meetings, Saavedra played the critical role of assuring compliance with the instructions to falsify data by threatening his staff that, if they failed to meet job placement goals "by any means necessary," "no one will have a job." *Id.* ¶33. Those allegations, read in the context of the fraudulent scheme, are more than sufficient to satisfy Rule 9(b) with respect to Saavedra's participation in the fraud. *See Kanneganti*, 565 F.3d at 186.

In addition, Saavedra oversaw and personally sent e-mails, identified in the Amended Complaint by date, to all center staff encouraging participation in the fraudulent job placement scheme. *Id.* ¶¶45-46. Saavedra also instructed his staff to engage in what were known as "re-engagement calls," which meant that staff were gathered at SEEDCO headquarters at the end of each quarter to telephone individuals, inquire whether they were employed, and then report job placement information based on that information, regardless of when or how the individual had gained employment. FAC ¶¶41-42. Moreover, the Amended Complaint details

two specific conversations in which Saavedra sought to conceal the fraud.  *Id.* ¶¶80, 86-88.  First, as head of the "task force" assembled after Relator blew the whistle in April 2011, Saavedra lied to SEEDCO counsel about the fraud, causing false statements to SBS.  *Id.* ¶¶80, 86. Second, in a September 2011 recorded conversation, Saavedra described his plan to lie to SBS about the fraud and directed another manager to "be in lockstep" with Saavedra in the "art of bulls--t."  *Id.* ¶88.

Saavedra's arguments with respect to Rule 9(b) should be rejected.  Contrary to Saavedra's claims, Def. Mem. at 5-11, the Amended Complaint is not required to identify every witness who made statements that are damaging to him.  *U.S. Bank Nat'l Ass'n v. PHL Variable Ins. Co.*, No. 12 Civ. 6811(CM)(JCF), 2013 WL 791462, at *9 (S.D.N.Y. Mar. 5, 2013) (denying Rule 9(b) motion to dismiss, where defendant argued complaint "'identifies only some of the statements and documents at issue' and . . . 'does not identify the individual(s) who supposedly received and read the alleged misrepresentations[;]'" because "plaintiff has provided the defendant with more than adequate notice of the circumstances of its claims.").  Likewise contrary to his claims, Def. Mem. at 11, the Amended Complaint adequately specifies the "time, place and manner" of Saavedra's instructions to his staff to commit fraud.  For example, Paragraphs 33, 36 and 37 specify that his instructions were made via oral communications at the Upper Manhattan SEEDCO Workforce1 center, primarily at Friday staff meetings, while Saavedra was Center Director, and more specifically between 2009 and 2011.  *Id.* ¶¶36-37.

In any event, such precise allegations are not required.  Even in cases alleging fraud outside of the FCA context, and in the more strenuous context of securities pleading, "Rule 9(b) does not require that a complaint plead fraud with the detail of a desk calendar or a street map."  *Gelles v. TDA Indus., Inc.*, No. 90 Civ. 5133 (MBM), 1991 WL 39673, at *6 (S.D.N.Y. Mar. 18, 1991).  "Plaintiff need not plead dates, times and places with absolute precision, so long

as the complaint gives fair and reasonable notice to defendants of the claim and the grounds upon which it is based." *Goldin Associates, L.L.C. v. Donaldson, Lufkin & Jenrette Sec. Corp.*, No. 00 Civ. 8688 (WHP), 2003 WL 22218643, at *6 (S.D.N.Y. Sept. 25, 2003) (internal quotation marks omitted). "The . . . question is: Do the defendants know what the United States is claiming?" *U.S. S.E.C. v. Gold*, No. 05–4713, 2006 WL 3462103, at *3 (E.D.N.Y. Aug. 18, 2006). Also, when a small number of defendants had the same "roles in a clear defined fraudulent scheme" – here, instructing staff to gather past or current employment information in order to report false job placements – "a requirement that plaintiff attribute each recitation of a misstatement to a particular defendant at an exact time and location would violate the liberal pleading requirements of the Federal Rules." *See Gelles,* 1991 WL 39673, at *6.

       Here, the Government has met Rule 9(b)'s requirements because the Amended Complaint "adequately provides [Saavedra] with notice as to the claims asserted against [him]." *U.S. ex rel. Taylor v. Gabelli*, 345 F. Supp. 2d 313, 339, 340 n.144 (S.D.N.Y. 2004) (denying motion to dismiss FCA claims where defendants argued that "the Complaint indiscriminately groups defendants together 'into one wrongdoing monolith, without specifying the alleged wrongdoing of each Defendant,'" because pleading "satisfied th[e] . . . requirements for pleading fraud in this circuit" by "alleging each defendant's relationship to a bidding entity, and, by implication, to the false statement proffered by that bidder."); *U.S. ex rel. Hood v. Satory Global, Inc.*, ___ F. Supp. 2d ___, 2013 WL 2274798, at *12 (D.D.C. May 23, 2013) (9(b) satisfied in FCA complaint because "Plaintiffs have alleged the who . . . , the what . . . , the when . . . , the where . . . , and the how . . ."); *A1 Procurement, LLC v. Hendry Corp.*, No. 11 Civ. 23582, 2012 WL 6214546, at *7-8 (S.D. Fla. Dec. 13, 2012) (denying motion to dismiss where "Defendants argue Relator fails to sufficiently allege who engaged in the fraud and what each individual did . . . In

particular, Defendants maintain Relator simply supposes an individual officer of a specified concern necessarily committed the alleged fraud as a result of being an officer of such corporation[,]" because "sufficient indicia of reliability" for Rule 9(b)).[3]

In addition, Saavedra's effort to escape liability based on the Amended Complaint's allegations that are specifically asserted against the Settling Defendants is unavailing.  *See* Def. Mem. at 3-4.  Not only do allegations regarding the participation of Saavedra's subordinates fail to detract from the specific allegations regarding Saavedra's role, including his instructions to commit fraud and conceal the scheme, but they reveal the flagrant and unchecked nature of the fraud that flourished under Saavedra's directorship and provide the context for the allegations as to Saavedra.  Therefore, all of the allegations, including those as to the Settling Defendants, only render more plausible the allegations as to Saavedra.  *See Adelphia Recovery Trust v. Bank of Am., N.A.*, 624 F. Supp. 2d 292, 320 (S.D.N.Y. 2009) ("To determine whether the claim is pleaded with the necessary particularity this Court looks at the entirety of the Amended Complaint to determine whether there are specific enough allegations . . . .").

Finally, Saavedra's arguments suggesting that certain of his instructions to commit fraud and specific falsehoods were innocent, *see* Def. Mem. at 10-11, raise nothing more

---

[3] Indeed, the Government sufficiently pleads Saavedra's role, even if the Court did not apply the relaxed 9(b) standard used for FCA claims.  *See Gabelli*, 345 F. Supp. 2d at 339; *United States v. Countrywide Fin. Corp., et al.*, __ F. Supp. 2d __, 12 Civ. 1422 (JSR), 2013 WL 4437232, at *8 (S.D.N.Y. Aug. 16, 2013) (denying Chief Operating Officer's motion to dismiss mail and wire fraud allegations, arguing that the complaint lumped her in with others, where it was alleged that she "[i] created a program that she knew was calculated to deceive purchasers[,] . . . [ii] by instructing one or more employees not to distribute quality control reports outside of her division, . . . knowingly helped conceal the information from the ultimate purchasers[,] and . . . [iii] "when faced with mounting evidence that the [underwriting] process was producing defective loans for sale, . . . did nothing to rectify the problems"); *United States v. Tomicic*, No. 3:09 Cr. 210 (WWE), 2012 WL 2116143, at *2 (D. Conn. June 8, 2012) (rejecting argument that fraud evidence insufficient where defendant "was not involved with procurement of the insurance, the filing of the claim at issue, or the handling and settlement of that claim" because he instructed others to take action that he knew would result in misrepresentations).

than "question[s] of fact that should not be addressed on a motion to dismiss," *see In re Refco Inc. Sec. Litig.*, 826 F. Supp. 2d 478, 529 n.42 (S.D.N.Y. 2011).  His argument also disregards the fact that the false job reporting scheme has already been admitted by the Settling Defendants. *See* Dkt. Nos. 27, 51-52, 63-65.  Moreover, that argument ignores the allegations that he lied and instructed others to lie in order to conceal the scheme.  *See* FAC ¶¶80, 87-88, *see S.E.C. v. Pentagon Capital Mgmt. PLC*, 612 F. Supp. 2d 241, 264 (S.D.N.Y. 2009) (strong inference of fraud found where defendants, *inter alia*, made efforts to conceal their fraudulent scheme from clients); *U.S. S.E.C. v. Savino*, No. 01 Civ. 2438 (GBD), 2006 WL 375074, at *14 (S.D.N.Y. Feb. 16, 2006) (a defendant's intent to defraud was "further demonstrated" by his efforts to "conceal their scheme after [the client] began to investigate [the defendant's] trades"). Accordingly, his motion grounded on Rule 9(b) should be denied.

## B.   THE AMENDED COMPLAINT STATES CLAIMS AGAINST SAAVEDRA FOR VIOLATIONS OF THE FALSE CLAIMS ACT

The False Claims Act was enacted "to reach all types of fraud, without qualification, that might result in financial loss to the Government" and reaches "all fraudulent attempts to cause the Government to pay out sums of money," including the fraudulent scheme alleged here.  *See United States v. Neifert-White Co.*, 390 U.S. 228, 231-33 (1968).  The Amended Complaint alleges that Alex Saavedra, through his misconduct while the Director of two SEEDCO Workforce1 Career Centers, violated two FCA provisions – 31 U.S.C. §§ 3729(a)(1)(A) and 3729(a)(1)(B). Section 3729(a)(1)(A) imposes liability on anyone who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," while Section 3729(a)(1)(B) applies to one who "knowingly makes, uses, or causes to

be made or used, a false record or statement material to a false or fraudulent claim."[4]  Saavedra's

arguments in support of dismissal of these claims fail because they misconstrue the claims'

elements and ignore the allegations set forth in the Amended Complaint.

        1.  <u>The Amended Complaint Sufficiently Pleads that Saavedra Caused the</u>
<u>Submission of False Claims and False Statements Material to False Claims</u>

Saavedra misstates the conduct required for liability under the FCA, arguing that

the Government must plead "that he presented the false statement for payment or approval[,]"

and that facts must be alleged "to show that a defendant was involved in the actual presentation

of the purportedly false claims."  Def. Mem. at 12.  That is not the law.  Instead, the FCA holds

individuals liable if they "caused" false claims to be submitted, or "caused" false statements that

were material to false claims being paid.  *See* 31 U.S.C. §§ 3729(a)(1)(A), (a)(1)(B); *U.S. ex rel.*

*Marcus v. Hess*, 317 U.S. 537, 544-545 (1943) (FCA reaches "any person who knowingly

assisted in causing the government to pay claims which were grounded in fraud . . ."); 

*Kanneganti*, 565 F.3d at 190 n.31 ("doctor can cause the fraud by putting a fraudulent record into

a system that he knows will ministerially crank out a fraudulent bill to the Government").

Further, "[t]he wealth of case law supports the proposition that the FCA reaches claims that are

---

[4] "Knowingly" under the FCA (A) means that a person, "with respect to information … (i) has
actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the
information; or (iii) acts in reckless disregard of the truth or falsity of the information; and (B)
require[s] no proof of specific intent to defraud."  31 U.S.C. § 3729(b)(1).

A "claim" "(A) means any request or demand, whether under a contract or otherwise, for money
or property and whether or not the United States has title to the money or property, that – . . . (ii)
is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used
on the Government's behalf or to advance a Government program or interest, and if the United
States Government – (I) provides or has provided any portion of the money or property requested
or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of
the money or property which is requested or demanded."  *Id.* § 3729(b)(2).

"Material" for purposes of Section 3729(a)(1)(B), means "having a natural tendency to influence,
or be capable of influencing, the payment or receipt of money or property."  *Id.* § 3729(b)(4).

rendered false by one party, but submitted to the government by another." *U.S. ex rel. Feldman v. City of New York*, 808 F. Supp. 2d 641, 650 (S.D.N.Y. 2011); *United States v. Raymond & Whitcomb Co.*, 53 F. Supp. 2d 436, 445 (S.D.N.Y. 1999) ("[T]he statute is violated . . . by one who engages in a fraudulent course of conduct that causes the government to lose money by honoring a false claim.").

The appropriate focus of the inquiry is on "the specific conduct of the person from whom the Government seeks to collect." *United States v. Bornstein*, 423 U.S. 303, 313 (1976). While "mere awareness" may be insufficient, liability may be imposed where the filing of a false claim is the foreseeable result of the conduct. *U.S. ex rel. Schmidt v. Zimmer*, 386 F.3d 235, 244-45 (3d Cir. 2004) (defendant could be found to have caused false claim, where conduct was "substantial factor" in that false filing was a "normal consequence of the situation created by that scheme"). Saavedra need not have initiated or controlled the fraudulent scheme; his participation is enough. *See United Savers Acceptance Corp. v. Kelton*, 775 F. Supp. 141, 143 (D. Vt. 1991) ("by knowingly participating in the scheme [defendant] contemplated that plaintiff would be harmed thereby, whether or not she initiated the plan or controlled its outcome").

Here, Saavedra undoubtedly "caused" false claims, as well as false statements material to such claims, to be submitted. The fact that "there is no allegation in the Complaint that Mr. Saavedra's role and responsibility at SEEDCO encompassed claims submission" is irrelevant. *See* Def. Mem. at 14. Saavedra both supervised and instructed his staff at the Workforce1 centers to falsify job placement data that was the basis for a portion of SEEDCO's compensation pursuant to its federally-funded Contracts, and backed up those instructions with threats to the security of their employment. FAC ¶¶33-37. The employees complied with the instructions to enter fabricated placement information into Worksource1. *See id.* ¶¶35-72. The

false reports were made directly to SBS, which used that information, in combination with

SEEDCO's certified expense reimbursement reports, to make performance payments under the

Contracts. *Id.* ¶¶21-30. Each of those false job placement reports are false statements, and each

of those expense reimbursement reports made to SBS pursuant to the Contracts are false claims,

under the FCA. *See Bornstein*, 423 U.S. at 312-13 (FCA action stated against subcontractor who

submits false invoices to a prime contractor for Government funded contracts). [5]

        Saavedra's conduct was a "substantial factor" in the submission of false claims

and false statements; indeed, their submission was the "normal consequence" of his actions. *See*

---

[5] Saavedra cites inapt cases in an effort to counter the allegations that he caused false claims to
be submitted and/or caused false statements material to false claims. *See* Def. Mem. 12-15; *see
U.S. ex rel. Shaver v. Lucas Western Corp.*, 237 F.3d 932 (8th Cir. 2001) (FCA claim not stated
against employer, where employee alleged that employer's refusal to pay employee's medical
bills as ordered by workers' compensation board, "caused" employee to submit the bills to
Medicare); *United States v. Murphy*, 937 F.2d 1032, 1039 (6th Cir. 1991) (Government not
entitled to summary judgment on FCA conspiracy count where fact question remained as to
whether defendant's conduct caused false claims to be submitted); *U.S. ex rel. Atkinson v. Penn.
Shipbuilding Co.*, 2000 WL 1207162, at *14 (E.D. Pa. Aug. 24, 2000) (FCA claim not stated
because "plaintiff fails to allege how the release of restrictive covenants by Sun Ship caused
Penn Ship to submit false claims. . . Nowhere . . . is it alleged, . . . , how the actions of Sun Ship
caused Penn Ship to make misrepresentations to the Navy").

In particular, certain of those cases involve dismissal of claims against a defendant alleged to be
in an oversight role because, unlike here, it was not alleged how the defendant's conduct caused
false claims or statements. *See United States v. Corinthian Colleges*, 655 F.3d 984, 998 (9th Cir.
2011) (dismissing, with leave to amend, FCA claims against board of directors regarding
recruiters' incentive compensation ban violations, where "[t]he only supporting factual allegation
involving the Individual Defendants is that they 'monitored and approved of the illegal recruiter
compensation practices . . .' The Complaint provides no additional detail as to the nature of the
Individual Defendants' involvement in the fraudulent acts, but simply attributes wholesale all of
the allegations . . . to the Individual Defendants," and "fails to allege that the Individual
Defendants had any role in making a false statement to the United States government."); *U.S. ex
rel. Camillo v. Ancilla Sys., Inc.*, 03 Civ. 0024 (DRH), 2005 WL 1669833, at *3 (S.D. Ill. Jul. 18,
2005) (FCA claim not stated against hospital's corporate parent, which set billing procedures, a
code of conduct, and had learned of relator's complaints, because relator did "not allege that
[defendant] . . . caused false claims to be submitted" and "creation of general circumstances
leading to the submission of false claims are insufficient to state a FCA violation"); *U.S. ex rel.
Piacentile v. Wolk*, No. 93–5773, 1995 WL 20833 (E.D. Pa. Jan. 17, 1995) (claim stated against
owner that "supervised and instructed the . . . employees who allegedly falsified" documents, but
claim dismissed as to another owner where no such supervision and instruction alleged).

*Zimmer*, 386 F.3d at 235, 44-45 (where seller of orthopedic implants used marketing scheme that it knew would, if successful, result in provider's false Medicare compliance certifications, seller caused false claims).   The involvement of other individuals or entities in the predictable course of events that followed does not break the causal connection.   *See, e.g.*, *U.S. ex rel. Franklin v. Parke-Davis*, 147 F. Supp. 2d 39, 53 (D. Mass. 2001) ("an intervening force only breaks the causal connection when it is unforeseeable . . ."). This court and others have held FCA claims stated based upon far more attenuated conduct.   *See City of New York*, 808 F. Supp. 2d at 650 (City caused false claims by sending false patient authorizations to the State, which resulted in improper Medicaid payments when vendors submitted claims for services to those patients); *U.S. ex rel. DeCesare v. Americare In Home Nursing*, 757 F. Supp. 2d 573 (E.D. Va. 2010); *Parke-Davis*, 147 F. Supp. 2d at 52 (pharmacists' submission of false Medicaid claims was not only foreseeable, but intended consequence of defendant's off-label marketing).

Finally, contrary to Saavedra's arguments, Def. Mem. at 14, 16, the Government had adequately pled false claims and statements by setting forth specific examples of false job placement reports that rendered SEEDCO's claims for performance payments under the Contracts false, along with individual false statements by Saavedra.  FAC ¶¶61-72, 80, 86, 88-89.   Courts have specifically sanctioned what the Government has done here – pled "a complex and far-reaching fraudulent scheme with particularity, and provide[d] examples of specific false claims submitted to the government pursuant to that scheme[.]"   *U.S. ex rel. Bledsoe v. Cmty. Health Sys.,* 501 F.3d 493, 510 (6th Cir. 2007); *see also Parke-Davis,* 147 F. Supp. 2d at 49 (where allegations are "complex and far-reaching, pleading every instance of fraud would be extremely ungainly, if not impossible").[6]

---

[6] Saavedra's citations to cases involving frivolous allegations also fail to support dismissal here, where the Government has alleged the details of a scheme (which the Settling Defendants

2.   The Amended Complaint Sufficiently Pleads Knowledge

Saavedra's cursory argument that the Amended Complaint does not plead that Saavedra "had knowledge of a false statement" also fails.  The FCA defines "knowing" as acting with "actual knowledge," "deliberate ignorance" or "in reckless disregard," of the truth or falsity of the information.  *See* § 3729(b)(1)(A).  That element may be pled generally and has been pled here.  *In re Cardiac Devices Qui Tam Litig.*, 221 F.R.D. 318, 339 (D. Conn. 2004) ("Rule 9(b) allows conditions of the mind, in this case, to 'knowingly' file a false claim, to be pled generally. Fraudulent intent needs neither to be pled nor proven in order for a plaintiff to state a claim under the FCA").  Saavedra's instructions to staff to report new job candidates' past or current employment, as if those were job placements for which SEEDCO could take credit, is sufficient to infer that he intended the natural consequences of that misconduct.  *See United States v. Hawley*, 619 F.3d 886, 896 (8th Cir. 2010) ("a defendant should answer under the statute for 'the natural, ordinary and reasonable consequences of his conduct,' . . . and a reasonable factfinder typically may infer that a person intends the ordinary consequences of his voluntary acts")

---

already have admitted) along with specific false claims and statements caused by defendant.  *See* Def. Mem. at 16; *Haas v. Gutierrez*, No. 07 CV 3623(GBD), 2008 WL 2566634, at *4 (S.D.N.Y. Jun. 26, 2008) (dismissing, on numerous grounds, 9/11 conspiracy case in which relators' purported to state FCA claims; stating that "Plaintiffs wish to reach the conclusion that no compensation was owing to defendants by relying on the other self-serving conclusion that the services they rendered were worthless. In plaintiffs' view, defendants would only be entitled to compensation if [the investigators of the 9/11 attack] had acknowledged plaintiffs' theory that directed energy weapons, and not a terrorist attack,  was responsible for the destruction of the WTC."); *U.S. ex rel. Finney v. Nextwave Telecom, Inc.*, 337 B.R. 479, 487 (Bk. S.D.N.Y. 2006) (dismissing relator's claims brought based upon a "troubling" "theory . . . -namely, that defendants violated the FCA by failing to bring a federal statute to the attention of the federal government in the course of a litigation to which the federal government was a party. This contention is patently absurd and cannot form the basis of FCA liability."); *see also U.S. ex rel. Carter v. Halliburton Co.*, 08 Civ. 1162 (JCC), 2009 WL 90134, at *4-5 (S.D.N.Y. Jan. 13, 2009) (dismissing allegations of failure to comply with army contract terms because it was not more than a "formulaic recitation of the elements" and provided "no basis from which to conclude that Plaintiff possesses the 'substantial prediscovery evidence' of the relevant facts").

(quoting *Allison Engine Co. v. U.S. ex rel. Sanders*, 553 U.S. 662, 672 (2008)).   Moreover,

Saavedra's efforts to conceal the fraud provide stark evidence of intent.  *See* Section II.A. above.

3.   The Amended Complaint Sufficiently Pleads Falsity

Saavedra's claim that the Government fails to allege any false certification is

likewise meritless.  *See* Def. Mem. at 16-17.  As an initial matter, a false claim or statement need

not be made through a "certification" – which is one method by which a plaintiff may establish

legal falsity – because the FCA reaches claims that are both "factually false" and "legally false."

*See U.S. ex rel. Mikes v. Straus*, 274 F.3d 687, 696-97 (2d Cir. 2001).  A claim is "factually

false" when it contains a false description of the goods or services paid for by the Government –

"in other words, the contractor bills for something it did not provide."  *U.S. ex rel. Kirk v.

Schindler Elevator Corp.*, 601 F.3d 94, 113-14 (2d Cir. 2010), *rev'd on other grounds*, 131 S. Ct.

1885 (2011).  "Legally false" claims are "predicated upon a false representation of compliance

with a federal statute or regulation or a prescribed contractual term."  *Mikes*, 274 F.3d at 697.

The Amended Complaint alleges factually false claims and statements.  *See U.S.

ex rel. Schwedt v. Planning Research Corp.*, 59 F.3d 196 (D.C. Cir. 1995) (FCA claim stated

where contractor submitted, related to milestone payments, "false progress reports stating that

the software delivered during the same period was complete when in fact it was not"); *Hood*,

2013 WL 2274798, at *10-12 (factually false FCA action, where alleged that defendant did not

perform services contracted by DOJ, and submitted invoices for work by employees who were,

in fact, working on non-DOJ projects); *United States v. St. Luke's Subacute Hospital and

Nursing Centre, Inc.*, No. 00 Civ. 1976 (MHP), 2004 WL 2905237 (N.D. Cal. Dec. 16, 2004)

(granting summary judgment to Government on FCA claims where defendants misrepresented

level of nursing care provided to Medicare patients to a fiscal intermediary, and fabricated

23

payroll reports and time cards by designating certain employees as working exclusively with Medicare patients when in fact these employees also provided care to non-Medicare eligible patients).  As such, the Court need not analyze whether they are also "legally false." *See Kirk*, 601 F.3d at 114 (where claims are "factually false," "application of the FCA is fairly straightforward").  Thus, Saavedra's motion to dismiss the FCA claims should be denied.

## C.  THE AMENDED COMPLAINT STATES COMMON LAW CLAIMS

Saavedra's arguments with respect to the Government's alternative common law causes of action also should be rejected.  First, for the reasons set forth above in Section II.A., the Government has stated a fraud claim against Saavedra.  *United States v. Sforza*, No. 00 Civ. 1307(AGS), 2000 WL 1818686, at *6 (S.D.N.Y. Dec. 12, 2000) ("A cause of action for common law fraud has five elements: (i) representation of a material fact; (ii) falsity of the representation; (iii) intent; (iv) reasonable reliance on the false representation; and (v) damages.").

The Amended Complaint also sufficiently pleads the equitable causes of action, payment under mistake of fact and unjust enrichment.  "The elements of a claim for payment by mistake are that plaintiff made a payment under a mistaken apprehension of fact, that defendant derived a benefit as a result of this mistaken payment, and that equity demands restitution by defendant to plaintiff."  *U.S. ex rel. Ryan v. Staten Island University Hosp.*, No. 04–CV–2483 (JG)(CLP), 2011 WL 1841795, at *5 (E.D.N.Y. May 13, 2011).[7]  To state a claim for unjust enrichment, a plaintiff must allege "that (1) defendant was enriched (2) at plaintiff's expense, and (3) that it is against equity and good conscience to permit . . . defendant to retain what is sought to be recovered."  *In re Canon Cameras*, No. 05 Civ. 7233 (JSR), 2006 WL 1751245, at *1-2 (S.D.N.Y. Jun. 23, 2006) (while there must be a "sufficient connection between the parties to

---

[7] Saavedra cites no cases for his novel notion that the payment under mistake of fact claim is subject to Rule 9(b) fraud pleading, Def. Mem. at 19-20, plainly because no such case law exists.

support a claim for unjust enrichment," New York does "not require either a direct relationship between the parties or that a direct benefit be conferred on the defendant."). These claims both turn on whether Saavedra "benefitted from what is rightfully the government's such that equity and good conscience demand restitution." *Ryan*, 2011 WL 1841795, at *5.

Here, the Amended Complaint alleges that Saavedra was unjustly compensated through federal funds paid under the Contracts, for the ostensible purpose of operating the Workforce1 centers, while he was instead defrauding the United States. FAC ¶¶23, 91. Saavedra received benefits that he would not have received had the Government and SBS known of the scheme. FAC ¶¶91-93.[8] Equity and good conscience require restitution. *See T.D. Bank, N.A. v. JP Morgan Chase Bank, N.A.*, No. 10–CV–2843 (JG)(ARL), 2010 WL 4038826, at *4 (E.D.N.Y. Oct. 14, 2010)(denying motion to dismiss "crossclaims for . . . payment by mistake, and unjust enrichment" where claimant alleged "the relationship between [plaintiff's] loss and [defendant's] gain is straightforward and proximate: certain identified funds were removed from [plaintiff's] account and placed into [defendant's] via a single intermediary;" and plaintiff's "failure to allege privity or direct dealings . . . d[id] not defeat its claims").

## CONCLUSION

For the foregoing reasons, Saavedra's motion to dismiss should be denied in its entirety.

---

[8] Saavedra's citations to unjust enrichment cases involve inapposite scenarios in which plaintiffs had "no prior course of business dealings with defendants whatsoever." *See, e.g., Reading Int'l, Inc. v. Oaktree Capital Mgmt. LLC*, 317 F. Supp. 2d 301, 333 (S.D.N.Y. 2003). In others, unlike here, "Defendants did not benefit at the expense of Plaintiffs." *Mazzaro de Abreu v. Bank of America Corp.*, 525 F.Supp.2d 381, 397 (S.D.N.Y. 2007); *see also Dunahoo v. Hewlett-Packard Co.*, No. 11 CV 05588(BSJ)(HBP), 2012 WL 178332, at *1, 4 (S.D.N.Y. Jan. 20, 2012) (dismissing *pro se* complaint alleging "cyber crime activity," because it did not allege how HP benefited at plaintiff's expense, where averred that HP hacked plaintiff's network and tampered with his security programs in order to "to breach Plaintiff's sensitive and confidential data, including accessing his emails" with the ultimate goal of "extract[ing] proprietary information").

Dated:  New York, New York
        August 30, 2013

                              Respectfully submitted,

                              PREET BHARARA
                              United States Attorney for the
                              Southern District of New York

                    By:    ___s/Sarah J. North_____
                              SARAH J. NORTH
                              Assistant United States Attorney
                              86 Chambers Street, 3rd Floor
                              New York, New York 10007
                              Tel.: (212) 637-2639
                              Fax: (212) 637-2717
                              E-mail: Sarah.North@usdoj.gov
                              *Attorney for the United States*