F4FJUSA1                         Katz — cross

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES of AMERICA,

4                    Plaintiff,

5            v.                              11 Civ. 6425 AKH

6    ALEX SAAVEDRA,

7                    Defendant.

8    ------------------------------x

9                                        April 15, 2015
                                         10:00 a.m.
10
     Before:
11
                    HON. ALVIN K. HELLERSTEIN,
12
                                         District Judge
13                                          and a jury

14

15                            APPEARANCES

16   PREET BHARARA,
          United States Attorney for the
17        Southern District of New York
     BY:  CARINA HYATT SCHOENBERGER,
18        JENNIFER ELLEN BLAIN,
          Assistant United States Attorneys
19
     LAW OFFICES OF BETTINA SCHEIN,
20        Attorneys for defendant
     BY:  BETTINA SCHEIN, Esq.
21        — and —
     LAW OFFICES OF ALAN S. FUTERFAS,
22   BY:  ALAN SAMUEL FUTERFAS, Esq.
                    Of counsel
23

24   Also Present:
          HARRY SOLOMON, Technical Support USAO
25        MARISA ALBERTI, Defense Paralegal & Technical Support

F4FJUSA1                          Katz – cross

1           (Trial resumes)

2           (In open court; jury not present)

3           THE COURT:  Good morning, everyone.  Be seated,

4    please.

5           THE CLERK:  Are we ready?

6           THE COURT:  Yes.

7           (Jury present)

8           THE COURT:  Good morning, members of the jury.

9           THE JURY:  Good morning.

10          THE COURT:  Mr. Katz, where are you?  The witness?  Be

11   seated, everybody.

12          (Pause)

13          THE COURT:  Good morning, Mr. Katz.  Come up, please.

14   I remind you that you remain under oath.  Mr. Futerfas --

15   please sit down -- Mr. Futerfas is conducting

16   cross-examination.  Please continue.

17   ALAN STEVEN KATZ, resumes

18   CROSS-EXAMINATION (Continued)

19   BY MR. FUTERFAS:

20   Q.  Good morning, Mr. Katz.

21   A.  Good morning.

22   Q.  When we broke yesterday, you recall that we were talking

23   about some of these large projects that you and others at

24   Workforce1 were fulfilling your employment needs for.  Do you

25   remember those conversations we had yesterday?

F4FJUSA1                          Katz – cross

1   A.  Yes.

2            THE COURT:  Keep your voice up, please.

3            THE WITNESS:  Yes.

4   BY MR. FUTERFAS:

5   Q.  I just wanted to talk to you a moment about, we spent some

6   time on the East River Plaza Project which was a large project?

7   A.  Yes.

8   Q.  We talked about that a little bit yesterday?

9   A.  Yes.

10  Q.  Do you recall that, with respect to that project which was

11  located on the East River, 125th Street, there was actually a

12  preference for hiring residents of East Harlem?

13  A.  Yes.

14  Q.  How was that, how did you effectuate that?

15  A.  It was prioritized by zip code, so you had the primary zip

16  codes in East Harlem, and there was a secondary of West Harlem,

17  and the third was the rest of the city, to prioritize

18  candidates for those opportunities.

19  Q.  Did you and others at Upper Manhattan Workforce deem it

20  part of your function to serve the local community?

21  A.  Yes.

22  Q.  There was another recall, you recall another recruitment or

23  larger employer called Italy.  Do you recall that?

24  A.  I do, yes.

25  Q.  What was Italy?

F4FJUSA1                        Katz - cross

1   A.  Italy was an Italian marketplace down in the Flatiron

2   District, that the marketplace included a winery, a couple of

3   restaurants and a market.

4   Q.  Did the recruitment and placement team, your team, work

5   with that market, with their management team to plan events and

6   did you employ -- well, I'll take one question at a time.

7           Did you work with that management team to plan events

8   there, job-fair-type events?

9   A.  Yes.

10  Q.  Did you advertise for those events?

11  A.  Yes.

12  Q.  What kind of advertising did you do?

13  A.  Craig's List advertising.

14  Q.  Was some of that advertising actually specific; in other

15  words, we need people with waitress experience or barista

16  experience or things like that?

17  A.  I am not sure what the job description encompassed in the

18  ad.  It listed the types of opportunities that they were

19  looking to fulfill.

20  Q.  Okay.  Then when these -- so the recruitment events for

21  Italy were planned for a given day or given series of days.  Is

22  that fair?

23  A.  Yes.

24  Q.  At those events people from recruitment and placement would

25  be there to screen these individuals and basically do the

F4FJUSA1                        Katz - cross

1   employment process for, for Italy, right?

2   A.  Yes.

3   Q.  And that would entail interviewing individuals, right?

4   A.  Yes.

5   Q.  And they would fill out, obviously fill out a CIF when they

6   were there?

7   A.  Yes.

8   Q.  Someone would take their ID to verify who they were?

9   A.  Yes.

10  Q.  And then find out what their skill-set was and things like

11  that?

12  A.  Yes.

13  Q.  Now, did these events also serve another purpose; that is,

14  that if someone wasn't a fit for any of the jobs at Italy, at

15  least you'd have their CIF, right?

16  A.  Yes.

17  Q.  So you'd have an idea of what they're capable of doing,

18  their job skill-set, right?

19  A.  Yes.

20  Q.  So that later when that CIF is entered, they're registered

21  in Work Source up at 125th Street, right?

22  A.  Correct.

23  Q.  Now what happens, even if that person who shows up at

24  Italy, they're not exactly a fit for Italy, but now they're in

25  your system, they might be fit for some other job opportunity

F4FJUSA1                        Katz - cross

1    that comes up?

2    A.   Correct, yes.

3    Q.   By the way, this process that we're talking about including

4    the giving out the CIF and collecting the CIF at these

5    recruitment events, that is all part of your job, right?

6    A.   Yes.

7    Q.   Did you think there was anything at all improper about

8    bringing CIFs to 23rd Street and having these people fill them

9    out there instead of having them fill out the CIFs at 125th

10   Street?

11   A.   No.

12   Q.   In your mind, is there a distinction between a recruitment

13   event and something called a job fair?

14   A.   No, no difference.

15   Q.   So a job fair is just another name for an event that your

16   team organizes and others at SEEDCO organize to bring job

17   seekers together and introduce them to opportunities, job

18   opportunities?

19   A.   Yes.  Can I --

20   Q.   Yes, of course.

21   A.   An event might be specific, a specific recruitment event

22   tailored to the actual position.

23   Q.   Okay.  All right.  So, for instance, was one of your AMAs

24   Marshalls?  Was an AMA Marshalls?

25   A.   Yes.

1    Q.  An AMA is -- I know you might have touched this on direct

2    examination -- is an Actively Managed Account?

3    A.  Yes.

4    Q.  And that is an employer with whom SEEDCO had a direct

5    relationship to try to fulfill their job needs?

6    A.  Correct.

7    Q.  When you say there might be a specific job fair, it may be

8    that whoever is handling the Marshalls account will find out,

9    Marshalls will say, you know, we need 30 stockroom people, and

10   then you plan an event to try to get people at an event who

11   might be able to fulfill those positions.  Is that fairly

12   accurate?

13   A.  Yes, yes.

14   Q.  There is nothing wrong with that?

15         That is part of your duties and responsibilities and

16   that's what you're supposed to do, right?

17   A.  Right.

18   Q.  By the way, did these employers -- let's say, for example,

19   Italy or one of your other AMAs -- did they appreciate the fact

20   that SEEDCO was coming in and doing the job screening and doing

21   all the work of kind of vetting candidates so that the

22   individuals that are being suggested to them to hire have

23   already been prescreened and vetted in some way?

24   A.  I would hope so, yes.

25   Q.  That is a big job?  It is a lot of work, isn't it?

F4FJUSA1                        Katz - cross

1   A.  Yes.

2   Q.  Now, a number of the events we have been talking about, the

3   Italy event and yesterday you mentioned Aloft, you mention the

4   Aloft Hotel recruitment, a lot of these events occurred in 2010

5   or came online in 2010.  Do you recall that?

6   A.  Yes.

7   Q.  Do you recall that in -- let me ask you more generally --

8   do you recall a fairly catastrophic economic event in 2008?

9   A.  Yes.

10  Q.  In fact, were you tangentially affected by that event,

11  right?

12  A.  Yes.

13  Q.  You were working at another firm, Alliance Capital or

14  something up until 2009?

15  A.  Yes.

16  Q.  And you were, I guess you were one of the many casualties

17  that lost your job as a result of the economic meltdown of 2008

18  or 2009.  Is that correct?

19  A.  Yes.

20  Q.  So the economic situation in 2009 was not good?

21  A.  Correct.

22  Q.  In 2010, did you at least observe working at SEEDCO that

23  with the East River Plaza Project and other stores, other

24  employers coming online and starting to work with SEEDCO, that

25  things seemed to be improving in 2010?

F4FJUSA1                        Katz - cross

1                THE COURT:  Excuse me for a minute.  When did you

2      leave?

3                THE WITNESS:  March 2009.  With SEEDCO or Alliance?

4                THE COURT:  SEEDCO?

5                THE WITNESS:  October 2011.

6                THE COURT:  You may ask the question.

7      BY MR. FUTERFAS:

8      Q.  Did you just have a general sense from your observations at

9      SEEDCO that in 2010 it seemed like a lot more job opportunities

10     were becoming available either because of a change in the

11     economy or just because these other large employers were

12     working with SEEDCO in 2010?

13               THE COURT:  As compared to what?

14     BY MR. FUTERFAS:

15     Q.  The previous year, 2009, or some other time.

16     A.  From a retail standpoint with new openings, yes.  Does that

17     mean I feel the economy was improving?  No.

18               MR. FUTERFAS:  Fair enough.

19               THE COURT:  You saw more openings?

20               THE WITNESS:  In retail, yes.

21               THE COURT:  What percentage improvement would you say,

22     if you can?

23               THE WITNESS:  I can't because I am not sure what

24     happened prior to me joining SEEDCO retail-wise.

25               THE COURT:  Would you say there was any improvement at

F4FJUSA1                        Katz - cross

1    all?

2              THE WITNESS:  From new stores opening, yes, I suppose,

3    but prior?  But prior to August when I got to SEEDCO, I didn't

4    really keep up on current events of stores opening.

5              THE COURT:  Are you able to say that there was or was

6    not any improvement?

7              THE WITNESS:  I can't, no.

8              MR. FUTERFAS:  Let me ask you this question then,

9    following up on his Honor's questions.

10   BY MR. FUTERFAS:

11   Q.  Have you heard of something called sectors?

12   A.  Yes.

13   Q.  Was one of the sectors for 125th Street the retail, retail

14   employers?

15   A.  Yes.

16   Q.  Could you just tell the jury briefly what your

17   understanding of sectors is as it applies to SEEDCO and the

18   business that it does.

19   A.   Industries, types of industries such as, an example,

20   McDonald's or Outback would be a food service for restaurant

21   sector.  Retail would encompass Costco, like Marshalls, T.J.

22   Maxx, any type of big box store.

23   Q.  Did SEEDCO or the 125th Street Workforce1 Center have

24   various sectors it was targeting or responsible for?

25   A.  Yes.

F4FJUSA1                         Katz - cross

1    Q.   And retail was one of those?

2    A.   Yes.

3    Q.   What were some of the others, if you recall?

4    A.   Health care, food services.

5    Q.   All right.  I'll move off this topic.

6             The bottom line is from what you observed in 2010,

7    there seemed to be a lot of retail job opportunities online

8    with SEEDCO?

9    A.   Yes.

10   Q.   You worked hard to fulfill those opportunities?

11   A.   Yes.

12   Q.   Now, do you recall also in 2010 that there was a proposal

13   made to renew the contract for Workforce1 at 125th Street?

14   A.   Yes.

15   Q.   Was that something that Mr. Saavedra was involved in?

16   A.   Yes.

17   Q.   Do you recall whether he spent a fair amount of work and

18   time on that project?

19   A.   Yes.

20   Q.   Did he do it with other people?  Was there a team put

21   together to assemble this proposal?

22   A.   Yes.

23   Q.   I want to talk to you a little bit about CIFs.

24            Sometimes individuals would come into Workforce1 and

25   who have already been to other locations, other workforce

F4FJUSA1                        Katz - cross

1     locations, right?

2     A.  Yes.

3     Q.  And because the nature of the workforce system was that

4     someone could go to, let's say, the workforce center in

5     Brooklyn and they could be given and fill out a CIF in

6     Brooklyn, right?

7     A.  Yes.

8     Q.  And then could go to another facility and try to find work

9     in the Bronx, go to a Bronx workforce center and fill out a CIF

10    there, right?

11    A.  They could fill out a CIF.  Once you completed a CIF, you

12    were typically given a card, like a membership card or so, or

13    when you checked into the front desk, if you didn't have the

14    card and were asked if you had ever been here before, they

15    could pull you up, the intake.

16    Q.  If you didn't have a card, though, you walked in, you would

17    say you would typically by given a CIF if you didn't have a

18    card?

19    A.  Yes, it could happen.

20    Q.  In fact, did you understand that under SBS rules, that

21    multiple CIFs could be collected for a person?

22    A.  I didn't know.  I don't know what the rule was.

23    Q.  You don't know one way or the other?

24    A.  No, right.

25    Q.  Now, I want to follow up with you on something the court

F4FJUSA1                        Katz - cross

1     asked yesterday, and do you remember the Judge's question

2     yesterday, Mr. Katz, about what would happen if an individual

3     goes to a recruitment event and they're hired and how long do

4     they have to work?

5              Do you remember these questions from the court, how

6     long they have to work to become a placement.  Do you remember

7     that?

8     A.   Yes.

9     Q.   Questions of that nature by the court yesterday?

10    A.   Yes.

11    Q.   At these recruitment events which you've testified about,

12    individuals who are screened and then I guess turned over to

13    management for their interview or whatever they do, they could

14    be hired on the spot there at the recruitment events, right?

15    A.   They could, yes.

16    Q.   So let's say if Fairway could say, there is a recruitment

17    event at Fairway and Fairway could say okay, I like the

18    following eight people, for instance, out of the 50 or 70

19    people who showed up, they could do that then and there, right?

20    A.   Yes.

21    Q.   And actually you kind of hope they do that, right?

22    A.   Yes.

23    Q.   Now, you understand that under SBS policy, a verbal

24    statement by either a job seeker or an employer is sufficient

25    to constitute employment for the purposes of a placement?

F4FJUSA1                          Katz - cross

1    A.  Yes.

2    Q.  So you understand that if one of those events, let's say

3    the hypothetical I am giving you at Fairway, the manager says

4    okay, I'll take these eight people, I am hiring them, your

5    staff can come back to 125th Street with the CIFs, enter the

6    CIFs, but also enter a placement because they received a verbal

7    from the management that they're hiring the following eight

8    people?

9    A.  Yes.

10   Q.  That's proper procedure, right?

11   A.  Yes.

12   Q.  That verbal, in fact, doesn't even have to be from the

13   management of the employer, it can be from the employee or the

14   job seeker, the job seeker can say I've been hired?

15   A.  Yes.

16   Q.  Now, what happens if one of these eight people -- that is,

17   given this hypothetical -- is hired at Fairway, and so your

18   recruitment and placement people go back to 125th Street, they

19   enter the placement because they've been told these eight

20   people have a job, then it turns out one of the eight people

21   doesn't show up for work the next day, or one of the other, one

22   of the eight people in the interim gets another job and decides

23   I don't want to work at Fairway, I found another job and I'm

24   going to go somewhere else, and actually the job never pans out

25   at Fairway.

F4FJUSA1                         Katz - cross

1          How does that ultimately get reconciled, if you know,

2     in the Work Source1 System?

3     A.  Well, to address your first point, they enter the placement

4     into the system, but it shouldn't be entered until their start

5     date.  So if they came back with eight placements in your

6     example, they're starting the next week, they shouldn't enter

7     eight placements that day.

8          I am not sure if that happened, but if they didn't

9     start, there shouldn't be -- it shouldn't be a placement if

10    they didn't start clearly.

11    Q.  Let me refine the hypothetical.

12         In your experience, all kinds of different scenarios

13    happened with job seekers and employers.  Is that fair?  We can

14    come up with hypotheticals, but lots of different kinds of

15    things happened in the course of your business at SEEDCO and

16    their relationship between job seekers and employers, right?

17    A.  Yes.

18    Q.  So, for example, if the manager says I'm hiring these eight

19    people, but I need them to start tomorrow, okay, so let's

20    refine the hypothetical, I need them to start tomorrow.

21         So your person goes back to 125th Street, enters the

22    placement, the start date is tomorrow, the following day, but

23    one of them doesn't show up, or the other one that night gets a

24    better offer somewhere else and goes somewhere else.

25         So in that circumstance, a placement would be entered,

1   right?

2           THE COURT:  Objection sustained.  Change your

3   question.

4           MR. FUTERFAS:  Okay.  Let me try to break it down.  If

5   it doesn't work, I'll move on.  I'll try to break it down.

6   BY MR. FUTERFAS:

7   Q.  If a manager selects a number of people to be hired and

8   says they can start immediately or start tomorrow, you

9   typically, your recruitment and placement person would go back

10  and be authorized and enter those as placements, right?

11  A.  Yes.

12  Q.  So the question now is, they're now entered placements and

13  they're placements in Work Source1, right?

14  A.  Yes.

15  Q.  Now what happens is a few days down the road one of those

16  individuals, the next day or two days later doesn't show up for

17  work, leaves the job, so they really -- maybe they never showed

18  up at all or maybe they only worked a couple of days and they

19  left --

20          THE COURT:  Mr. Futerfas, this is not a conversation,

21  it is a question, and that is not a question.

22          MR. FUTERFAS:  Fair enough.  I'll move on, your Honor.

23  BY MR. FUTERFAS:

24  Q.  Was there a department in Upper Manhattan called the

25  Advance at Work Program?

F4FJUSA1                          Katz – cross

1   A.  Yes.

2   Q.  Just what was the Advance at Work Program?

3   A.  They were tasked with, the department was tasked with

4   finding higher paying opportunities for individuals that were

5   currently employed.

6   Q.  Were their individuals called career coaches?

7   A.  I am not sure what their titles were.

8   Q.  But going back to your answer about Advance at Work, this

9   is a program that is working with currently employed people?

10  A.  Yes.

11  Q.  The objective of the program is to try to get them a higher

12  salary or a better position within their existing jobs?

13  A.  Yes.

14  Q.  By the way, have you heard the term a promotion?

15  A.  Yes.

16  Q.  In fact, a promotion is a kind of placement, isn't it?

17  A.  Yes.

18  Q.  So that if someone is in a preexisting job, and they're

19  earning $10.00 an hour, for example, and they come to SEEDCO or

20  they get some services from SEEDCO, and after those services

21  they get a raise, now they're earning $13.00 an hour, that

22  constitutes a promotion, right?

23  A.  Yes.

24  Q.  And in the Work Source1 System somewhere, that is counted

25  as a type of placement.  Isn't that right?

F4FJUSA1                    Katz - cross

1    A.  I'm not sure.  I don't know.

2    Q.  But you understand it is a placement, you are --

3            THE COURT:  He doesn't know.  He is not sure.  So

4    there is no answer to the question.

5    BY MR. FUTERFAS:

6    Q.  Let me show you defendant's, if I could, Defendant's D4.

7    It will pop up on your screen, for identification.

8            THE COURT:  You won't see it, members of the jury,

9    until it is admitted.  It is not yet admitted.

10           (Pause)

11           THE COURT:  Aren't your exhibits letters?

12           MS. ALBERTI:  Yes, but it would be DDDD, so it would

13   be notated as D4 so we wouldn't have to be searching forever.

14           THE COURT:  What is the exhibit for identification?

15           MR. FUTERFAS:  The quadruple D, so we call it D4, your

16   Honor.

17           THE COURT:  Call it Quadruple D, DDDD.

18           (Off-the-record discussion)

19           THE COURT:  Let me tell you, members of the jury,

20   about exhibits for identification and exhibits.

21           Everything during the trial has to be put into a

22   record because it is subject to appeal to a higher court.  So

23   everything that is shown to a witness must be identified, and

24   it is identified either by a number or a letter.

25           That doesn't mean it is in evidence.  There are many

F4FJUSA1                        Katz - cross

1    ways you can question a witness and it doesn't have to be with

2    an exhibit in evidence.  If the exhibit is in evidence, the

3    attorney has to offer it in evidence.  I have to admit it in

4    evidence, and then it is shown to you.  Then it is of

5    evidentiary quality.

6            Sometimes, for example, you show a document to a

7    witness, a document for identification and ask the witness if

8    it refreshes his recollection.  That doesn't mean the document

9    is in evidence.  It just is something so the witness can use to

10   refresh his recollection in a given testimony.

11           MR. FUTERFAS:  Your Honor, we are --

12           THE COURT:  DDDD for identification?

13           MR. FUTERFAS:  I may be able to do it on the Elmo.

14           THE COURT:  No, you can't do it on the Elmo.

15           MS. ALBERTI:  The court system, I previewed it --

16           THE COURT:  You can't do it on the Elmo.  Show it to

17   the witness.

18           MR. FUTERFAS:  I'll do it the old fashioned way.

19           THE COURT:  The old fashioned way.

20           MR. FUTERFAS:  Do we have a copy for the court?

21           THE COURT:  Don't worry about it.

22   BY MR. FUTERFAS:

23   Q.  Let me hand you what has been marked -- it says D4 on the

24   document, but we'll call it quadruple D?

25           THE COURT:  Call it what it says on the document,

F4FJUSA1                    Katz - cross

1    D4 --

2              MR. FUTERFAS:  Thank your Honor.

3              THE COURT:  -- for identification.  What is the

4    question?

5    BY MR. FUTERFAS:

6    Q.  Mr. Katz, do you recognize that as a policy statement from

7    SBS?

8    A.  Yes.

9    Q.  Are those the kinds of policy statements that SBS would

10   send to SEEDCO with respect to informing SEEDCO of the policies

11   and procedures?

12   A.  Yes.

13   Q.  You would review -- you would obtain that document within

14   your regular course of business when you're working at SEEDCO?

15   A.  Yes.

16             MR. FUTERFAS:  I would move to admit the document,

17   your Honor.

18             MS. SCHOENBERGER:  No objection.

19             THE COURT:  Received.

20             (Defendant Exhibit DDDD received in evidence)

21             THE COURT:  Now it can be published to the jury.

22             MR. FUTERFAS:  Thank you.  May I collect the document?

23             THE COURT:  You may.

24             MR. FUTERFAS:  I may have to use the Elmo.

25             THE COURT:  Now you can use the Elmo.

F4FJUSA1                          Katz - cross

1          MR. FUTERFAS:  Thank your Honor.

2          (Pause)

3    BY MR. FUTERFAS:

4    Q.  Mr. Katz, I'm showing you what is now in evidence as

5    Defendant's Exhibit D4, and as you've testified, the policy

6    statements like this, would SEEDCO receive policy updates from

7    SBS with some regularity?

8    A.  Yes.

9    Q.  These would provide interpretation and guidance in matters

10   of that sort to SEEDCO?

11   A.  Yes.

12   Q.  On this one, which is dated -- it says updated March 15th,

13   2011, you see at the very top of this it says Work Source1

14   placement and promotion record.  Do you see that?

15   A.  No.  It is offline.

16   Q.  I will pull it down.  There we go.  Do you see that now?

17   A.  Yes.

18   Q.  Then it says, if you look at the purposes clause, there it

19   says the purpose, "SBS is issuing this policy to specify

20   requirements for job placement and promotion data entry in Work

21   Source1."

22          Do you see that?

23   A.  Yes.

24   Q.  Then it talks about, if you go down to key terms in the

25   middle of the page, I have a line in there somehow, I am not

1    sure how that is happening.  In any event, it talks about

2    placement as a key term.  Do you see that?

3    A.  Yes.

4    Q.  It talks about what placement is, what a placement is,

5    right?

6    A.  Yes.

7    Q.  It says that a placement is employment obtained by the job

8    seeker after consumption of services through an SBS workforce

9    development program.  And then it says, "Individual programs

10   may have different contractual requirements for placements;

11   those can be found in their respective contracts and not this

12   document."

13           Do you see that language, right?

14   A.  Yes.

15   Q.  Underneath that what I want to focus on is the word

16   "promotion," and it defines promotion, right?

17   A.  Yes.

18   Q.  It calls a promotion, "an advance in either wages or hours

19   by a job seeker customer with the same employer that occurred

20   after consumption of services through an SBS workforce

21   development program.  The employer can be either the job

22   seeker's employer at the time of enrollment or an employer that

23   the job seeker was placed with after program enrollment."

24           Do you see that?

25   A.  Yes.

F4FJUSA1                         Katz – cross

1            THE COURT:  What do we do with that information?  Do

2    you have a question?

3            MR. FUTERFAS:  Was that your Honor's question?

4            THE COURT:  You put it.  What happens if someone is

5    promoted, how does it work into the targets for companies like

6    SEEDCO?  Do you know?

7            THE WITNESS:  I don't know.

8            MR. FUTERFAS:  If can follow up.

9    BY MR. FUTERFAS:

10   Q.  You do understand maybe just generally if not specifically

11   that a promotion is some kind of placement?

12   A.  Yes.

13           THE COURT:  Is it a placement?

14           THE WITNESS:  It would be part of a placement, yes.

15           THE COURT:  What do you mean, part of a placement?

16           THE WITNESS:  We count it as a placement if they

17   received a promotion in their current job.

18           THE COURT:  Just the same as if a person is employed

19   for the first time through your reference?

20           THE WITNESS:  Yes.

21           THE COURT:  How do you measure if it is through your

22   reference?

23           THE WITNESS:  The job seeker would meet with the

24   Advance at Work Program folks, and they would discuss

25   opportunities.  They would discuss opportunities that my

F4FJUSA1                         Katz - cross

1    recruitment team was working on, and they would be aware of

2    what the salaries were paying, the staff within SEEDCO in that

3    Advance at Work Program, so they can refer these individuals

4    that they meet to a recruitment and placement event or to walk

5    them over to meet with an account manager, to screen them for

6    the higher paying opportunity that we would be working on.

7            THE COURT:  So if SEEDCO assisted some employee in

8    advancing in salary or position, you counted that as the same

9    as an original placement for the job?

10           THE WITNESS:  Yes.

11           THE COURT:  You counted that as meeting your targets?

12           THE WITNESS:  It applied towards meeting our targets.

13           MR. FUTERFAS:  May I have a moment, your Honor?

14           THE COURT:  You may.

15           (Pause)

16   BY MR. FUTERFAS:

17   Q.  Let me show you -- again we'll have to do this with your

18   Honor's permission -- the proverbial old fashioned way for a

19   moment until we get our computer system --

20           THE COURT:  I am more comfortable that way, too, Mr.

21   Futerfas.  If anything, I am old fashioned.

22           MR. FUTERFAS:  I do it the same way.

23           MR. FUTERFAS:  Anyway, if I could show the witness

24   Defense Exhibit SSS for identification.

25           THE COURT:  S3, as you call it.

F4FJUSA1                        Katz – cross

1            (Pause)

2    BY MR. FUTERFAS:

3    Q.  Mr. Katz, I've handed you Defense Exhibit SSS for

4    identification, if I you can, if you can just take a moment.

5            Have you had a moment to look at it?

6    A.  Yes.

7    Q.  Yes?

8    A.  Yes.

9    Q.  Is that another policy statement issued by SBS to SEEDCO?

10   A.  Yes.

11   Q.  Would you review those statements in the normal course of

12   your work when you were at SEEDCO?

13   A.  Yes.

14   Q.  And this policy statement is dated July 1, -- yes, July 1,

15   2009, right?

16   A.  Yes.

17           MR. FUTERFAS:  Your Honor, we move to admit Defense

18   Exhibit SSS.

19           MS. SCHOENBERGER:  Objection.

20           THE COURT:  Let me see it.

21           (Pause)

22           THE COURT:  Did SEEDCO receive this in the ordinary

23   course of its business from somebody?

24           THE WITNESS:  Yes.

25           THE COURT:  From whom?

F4FJUSA1                          Katz - cross

1            THE WITNESS:  From the Department of Small Business

2    Services, member of SBS.

3            THE COURT:  This is an SBS-issued document?

4            THE WITNESS:  Yes.

5            THE COURT:  What date, approximately, was the document

6    issued?

7            THE WITNESS:  This was dated July 1, 2009.

8            THE COURT:  Was it received by SEEDCO on or about that

9    date?

10           THE WITNESS:  I wasn't employed with SEEDCO.

11           THE COURT:  In the ordinary course of business, does

12   SEEDCO receive documents from SBS close to the date shown on

13   the document?

14           THE WITNESS:  Yes.

15           THE COURT:  Objection overruled.  The document is

16   received in evidence and it may be published.

17            (Defendant Exhibit SSS received in evidence)

18   BY MR. FUTERFAS:

19   Q.  Mr. Katz, just quickly, do you see this is a placement

20   policy, dated July 1, 2009?

21   A.  Yes.

22   Q.  And again this is the kind of document that SEEDCO would

23   receive from SBS with regularity, right?

24   A.  Yes.

25   Q.  I will ask you to turn your attention to Page 2, and excuse

F4FJUSA1                        Katz - cross

1   my writing, this is my own copy, but on Page 2, Paragraph 2,

2   validating the placement.

3            (Off-the-record discussion)?

4            THE COURT:  The jury can easily disregard the

5   markings.

6   BY MR. FUTERFAS:

7   Q.  Anyway, on validating that placement, do you see that, Mr.

8   Katz?

9   A.  I do.

10  Q.  Just quickly, what we were talking about before, when a job

11  seeker goes to an event and either tells you directly or your

12  team directly or the manager tells your team directly that

13  they're hired, that is sufficient for that person to then go

14  and rely on that for the purpose of recording a placement,

15  right?

16  A.  Yes.

17  Q.  That is embedded, in fact, in this policy about validating

18  a placement, it says what is appropriate verification for the

19  purpose of a placement in those circumstances.  Do you see

20  that?

21  A.  Yes.

22  Q.  Particularly in italics, it says verbal attestation from

23  the job seeker or employer is sufficient, right?

24  A.  Yes.

25  Q.  Now, if I could turn to Page 3, and the first full

F4FJUSA1                         Katz - cross

1   paragraph beginning, "It is important to note," do you see

2   that?

3   A.  Yes, yes.

4   Q.  That language is:

5        "It is important to note final validation of the job

6   seeker's employment status, for contractual payment purposes,

7   is conducted by a third-party organization.  Job seekers are

8   contacted in the first and third quarter following the quarter

9   the placement was data entered into Work Source1.  Therefore,

10  centers should not contact job seekers in the context of an

11  administrative or compliance exercise."

12       Do you see that language in there?

13  A.  Yes.

14  Q.  By the way, had you ever heard --

15       THE COURT:  Wait, just before you get into that, let's

16  make sure we understand this language.  What is an

17  administrative exercise?

18       THE WITNESS:  I don't know.

19       THE COURT:  What is a compliance exercise?

20       THE WITNESS:  I don't know.

21       THE COURT:  Going down to the verification issue

22  flashed before, SEEDCO is supposed to verify the job placement

23  and it can do so by just getting an oral okay from either the

24  employer or the employee, right?

25       THE WITNESS:  Yes.

1           THE COURT:  Would you show that language, Mr.

2      Futerfas?

3           MR. FUTERFAS:  Yes, of course, your Honor.

4           (Pause)

5           THE COURT:  That is what is meant by verbal

6      attestation from the job seeker or employee --

7           THE WITNESS:  Yes.

8           THE COURT:  -- in that other paragraph?

9           MR. FUTERFAS:  May I change it, your Honor?

10          THE COURT:  Yes.  In that other paragraph SEEDCO is

11     not supposed to do it when it is involved in an administrative

12     or compliance exercise.  Do you know the distinction between

13     those two different modes?

14          THE WITNESS:  It seemed, it seems to me that it

15     contradicts each other, those two statements.

16          THE COURT:  Okay.

17          MR. FUTERFAS:  If I could follow up, your Honor.

18     BY MR. FUTERFAS:

19     Q.  Let me ask you this question:  Had you heard in your

20     business there, your work at SEEDCO --

21          THE COURT:  You have to do it through another witness.

22     He doesn't know.

23     BY MR. FUTERFAS:

24     Q.  For the purpose of -- let me ask it this way.

25          You weren't aware beyond the job seeker being told or

F4FJUSA1                      Katz - cross

1   the manager of the store telling your, your representative that

2   the job seeker was hired, and using that as a placement, you

3   are not aware of any SEEDCO extra compliance efforts to follow

4   up and verify the job?

5   A.  No.  I don't know.

6   Q.  But were you aware of any additional or third-party efforts

7   to verify placements either conducted through SBS or some other

8   third party agency?

9   A.  I know there was a third-party agency that verified

10  placements.

11  Q.  That what?

12  A.  That verified placements somehow.

13  Q.  You don't know the name of or anything about it?

14  A.  It was called Charney.  That was the extent of I know about

15  them.

16  Q.  You heard that Charney verified placements in your work at

17  SEEDCO?

18  A.  They were supposed to, yes.

19          MR. FUTERFAS:  I am done with that exhibit, your

20  Honor.

21          (Pause)

22  BY MR. FUTERFAS:

23  Q.  Now, we saw yesterday a number of CIFs.  Do you remember

24  that?

25  A.  Yes.

1          MR. FUTERFAS:  Withdrawn.  Withdrawn.  May I have a

2    moment to consult my co-counsel.

3          (Off-the-record discussion)

4    BY MR. FUTERFAS:

5    Q.  Let me turn to again sometime in the Fall of 2010.

6          Do you remember at some point that SEEDCO sought and

7    was awarded the contract to open a new workforce center in the

8    Bronx?

9    A.  Yes.

10   Q.  That center had to be opened by January 1, 2011 or

11   thereabouts, right?

12   A.  Yes.

13   Q.  Do you recall that Mr. Saavedra spent some time on trying

14   to open that, get that facility ready?

15   A.  Yes.

16   Q.  Were you involved in that process?  Did you hire people or

17   assist in that process in some way?

18   A.  Yes.

19   Q.  Particularly with hiring or at least -- what was your

20   involvement in the process?

21   A.  With hiring folks for the Bronx or Upper Manhattan, to

22   determine where we can place folks.

23   Q.  But opening a new facility, it is fair to say is a

24   substantial undertaking.  Is that right?

25   A.  Yes.

F4FJUSA1                          Katz - cross

1   Q.  It was going to be a fully staffed facility with 40 or 50

2   employees?

3   A.  Yes.

4   Q.  It had to have rooms and computers and all the stuff that a

5   facility has to have to function?

6   A.  Yes.

7   Q.  That had to happen, the opening, do you recall the opening

8   date was, in fact, January 1, 2011?

9   A.  Yes.

10  Q.  Do you recall the contract was awarded about September

11  2010?

12  A.  I am not sure when it was awarded, but it was awarded in

13  the fall sometime.

14  Q.  Fair enough.

15          Let me ask you, you talked on direct examination

16  about, a little bit about resumes.  Do you recall your direct

17  testimony about resumes?

18  A.  Yes.

19  Q.  Now, in fact, as part of your duties in your department,

20  you used Monster.com and other kinds of websites to locate

21  individuals who you would be be interested in bringing into the

22  center and seeing if you could get them placed, right?

23  A.  Yes.

24  Q.  That was a proper and appropriate part of your

25  responsibilities, right?

F4FJUSA1                          Katz - cross

1    A.  Yes.

2    Q.  By going and doing and looking for resumes, you were

3    finding people who:  A, had the ability to put a resume

4    together, right?

5    A.  Right.

6    Q.  And then sometimes they would have -- you would see

7    skill-sets that might be helpful to fulfill a job opportunity

8    that you have, right?

9    A.  Yes.

10   Q.  So that was something that you did in the ordinary course

11   of your business there?

12   A.  Yes.

13   Q.  Let me talk to you about called re-engagement calls.  Have

14   you ever heard of re-engagement calls?

15   A.  Yes.

16   Q.  What are those?

17   A.  Just follow-up phone calls to folks that have been through

18   our Workforce1 Career Center.  They could have utilized any

19   service within the center, and we reach out to them as a

20   reminder that we're still here, we still have job

21   opportunities, encourage them to come back in and to see if

22   they found employment.

23   Q.  Were re-engagement calls an important way to try to get

24   placements?

25   A.  Yes.

F4FJUSA1                          Katz – cross

1    Q.  Why?

2    A.  We have seen a volume of folks that would come through the

3    center to utilize any types of services.  They would have been

4    registered into the Work Source system.

5         We can run reports of folks that have been through the

6    center, and we would reach out to them to find out what their

7    job status was, and then if they're not working, we're still

8    here.

9    Q.  So I understand the process, and for the jury to understand

10   the process, someone comes in and they fill out a CIF and

11   registered with Workforce1, right?

12   A.  Yes.

13   Q.  And now what happens is that a list would be generated for

14   these re-engagement calls, right?

15   A.  Yes.

16   Q.  That would be circulated to everyone who is tasked with

17   doing these phone calls, right?

18   A.  Yes.

19   Q.  Did pretty much everyone have to do it?  (Did)?

20   A.  Towards the end of my tenure, yes.

21   Q.  Sometimes it would be re-engagement call events where

22   everyone would come in on a Saturday or everyone go, in fact,

23   to SEEDCO at 915 Broadway, corporate headquarters, and make

24   calls on a Saturday, right?

25   A.  Yes.

F4FJUSA1                      Katz - cross

1    Q.  And the purpose of these calls was to reengage, was to call

2    up the person who had registered at SEEDCO and find out what's

3    happening with that person, right?

4    A.  Yes.

5    Q.  Because when they came in and they got a CIF, they got some

6    service when they got the CIF, right?

7    A.  Yes.

8             MS. SCHOENBERGER:  Objection.

9             THE COURT:  Overruled.

10   BY MR. FUTERFAS:

11   Q.  And so now what you're doing, you'll calling them up and

12   saying to the individual, you know, Mr. or Mrs. Smith, you came

13   into our center, we haven't heard from you, did you find a job

14   or things of that nature, right?

15   A.  Yes.

16            THE COURT:  Is that what was said on the call?

17            THE WITNESS:  We would confirm, we would confirm their

18   job status, their current job status, yes, or filling out the

19   EIF form, when did they start, how much are they earning and

20   that is a placement, an indirect placement towards our targets,

21   overall targets.

22   BY MR. FUTERFAS:

23   Q.  If they got a job?

24   A.  If they found a job.

25   Q.  So everyone making these re-engage meant calls has a form

F4FJUSA1                          Katz - cross

1    called EIF form, right?

2    A.  Yes.

3    Q.  If you call someone up and they say yes, I came to your

4    center, but I am still unemployed, that is not a placement,

5    right?

6    A.  Right.

7    Q.  But if you call them up and they said yeah, I did find a

8    job, I'm now working at so and so, the individual on the call,

9    the individual SEEDCO employee would take down that

10   information, right?

11   A.  Right.

12   Q.  As the court asked where the person is working, their

13   current salary, things like that, right?

14   A.  Right.

15   Q.  Because now they have a job after receiving services, they

16   can fill out an EIF and that can be recorded as a placement,

17   right?

18   A.  Right.

19   Q.  Was it understood that just by virtue of mathematics and

20   percentages, that if you called a lot more people, you would

21   end up with more placements?

22   A.  Yes.

23   Q.  This was a normal part of your business, right?

24   A.  Yes.

25             THE COURT:  Was that an objection?

F4FJUSA1                         Katz - cross

1              MR. FUTERFAS:  No, your Honor.

2              (Pause)

3              THE COURT:  What do you mean by, "normal"?

4              THE WITNESS:  Re-engagement calls were normal practice

5    within our centers.  So you follow up with job seekers or

6    anyone that came through our doors and registered.

7    BY MR. FUTERFAS:

8    Q.  There is nothing improper about that practice, is there?

9    A.  No.

10   Q.  Do you know someone named Kimberly Nesmith?

11   A.  Yes.

12   Q.  Did you fire Kimberly Nesmith?

13   A.  Yes.

14   Q.  Why did you fire Kimberly Nesmith?

15   A.  She just wasn't -- underperforming, she was just

16   underperforming.

17   Q.  Did you draft a four-or-five-page report, a termination

18   report of her firing?

19   A.  I don't remember if it was that long, but I am sure I

20   drafted justification.

21   Q.  By the way, was it hard to fire someone at SEEDCO?

22   A.  Yes, yes.

23   Q.  Why was that?

24   A.  I didn't like firing people.

25   Q.  Aside from you personally, the process, the process, there

F4FJUSA1                      Katz - cross

1   would have to be a very documented process to fire someone at

2   SEEDCO.  Is that fair?

3   A.  That's fair, yes.

4   Q.  Now, you talked yesterday about conversations within SEEDCO

5   about various practices.  Do you remember that general

6   questioning by the government?

7   A.  Yes.

8   Q.  Let me ask you this question, okay?

9          Before April 2011, and just for -- actually, let me

10  withdraw that question.

11         Do you recall that in or about April 2011, and I think

12  you testified about this yesterday, that people learned that

13  there was a whistle blower who was making claims of improper

14  practices at SEEDCO.  Do you remember that?

15  A.  Yes.

16  Q.  My question for you is this:

17         Before April 2011, did you ever have a discussion with

18  Alex Saavedra, discussion with Alex Saavedra about improper

19  placement practices at SEEDCO?

20  A.  No.

21  Q.  Let me ask you this question.

22         When you, you testified before that you left this job

23  or you were laid off this job at Alliance, and you began at

24  SEEDCO I think August 31, 2009.  Is that right?

25  A.  Yes.

F4FJUSA1                          Katz – cross

1   Q.   You had no prior experience before August 31, 2009 with

2   EIFs or CIFs or anything like that, right?

3   A.   Right.

4                (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F4fnusa2                          Katz - cross

1   Q.  So you are coming into SEEDCO having -- let me ask you

2   this.  What did you do at Alliance Capital, the job before

3   SEEDCO?

4   A.  It was human resources, recruitment, campus recruitment,

5   benefits.

6   Q.  But you wouldn't describe it as a placement-type agency,

7   would you?

8   A.  No.

9   Q.  Before that you had a different kind of employment, but,

10  again, that employment didn't involve CIF and EIFs and things

11  like that?

12  A.  Yes.

13  Q.  Is that fair?  OK.

14          You come into SEEDCO on August 31, 2009.  When you got

15  there, and you got assigned to this or hired into this

16  recruitment and placement team, when you started there, did you

17  direct people to do improper practices?

18  A.  No.

19  Q.  In fact, you got there and over a period of time you began

20  to understand that there were certain people in recruitment and

21  placement who were doing improper practices, right?

22          MS. SCHOENBERGER:  Objection.

23          THE COURT:  Sustained.

24  Q.  Let me ask you this.  Maybe I can phrase it in a

25  nonobjectionable way.

F4fnusa2                        Katz - cross

1          Did there come a time that you learned that certain

2    individuals were conducting --

3          THE COURT:  It is the same objection.

4    Q.  Did there come a time that you learned of improper

5    practices?

6          THE COURT:  It is the same objection.  It is a hearsay

7    objection.

8          MR. FUTERFAS:  Your Honor, if I may, just a personal

9    observation?

10         THE COURT:  No.

11         MR. FUTERFAS:  Your Honor, at a break or an

12   appropriate time, whatever it is, I would like to revisit the

13   objection, but I can move on.

14         THE COURT:  Just move on, Mr. Futerfas.

15         MR. FUTERFAS:  Thank you.

16         THE COURT:  Anybody can revisit anything with me at

17   any time, as long as it is not on jury time.

18         MR. FUTERFAS:  All right.

19   Q.  You testified on direct about various kinds of meetings.

20   Do you remember that yesterday?

21   A.  Yes.

22   Q.  There are the Friday staff meetings, right?

23   A.  Yes.

24   Q.  And there are manager meetings, yes?

25   A.  Correct, yes.

F4fnusa2                         Katz - cross

1    Q.  And you even talked about meetings at SBS downtown, right?

2    A.  Yes.  Over the phone SBS meetings at our center.

3    Q.  Now, let me ask you.  What were managers' meetings?

4    A.  They were center manager weekly meetings to discuss

5    activities within our areas, updates.

6    Q.  Do you recall discussing improper practices at managers'

7    meetings?

8    A.  I wouldn't use the word "improper" ever, but I described

9    like orientations at meetings and regular updates, but to say

10   this is how we are going to get improper placement, no.

11   Q.  The managers' meetings would -- do you know someone named,

12   do you remember someone who worked there named Bill Harper?

13   A.  Yes.

14   Q.  What was Bill Harper's role at SEEDCO?

15   A.  He was the strategic operations coordinator.

16   Q.  Was he at some of these managers' meetings?

17   A.  Yes.

18   Q.  Let me ask you about these Friday all-staff meetings where

19   everyone would be there.  Do you recall whether at these Friday

20   all-staff meetings improper practices were discussed?

21   A.  I wouldn't use the word improper practices, but in terms of

22   updates, yes.  But we wouldn't use the term improper

23   placements.  It was like an orientation, for example, the

24   orientation example I gave yesterday.

25   Q.  Was Bill Harper at these Friday meetings?

F4fnusa2                        Katz - cross

1    A.  Yes.

2    Q.  Do you recall --

3    A.  Can I mention -- say one more thing?

4          THE COURT:  No.  Wait for the question.

5          THE WITNESS:  OK.

6    Q.  Do you recall being deposed about this matter back in

7    October of 2014?

8          THE COURT:  "This matter" being the case?

9          MR. FUTERFAS:  Yes, your Honor.

10   A.  Yes.

11   Q.  That was testimony under oath, right?

12   A.  Yes.

13   Q.  Do you recall being asked the following question and giving

14   the following answer.

15         MS. SCHOENBERGER:  Objection.

16         THE COURT:  Objection sustained.

17   Q.  Do you recall whether you were asked at your deposition --

18         THE COURT:  No.  You have to set it up properly.  You

19   haven't.

20         MR. FUTERFAS:  All right.

21         THE COURT:  In civil cases, ladies and gentlemen,

22   there is an extensive pretrial discovery program.  Each side

23   takes depositions of various witnesses, usually of the other

24   side, documents are exchanged.  Lawyers get ready for trial in

25   that way.

F4fnusa2                         Katz – cross

1          There are rules that limit what can be done with that

2     information.  One primary purpose is to prepare the lawyers in

3     getting an extensive knowledge about the case and about what

4     witnesses would say if called at the trial.  But it is the

5     trial testimony that counts.  There are specific rules that

6     allow deposition questions and answers, but they must be

7     satisfied, for example, if they are necessary to refresh

8     recollection.  But in order to do that, you first have to ask

9     the witness about a substantive issue.  If the witness has a

10    recollection, then you don't go into the deposition.  If he

11    says I don't remember, you can refresh recollection using

12    anything, including a prior question and answer.

13         MR. FUTERFAS:  Your Honor, with that instruction, I am

14    finished.  I appreciate it.  Thank you.

15         THE COURT:  That finishes the cross-examination.

16         Let's take a little break, and then we will have any

17    redirect.  Close up your books.  Leave them on your chair.

18         (Continued on next page)

19

20

21

22

23

24

25

F4fnusa2                          Katz - cross

1              (Jury not present)

2              THE COURT:  Take ten.  The jury will come back at 20

3    after.

4              Step down and don't talk to anybody, please.

5              THE WITNESS:  OK.

6              THE COURT:  Are you going to have redirect,

7    Ms. Schoenberger.

8              MS. SCHOENBERGER:  Yes, not lengthy, your Honor.

9              THE COURT:  You have another witness ready?

10             MS. SCHOENBERGER:  We will make sure of that.

11             (Recess).

12             MS. SCHOENBERGER:  Your Honor, we have a technical

13   question.

14             THE COURT:  Yes.

15             MS. SCHOENBERGER:  There appears to be a green mark on

16   the monitors for the electronic documents, and we're wondering

17   if there is a way to clear it.

18             THE COURT:  There is a way, but if you ask me what it

19   is I can't tell you.

20             MS. SCHOENBERGER:  It sounds like the witness may have

21   touched the screen.

22             THE COURT:  Yes.  It's supposed to be an emphasis

23   mark.

24             MR. SOLOMON:  We can't clear it from here.

25             THE COURT:  You can't clear it?

F4fnusa2                    Katz – cross

1          MS. SCHOENBERGER:  It seems like not.

2          THE COURT:  During the break ask the guy in the court

3     who is supposed to know this stuff.

4          THE WITNESS:  I thought it was to move the document

5     down, your Honor, when you asked me the question.

6          MS. SCHOENBERGER:  Would it be all right if I looked

7     at the witness monitor to see if there is a clear button?

8          THE COURT:  Yes.  Go ahead.

9          Were you able to get rid of it?

10         MS. SCHOENBERGER:  No.

11         THE COURT:  Mr. Futerfas, I have you starting at 10:05

12    and finishing at 11:10.

13         MR. FUTERFAS:  As we have, your Honor.  Thank you.

14         MR. SOLOMON:  I wasn't able to find anything, your

15    Honor.  I will ask someone during the lunch break from IT.

16         THE COURT:  To get rid of that green mark?

17         MR. SOLOMON:  Yes.

18         THE COURT:  What happens if you put your hand on that

19    dot?  Nothing.  In the top right there is something that will

20    flash on various signals.  This is a highlight mark.

21         MR. SOLOMON:  That doesn't appear on my computer

22    screen.  It is on the monitor.  Nothing happens if we touch our

23    monitor.

24         THE COURT:  Is there a way that you can display all

25    the different things you can mark?

F4fnusa2                        Katz - cross

1          MS. SCHOENBERGER:  I think we can pull the document,

2     and it will have that green mark.  I don't think it's going to

3     devastate things until lunch.  We can wait until we hear from

4     IT.

5               THE COURT:  OK.  There you go.

6               MS. SCHOENBERGER:  Thank you.

7               THE COURT:  Tell everybody how you did it.

8               THE LAW CLERK:  Touching that little green line

9     expanded the thing.  It was slightly off the touch screen.

10              (Continued on next page)

F4fnusa2                          Katz - cross

1          (Jury present)

2          THE COURT:  Be seated, everyone.  Mr. Katz, you remain

3   under oath.  Ms. Schoenberger will now conduct her redirect

4   examination.

5   REDIRECT EXAMINATION

6   BY MS. SCHOENBERGER:

7   Q.  Good morning, Mr. Katz.

8   A.  Good morning.

9   Q.  Can you take a look at the exhibit that's been marked as

10  Defendant's D-4.  That's already been received into evidence.

11  If you can look at the key terms that are listed on this page

12  in the center there.

13          Do you see where it defines placement?

14  A.  Yes.

15  Q.  And it says, "Employment obtained by jobseeker customer."

16          What is a jobseeker customer?

17  A.  It is a candidate, a job candidate.

18  Q.  Next it says, after consumption of services through an SBS

19  workforce development program.  First, do you know what an SBS

20  workforce development program is?

21  A.  Yes.

22  Q.  What is that?

23  A.  They are programs within the Workforce1 Career Center, such

24  as recruitment, placement, career advisement, training program.

25  I don't remember the name of the program.

F4fnusa2                        Katz - redirect

1    Q.  What does after consumption of services mean?

2    A.  After they utilize one of the services within the

3    Workforce1 Career Center.

4    Q.  So a placement is employment obtained by a job seeker

5    customer after they have received the service at the Workforce1

6    Center, correct?

7    A.  Yes.

8    Q.  Would a placement be a job that a job seeker received

9    before receiving a service at a Workforce1 Center?

10   A.  I'm sorry.  Can you repeat, please.

11   Q.  Sure.  Would it be a placement if the job was received

12   before the job seeker received a service at the Workforce1

13   Center?

14   A.  No.

15   Q.  Was that your understanding at the time that you worked at

16   the Workforce1 Center?

17   A.  Yes.

18   Q.  You have used the phrase capture a placement.

19          What did you mean by capture a placement?

20   A.  Count a placement towards our goal.

21   Q.  Does that mean taking credit for the job?

22   A.  Yes.

23   Q.  So could SEEDCO take credit for a job that was received

24   before the job seeker received a service at the Workforce1

25   Center?

F4fnusa2                    Katz – redirect

1   A.  No.

2   Q.  In your time at SEEDCO, did SEEDCO take credit for jobs

3   that were received before people received services at

4   Workforce1 centers?

5   A.  Yes.

6   Q.  Did that happen regularly?

7   A.  Yes.

8   Q.  With respect to the key term here promotion, you do see

9   that this is described as, "An advance in either wages or hours

10  by a jobseeker customer with the same employer that occurred

11  after consumption of services through an SBS workforce

12  development program"?

13  A.  Yes.

14  Q.  Is it your understanding that that also means that the pay

15  raise has to come after services are received at the Workforce1

16  Center?

17  A.  Yes.

18  Q.  Could a promotion be counted as a placement if it was

19  received before the job seeker received a service at the

20  Workforce1 Center?

21  A.  No.

22  Q.  Is there any doubt in your mind as you sit here today that,

23  during your time at SEEDCO, SEEDCO counted job placements for

24  jobs that had not been obtained through the help of SEEDCO?

25          MR. FUTERFAS:  Objection.

F4fnusa2                        Katz - redirect

1           THE COURT:  Sustained.

2    Q.  Mr. Futerfas asked you some questions about recruitment

3    events.  Do you recall those?

4    A.  Yes.

5    Q.  Do recruitment events differ from orientation events that

6    you discussed yesterday?

7    A.  Yes.

8    Q.  In what way?

9    A.  Orientation events aren't really events.  The new-hire

10   orientations were events by the -- not even an event, excuse

11   me, were when, a new hire's first day with their new employer.

12   They already secured the job.  Where a recruitment event was

13   we're vetting candidates to see if they were appropriate for a

14   job.

15   Q.  Were there any of kinds of recruitment events?

16   A.  Yes.

17   Q.  What were the different kinds?

18   A.  Recruitment events occurred on site, like our workshops.

19   We would have a recruitment event within the center for various

20   retail positions where we can, you know, see which opportunity

21   the candidate was appropriate for.  Another recruitment event

22   would be an employer that was utilizing our services.  They

23   would host a recruitment event on site or off site at their

24   location.

25   Q.  Was there a distinction between recruitment events where an

F4fnusa2                         Katz - redirect

1   employer was present and events where an employer was not

2   present?

3   A.  Yes.  If the employer was present, and we are helping them

4   vet through candidates, they can make a decision on the spot

5   whether they were going to hire someone or not.  An event where

6   we would refer candidates to employers there is a waiting game.

7   You know, it's fingers crossed that they would actually show up

8   to the interview, that they would do well in the interview,

9   that we can get feedback from the employer or the candidate

10  whether they secured the position.

11  Q.  So at an event where the employer is not present, you

12  wouldn't know at that time whether a certain candidate had been

13  placed in the job or not, would you?

14  A.  We would not.

15  Q.  Which type of event did you conduct more frequently?  The

16  type with an employer present, or the type where employers were

17  not present?

18           MR. FUTERFAS:  Objection.

19           THE COURT:  Overruled.

20  A.  It was split.  I would say an even split.

21  Q.  Would you say it's about half and half?

22  A.  50/50.

23  Q.  You said that the Workforce1 Center advertised for these

24  events on Craigslist, is that right?

25  A.  Yes.

F4fnusa2                        Katz – redirect

1   Q.  How much would it cost to post an ad on Craigslist?

2   A.  I think it was $25 per posting at the time.

3   Q.  At recruitment events would SEEDCO staff gather information

4   about candidates' prior work history?

5   A.  Would we gather the CIF?  Yes.

6   Q.  The CIF would contain work history?

7   A.  Yes.

8   Q.  Did work history mean jobs that people received prior to

9   filling out the CIF?

10  A.  Yes.  It was positions they were currently working in prior

11  to receiving or prior to completing the CIF, yes.

12  Q.  Was that information about prior work history used to enter

13  placements into Worksource1?

14  A.  Yes.

15  Q.  Were those jobs that SEEDCO had actually helped place a

16  candidate in?

17  A.  No.

18  Q.  Would that satisfy the definition of placement that you saw

19  in Defendant's Exhibit D-4?

20  A.  No.

21              MR. FUTERFAS:  I object.

22              THE COURT:  Overruled.

23              Stand up, Mr. Futerfas, when you make an objection so

24  I can recognize it.

25              MS. BLAIN:  Mr. Solomon, you can take down Exhibit

F4fnusa2                        Katz - redirect

1    D-4.  Thank you.

2    Q.  Mr. Futerfas also asked you some questions about

3    reengagement calls.  Do you recall that?

4    A.  Yes.

5    Q.  I believe that you said that they were conducted toward the

6    end of your tenure, is that right?

7    A.  Yes.

8    Q.  Why did you say that specifically?

9    A.  Specific reengagement call events towards the end of my

10   tenure -- reengagement calls were part of the operation within

11   the center, which is fine.  Towards the end of my tenure,

12   SEEDCO staff from both centers in the Bronx and upper Manhattan

13   would gather at SEEDCO headquarters to conduct these

14   reengagement calls.

15   Q.  Why was that?

16   A.  Placements, for placements.  And we would gather at SEEDCO

17   headquarters because the centers would close at a certain time,

18   and we couldn't be in the center.

19   Q.  Do you have an understanding of why that took place more

20   toward the end of your tenure than at the beginning?

21   A.  To squeeze as many placements as we can towards our goal.

22   Q.  Do you know what was said on placement calls -- I mean,

23   pardon me, reengagement calls?

24   A.  It was, "Hi, this is Alan from Workforce1 Career Center.  I

25   understand you have received a service through our Bronx

F4fnusa2                          Katz - redirect

1    center.  Just calling as a follow-up to see if you've found a

2    position.

3            "Yes.

4            "Great, let me document that.  So when did you start?

5    How much are you earning?  No, you didn't receive -- no, you

6    are currently looking?  Please feel free to come into any one

7    of our centers in upper Manhattan or the Bronx for services.

8    We are still here."

9            But the overall goal of those calls was placements.

10           THE COURT:  Placements meaning what?  Getting a job or

11   putting --

12           THE WITNESS:  Understanding --

13           THE COURT:  Go ahead.

14           THE WITNESS:  Understanding whether they found a

15   position on their own after they received a service within our

16   center.  Because we had the reports, so if they were listed on

17   the report, then they came into the Workforce1 Center.  So

18   we're calling them.  They received a service.  Those calls were

19   to find out whether they secured a position on their own,

20   indirect placement, which was allowed and was counted towards

21   our overall placement target for the quarter or week.

22   Q.  Mr. Futerfas also asked you questions about allegations

23   that were brought forward by the whistleblower, is that right?

24   A.  Yes.

25   Q.  Yesterday you talked about a phone call where you learned

F4fnusa2                          Katz – redirect

1    about those allegations.  Do you remember that?

2    A.  Yes.

3    Q.  At the time of that call, what was your understanding of

4    what those allegations were about?

5    A.  I thought it was placements.  I wasn't exactly sure until,

6    you know, Whatever was going on in those centers needs to stop.

7    There is a whistleblower, and the accusations are placement

8    related.  So on that call I understood the severity of the

9    allegation.

10   Q.  Why did you understand the severity of the allegations?

11            MR. FUTERFAS:  Objection.

12            THE COURT:  Sustained.

13   A.  Be --

14            THE COURT:  Don't answer.

15            MS. SCHOENBERGER:  Don't answer.

16   Q.  Did you understand anything more about what was meant by

17   placement-related allegations?

18            MR. FUTERFAS:  Objection.

19            THE COURT:  Sustained as to the form.

20   Q.  What specifically did Mr. Saavedra say to you regarding the

21   allegations on that call.

22            MR. FUTERFAS:  Objection.

23            THE COURT:  Stand up, Mr. Futerfas, if you want to

24   object.  Sustained.

25            Come up.

F4fnusa2                          Katz - redirect

1            (Continued on next page)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F4fnusa2                        Katz - redirect

1              (At sidebar)

2              THE COURT:  I have a tension between two rulings.

3    Maybe you can help me.  One, is this is hearsay.  The second is

4    that Mr. Futerfas --

5              MS. SCHOENBERGER:  The party --

6              THE COURT:  Just a minute.

7              The second is Mr. Futerfas opened the door.

8              So I don't want to cut you too tight, but I don't

9    really know where the right compromise is.

10             MS. SCHOENBERGER:  I would say that anything that

11   Mr. Saavedra said to him is a party's statement, and I think

12   that is not hearsay.

13             THE COURT:  That wasn't your question.  Did you ask

14   what Mr. Saavedra said?

15             MS. SCHOENBERGER:  Yes.  That was when I rephrased the

16   question after the objection was sustained.

17             THE COURT:  Keep your voice up.

18             MS. SCHOENBERGER:  OK.

19             MR. FUTERFAS:  Your Honor, I specifically stayed away

20   entirely from the conversation between Mr. Saavedra and

21   Mr. Katz.  All I asked him, for the purpose of orientation of

22   time, was did he come to learn in April 2011 that there was a

23   whistleblower allegation.  That was the only question I asked.

24   I deliberately stayed away from the conversation between

25   Mr. Saavedra and Mr. Katz that they covered.

F4fnusa2                          Katz – redirect

1            THE COURT:  I think she can ask what that conversation

2     was.

3            MR. FUTERFAS:  Your Honor.  It was asked and answered.

4            THE COURT:  It's answered.  I ruled.

5            MS. SCHOENBERGER:  But he didn't answer it.

6            THE COURT:  I ruled.  He can answer.

7            MS. SCHOENBERGER:  OK.

8         (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F4fnusa2                        Katz - redirect

1              (In open court)

2              THE COURT:  Re-put the question, please,

3     Ms. Schoenberger.

4     Q.  Mr. Katz, what did Mr. Saavedra say to you on the call

5     regarding the allegations?

6              THE COURT:  Let's fix the time and date, please.

7     Q.  Did you have a phone call with Mr. Saavedra in April 2011?

8     A.  Yes.

9     Q.  During that call did you learn that a whistleblower had

10    come forward to make allegations?

11    A.  Yes.

12    Q.  What did Mr. Saavedra tell you regarding those allegations?

13    A.  Improper placements --

14             THE COURT:  Excuse me.  As best you can recall, tell

15    us what Mr. Saavedra said to you and what you said to him.

16             THE WITNESS:  That there was a whistleblower.

17             THE COURT:  Who said this?

18             THE WITNESS:  Alex.

19             THE COURT:  Go ahead.

20             What did he say?

21             THE WITNESS:  He said there was a whistleblower

22    regarding placements.  That is all I remember.  Whatever is

23    going on in that center needs to stop.

24             THE COURT:  Who said that?

25             THE WITNESS:  Alex.

F4fnusa2                        Katz – redirect

1              My question to him was who's the whistleblower.  And I
2    learned it was Bill Harper.  And I don't remember the rest of
3    the call.  It was relatively short.
4              MS. SCHOENBERGER:  Thank you.
5              THE WITNESS:  That's when I learned.
6    Q.  You testified yesterday when we were talking with
7    Mr. Futerfas that you and others worked hard to get people real
8    jobs, right?
9    A.  Yes.
10   Q.  Some of the job placements that your team took credit for
11   were based on real jobs, right?
12   A.  Yes.
13   Q.  Were some of them based on promotions as well?
14   A.  Yes.
15   Q.  Were some of the jobs that your team took credit for jobs
16   that SEEDCO did not get for people?
17   A.  Yes.
18   Q.  During your time at SEEDCO, did the Workforce1 center ever
19   make a green light, in other words, meet its target placement
20   goals?
21   A.  Yes.
22   Q.  When the center met its placement targets, was that based
23   only on jobs that SEEDCO helped job seekers obtain?
24   A.  No.  It was on proper placements that we've helped
25   individuals obtain and improper.  It was a mixture.

F4fnusa2                    Katz – redirect

1  Q.  To your knowledge, while you were at SEEDCO, did the

2  Workforce1 Center ever meet a placement target without using

3  false placements?

4            MR. FUTERFAS:  Objection.

5            THE COURT:  Overruled.

6  A.  When I started, I was -- I started the end of August, so it

7  was around the time the first targets were met.  So I am not

8  sure if that was legitimate or not.  But during the majority of

9  my tenure, no.  No.  Not legitimate, all the placements, no.

10            MS. SCHOENBERGER:  Thank you.  Nothing further, your

11  Honor.

12            THE COURT:  OK.

13            MR. FUTERFAS:  If I may have a moment.

14            (Defense counsel conferred)

15            MR. FUTERFAS:  Nothing from the defense, your Honor.

16            THE COURT:  You are excused, Mr. Katz.

17            THE WITNESS:  Thank you.

18            (Witness excused)

19            THE COURT:  Next witness.

20            MS. BLAIN:  Your Honor, the government calls Ana

21  Yatiz-Bryant.

22   ANA YATIZ-BRYANT,

23       called as a witness by the Plaintiff,

24       having been duly sworn, testified as follows:

25  DIRECT EXAMINATION

F4fnusa2                          Yatiz–Bryant – direct

1   BY MS. BLAIN:

2            THE COURT:  Ms. Blain, you may inquire.

3            MS. BLAIN:  Thank you, your Honor.

4   Q.  Good morning, Mrs. Bryant.

5   A.  Good morning.

6   Q.  Mrs. Bryant, can you please tell the jury your name again.

7   A.  Ana Yatiz–Bryant.

8   Q.  Did you ever go by the name Ana Marchany?

9   A.  Yes.

10           THE COURT:  I need you to keep your voice up.  Lean

11  forward and speak loudly.

12  Q.  Maybe if I ask the witness to move your microphone slightly

13  closer to your body.  Why do you know go by the name of Ana

14  Yatiz–Bryant?

15  A.  I got married.

16  Q.  Mrs. Bryant, are you currently employed?

17  A.  Yes.

18  Q.  Where do you currently work?

19  A.  Lantern Group.

20  Q.  What is Lantern Group?

21  A.  They provide supportive housing for people with

22  disabilities.

23  Q.  What is your position at Lantern Group?

24  A.  Leasing and compliance.

25  Q.  I'm sorry?

F4fnusa2                          Yatiz-Bryant - direct

1   A.  Leasing and compliance.

2   Q.  Mrs. Bryant, did you ever work at an organization called

3   SEEDCO?

4   A.  Yes.

5   Q.  When did you work at SEEDCO?

6   A.  I believe in 2008.

7   Q.  That is when you started at SEEDCO?

8   A.  Yes.

9   Q.  What positions did you have at SEEDCO?

10  A.  I was the front desk greeter and then operations assistant.

11  Q.  When you started at SEEDCO, at which SEEDCO location did

12  you work?

13  A.  Upper Manhattan.

14  Q.  Was that a Workforce1 Center?

15  A.  Yes.

16  Q.  At your time at SEEDCO, did you always work at the upper

17  Manhattan Workforce1 Center?

18  A.  No, they moved me to the Bronx center.

19  Q.  When did you move to the Bronx center?

20  A.  I think it was 2011 when they first got the center.

21          THE COURT:  Is the jury hearing Ms. Bryant?

22          JURORS:  Yes.

23          THE COURT:  OK.

24  Q.  Now let's focus on the time that you worked at the front

25  desk.  When you worked at the front desk, did you know Alex

F4fnusa2                         Yatiz-Bryant - direct

1   Saavedra?

2   A.  Yes.

3   Q.  Were you familiar with his role?

4   A.  Yes.

5   Q.  What was Alex Saavedra's role at the Workforce1 Center when

6   you worked at the front desk?

7   A.  He was the director.

8   Q.  What were your job responsibilities when you worked at the

9   front desk?

10  A.  Greeted the customers when they came in, asked them what

11  they were there for and directed them in the right direction.

12  Q.  When you worked at the front desk, did you become familiar

13  with the term CIF?

14  A.  Yes.

15  Q.  How did you become familiar with a CIF?

16  A.  When the customers came to the center, we had to give them

17  the CIF form at the front desk so that they can complete it at

18  orientation.

19  Q.  What is a CIF?

20  A.  A customer information form.

21  Q.  Are you familiar with the information on a customer

22  information form?

23  A.  Yes.

24  Q.  What information is contained on a customer information

25  form?

F4fnusa2                      Yatiz–Bryant – direct

1   A.  The customer's name, address, date of birth, Social

2   Security number, work history, and what they were at the center

3   for.

4   Q.  Do you know who fills out a CIF?

5   A.  A customer.

6   Q.  Mrs. Bryant, if I can please direct your attention to

7   Exhibit 57.  You should have 57 in that second binder in front

8   of you, I believe.

9        MS. BLAIN:  Your Honor, this has been received into

10   evidence.

11        May I publish it to the jury?

12        THE COURT:  You may.

13   Q.  Do you have Exhibit 57 in front of you?

14   A.  Yes.

15   Q.  What is Exhibit 57?

16   A.  A CIF form.

17   Q.  What is the name of the job seeker that appears on the CIF?

18   A.  Amy Bursor.

19   Q.  And if you could turn to the second page, please.  What

20   does the date on the bottom of this document represent?

21   A.  The date that they came for the orientation.

22   Q.  So what date appears on the bottom of this document?

23   A.  January 24, 2011.

24   Q.  What does this person do as reflected in the CIF?

25   A.  Currently working as a bartender.

F4fnusa2                        Yatiz–Bryant – direct

1   Q.  So this person is currently working?

2   A.  Yes.

3   Q.  Would this person be currently working when this person

4   filled out the CIF?

5   A.  Yes.

6   Q.  Where does this document say the person is currently

7   working?

8   A.  The third column on the right, where it says currently

9   employed.

10  Q.  Do you know at what employer this person works?

11  A.  It says Broadway East.

12  Q.  When did this person start that job at Broadway East as

13  reflected on this form?

14  A.  September 2009.

15  Q.  So did this person have this job at Broadway East before

16  going to SEEDCO?

17  A.  Yes.

18  Q.  How do you know that?

19  A.  The job start date is before the date they signed the CIF

20  form.

21  Q.  Mrs. Bryant, are you familiar with the term "placement"?

22  A.  Yes.

23  Q.  What do you understand a placement to mean?

24  A.  When a customer got a job after receiving services at the

25  Workforce1 Center.

F4fnusa2                          Yatiz-Bryant – direct

1   Q.  So, under normal circumstances, would Mrs. Bursor's job

2   here at Broadway East count as a placement by SEEDCO?

3   A.  It shouldn't be.

4   Q.  Why do you say it shouldn't be?

5   A.  Because she was working already.

6   Q.  Do you know what department at SEEDCO was responsible for

7   processing the information on CIFs?

8   A.  The intake department.

9   Q.  Do you know what the intake department would do with the

10  information on CIFs?

11  A.  Place this information into the computer system.

12  Q.  Do you know what that computer system was called?

13  A.  Worksource1.

14  Q.  Are you familiar, or at the time that you worked at SEEDCO,

15  were you familiar with Worksource1?

16  A.  Yes.

17  Q.  What did you understand Worksource1 to be?

18  A.  Just like an online database of all our customers.

19  Q.  After you worked at the front desk, what was your next

20  position?

21  A.  Operations assistant.

22          MS. BLAIN:  Mr. Solomon you can take down Exhibit 57.

23  Thank you.

24  Q.  In what department were you an operations assistant?

25  A.  Recruitment and placement.

1   Q.  When you first joined recruitment and placement, who did

2   you report to?

3   A.  Joel Donawal.

4   Q.  Do you know who Mr. Donawal reported to?

5   A.  Alex Saavedra.

6   Q.  Were you familiar with Mr. Saavedra's role at that time?

7   A.  He was still the director.

8   Q.  Did you always report to Mr. Donawal when you were in the

9   recruitment and placement department?

10  A.  No.  Mr. Donawal left.

11  Q.  Who was the next person you reported to?

12  A.  Alan Katz.

13  Q.  Do you recall when you started reporting to Alan Katz?

14  A.  No.

15  Q.  What were your job responsibilities when you joined the

16  recruitment and placement team as an operations assistant?

17  A.  First, I was just, you know, helping the recruitment and

18  placement team with whatever they needed help with entering

19  placements into the system.

20          I did the orientation.  At one point they changed like

21  who was doing the orientation from the intake department, so I

22  did it for a little while.

23  Q.  When you said you entered placements into the system, what

24  did you mean?

25  A.  Data entry of placements.

F4fnusa2                          Yatiz-Bryant - direct

1    Q.  How did you enter placements?

2    A.  There was an EIF form which stated the customer's name,

3    information, their job placement information, so we would just

4    enter it into Worksource1.

5    Q.  I believe you said EIF, is that right?

6    A.  Yes.

7    Q.  What is an EIF?

8    A.  Employment information form.

9    Q.  Are you familiar with the information that would be

10   contained on an EIF?

11   A.  Yes.

12   Q.  Can you tell the jury again what information was on an EIF.

13   A.  The customer's name, some identifying information, like the

14   last four digits of the social or date of birth, and what job

15   they received, the title, the job start date.

16   Q.  How is an EIF different than a CIF?

17   A.  The EIF was given, was submitted when a placement was

18   claimed, and a CIF was given when the customer first walks into

19   the center.

20   Q.  So who fills out an EIF?

21   A.  Staff.

22   Q.  Not a job seeker?

23   A.  No.

24   Q.  Under ordinary circumstances, would the date that a person

25   got a job as reflected on an EIF be after the date that the

F4fnusa2                              Yatiz-Bryant - direct

1   person first went to Workforce1 for help?

2   A.  Yes.

3   Q.  After a SEEDCO staff member fills out an EIF, where would

4   that document go?

5   A.  To the recruitment and placement team.

6   Q.  And that would include you?

7   A.  Yes.

8   Q.  And then what would you do with that document, the EIF?

9   A.  Enter it into the computer.

10  Q.  When you started as an operations assistant, did you get

11  any training on how to enter that information into the

12  computer?

13  A.  No.  It was pretty straightforward.  The EIF paper was the

14  same as in the computer.

15  Q.  What do you mean by the same as in the computer?

16  A.  The same information.  So the EIF would say customer's

17  name, you would type in the customer's name; the title, you

18  would type in the title; start date, type in the start date.

19  Q.  Was recording this information a significant part of your

20  job when you were an operations assistant?

21  A.  Yes.

22  Q.  When you were an operations assistant, did you always

23  accurately enter the information contained on an EIF into

24  Worksource1?

25  A.  No.

F4fnusa2                    Yatiz-Bryant - direct

1  Q.  What information did you not accurately enter?

2  A.  We were instructed to play with the start dates and make

3  sure it looked correct in the system.  We were told to, if a

4  customer was working already when they walked in, to enter it

5  into the system.  And if a customer was, came to the, came and

6  was working within the last couple of months to enter it into

7  the system.

8  Q.  When you say play with the start date, what do you mean?

9  A.  So, a customer that came in already working, the start date

10  would be before the date the customer came to the center.  So

11  we had to put a date that was after the date that the customer

12  came in so it wasn't really the date the customer started

13  working.

14  Q.  Mrs. Bryant, if I can direct your attention to Exhibit 57

15  again, and the second page of that.

16      MS. BLAIN:  You can publish it.

17  Q.  If you received information about this job seeker -- we've

18  seen the CIF before, right?

19  A.  Yes.

20  Q.  If you received --

21      THE COURT:  What is the exhibit number again?

22      MS. BLAIN:  Exhibit 57, your Honor.

23  Q.  If you received information about this customer who was

24  currently working at Broadway East, what information, if any,

25  would you change into the Worksource1 system?

1   A.  The job start date.

2   Q.  Would you make the job start date come before January 24,

3   2011 or after?

4   A.  After.

5   Q.  What was the purpose of doing that?

6   A.  To make it look right in the system.

7   Q.  How often did you change the start date from an EIF into

8   the system?

9   A.  A lot.

10  Q.  Can you estimate how much a lot is?

11  A.  Maybe 50 percent of the time.

12  Q.  Please turn to tab 10 in your binder, which is the other

13  binder on your table.

14          MS. BLAIN:  Your Honor, this has already been received

15  into evidence.  May I publish it?

16          THE COURT:  What is the number?

17          MS. BLAIN:  Exhibit 10.

18          THE COURT:  Yes, you may.

19          MS. BLAIN:  Thank you very much.

20  Q.  Mrs. Bryant, do you recognize this to be an e-mail string?

21  A.  Yes.

22  Q.  Did you receive this e-mail string?

23  A.  Yes.

24  Q.  On what date did you receive this e-mail string?

25  A.  April 15, 2010.

1    Q.  Did this e-mail string to you contain three e-mails?

2    A.  Yes.

3    Q.  What is the subject line of this e-mail?

4    A.  Indirect placements -- CIF.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F4FJUSA3                          Bryant - direct

1   Q.  Please focus on the e-mail on the bottom of the page.  Who

2   sent the e-mail at the bottom of the page?

3   A.  Alan Katz.

4   Q.  Who is Mr. Katz at this time?

5   A.  He was the supervisor of Recruitment & Placement.

6   Q.  Was he your supervisor?

7   A.  Yes.

8   Q.  He sends this to someone named Monique Tarry.  Is that

9   right?

10  A.  Yes.

11  Q.  Did you have an understanding who Monique Tarry at the

12  time?

13  A.  Yes.

14  Q.  Who was she?

15  A.  She was the supervisor of intake.

16  Q.  Please read, if you would, to the jury the second sentence

17  of this bottom paragraph starting with, "We shouldn't enter."

18  A.  "We shouldn't enter CIF, the CIF into Work Source as we

19  cannot capture the placement once the work history is

20  inputted."

21  Q.  Did you have an understanding at the time as to who the

22  "we" referred to in this sentence?

23  A.  Staff.

24  Q.  Particularly what staff?

25  A.  Intake.

1  Q.  Did you have an understanding at the time of what, "We

2  shouldn't enter the CIF to the WS" meant?

3  A.  Yes.

4  Q.  What does that mean?

5  A.  That the CIF shouldn't be entered into Work Source.

6  Q.  Did you have an understanding at the time as to what

7  information on the CIF shouldn't be entered into Work Source?

8  A.  The work history.

9  Q.  If we can quickly turn back to Exhibit 57.  So to flip

10  between your binders, Mrs. Bryant.

11  A.  (Pause)

12  Q.  And the second page, can you identify where the work

13  history is on this document that should not be, "should not be

14  entered into Work Source"?

15  A.  Section D, No. 5.

16          MS. BLAIN:  Would you highlight that, please, Mr.

17  Solomon, Section D.

18  BY MS. BLAIN:

19  Q.  Is this the information that you understand Mr. Katz is

20  directing the intake team not to enter into Work Source?

21  A.  Yes.

22  Q.  Flip back to the e-mail which is Exhibit 10.  Again focus

23  on that bottom e-mail, when Mr. Katz writes, "We shouldn't

24  enter the CIF into WS as we cannot capture the placement once

25  the work history is inputted."

1           Did you have an understanding at the time as to what

2     we cannot capture the placement meant?

3     A.  Yes, we can't put it in as a placement.

4     Q.  Why was that?

5     A.  Because if it was put in as work history, you can't,

6     couldn't be counted as a placement.

7     Q.  If we can focus on the second e-mail on the page which is

8     in the middle, if you could read to the jury the first sentence

9     of this e-mail.

10    A.  "I spoke to Ana and Giselle about this.  As far as I know,

11    there were only a few EIFs submitted where staff forgot to not

12    enter work history."

13    Q.  Who sent this e-mail?

14    A.  Monique Tarry.

15    Q.  Who did she end it to?

16    A.  Alex Katz.

17    Q.  Again Monique Tarry was the supervisor of intake?

18    A.  Yes.

19    Q.  Did you have an understanding at the time what she meant

20    when she wrote, "As far as I know, there were only a few EIFs

21    submitted"?

22    A.  That they only submitted a few EIF forms to Recruitment &

23    Placement where the staff forgot to enter work history.

24    Q.  Did you have an understanding at the time whether the

25    intake department was filling out EIFs as well as receiving

F4FJUSA3                          Bryant - direct

1    information from CIFs?

2    A.  Yes.

3    Q.  What was that understanding?

4    A.  If someone came in with a work history, they would fill

5    out -- enter the CIF as well as submit an EIF for placement.

6            We also were instructed to do re-engagement phone

7    calls, so anyone at the center, including intake, would be

8    filling out the EIF forms.

9    Q.  Once intake filled out an EIF with the job seeker's

10   information, what would intake do with that EIF?

11   A.  Bring it to recruitment.

12   Q.  What would you do with that EIF?

13   A.  Enter it into the system.

14   Q.  To the best of your understanding, did EIF sometime contain

15   the work history that was on Part D of that CIF?

16   A.  Yes.

17   Q.  And then Recruitment & Placement, would you enter Part D of

18   that CIF into Work Source1 as a SEEDCO placement?

19   A.  Yes.

20   Q.  In the normal course, would the Recruitment & Placement

21   team have any of these that have CIFs?

22   A.  They shouldn't have.

23   Q.  Why do you say they shouldn't?

24   A.  Because that was intake's document basically.

25   Q.  Could placements in the normal course, could placements be

1   recorded based on the information job seekers gave in a CIF?

2   A.  It shouldn't happen.

3   Q.  Do you know if it actually was?

4   A.  Yes.

5   Q.  Do you have an understanding as to whether you ever entered

6   a person's current employment as having been obtained by

7   SEEDCO?

8   A.  Now I believe I did, yes.

9   Q.  Did you have an understanding at the time?

10  A.  Not really.  I mean the e-mails came, so yes.

11  Q.  What do you mean, "yes"?

12  A.  Yes, we knew because the e-mails directed us basically to

13  do it.

14  Q.  When you changed a job seeker's start date, were you

15  requesting that SEEDCO get credit for that person's job?

16  A.  Can you repeat that.

17  Q.  When you made a job seeker's start date come after the time

18  the person went to Work Source, were you, therefore, requesting

19  that SEEDCO got credit for that job?

20  A.  Yes.

21  Q.  At the time did you know that that person got the job

22  before going to SEEDCO?

23  A.  If it was on the EIF form, there really was no way of

24  telling unless someone told us that it was because the EIF,

25  there wasn't like a verifying -- there was no way to verify a

F4FJUSA3                      Bryant - direct

1    job placement.  We didn't have to call the employers.  We just

2    were entering what was on the EIF form.  So unless we saw the

3    CIF form, we really didn't know.

4    Q.  How did you know what date to back-date the start date?

5    A.  You would look at the services and you will see like the

6    date that it was entered into Work Source1, so you would enter

7    a date after that.

8    Q.  I am sorry.

9            So how did you know what date to make the person's

10   start date?

11   A.  To make it active the date the CIF was entered.

12           THE COURT:  Any date?

13           THE WITNESS:  Yes.

14           THE COURT:  Any date afterwards?

15           THE WITNESS:  Yes.

16           THE COURT:  You picked them?

17           THE WITNESS:  Yes.

18   BY MS. BLAIN:

19   Q.  So why did you enter this inaccurate information into Work

20   Source1?

21   A.  We were directed to do it.

22   Q.  Who directed you to do it?

23   A.  Alan Katz.

24   Q.  How often did Mr. Katz tell you to enter false entries?

25   A.  Like verbally?

F4FJUSA3                          Bryant - direct

1    Q.  What was your understanding about what he told you to do?

2    A.  To enter, just make it look right in the system.

3    Q.  How often did he tell you to do that?

4    A.  Probably a couple of times, and then it just was the common

5    practice.

6    Q.  Was the practice of gathering false placements discussed in

7    meetings?

8    A.  Yes.

9    Q.  Which meetings was it discussed in?

10   A.  Staff meetings.

11   Q.  What do you mean by, "staff meetings"?

12   A.  There would be all-staff meetings and team meetings.

13   Q.  What do you recall hearing in those all-staff meetings

14   about improper placements?

15   A.  They would tell the staff if anyone comes across customers

16   that are working, to submit it into the Recruitment & Placement

17   team.

18   Q.  Do you recall if Mr. Saavedra attended these meetings?

19   A.  Yes.

20   Q.  How often do you recall Mr. Saavedra attending these

21   meetings?

22   A.  Pretty often.  We were mandated to go to the meetings.  We

23   were threatened with a write-up if staff wasn't there.  So for

24   the most part all staff was always at the meetings.

25   Q.  When Mr. Saavedra attended these meetings, was he the

F4FJUSA3                          Bryant - direct

1   highest level manager at these meetings?

2   A.  Yes.

3   Q.  Did he ever run these meetings?

4   A.  Yes.

5   Q.  Was entering false placements into Work Source1 also

6   discussed in Recruitment & Placement meetings?

7   A.  Yes.

8   Q.  Who participated in those Recruitment & Placement meetings?

9   A.  The Recruitment & Placement team.

10  Q.  Do you recall if Mr. Saavedra ever attended these meetings?

11  A.  I am not too sure.

12  Q.  Would you please turn to Exhibit 70 in your binder.

13  A.  70?

14  Q.  Yes, 7-0.  It should be all the way towards the back.

15          THE COURT:  This has not been offered yet?

16          MS. BLAIN:  Correct, your Honor.

17  BY MS. BLAIN:

18  Q.  Mrs. Bryant, do you have Exhibit 70 in front of you?

19  A.  Yes.

20  Q.  What is this document?

21  A.  An e-mail.

22  Q.  Did you receive and send this e-mail string as part of your

23  job at SEEDCO?

24  A.  Yes.

25  Q.  What is the date of this e-mail?

F4FJUSA3                          Bryant - direct

1    A.  January 19th, 2011.

2          MS. BLAIN:  Your Honor, the United States offers

3    Government Exhibit 70 into evidence.

4          MR. FUTERFAS:  No objection.

5          THE COURT:  Received.

6          (Government Exhibit 70 received in evidence)

7          THE COURT:  You may publish it.

8    BY MS. BLAIN:

9    Q.  Mrs. Bryant, this is an e-mail string between you and

10   Rosanna Lam?

11   A.  Yes.

12   Q.  Who is Rosanna Lam?

13   A.  She worked on the intake team.

14   Q.  At what SEEDCO location were you working at the time?

15   A.  The Bronx.

16   Q.  What is the subject line of this e-mail?

17   A.  "Regarding walk-in CIFs who are currently employed."

18   Q.  Mrs. Bryant, if you can read to the jury, focusing on this

19   bottom e-mail, the bottom of the page, the first sentence.

20   A.  "I just wanted to make sure I'm entering appropriate fields

21   for the customers that checked that they are currently

22   employed."

23   Q.  Did you have an understanding what she meant when she

24   wrote, "appropriate fields"?

25   A.  Yes.

F4FJUSA3                        Bryant - direct

1    Q.   What did she mean?

2    A.   The work history part of the CIF.

3    Q.   Did you have an understanding what she meant when she

4    wrote, "I'm entering appropriate fields for the customers that

5    checked they're currently employed"?

6    A.   Yes.

7    Q.   What did you understand that to mean?

8    A.   She wanted to know the right information to put into Work

9    Source for the customers that came into the center working.

10   Q.   Can you read, please, to the jury the next sentence.

11   A.   So far I've entered everything as-is from the CIF,

12   including the customer is employed.

13   Q.   Did you have an understanding as to what she meant when she

14   wrote so far I've entered everything as is from the CIF?

15   A.   Yes, she entered everything that was written on the CIF.

16   Q.   When she says, "Including that the customer's employed," do

17   you have an understanding what that meant?

18   A.   That she clicked the customer was currently employed in the

19   system.

20   Q.   Can you read to the jury the next sentence, please.

21   A.   "As per Deborah's request, I'm not entering the current job

22   info during the work history tab."

23   Q.   When she wrote, "I am not entering the current job info,"

24   what did you understand her to mean?

25   A.   That she is not inputting the customer's current job

1    information.

2    Q.  Would that be reflected in Section D of the CIF?

3    A.  Yes.

4    Q.  The same sort of Section D that you've seen?

5    A.  Yes.

6    Q.  Can you read to the jury the next sentence, please.

7    A.  "Let me know if there's anything that needs to be done

8    differently."

9    Q.  Do you have an understanding what she meant?

10   A.  She is asking if she is doing it correctly.

11   Q.  Can you please focus on your response.  Can you read to the

12   jury the first sentence of your response to her.

13   A.  "If the customer is currently working, we should not mark

14   'currently employed' when entering the CIFs."

15   Q.  What did you mean when you wrote, "We should not mark

16   currently employed when entering the CIFs"?

17   A.  That we shouldn't put that the customer is currently

18   working.

19   Q.  We should not put that where?

20   A.  In Work Source1.

21   Q.  Can you please read the next sentence.

22   A.  "That may raise a red flag when we enter the placement

23   information."

24   Q.  What do you mean, that that may raise a red flag?

25   A.  I meant if the customer came in working, it needed to be

1   put in as work history.  It wouldn't be counted as a placement.

2   Q.  Why wouldn't it be counted as a placement?

3   A.  Because it will be in work history.

4   Q.  Could you go back into the system once work history was

5   inputted by intake?  Let me rephrase that question.

6          Could you go back into that system and exchange the

7   work history once work history was entered by intake?

8   A.  I don't think so.  I am not sure.

9   Q.  Once work history was entered by intake into Work Source1,

10  that is the way it appeared in Work Source1?

11  A.  Yes.

12  Q.  Can you please read the next sentence.

13  A.  "Please mark them as unemployed."

14  Q.  What did you mean by that?

15  A.  That she should have checked they weren't working when they

16  came into the center.

17  Q.  Where should she check they're not working?

18  A.  In Work Source1.

19  Q.  As a result of this, what were you instructing her to do?

20  A.  Put that the customer wasn't working in the system.

21  Q.  Even if the customer was working?

22  A.  Yes.

23  Q.  Can you read the next sentence, please.

24  A.  "Also I will need a copy of the CIFs for the customers that

25  are currently working so I may capture that information."

F4FJUSA3                         Bryant - direct

1    Q.  When you wrote "capture that information," what did you

2    mean?

3    A.  Enter it as a placement.

4    Q.  As a result of intake not entering a job -- withdrawn.

5            As a result of intake not entering a customer's

6    current job, would you then use that person's current job as a

7    SEEDCO placement?

8    A.  Yes.

9    Q.  Even though that person got the job before going to SEEDCO?

10   A.  Yes.

11   Q.  If you could turn, please, to Tab 5 in that same binder.

12   A.  In the other one?

13   Q.  It will be in the front.

14           MS. BLAIN:  This has not yet been received, your

15   Honor.

16           THE COURT:  What is the number?

17           MS. BLAIN:  Exhibit 5.

18   BY MS. BLAIN:

19   Q.  Do you have Exhibit 5 in front of you, Mrs. Bryant?

20   A.  Yes.

21   Q.  What is this document?

22   A.  An e-mail.

23   Q.  Are you copied on this e-mail string?

24   A.  Yes.

25   Q.  What date is this e-mail string?

F4FJUSA3                          Bryant - direct

1    A.  April 7th, 2011.

2    Q.  Did you receive and send this e-mail string as part of your

3    job at SEEDCO in 2011?

4    A.  Yes.

5              MS. BLAIN:  Your Honor, we offer Exhibit 5 in

6    evidence.

7              MR. FUTERFAS:  No objection.

8              THE COURT:  Received.

9              (Government Exhibit 5 received in evidence)

10   BY MS. BLAIN:

11   Q.  If you could please focus on the second to, the e-mail the

12   second from the top.  It is from Alan Katz.  Again what is the

13   date of this e-mail?

14   A.  April 7th, 2011.

15   Q.  Who did Mr. Katz send this e-mail to?

16   A.  Tage Chandarpaul, Andy Marmolejos and myself.

17             THE COURT:  Please keep your voice up.

18   BY MS. BLAIN:

19   Q.  Who is Tage Chandarpaul at this time?

20   A.  She was the director of the Bronx center.

21   Q.  Do you know who she reported to?

22   A.  Alex Saavedra.

23   Q.  Who is Andy Marmolejos at this time?

24   A.  He was the community-based liaison.

25   Q.  Do you know to whom he reported at the time?

F4FJUSA3                         Bryant - direct

1   A.  I believe Alex Saavedra.

2   Q.  Can you read to the jury what Mr. Katz writes in this

3   e-mail.

4   A.  Can you repeat that?

5   Q.  Can you read to the jury what Mr. Katz writes in this

6   e-mail.

7   A.  "Ana, correct me if I'm wrong, but they're entering the

8   CIFs minus the work history for us to capture the placement

9   without any backlash from SBS, right?"

10  Q.  Did you have an understanding as to what Mr. Katz meant

11  when he said they're entering the CIFs?  Who is "they"?

12  A.  Intake.

13  Q.  Did you have any understanding at the time what he meant

14  when he wrote, "they're entering the CIFs minus the work

15  history"?

16  A.  Yes, the intake wasn't going to put the work history from

17  the CIF.

18  Q.  What did you understand him to mean when he wrote they are

19  entering the CIFs --

20          MS. BLAIN:  I am sorry, your Honor.  I am trying to

21  make this have no feedback.

22          THE COURT:  I need you to keep your voice up.  That is

23  the basic point.

24          MS. BLAIN:  My voice?

25          THE COURT:  Your voice and the witness's voice.

1              MS. BLAIN:  Okay.

2     BY MS. BLAIN:

3     Q.  Again focusing on this e-mail, Mrs. Bryant, what did you

4     understand him to mean when he wrote they're entering the CIFs

5     minus the work history for us to capture the placement?

6     A.  That intake was entering the CIFs without the work history.

7     Q.  What did you understand him to mean when he wrote, "without

8     any backlash from SBS"?

9     A.  That we wouldn't get in trouble.

10    Q.  Why would you have gotten in trouble?

11    A.  Because if a customer came in working, they should have

12    been put in as work history.

13    Q.  How did you respond to Mr. Katz?

14    A.  "Correct."

15    Q.  If you can please turn to Exhibit 3 in your binder, Tab 3.

16    What is this document?

17    A.  An e-mail.

18    Q.  Did you receive this e-mail as part of your job at SEEDCO?

19    A.  Yes.

20    Q.  What is the date of this e-mail?

21    A.  January 15th, 2009.

22              MS. BLAIN:  Your Honor, the United States offers

23    Government Exhibit 3 into evidence.

24              MR. FUTERFAS:  No objection.

25              THE COURT:  Received.

F4FJUSA3                          Bryant - direct

1              (Government Exhibit 3 received in evidence)

2              THE COURT:  It may be published.

3    BY MS. BLAIN:

4    Q.  Mrs. Bryant, is this the top e-mail an e-mail from Alex

5    Saavedra?

6    A.  Yes.

7    Q.  He sent it to staff WF1 CC.  Is that right?

8    A.  Yes.

9    Q.  Who is included in the staff WF1 CC?

10   A.  Everyone who worked at the Workforce1 Center.

11   Q.  Would that include you?

12   A.  Yes.

13   Q.  Can you please read the first paragraph of his e-mail.

14   A.  "We won't have a lot of time to get on track.  We'll brief

15   everyone on our quarterly face-to-face.  Placements is the

16   biggest problem, mainly our percentage of fulfillment."

17   Q.  Did you have any understanding as to what he meant when he

18   wrote placements is the biggest problem?

19   A.  That we haven't captured enough.

20   Q.  Can you please read the next paragraph to the jury.

21   A.  "I would like for everyone to double their efforts to gain

22   indirect placements as the R/P team is digging in to build a

23   decent quarter."

24   Q.  Did you understand what the R/P team meant?

25   A.  Yes.

F4FJUSA3                          Bryant - direct

1    Q.  What did that mean?

2    A.  Recruitment & Placement.

3    Q.  Mrs. Bryant, when did you stop working at SEEDCO?

4    A.  October 2011.

5    Q.  Do you have an understanding as to why you stopped working

6    at SEEDCO?

7    A.  They terminated me due to the investigation.

8    Q.  What investigation are you referring to?

9    A.  The investigation into false placements.

10          MS. BLAIN:  Thank you very much.

11          THE COURT:  Did you conclude your questioning?  Have

12   you concluded your questioning?

13          MS. BLAIN:  Yes, your Honor, I have.

14          THE COURT:  Cross-examination, Mr. Futerfas.

15          MR. FUTERFAS:  Thank you, your Honor.  May I inquire?

16          If the government can leave up, if possible, what they

17   just had up which was Government Exhibit 3.

18          THE COURT:  Yes, leave it up.

19   CROSS-EXAMINATION

20   BY MR. FUTERFAS:

21   Q.  Ms. Bryant, good afternoon.

22   A.  Good afternoon.

23   Q.  Let me direct your attention to the third paragraph in that

24   e-mail on Government Exhibit 3.  That is actually underlined.

25   Could you read those words, please, to the jury.

F4FJUSA3                          Bryant - cross

1   A.  "I'd like to start early this quarter to ask for volunteers

2   who can spend an extra hour or two."

3   Q.  Do you have an understanding what that was referring to?

4   A.  Yes.

5   Q.  What is that?

6   A.  Re-engagement calls.

7   Q.  What is a re-engagement call?

8   A.  Re-engagement calls is when we would get a list of

9   customers, and we would have to stay after 5:00 o'clock to call

10  them to see if they got a job.

11  Q.  What was the purpose of doing re-engagement calls?

12  A.  To find placements.

13  Q.  How would you find placements?

14  A.  You would call the customer.

15  Q.  Now, the customer you're calling, did you get a list of

16  customers?

17  A.  Yes.

18  Q.  Do you know who generated the list?

19  A.  Mr. Harper or Denise, I am not sure.  We would just get a

20  list.

21  Q.  Was that list generated from people who had registered with

22  the center?

23  A.  Yes.

24  Q.  Would that list have the individual's names and phone

25  numbers and things like that?

1    A.   Yes.

2    Q.   Could you tell us what a typical re-engagement call would

3    sound like?

4    A.   "Hi, this is Ana calling from the Upper Manhattan Workforce

5    Source Center.  I notice you came to a recruitment event.  I

6    just wanted to know if you got a job."

7    Q.   If the individual said they hadn't received a job, what

8    would you say then?

9    A.   If they hadn't received a job?

10   Q.   Yes, if they hadn't gotten a job yet?

11   A.   We would offer for them to come back to use services.

12   Q.   If they did get a job, what would you do?

13   A.   We would try to fill out a CIF form with them.

14   Q.   A CIF or EIF?

15   A.   Sorry.  EIF form.

16   Q.   That is not -- the EIF form, we have seen CIFs on the

17   screen, right?

18   A.   Yes.

19   Q.   Those are not EIF forms?  EIF is something different?

20   A.   Correct.

21   Q.   Would all the people making these re-engagement calls have

22   EIF forms?

23   A.   Yes.

24   Q.   In case the person you called did happen to get a job?

25   A.   Yes.

 1   Q.  Let's go through the script a little bit.

 2            That if you're on the phone with this job seeker and

 3   they say to you yes, I have gotten a job, how would that

 4   conversation go?

 5   A.  I would say something like oh, that's great.  Where are you

 6   working?  And if they answer, I'll say, you know, what is your

 7   title?  What locations do you work?  When did you start?

 8   Q.  From that information would you write that information down

 9   on an EIF form?

10   A.  Yes.

11   Q.  And then when you said goodbye to the customer and hung up,

12   what would you then do with the form?

13   A.  We would leave it for the next day to enter.

14   Q.  So they would take that, the information on that form and

15   enter it.  When you say "enter it," that is into the Workforce1

16   Center?

17   A.  Yes.

18   Q.  That is a placement entered into the Workforce1 system?

19   A.  Yes.

20   Q.  It is a placement because the individuals who are on that

21   call list had come into Work Source1 and filled out a CIF at

22   some point, right?

23   A.  Yes.

24   Q.  After filling out that CIF, you're now calling to see if

25   they got a job.  If they got a job, you can then enter it as a

F4FJUSA3                          Bryant - cross

1   placement?

2   A.  Yes.

3   Q.  How often were you and others told to do the re-engagement

4   calls?

5   A.  I believe it was once or twice a week.  I am not too -- I

6   don't remember too well.

7   Q.  It was pretty regular?

8   A.  Yes.

9   Q.  I noticed that this particular government exhibit is dated

10  January 2009.

11  A.  Yes.

12  Q.  Right?

13          So certainly as of January 2009 you were doing

14  re-engagement calls, right?

15  A.  Yes.

16  Q.  Was that consistent from the time you started at Workforce1

17  through the time you left SEEDCO?

18  A.  Yes.

19  Q.  Were there some times that re-engagement call events, like

20  they would ask people to come to corporate headquarters at 915

21  Broadway and spend even a weekend day doing re-engagement

22  calls?

23  A.  They did, yes.  I didn't go to 915 Broadway.

24  Q.  You had done enough of them during the week, right?

25  A.  Yeah.

F4FJUSA3                        Bryant - cross

1    Q.  In fact, is it fair to say that this process of doing

2    re-engagement calls is fairly boring?

3    A.  I guess.

4    Q.  Did you find it boring or did you dislike the task of going

5    through and calling all these people?

6    A.  I didn't like it.  I would rather have been home after 5:00

7    o'clock.

8    Q.  Fair enough.

9            Was everyone, to your knowledge, to your recollection,

10   was everyone in the center kind of required to do these calls?

11   A.  Yes.

12   Q.  Now, you talked about meetings during the week at SEEDCO.

13   Do you remember that testimony a few moments ago?

14   A.  Yes.

15   Q.  You talked about these staff meetings.  Do you remember

16   that?

17   A.  Yes.

18   Q.  Staff meetings were generally held on a Friday?

19   A.  I believe so, yes.

20   Q.  And those were all-staff meetings everyone was supposed to

21   attend?

22   A.  Yes.

23   Q.  During the week there were other meetings?

24           There were, for example, your team had its own meeting

25   called the R&P meeting, Recruitment & Placement meeting?

1   A.  Yes.

2   Q.  At these all-staff meetings you talked about, was Bill

3   Harper there at those meetings?

4   A.  Yes.

5   Q.  Did Newton James?

6   A.  Yes.

7   Q.  And Shandell Velez?

8   A.  Yes.

9   Q.  To your recollection, did Bill Harper at these all-staff

10  meetings ever say anything about the fact that words were said

11  that might have suggested something improper?

12          MS. BLAIN:  Objection, your Honor.

13          THE COURT:  Objection sustained.

14  BY MR. FUTERFAS:

15  Q.  Now, you talked about these improper false placement

16  practices in the R&P team just a few minutes ago with the

17  government.  Do you remember that?

18  A.  Yes.

19  Q.  Did you do any of these practices before Mr. Katz joined

20  Recruitment & Placement?

21  A.  No.

22  Q.  So it was only when Mr. Katz joined Recruitment & Placement

23  that he directed this?

24  A.  Yes.

25  Q.  By the way, prior to getting work at SEEDCO, did you work

F4FJUSA3                         Bryant - cross

 1   at a company or a company called LaGuardia?

 2   A.  Yes.

 3   Q.  What was LaGuardia?

 4   A.  I worked at the LaGuardia Workforce1 Center.

 5   Q.  So that was another Workforce1 Center?

 6   A.  Yes.

 7   Q.  What were your responsibilities there?

 8   A.  Initially I was the placement director, and I entered

 9   placements.  As the directors changed, my role kind of changed,

10   so I was entering placements there also.

11   Q.  Did you engage in any improper practices at LaGuardia?

12   A.  No.

13   Q.  Placement practices?

14   A.  No.

15   Q.  Was there one customer at LaGuardia who was hiring,

16   supposedly hiring 50 percent of the job applicants?

17   A.  Yes.

18   Q.  Did you think that that was -- did you have a suspicion

19   that that was improper?

20   A.  I had a suspicion, yes.

21   Q.  Did you ever tell, did you ever tell Mr. Katz that you

22   engaged in improper practices at LaGuardia?

23   A.  I might have mentioned that employer and that I would

24   suspect that it was improper, yes.

25   Q.  You were part of the placement team at LaGuardia?

1   A.  Placement team, no.

2   Q.  You entered placements at LaGuardia?

3   A.  Yes.

4   Q.  Now, if I could direct your attention -- if the government

5   could put up, or we could do it, the government just used it.

6   You just saw an Exhibit 57, the CIF form.

7           THE COURT:  Someone can put it up.

8           MR. FUTERFAS:  We can do it, your Honor.  It is in

9   evidence.

10          (Pause)

11          THE COURT:  Who is putting it up?

12          MR. FUTERFAS:  We are, your Honor.

13  BY MR. FUTERFAS:

14  Q.  Now, this is, Ms. Bryant, this is an example of a CIF form,

15  right?

16  A.  Yes.

17  Q.  Now, the forms collect various kinds of information as

18  reflected on the form, right?

19  A.  Yes.

20  Q.  In determining ultimately whether a customer who fills out

21  a CIF form becomes a placement, a proper placement, right,

22  there are a number of things that someone would have to look

23  at, right?

24          Let me give you an example.  For example, certainly if

25  a person comes in filling out a CIF form and is not employed or

F4FJUSA3                         Bryant - cross

1    not currently employed, and subsequently you learn that they

2    get employment, you can enter a placement, proper placement

3    there, right?

4    A.  Yes.

5    Q.  And that was, in fact, the purpose of these re-engagement

6    calls.  Is that right?

7    A.  Yes.

8    Q.  If a person on the CIF form, if the person is currently

9    employed, they could still become a proper placement being

10   currently employed, right?

11   A.  They can be, yes.

12   Q.  If they receive a raise, right?

13   A.  That would be a promotion.

14   Q.  So if they receive -- if they come in and they're currently

15   employed, and after coming in to SEEDCO they subsequently

16   receive a raise, that would be a promotion?

17   A.  Correct.

18   Q.  What about if, for example, this CIF form, I think the

19   hours denoted were 10 hours.  It might be on Page 2.  Do you

20   see at the top under, "work history"?

21   A.  Yes.

22   Q.  So this individual is saying that the individual works as a

23   bartender at a certain address making $4.50 an hour and is

24   working 10 hours a week.  Do you see that?

25   A.  Yes.

F4FJUSA3                          Bryant - cross

1    Q.  Now, if after coming in to SEEDCO the individual gets more

2    hours, let's say gets 20 hours a week, that could also be a

3    promotion, right?

4    A.  Yes.

5    Q.  A proper promotion?

6    A.  Promotion, yes.

7    Q.  I guess also if the individual's currently working and gets

8    a promotion, meaning they get a higher position in the company

9    that may be accompanied by more wages or things like that, that

10   could also qualify as a promotion, right?

11   A.  Yes.

12   Q.  In fact, do you know whether a job of 10 hours a week even

13   qualifies as a job under the policies and procedures at SEEDCO?

14   A.  I don't remember.

15   Q.  I just tried to refresh your recollection.

16          Do you recall whether 20 hours a week was a minimum to

17   constitute a job under your guidelines or policies?

18   A.  I don't remember.

19   Q.  You were shown -- I am trying to get the name of it -- you

20   were shown Government Exhibit 3.  No, no that is not it.

21          MS. ALBERTI:  It is 5 probably.

22          (Pause)

23          THE COURT:  Could I see counsel off the record.

24          (Sidebar conference not reported)

25   BY MR. FUTERFAS:

F4FJUSA3                          Bryant - cross

1   Q.  I just have a very quick question for you.

2            Ms. Bryant, do you recognize Government Exhibit 70

3   that is in front of you on the screen?

4   A.  Yes.

5   Q.  You were just asked a few questions about that by

6   Ms. Blain?

7   A.  Yes.

8   Q.  This woman Rosanna Lam, was she a new hire in the Bronx?

9   A.  Yes.

10  Q.  Was she basically telling you in the bottom paragraph that

11  effectively she was doing it properly, she was putting in all

12  the information, right?

13           MS. BLAIN:  Objection, your Honor.

14           THE COURT:  Overruled.

15  BY MR. FUTERFAS:

16  Q.  To your understanding?

17  A.  She was asking, yes.  She was asking me how to finish

18  completing it.

19  Q.  She was saying at the bottom --

20           THE COURT:  Highlight it, Mr. Solomon.

21  Q.  I just want to make sure --

22           THE COURT:  It speaks for itself.

23  BY MR. FUTERFAS:

24  Q.  I want your understanding, Ms. Bryant, from what Ms. Lam is

25  writing you, she is doing it properly.  Did you have that

F4FJUSA3                           Bryant - cross

1    understanding from her e-mail?

2              MS. BLAIN:  Objection.

3              THE COURT:  Sustained.  It sets out what she is doing.

4    There is no need for interpretation.

5              MR. FUTERFAS:  All right, your Honor.

6    BY MR. FUTERFAS:

7    Q.  When you respond, you basically are telling her to do it

8    improperly.  Is that right?

9    A.  I was telling her to do it the way I was directed to do it.

10   Q.  By Mr. Katz?

11   A.  Yes.

12   Q.  And then if I could have --

13             MR. FUTERFAS:  One more minute, your Honor.  I am

14   almost done.

15             (Pause)

16   BY MR. FUTERFAS:

17   Q.  I show you now Government Exhibit 5 that you just saw, Ms.

18   Bryant.  Do you remember recognize that?

19   A.  Yes.

20   Q.  I just want to direct your attention to the bottom of that

21   e-mail, the first page there.  Can you see the bottom, yes, the

22   bottom section is from Alan Katz at 1:10 pm.

23             Do you see that?

24             THE COURT:  Do you want that highlighted?

25             MR. FUTERFAS:  Yes, your Honor.

1           THE COURT:  Please, Mr. Solomon.

2    A.  Yes.

3    BY MR. FUTERFAS:

4    Q.  That e-mail is on Thursday, April 7, at 1:10 pm, and it is

5    from Alan Katz and it is to Ms. Tage Chandarpaul and

6    Mr. Saavedra is CC'd and Mr. Andy Marmolejos is CC'd.  Do you

7    see that?

8    A.  Yes.

9    Q.  If you can see the response to that e-mail in the middle

10   from Tage Chandarpaul at 1:13 --

11   A.  Yes.

12   Q.  -- you see she responds, and when she responds, she

13   responds to Mr. Katz and Mr. Marmolejos.  Do you see that?

14   A.  Yes.

15   Q.  And later, that is three minutes later, correct, from 1:10

16   to 1:13 pm.  Is that correct?

17   A.  Yes.

18   Q.  And then we can close out of that little section.  And then

19   on the top section where Mr. Katz then responds to her at 1:16

20   pm, do you see that?

21   A.  Yes.

22   Q.  Now, Mr. Katz is responding at 1:16, and he responds to Ms.

23   Chandarpaul, Mr. Marmolejos, but then he adds you.  Do you see

24   that?

25   A.  Yes.

F4FJUSA3                          Bryant - cross

1    Q.  So that you're now a recipient?

2    A.  Yes.

3    Q.  And Mr. Saavedra is not on that e-mail, correct?

4    A.  Right.

5    Q.  Finally -- if we can close out of that section -- finally,

6    at the very top, at 1:21 when you respond, "Correct" at 1:21

7    pm, Thursday, April 7, you respond to Mr. Katz, Ms. Chandarpaul

8    and Andy Marmolejos, correct?

9    A.  Yes.

10            MR. FUTERFAS:  No further questions, your Honor.

11            THE COURT:  Redirect?

12            MS. BLAIN:  Thank you.

13   REDIRECT EXAMINATION

14   BY MS. BLAIN:

15   Q.  Just a few questions, Ms. Bryant.

16            MS. BLAIN:  Can I please see Exhibit 71, Mr. Solomon.

17   Government's 71, your Honor, has been received in evidence.

18            THE COURT:  It has, right?

19            MS. BLAIN:  Has, yes.

20            MS. BLAIN:  If you could please, Mr. Solomon,

21   highlight the top two e-mails.

22   BY MS. BLAIN:

23   Q.  Mrs. Bryant, do you see the e-mail from Mr. Katz to

24   Ms. Chandarpaul and -- Ms. Chandarpaul, Mr. Saavedra and

25   Mr. Marmolejos?

F4FJUSA3                        Bryant - redirect

1   A.  Yes.

2   Q.  And Mr. Futerfas just asked you questions about that?

3   A.  Yes.

4   Q.  And on the top, is that an e-mail from Mr. Saavedra?

5   A.  Yes.

6   Q.  Is Mr. Saavedra responding to the bottom three points?

7           MR. FUTERFAS:  Objection.

8           MS. BLAIN:  I'll rephrase.

9   BY MS. BLAIN:

10  Q.  Is Mr. Saavedra responding to the e-mail Mr. Katz sent at

11  1:10 pm?

12          MR. FUTERFAS:  Objection.

13          THE COURT:  Sustained.  It speaks for itself.

14          MS. BLAIN:  Fair enough.  We can remove that, Mr.

15  Solomon.

16  BY MS. BLAIN:

17  Q.  Ms. Bryant, when you changed information from EIFs into the

18  Work Source1 database, did you change anything else other than

19  start dates?

20  A.  No.

21  Q.  When Mr. Katz gave you instructions to enter false

22  placements, was anybody else around?

23  A.  I don't remember the exact, like where we were, so I don't

24  remember.

25  Q.  Do you remember if he told you to enter false placements in

F4FJUSA3                     Bryant - redirect

1  meetings?

2  A.  I don't remember.

3  Q.  Do you remember the practice of gathering false placements

4  being discussed in meetings, as you testified?

5  A.  Yes.

6  Q.  Do you remember who else was at those meetings?

7  A.  The re-engagement and placement was at all-staff meetings

8  and all-staff at the center, at the all-staff meetings.

9  Q.  Do you recall Mr. Saavedra being at those all-staff

10 meetings, right?

11 A.  Yes.

12         MS. BLAIN:  Thank you very much.  I have, in fact,

13 concluded my questioning.

14         MR. FUTERFAS:  Nothing further from the defense.

15         THE COURT:  Thank you.  You are excused.

16         Members of the jury we'll break now for lunch and come

17 back at 2:05.  Close up your books.  Ms. Jones will collect

18 them as you enter the jury room.  Don't discuss the case,

19 please.

20         (Jury excused)

21         THE COURT:  Who is your next witness?

22         MS. BLAIN:  Kimberly Nesmith, your Honor.

23         THE COURT:  Have her up on the stand when you come

24 back.

25         MS. BLAIN:  Yes.

F4FJUSA3                         Bryant - redirect

1                THE COURT:  Have a good lunch.

2                (Luncheon recess)

3                (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    A F T E R N O O N   S E S S I O N

2                          (2:10 p.m.)

3              THE COURT:  Good afternoon, ladies and gentlemen.

4              Be seated, everybody.  We have Kimberly Nesmith as our

5    next witness.  If people will pay attention, she will be sworn.

6     KIMBERLY NESMITH,

7         called as a witness by the Plaintiff,

8         having been duly sworn, testified as follows:

9    DIRECT EXAMINATION

10   BY MS. SCHOENBERGER:

11             THE COURT:  You may inquire.

12   Q.  Good afternoon, Ms. Nesmith.

13             Ms. Nesmith, did you ever work for an organization

14   called SEEDCO?

15   A.  I did.

16   Q.  When did you work for SEEDCO?

17   A.  February 12, 2007, through, I believe it was July 23, 2010.

18   Q.  What was your job at SEEDCO?

19   A.  Administrative assistant to Alex Saavedra.

20   Q.  Did your job change at any point?

21   A.  At one point, toward the end of my time there, my title

22   changed.

23   Q.  What did your title change to?

24   A.  From an administrative assistant to an assistant to an

25   assistant.

f4fnusa4                          Nesmith - direct

1   Q.  Did you have an understanding of why that title was

2   changed?

3   A.  Because my work had suffered.  My grade of work had

4   declined a bit.

5   Q.  Was there a reason for that?

6   A.  I was not as focused.  Because earlier in that year my

7   niece committed suicide and I took it very hard, so I wasn't

8   able to function.

9   Q.  When did you leave SEEDCO?

10  A.  2010.

11  Q.  Why did you leave SEEDCO?

12  A.  I was terminated.

13  Q.  Did you have an understanding as to why you were

14  terminated?

15  A.  Due to the low performance of my work.

16  Q.  At the time that you were an administrative assistant, did

17  you report to anyone else besides Alex Saavedra?

18  A.  No, only Alex.

19  Q.  Did you work at a Workforce1 center?

20  A.  I did.  Where was that located?

21  A.  225 West 125th Street on the sixth floor.

22  Q.  Was Mr. Saavedra also located at that Workforce1 Center?

23  A.  Yes, he was.

24  Q.  Did you sit near him?

25  A.  I sat right in front of his door.

f4fnusa4                        Nesmith - direct

1  Q.  What were your job responsibilities as Mr. Saavedra's

2  assistant?

3  A.  To take care of Alex, to maintain his calendar, schedule

4  all his meetings, answer his calls; also to maintain office

5  supplies, the attendance of staff, and anything that he

6  instructed me to do thereafter.

7  Q.  How often was Mr. Saavedra in the office when you worked at

8  SEEDCO?

9  A.  He was there often, unless he had a meeting to go to or

10  something.  But I would say he was in the office more so than

11  he was out of the office.

12  Q.  Did you see him every week?

13  A.  Every day.

14  Q.  You saw him every day.  As part of your job at SEEDCO, did

15  you enter information into the Worksource1 database?

16  A.  I did.

17  Q.  What sort of information did you enter into the database?

18  A.  Customer information and job placements.

19  Q.  As part of your job at SEEDCO, did you ever go to job

20  fairs?

21  A.  I did.

22  Q.  What are job fairs?

23  A.  A job fair is when there is a large group of people seeking

24  employment, like maybe sometimes it would be 500, 300 or more

25  people and they would go to like, one job fair I remember in

1  particular was a job fair hosted by STRIVE.  It was given for

2  Target.  They were opening a new Target store.  I think the job

3  fair was maybe a week or two.  A lot of people would go, maybe

4  a hundred people or so a day, and we would go and we would get

5  their information.  We would go with customer information forms

6  and get the people's information.

7  Q.  Who went to the job fair with customer information forms?

8  A.  Myself, a few other staff members from the job development

9  team.

10 Q.  What would you do with the information that you gathered at

11 the job fairs?

12 A.  We would go back to our center and enter it into the system

13 as if they had come to our center that day for assistance.

14 Q.  Was that entered as a registration or a job placement?

15 A.  That was entered as a registration.

16 Q.  Did you follow up with any of the people that you gathered

17 information from?

18 A.  We would follow up with everyone that we had gotten

19 information from.

20 Q.  How would you do that?

21 A.  Give them a phone call.

22 Q.  What would you say on the phone call?

23 A.  Ask them if they had gotten the job, the job, the original

24 job for the job fair, ask them did they get hired.  And if they

25 did get hired, we would ask, When is your start date?  What

f4fnusa4                        Nesmith - direct

1    would be your salary?  And we would enter that information.

2    Q.  You would enter that information.  Where would you enter

3    that information?

4    A.  Into our Worksource1 system.

5    Q.  Would that be entered as a placement?

6    A.  That would be entered as a placement.

7    Q.  What if the person said they had not received a job from

8    the job fair?

9    A.  We would ask them if they are currently working, and, if

10   so, and if they were working was in that quarter of a period,

11   we were allowed to enter that job information into the system.

12   Q.  Why did you think you were allowed to enter that

13   information into the system?

14   A.  Because it was said so by Alex.

15   Q.  Who said it?

16   A.  Alex.

17   Q.  And what if the job -- could it be counted if the job start

18   date was prior to the job fair?

19   A.  It could be counted if it was prior to that job fair as

20   long as the job was within that like a three- four-month, the

21   quarter period of the -- oh, gosh, I can't find the right word.

22         But, yeah, even -- if they didn't get the job at the

23   job fair, as long as they were working within that time frame,

24   we could enter it as a job placement.

25         THE COURT:  Run this by again, Ms. Schoenberger.

1    Q.   If the person had not received the job at the job fair, you

2    would ask them if they were currently employed, is that right?

3    A.   Correct.  "Are you currently employed?"

4              THE COURT:  What did you say?

5    A.   Correct.  We would say, "Are you currently employed?"

6    Q.   What else would you ask them about their current

7    employment?

8    A.   "When did you start?"

9              THE COURT:  Let's take it both ways.  They said they

10   were currently employed.  What do you do?

11             THE WITNESS:  Enter their information into the system.

12             THE COURT:  If they were not currently employed, what

13   would you do?

14             THE WITNESS:  We would ask them to come back to the

15   center, ask them if we could bring them back in.

16             THE COURT:  Try to help them?

17             THE WITNESS:  Yes.

18             THE COURT:  To get a job?

19             THE WITNESS:  Yes, correct.

20             THE COURT:  Let's say they said, "Yes, I am employed

21   now.  I wasn't employed when you sent me somewhere or you

22   couldn't send me somewhere, but now I have my job"?

23             What else would you do then?

24             THE WITNESS:  Ask for information:  "Who is your

25   immediate supervisor?  What is your schedule?  How much do you

1    make?"

2              THE COURT:  And, "When did you start?"

3              THE WITNESS:  And get the start date.

4              THE COURT:  Go ahead.  Take it over.

5    BY MS. SCHOENBERGER:

6    Q.  If the start date was prior to the date of the job fair

7    could you still enter that information as placement?

8    A.  We did, yes.

9    Q.  Why did you think you could do that?

10   A.  It was told by us that we could.  In the staff meeting --

11   Alex would head up the staff meeting every week, and we would

12   talk about the numbers, the job placements, how many we needed

13   for that week and what could be allowed as placement and what

14   wasn't.

15   Q.  When you say that as long as that person was working within

16   the quarter, do you mean within the three months prior to when

17   you were talking to them on the phone?

18   A.  Correct.

19   Q.  Regardless of when they --

20             THE COURT:  Let's not lead.

21             What did Mr. Saavedra say typically at these staff

22   meetings concerning people who did not get a job when you tried

23   to place them but subsequently did get work?

24             THE WITNESS:  "That's fine.  It's a job.  Enter it."

25             THE COURT:  He said what?

f4fnusa4                        Nesmith - direct

1              THE WITNESS:  "That's fine.  It's a job.  Enter it."

2              THE COURT:  Did he say anything about start dates?

3              THE WITNESS:  Yeah.  It was important to know the

4    start date.

5              THE COURT:  Did he say why it was important to know

6    the start dates?

7              THE WITNESS:  Because if they started prior to that

8    quarter period, then we could not use that person, because they

9    would not be counted as a placement for that quarter period.

10             THE COURT:  Did any people start during a quarter, but

11   before they had any meeting with SEEDCO?

12             THE WITNESS:  Well, a lot of people, yes, they started

13   during that quarter, but they had never came into the center to

14   register because we would go to the job fair to get their

15   information?

16             THE COURT:  Did some have a job before they went to

17   the job fair?

18             THE WITNESS:  Some people did have a job before they

19   went to the job fair.

20             THE COURT:  Did you get instructions from Mr. Saavedra

21   how to deal with those people?

22             THE WITNESS:  Record the information and enter it.

23             THE COURT:  What did he say?

24             THE WITNESS:  Record that information and enter it

25   into the system.

1   BY MS. SCHOENBERGER:

2   Q.  Would that information be entered into the system as a

3   placement?

4   A.  It would be.

5           MS. SCHOENBERGER:  I have nothing further, your Honor.

6           THE COURT:  Thank you.

7           Mr. Futerfas.

8           MR. FUTERFAS:  May I inquire, your Honor?

9           THE COURT:  Yes.

10  CROSS EXAMINATION

11  BY MR. FUTERFAS:

12  Q.  Ms. Nesmith, have you ever seen SBS placement policies

13  regarding job placements and when and how they can be counted?

14  A.  I'm sure I have.

15  Q.  Do you recall placement policies regarding job start dates

16  and whether a job can be counted depending on how far back the

17  job began and started?  Do you recall policies like that

18  published by SBS?

19  A.  I do recall.

20  Q.  Do you recall a policy about 180 days?  Do you recall

21  anything like that?

22          MS. SCHOENBERGER:  Objection.

23          THE COURT:  Overruled.

24  Q.  I'm just asking, do you remember reading policy about 180

25  days or 120 days published by SBS?  Do you remember anything

f4fnusa4                          Nesmith – cross

1  like that?  If you don't, say so.

2  A.  No.  I'm trying to remember.  180, 120 days.

3           THE COURT:  Mr. Futerfas, give her a chance.

4           MR. FUTERFAS:  Fair enough.

5           THE COURT:  Let's put the question broadly.

6           Do you remember any policy statements coming from SBS

7  Small Business Systems, or a title like that, coming from SBS

8  and advising anything having to do with the number of days with

9  regard to entry of placements?

10          THE WITNESS:  Vaguely I do.

11          THE COURT:  What do you remember?

12          THE WITNESS:  I know I do remember if the person was

13  on the job for X amount of time and they got like a promotion

14  or something, we could enter that into the system.

15          THE COURT:  Anything else you remember?

16          THE WITNESS:  No.

17  Q.  Ms. Nesmith, you recall you were working for Mr. Saavedra

18  for a while, right?

19  A.  Correct.

20  Q.  At some point you received a performance evaluation by

21  Mr. Saavedra.  Do you remember that?

22  A.  I remember that.

23  Q.  You were asked to sign that performance evaluation.  Do you

24  remember that?

25  A.  I do remember that.

f4fnusa4                         Nesmith – cross

1    Q.  You refused to sign it?

2    A.  I declined to sign it because I wrote a rebuttal.

3             MR. FUTERFAS:  If I could have just for identification

4    defendants O7.

5    Q.  I will be showing you, Ms. Nesmith, on your screen a

6    document.  Can you look at that when it comes up.

7    A.  OK.

8    Q.  Ms. Nesmith, if you could look at that document and perhaps

9    we could scroll through it.

10            Do you recognize that document?

11   A.  I do.  It looks very familiar.

12            MR. FUTERFAS:  Can you just go back to the top,

13   please.

14            Thank you.

15            If it would be easier, your Honor, could I show the

16   witness a hard copy.

17            THE COURT:  Are you offering this?

18            MR. FUTERFAS:  Yes, your Honor.

19            THE COURT:  Is there any objection?

20            MS. SCHOENBERGER:  Yes, your Honor.

21            MR. FUTERFAS:  It is not on there because it is not

22   published, your Honor.

23            THE COURT:  Apart from foundation, is there an

24   objection?

25            MS. SCHOENBERGER:  Relevance, your Honor.

f4fnusa4                           Nesmith - cross

1          THE COURT:  I will hear you at sidebar.

2          (At sidebar)

3          THE COURT:  What is relevant about this, Mr. Futerfas?

4          MR. FUTERFAS:  Your Honor, first of all, the

5     government has clearly opened the door.  This goes to motive

6     and bias.

7          THE COURT:  The government has said that she was

8     canned.

9          MR. FUTERFAS:  Right.

10         THE COURT:  She said that my niece died.  I wasn't

11    performing well.

12         MR. FUTERFAS:  She is testifying, and I think it's

13    maybe apparent, but she's testifying to procedures and policies

14    that these reports reflect she knows nothing about.  She

15    doesn't have a basic understanding of what her job was.  She

16    doesn't have a basic understanding.

17         THE COURT:  She just testified as to what she said

18    Saavedra said.

19         MR. FUTERFAS:  As your Honor has seen, the policies

20    and procedures --

21         THE COURT:  Tell me what in here you think is

22    relevant.

23         MR. FUTERFAS:  Your Honor, it is a lengthy

24    description.

25         THE COURT:  Is there anything in particular that is

f4fnusa4                        Nesmith – cross

1    relevant?

2              MR. FUTERFAS:  First of all, your Honor, it makes

3    clear from evaluation that her job was not to do what she is

4    saying it was to do.  Her job was as his assistant to sit

5    outside his door.  She wasn't going to recruitment events.

6              THE COURT:  Objection sustained.  She can testify to

7    what Mr. Saavedra said and nothing here crosses that.

8              MR. FUTERFAS:  What about for motive and bias, your

9    Honor?  OK.

10             (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court)

2          THE COURT:  Please take down the exhibit.  I sustain

3     the objection.

4     Q.  Ms. Nesmith, do you recall receiving an evaluation by

5     Mr. Saavedra?

6     A.  I do.

7     Q.  In that evaluation, he suggested that you were not suitable

8     to be his administrative assistant any longer, right?

9     A.  Correct.

10          THE COURT:  Objection sustained.  Don't answer the

11    question.  Objection sustained.

12    Q.  After that happened --

13          THE COURT:  If I sustain the objection, members of the

14    jury, the answer you may have heard, it doesn't count.  It is

15    not to be considered.

16    Q.  After that you were then moved, you then went -- I think

17    you were asked by the government did you then go to, did you

18    take another role at SEEDCO.  Do you remember those questions

19    by the government a few moments ago?  Let me start again.

20    A.  I'm sorry.

21    Q.  Do you remember on direct examination a few moments ago the

22    government asked you whether you then took a different role,

23    you had a new title at SEEDCO?  Do you remember that?

24          THE COURT:  Let me ask.

25          You said you started at SEEDCOand in 2009 and you were

f4fnusa4                          Nesmith - cross

1  terminated in 2010.

2          THE WITNESS:  I started in 2007 and terminated in

3  2010.

4          THE COURT:  You started in 2007 and you were

5  terminated in 2010?

6          THE WITNESS:  Yes.

7          THE COURT:  You had a certain job.  Did there come a

8  time when your job changed?

9          THE WITNESS:  Yes, my title did change.

10          THE COURT:  When did it change?

11          THE WITNESS:  I think that was 2010.

12          THE COURT:  In 2010?

13          THE WITNESS:  Yes.

14          THE COURT:  And when in 2010?  Do you remember?

15          THE WITNESS:  I think it was March.  Maybe March or

16  May.

17          THE COURT:  Sort of the beginning of the year, March,

18  May?  Like the middle of the year.  About a quarter?

19          THE WITNESS:  Yes.

20          THE COURT:  From what to what did it change?

21          THE WITNESS:  From administrative assistant to

22  assistant to an assistant.

23          THE COURT:  From administrative assistant to?

24          THE WITNESS:  Assistant to an assistant.

25          THE COURT:  An assistant to an assistant.  So it was a

f4fnusa4                        Nesmith - cross

1    downgrade?

2              THE WITNESS:  Yes.

3              THE COURT:  Anything else, Mr. Futerfas?

4              MR. FUTERFAS:  Yes, thank you.

5    BY MR. FUTERFAS:

6    Q.  The downgrade, the change in position, let's put it that

7    way, that change in position, you then started working with

8    Mr. Katz?

9    A.  Alan Katz.  Correct.

10   Q.  You worked under him about how long?

11   A.  Maybe three months.

12   Q.  After that you were terminated?

13   A.  Correct.

14   Q.  Did Mr. Katz terminate you?

15   A.  Yes.  At that time he was the supervisor, yes, so he was in

16   the meeting.  I met with him, Alex, and Rick Green on the day

17   that I was terminated.

18   Q.  At the time that happened, Ms. Nesmith, is it fair to say

19   that you were not happy with that, with being terminated and

20   being moved from one department --

21   A.  I was fine with it.

22             MS. SCHOENBERGER:  Objection.

23             THE COURT:  Overruled.

24   A.  I was fine with it at that time.  Because, as I stated, my

25   work did suffer because I had a niece that, you know, had taken

1   her life and I took it very hard.

2            at that time I was still under Alex as his

3   administrative assistant.  He suggested that I seek counseling,

4   and I did.  He even allowed me two hours extra lunch to go to

5   therapy and everything, but I needed more time.  So that

6   termination I took it as a blessing, because therefore I was

7   able to really focus on me and really heal.

8   Q.  I recognize that Mr. Saavedra tried to assist you, but then

9   you went from Mr. Saavedra to Mr. Katz, right?

10  A.  Correct.

11  Q.  As his Honor just --

12  A.  Yes, before I was terminated I was under Mr. Katz for three

13  months.

14            THE COURT:  Was he the assistant to whom you were the

15  assistant?

16            THE WITNESS:  No.  He was the coordinator, and he had

17  another assistant named Ana.

18            THE COURT:  So you were assistant to Ana?

19            THE WITNESS:  Yes.

20            THE COURT:  As assistant to Ana, was it that position

21  that you were fired from?

22            THE WITNESS:  That's the position.  Basically all I

23  did that day I was told I had to make 200 phone calls a day,

24  and I was basically focused on doing placements.

25  Q.  The 200 phone calls a day, what was that for, Ms. Nesmith?

f4fnusa4                        Nesmith – cross

 1    A.   Calling customers to seek employment information.

 2              MR. FUTERFAS:  If I could have a moment, your Honor.

 3              (Defense counsel conferred)

 4              MR. FUTERFAS:  I have no further questions, your

 5    Honor.  Thank you.

 6              THE COURT:  Redirect?

 7              MS. SCHOENBERGER:  No redirect, your Honor.

 8              THE COURT:  Thank you very much.  You're excused.

 9              (Witness excused)

10              MS. BLAIN:  Your Honor, the government calls Angie

11    Kamath.  However I note that the Court wants to finish the day

12    at 3:30, and we anticipate Ms. Kamath's direct taking

13    potentially more than the time.

14              THE COURT:  You will go as far as you can go.

15              MS. BLAIN:  OK.  Thank you.

16     ANGIE KAMATH,

17         called as a witness by the Plaintiff,

18         having been duly sworn, testified as follows:

19    DIRECT EXAMINATION

20    BY MS. BLAIN:

21              THE COURT:  Ms. Blain you may inquire.

22              MS. BLAIN:  Thank you, your Honor.

23    Q.   Good afternoon, Ms. Kamath.

24    A.   Good afternoon.

25    Q.   Were you ever employed by the New York City Department of

                      SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

f4fnusa4                          Kamath - direct

1   Small Business Services?

2   A.  Yes.

3   Q.  May I use SBS to refer to the New York City Department of

4   Small Business Services?

5   A.  Yes.

6   Q.  When did you join SBS?

7   A.  January of 2006.

8   Q.  What was your title when you joined?

9   A.  Executive director of community partnerships.

10  Q.  Did your title change at some point?

11  A.  It did.

12  Q.  When did it change?

13  A.  In 2007 I became an assistant commissioner and then in 2008

14  I became deputy commissioner.

15  Q.  When you became assistant commissioner, was that a

16  promotion?

17  A.  It was.

18  Q.  When you became deputy commissioner, was that another

19  promotion?

20  A.  It was.

21  Q.  In what year did you become deputy commissioner?

22  A.  It was March 2008.

23  Q.  How long did you hold the title of deputy commissioner?

24  A.  For five years.

25  Q.  So when would that be approximately?

f4fnusa4                          Kamath – direct

A.   I was deputy commissioner from March 2008 to February 2013.

Q.   Was your full title deputy commissioner?

A.   Deputy commissioner of the Workforce Development Division.

Q.   What is the Workforce Development Division?

A.   It is one of three divisions of the New York City
Department of Small Business Services.  It oversees all of the
city's federally funded state and locally funded adult job
training and job placement programs.

Q.   Who did you report to while you were deputy commissioner of
that division?

A.   The commissioner of the agency, Rob Walsh.

Q.   How many people reported to you when you were deputy
commissioner?

A.   Between 65 and 70.

Q.   What were your duties and responsibilities in connection
with being the deputy commissioner of that division?

A.   So, I had responsibility and oversight over, it was about a
$75 million portfolio of job training and job placement
programs.  Primarily it was federally funded, Workforce
Investment Act, WIA one-stop job centers that were housed
throughout the city, as well as a number of other job training
and job placement contracts that we operated.  So, oversight,
budget, performance management for all of those contracts.

Q.   I believe you referred to the term WIA.  What is WIA?

A.   WIA is a federal funding stream from the U.S. Department of

f4fnusa4                          Kamath – direct

1    Labor.  It's called the Workforce Investment Act.  Its intent

2    is to provide services to unemployed and underemployed

3    individuals in order to get them a job.

4    Q.   Did SBS receive funding through this WIA program?

5    A.   Yes.  So the federal funding kind of is mandated.  It was a

6    federal funding stream that was created in the late '90s after

7    welfare reform that basically goes to every county in the

8    country.  So it's a federal funding stream that flows from the

9    U.S. Department of Labor to the state department of labor to

10   cities as a requirement of services that have to be delivered

11   in local areas.

12   Q.   You mentioned something called one-stop centers.  What are

13   those?

14   A.   One-stop centers are what the federal legislation requires

15   to be used by the funds.  They are bricks-and-mortar centers

16   that are created to offer career advice, job training, and job

17   placement services.

18   Q.   Does SBS itself operate those centers?

19   A.   No, they don't.  They contract the operation of those

20   centers to outside organizations.  Those could be nonprofits,

21   for-profits, colleges, kind of outside entities that

22   competitively bid and win the contracts.

23   Q.   In the time frame of 2009 to 2011, do you know

24   approximately how many workforce centers there were in New York

25   City?

f4fnusa4                           Kamath - direct

1   A.  We had, I think the number was 16.  We had six large

2   federally funded Workforce1 career centers, and then we had

3   nine other locally funded job training centers.  During that

4   time, the economic recession, there was investment and growth

5   of the system to deal with the unemployment.

6   Q.  Did the number of centers that existed between 2000 and

7   2011 fluctuate?

8   A.  It did.  It grew.  So it started in 2004, which was the

9   beginning and the inception of the system at five, one center

10  in each borough, and then it grew from there.

11  Q.  Do you know where the six federally funded career centers

12  were?

13  A.  Yes.

14  Q.  Where were they?

15  A.  So one large center in each borough, and the borough of the

16  Bronx had two.  One in the South Bronx area and one in the

17  Hunts Point area.

18  Q.  Do you still work at SBS?

19  A.  I don't.

20  Q.  Where do you work now?

21  A.  I work at job training and placement organization call Per

22  Scholas in the South Bronx.

23  Q.  Did you leave SBS voluntarily?

24  A.  I did.

25  Q.  Now, Ms. Kamath, I would like focus on the time frame of

f4fnusa4                          Kamath - direct

1    2009 to 2011 if we could.

2    A.   Sure.

3    Q.   In that time frame you were a deputy commissioner, is that

4    right?

5    A.   Yes.

6    Q.   In that time frame, were you familiar with a company called

7    SEEDCO?

8    A.   Yes.

9    Q.   When did you first learn of SEEDCO in connection with your

10   job at SBS?

11   A.   When I joined the agency in 2006, they were the operator of

12   the upper Manhattan Workforce1 Career Center.

13   Q.   Did you have occasion to become familiar with the contracts

14   that governed SBS's relationship with SEEDCO?

15   A.   Yes.

16   Q.   How did you come to become familiar with them?

17   A.   Sure.  So, I joined the agency in a managerial position, so

18   as executive director, as an assistant commissioner, as deputy

19   commissioner, programs that I worked on would be kind of

20   governed and would be, often budgets would be increased to

21   federal contracts based on some of the activities that I was

22   directly involved in.

23   Q.   So did you review those contracts?

24   A.   Often, yes.

25   Q.   You were familiar with those contracts?

f4fnusa4                          Kamath – direct

1    A.  Yes.

2    Q.  If I could please direct your attention to one of the large

3    binders in front of you?

4    A.  Yes.

5    Q.  If you could turn quickly to tabs 30 to 44.  I am not sure

6    if those are up in front of you?

7    A.  I think it might be binder 2, which is not here.  I've got

8    1 and 3.

9             MS. BLAIN:  Your Honor, may I approach the witness and

10   hand the binder?

11            THE COURT:  Yes.

12            THE COURT:  Ms. Blain, are you going to be working

13   with multiple exhibits or just one?

14            MS. BLAIN:  Multiple exhibits, your Honor.  But just

15   briefly with these.

16   Q.  Ms. Kamath so if you could turn to 30 to 44?

17   A.  Sure.

18   Q.  Just tell us if you recognize those documents.

19   A.  I'm sorry.  Yes.  These are the contracts and contract

20   amendments that governed our work in the Department of Small

21   Business Services with SEEDCO.

22            MS. BLAIN:  Your Honor, the government moves to admit

23   Exhibits 30 to 44.

24            MS. SCHEIN:  No objection.

25            THE COURT:  Received.

f4fnusa4                         Kamath – direct

1           (Government's Exhibits 30 to 44 received in evidence)

2    Q.   What did these contracts require SEEDCO to do generally?

3    A.   Sure.  So, the contract was to operate a Workforce

4    Investment Act-funded one-stop.  The federal funding stream

5    really dictates what work happens.

6           The common measures that are part of the contract

7    responsibilities really are looking at how many people enter

8    and exit the system, so how many kind of unemployed individuals

9    are flowing through the system, how many folks are entering

10   employment, what the average earnings are, and then what the

11   job retention is.  That's the federal requirements.

12          These local contracts are essentially articulating the

13   delivery of services that would lead to individuals getting

14   jobs where they had average earnings of a certain level and

15   that they were able to retain.

16   Q.   What did these contracts require SBS to do generally in

17   return?

18   A.   SBS, as the kind of governing contracting agency, is

19   required to manage performance and so make sure that the

20   delivery of those services are occurring, and that the centers

21   are resourced in order to be able to kind of comply with the

22   federal legislation and the intent of the programs that the

23   funding stream comes down to the city from the federal

24   government to provide.

25   Q.   Ms. Kamath, if I could direct your attention specifically

f4fnusa4                          Kamath - direct

1    to tab 42 in your binder, which is Government's Exhibit 42.

2    A.   Sure, yes.

3    Q.   Is this an agreement between SBS and SEEDCO?

4    A.   Yes.  It is an amendment to the contract.  So, in the

5    course -- these contracts last for multiple years, so in the

6    course of managing a contract we would amend to change and make

7    changes or make additions to it.  So this is the tenth

8    amendment to the contract.

9    Q.   If you could please turn to page 3 of this contract, under

10   Section I.

11   A.   Yes.

12   Q.   What time frame does this particular amendment cover?

13   A.   The three-month time frame from January 2011 through the

14   end of March 2011.

15   Q.   If you could please turn to the next page of exhibit, under

16   Section III.

17   A.   Yes.

18          MS. BLAIN:  If you could please highlight -- you've

19   got it.  Thank you, Mr. Solomon.

20   Q.   If you could please read to the jury the second sentence

21   under III?

22   A.   "The agreement's new aggregate total"?  That one?

23   Q.   Yes.

24   Q.   "The agreement's new aggregate total shall not exceed

25   $19,645,391 in consideration of all services to be performed

1    during the renewal period and the extension term."

2    Q.   What does "aggregate total" mean?

3    A.   So the city would contract -- these are, again, large

4    Workforce1 career centers that see hundreds, if not thousands,

5    of people in any given week.  So there would be contracts for

6    three-year periods, with then a three-year renewal period.

7    What this says is the aggregate would be of the term, which

8    could be up to six years.

9    Q.   And the aggregate of the term could be how much money?

10   A.   $19,645,391, but not to exceed that amount.

11   Q.   Approximately how much of that, how much is that a year?

12   A.   Kind of looking down, year four, 3.19 -- $3.2 million, year

13   five $3.6 million.  Yeah, an average of, you know, three, three

14   and a half million dollars per year let's say.

15   Q.   If you can please turn to Exhibit 34, which is tab 34 in

16   your binder.

17   A.   Sure.  Yes.

18   Q.   Page 1 of this, under Part B(a)?

19   A.   Yes.

20   Q.   Do you see it says "(a) performance-based payments"?

21   A.   Yes.

22   Q.   What does performance-based payments mean?

23   A.   Sure.  In a contract, because it is a sort of

24   bricks-and-mortar establishment, has about 30 to 35 staff, the

25   majority of costs were personnel.  The way the contracts were

1    structured, there was, 70 percent of the contracts would just

2    be reimbursed based on expenses based on invoices given to the

3    government, and then 30 percent of the budget would be based on

4    how the contract was performed on.

5    Q.  What do you mean, based on how the contract was performed

6    on?

7    A.  In every contract kind of stemming from those federal

8    guidelines of getting individuals into jobs that they would

9    retain, etc., there were specific services that we at the

10   Department of Small Business Services required all of our

11   centers to perform.  So, metrics and milestones and indicators

12   that would evidence that the work that we wanted to have happen

13   was indeed happening.

14        Those activities, if metrics were achieved, they would

15   be performing, and they would be able to earn up to 30 percent

16   of the value of the contract.

17   Q.  If you could turn to page 2 of that exhibit.

18   A.  Sure.

19   Q.  Do you see under No. 1 the words, "Total Job Placements"?

20   A.  Yes.

21   Q.  What does total job placements mean?

22   A.  On an annual basis we would set the number of job

23   placements that each of our centers were required and

24   contracted to make.  Total job placements means that kind of

25   annual number, and then we would divide the annual number into

f4fnusa4                          Kamath - direct

1    kind of quarterly goals.

2    Q.  Did you have any role in determining what those annual

3    numbers would be?

4    A.  Yes.

5    Q.  How were those annual numbers determined?

6    A.  We were managing, again, a system of 16 centers, so we

7    would figure out what we wanted to achieve and accomplish as a

8    system, and then look at each center and each component of the

9    system and look at historical, look at the data, how many

10   people were coming through, look at the type of business

11   opportunities that center had access to, and negotiate a job

12   placement total annual goal based on that data and that kind of

13   track record and experience.

14   Q.  Do you recall if you had these sorts of conversations with

15   people from SEEDCO?

16   A.  Yes.

17   Q.  Do you have an understanding as to how SEEDCO communicated

18   to SBS whether or not it made its placement targets?

19   A.  Our system of record for the entire system, for all 16

20   centers, including the Upper Manhattan Workforce1 Career

21   Center, was through our dataBase called Worksource1.  That was

22   the system that all of our centers had access to.  It was the

23   system of record.  It was the system that was sort of up on

24   every staff member's computer in order to facilitate the work,

25   but also to capture all of the data and all of the services and

1    all of the happenings that went on in the center, including job

2    placements.

3    Q.  Was it part of your duties and responsibilities as

4    assistant and deputy commissioner to become familiar with the

5    Worksource1 database?

6    A.  Yes.

7    Q.  If I could please direct your attention to an exhibit that

8    will appear on your screen but will not yet be published for

9    the jury.  It's Exhibit 21.

10            MR. SOLOMON:  Exhibit 21?

11            MS. BLAIN:  21.

12   Q.  Ms. Kamath, did something appear on your screen?

13   A.  Yes.

14   Q.  Do you recognize this document?

15   A.  Yes.

16   Q.  What do you recognize this document to be?

17   A.  This is an Excel download of the data that was housed

18   within Worksource1.

19   Q.  Did you have any role in causing this Excel download to be

20   created?

21   A.  Yes.

22   Q.  Do you look at this document once it was created?

23   A.  Yes.

24   Q.  Is this a true and accurate copy of an exported file from

25   the Worksource1 database?

f4fnusa4                      Kamath - direct

1    A.   Yes.

2    Q.   Was this spreadsheet created in the regular course of SBS's

3    business?

4    A.   This was -- I mean, yes.  We would download Excel

5    spreadsheets all the time from the database in order to kind of

6    understand, analyze, and see what was happening within the

7    system.  I think this one in particular was related to the

8    issues with SEEDCO.

9         MS. BLAIN:  Your Honor, we move to admit Government's

10   Exhibit 21 into evidence.

11        MR. FUTERFAS:  Your Honor, may I ask a question or two

12   on voir dire?

13        THE COURT:  Yes.

14        MR. FUTERFAS:  Thank you.

15        THE COURT:  Questions on voir dire are questions that

16   go to the foundation of the document to see if the document may

17   properly be entered into evidence.  The substance will go later

18   in terms of either direct or cross or both.

19        Go ahead, Mr. Futerfas.

20        MR. FUTERFAS:  May I inquire from here, your Honor?

21        THE COURT:  You may.

22   VOIR DIRE EXAMINATION

23   BY MR. FUTERFAS:

24   Q.   Ms. Kamath, just briefly, Government Exhibit 21 is not the

25   entire Worksource1 database that covers 16 centers, is it?

1   A.  This spreadsheet is what we could call just an Excel

2   download of particular time periods for particular centers.

3           I guess everyone can see it, so the four tabs are sort

4   of the data that we queried, that we sort of, the filter that

5   we applied to be able to look at this data set for the upper

6   Manhattan and the Bronx centers for different years.

7   Q.  So my question was, and I guess the answer is --

8           THE COURT:  Mr. Futerfas wants to know if this covers

9   more than SEEDCO's operations.

10          That's your question, right?

11          MR. FUTERFAS:  Correct, your Honor.  Thank you.

12  A.  This covers SEEDCO's operations.  The Bronx, I guess I

13  can't -- I don't -- I'm not able to click through the Bronx

14  tab.  I don't know --

15          THE COURT:  Ms. Blain, do you have the document in

16  hard copy.

17          MS. BLAIN:  Your Honor, there is a very large Excel

18  spreadsheet.  It doesn't actually exist in hard copy, but she's

19  welcome to click on the laptop that we have it on.  She would

20  be familiar with that.

21          THE COURT:  Bring up the laptop and show her.

22          MR. SOLOMON:  I will be disconnecting it from the

23  monitor, so you won't be able to.

24          THE COURT:  We won't be able to see it on the monitor.

25  Can you reconnect?

f4fnusa4                      Kamath - direct

1          MS. SCHOENBERGER:  Also, Mr. Solomon clicked through

2     according to the witness's instructions to manipulate the Excel

3     spreadsheet, if that might be simpler.

4          THE COURT:  If he clicks through, that way the defense

5     bench and I could see it?

6          MS. SCHOENBERGER:  Exactly.

7          THE COURT:  But the jury can't see it?

8          MS. BLAIN:  That's correct.

9          THE COURT:  OK.  I think that would be better, if you

10    could do that.

11          THE WITNESS:  Sure.

12          THE COURT:  I think first you want to see a title

13    page, what the document is supposed to be.

14          THE WITNESS:  Sure.  Yeah, I mean, I think, if I

15    understand the question correctly, SEEDCO always ran from 2004

16    through 2011.

17          THE COURT:  It is a technical question.

18          THE WITNESS:  OK.  I'm sorry, sir.

19          THE COURT:  The rules of evidence, with exceptions,

20    require complete documents.

21          So, Mr. Futerfas is asking if the document that we are

22    showing on our screen is the complete document.  Clearly it's

23    not.  But what he's now asking is if the document that's the

24    complete document has data coming not only from SEEDCO but from

25    other sources as well.

f4fnusa4                         Kamath – direct

1          Have I got your question right?

2          MR. FUTERFAS:  That's certainly one of my questions,

3   your Honor.  Thank you.

4          THE COURT:  OK.

5          THE WITNESS:  OK.

6          THE COURT:  So what is the answer?

7          THE WITNESS:  This looks to be SEEDCO data.

8          THE COURT:  Only SEEDCO data?

9          THE WITNESS:  So the one question would be for the

10  Bronx tab, if we could click through that.

11         THE COURT:  You want to look at something?

12         THE WITNESS:  So, SEEDCO commenced their operation of

13  the Bronx center on January 1, 2011.  If there's customers --

14  there was a changeover of contractors, so an organization

15  called Wildcat run it prior to theirs.  So that was my one

16  question that I had in my mind, if this covered individuals who

17  were using the system while a different operator was managing

18  it.

19         Other than that, this suggests to me by looking at

20  this that this is all SEEDCO placements.  The title of the

21  document is SEEDCO-Reported Job Placements.  So that leads me

22  to believe this is all SEEDCO.

23         MR. FUTERFAS:  One more question.

24  BY MR. FUTERFAS:

25  Q.  You said before, Ms. Kamath, something about the cells

f4fnusa4                          Kamath - direct

1   populating, that people took various information to populate

2   the spreadsheet?

3   A.   No, I didn't say that.

4   Q.   Let me ask you this:  You didn't actually do the data

5   recovery from Worksource to put it into the spreadsheet, did

6   you?  Or did someone else do it?

7   A.   Worksource1 is the database that all staff uses and kind

8   of --

9            THE COURT:  Sorry.  That all?

10           THE WITNESS:  That all staff.

11           THE COURT:  All staff?

12           THE WITNESS:  In the Workforce1 career centers use in

13   order to -- it is a system that had at any point in time

14   probably 100,000 to 150,000 records of individuals that used

15   the centers and the services across all of New York.  So it's

16   not possible to pull all that down into one spreadsheet.

17           In order to understand what was going on, you would do

18   Excel downloads of particular questions that you would be

19   looking to manage or a performance you would be looking to

20   understand.

21           So, did I directly input information into Worksource1?

22   No.

23           Did I directly create this download?  No.

24           But our staff, my direct staff did.

25           MR. FUTERFAS:  My question --

f4fnusa4                     Kamath - direct

 1           THE COURT:  The question --

 2           THE WITNESS:  I'm sorry.  I am not understanding the

 3    question.

 4           THE COURT:  At your direction did your staff compile

 5    this information?

 6           THE WITNESS:  Yes.

 7           THE COURT:  From information supplied by others, and

 8    others being SEEDCO and others?

 9           THE WITNESS:  Yes.

10    BY MR. FUTERFAS:

11    Q.  My question is very simple question:  As it pertains to

12    SEEDCO, upper Manhattan and the Bronx, did you download all the

13    information about those centers from Worksource centers, or did

14    someone make a selection of information to download from

15    Worksource into the spreadsheet?  That's my question.

16    A.  This is a download looking at a particular time period.

17           THE COURT:  So everything in that time period?

18           THE WITNESS:  Correct.

19           MR. FUTERFAS:  OK.

20           THE WITNESS:  SEEDCO-reported job placements from the

21    period of January 1, 2009 to June 30, 2011.

22    BY MR. FUTERFAS:

23    Q.  Was there anything during that time period in the selection

24    from the Worksource program that was excluded relating to

25    SEEDCO or the Bronx center, or was everything taken out of

f4fnusa4                        Kamath – direct

1    Worksource about those centers to create the spreadsheet?   That

2    is my question?

3    A.   The best that I can answer here is that this is a

4    downloaded spreadsheet of SEEDCO-reported job placements.   It's

5    really from January 1, 2009 to June 30, 2011.

6             THE COURT:   Mr. Futerfas, you can pursue more on

7    cross.   For the purposes of the voir dire, the foundation is

8    adequate and the document is admitted.

9             (Government's Exhibit 21 received in evidence)

10   BY MS. BLAIN:

11   Q.   Ms. Kamath, I believe you just touched on this, but who had

12   access to Worksource1?

13   A.   All of the staff in our Workforce1 career centers were

14   assigned an ID and log-in password code.   Then, similarly, on

15   the Department of Small Business Services side, SBS, we would

16   each have a Worksource1 log-in and password.   So it was a

17   managed and kind of password-protected database so we could see

18   who was doing the input, who was changing the input, and who

19   had access rights around viewing or editing.

20            THE COURT:   You are saying Worksource or Workforce?

21            THE WITNESS:   The database was Worksource1 with an S

22   and the centers were Workforce1, with an F.   Sorry if it's

23   unclear.

24            THE COURT:   It would be helpful, perhaps only to me,

25   but maybe to the jury as well, if we got an understanding how

f4fnusa4                          Kamath - direct

1    the records were built up and examined by SBS.

2              (Continued on next page)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F4FJUSA5                          Kamath – direct

1    Q.   Okay, do you have an understanding as to what information

2    is contained in Work Source1?

3    A.   Yes.

4    Q.   What information is contained in Work Source1?

5    A.   So as the entire system of record for all of the job

6    placement, job advisement and training services for the City of

7    New York, it was Work Source1 is a database that would have all

8    of the information associated with case management of

9    individuals coming into a center.

10           So all of the personally identifiable information, job

11   history information, contact information, activity and service

12   information for what they did within the Workforce1 career

13   centers, and then job placement information.

14   Q.   Who entered the information in the Work Source1?

15   A.   Workforce1 Career Center staff.

16   Q.   That would not be SBS staff.  Is that right?

17   A.   SBS staff did not input to the system.

18   Q.   Do you know what SBS staff did with the information once it

19   got into Workforce1?

20   A.   So as the government agency tasked with managing the

21   performance of the system, we would be looking at activity

22   levels, we would be looking at data on a daily, weekly,

23   monthly, quarterly basis to look at how individual centers were

24   performing, how the system was performing, different trends,

25   different levels of activity.  That would be number one, just

1    understanding and managing performance.

2            Number two is just daily integrity and making sure if

3    there were things like duplicate records or records that showed

4    kind of obvious errors, that we would be flagging those types

5    of incidences to clean up the system, so making sure that the

6    system had clean data so we could analyze it and run reports

7    that made sense.

8            I guess the third piece around our activity around

9    Work Source1, the database, was just continually understanding

10   how to improve it and continuously kind of revamp it so it

11   could meet the needs of the staff at the center.

12           THE COURT:  Let me slow you down.  You're talking

13   about management goals, and I want you to focus not so much on

14   management goals, but on the records that were kept.

15           You referred to workforce.  Are the workforce the

16   private career centers, yes, no?

17           THE WITNESS:  The Workforce1 centers are the centers,

18   the kind of bricks and mortar centers.  What happened that

19   SEEDCO ran and managed the Upper Manhattan and eventually the

20   Bronx center.

21           THE COURT:  Workforce, that is a title that pertains

22   to a company or is it a title that pertains to some regional

23   organization established by SBS?

24           THE WITNESS:  Sure.  So the workforce name was a brand

25   that New York City created to unify the 16 centers so that as

F4FJUSA5                         Kamath - direct

1    you're going into any McDonald's, a franchise, you could always

2    feel you could conceive and consume the same type of services

3    whether you're working in a workforce in up Upper Manhattan, or

4    Jamaica Queens or the South Bronx.

5              THE COURT:  It is a name, and within that there are a

6    number of companies?

7              THE WITNESS:  Correct.

8              THE COURT:  Of which SEEDCO is one?

9              THE WITNESS:  Correct.

10             THE COURT:  How many more companies are there,

11   approximately, during that period of time?

12             THE WITNESS:  There were five, five contractors that

13   ran the different centers.

14             THE COURT:  You're collecting information that comes

15   from a number of career centers?

16             THE WITNESS:  Correct.

17             THE COURT:  We're interested in this case to isolate

18   the data that per takes to SEEDCO.

19             THE WITNESS:  Yes.

20             THE COURT:  What is the lowest ranking item of data

21   that SBS collects that pertains to SEEDCO?

22             THE WITNESS:  Sure.  So the way the system is, the way

23   the database system is created, all of the information for

24   those, let's say, 30 SEEDCO staff in Upper Manhattan that would

25   input information on the clients and participants that they

1    would work with would be associated only with their center, and

2    so by nature of who was doing the input, they were a SEEDCO

3    employee, and they would only be able to see the clients and

4    input for the clients that they were seeing within the system.

5            THE COURT:  How does that information get related to

6    you?

7            THE WITNESS:  Right.

8            THE COURT:  To you and to your staff?

9            THE WITNESS:  Sure.  As a kind of government oversight

10   agency, you could think we had a master level access to all of

11   the data across all of the centers and all of the staff that

12   were were inputting information to the system.

13           So again some fields would be visible to everyone,

14   many fields would be visible only to the staff in a particular

15   center.

16           THE COURT:  So in the data arrangement that SEEDCO

17   staff inputs, you're able electronically to see some of those

18   fields?  Not all, but some?

19           THE WITNESS:  SBS, as a government entity overseeing

20   the system, could see all of the fields.

21           THE COURT:  All of the fields?

22           THE WITNESS:  Correct.

23           THE COURT:  So if an input operator at SEEDCO puts in,

24   let's say, 10 fields, you're able instantly to see all 10?

25           THE WITNESS:  Yes.  It is a realtime database system

F4FJUSA5                          Kamath - direct

1    of record, yes.

2              THE COURT:  Is that record that you see a record that

3    you keep as well as SEEDCO?

4              THE WITNESS:  So it was a web-based database, and so

5    kind of in realtime as it was being input and saved at a site

6    in Upper Manhattan, we downtown at 110 Williams Street could

7    see and access that record or that file.

8              THE COURT:  Take it from there.

9    BY MS. BLAIN:

10   Q.  I believe you said SBS used the information Work Source1 to

11   track performance.  Is that right?

12   A.  Correct.

13   Q.  What do you mean by track performance?  What performance

14   were you tracking?

15   A.  So we set annual and then quarterly goals across a variety

16   of outcomes that we were wishing to see, whether that was

17   around training or job placement or activity with businesses,

18   and so it is that activity that we would be looking at on a

19   weekly, monthly, very regular and frequent basis.

20   Q.  In your role as SBS deputy commissioner, was the

21   information SEEDCO reported in this Work Source1 database

22   important to you?

23   A.  Very important.  It was the system of records.  If it was

24   not reflected in the system, it wasn't clear to us that

25   anything was happening.

1  Q.  Was it important to you that the information that SEEDCO

2  reported into Work Source1 be accurate?

3  A.  Yes.

4  Q.  Why was that important?

5  A.  The entire system that we were managing, the mission of our

6  program to enable New Yorkers to get into jobs, to enable

7  businesses to fill their open positions, was dependent on the

8  ability to verify and track that activity was actually

9  happening.  As a federal program, there were oversight

10  responsibilities outside New York City as well.

11  Q.  Do you know if the information SEEDCO inserted into

12  Workforce1 affected how much money SBS would pay SEEDCO?

13  A.  Yes.

14  Q.  How did it affect how much money SBS would pay SEEDCO?

15  A.  Through the performance-based portion of the contract.

16              THE COURT:  The 30 percent?

17              THE WITNESS:  The 30 percent, correct.

18              THE COURT:  Were there criteria for measuring

19  performance?

20              THE WITNESS:  Yes.

21  BY THE COURT:

22  Q.  What were those criteria?

23  A.  So I am looking at Page 2 of Exhibit 34.  Around job

24  placement, around job retention, around employer fulfillment we

25  would set the definitions of what success would look like.

1          So for a job placement --

2          THE COURT:  Excuse me.  Criteria provided in the

3     contract?

4          THE WITNESS:  In the contract and then in the annual

5     operating plans.

6          MS. BLAIN:  We're pulling that up, your Honor.

7     BY MS. BLAIN:

8     Q.  What page on Exhibit 34 are you referring to?

9     A.  Just Page 2 right here.

10    Q.  So I believe the question was what performance targets was

11    SBS measuring within Work Source1?

12    A.  Sure.  Within Work Source1 certainly job placements was a

13    very primary and important indicator of what we were looking

14    at.

15         Employment retention is an indicator that we would --

16    was part of the performance-based payment.  Employer-specific

17    retention and employer fulfillment within the database, we

18    would be measuring business activity.  So we would be measuring

19    and holding the centers accountable to be working directly with

20    businesses to find employers with open job opportunities that

21    would then be filled by qualified candidates working into the

22    centers.

23         So a very fair definitions in the annual operating

24    plan, in the policies and procedures that we worked on.

25    Q.  Focusing on again No. 1 on this page, total job placements,

1    how would the information that SEEDCO reported in Work Source1

2    affect the total job placement review SBS conducted?

3    A.  So we would set annual goals that would then be kind of

4    chopped into quarterly goals depending upon the amount of total

5    job placements that were claimed to be made.

6          We would then have a process where we would seek to

7    verify those jobs, and then based upon that verification

8    process we would pay out, and the centers would earn, SEEDCO

9    would earn a portion of their performance-based payment.

10   Q.  You mentioned a verification process.  What did you mean by

11   verification process?

12   A.  So we would work with a third-party organization to verify

13   with job seekers that, indeed, they were working.  So the

14   process was someone would kind of go to a career center through

15   the kind of consumption of services, get a job, staff would

16   enter that job placement into the system.

17         We would look at that number in realtime to manage

18   performance on a weekly, monthly, quarterly basis.  Then at the

19   end of every quarter, we would take the roster from Work

20   Source1 of individuals that were claimed to have been placed in

21   jobs and work with a third-party entity to call all of those

22   job seekers to verify that they were, indeed, working.

23   Q.  You said create a roster of individuals from the Work

24   Source1 database.  Did that roster of individuals include every

25   single job seeker that SEEDCO claimed to have placed?

F4FJUSA5                        Kamath - direct

```
 1   A.  So the roster would look very much like that download that

 2   was shared earlier and we would --

 3              THE COURT:  I don't think we all saw it.

 4              THE WITNESS:  The roster --

 5              THE COURT:  An Excel Spreadsheet that lists every

 6   person claimed to have gotten a job?

 7              THE WITNESS:  Correct, because the methodology for the

 8   verification was to call up individuals, there would be a sort

 9   of scrub of the data to make sure that everyone that would be

10   giving to the third party to call had phone numbers.

11              In some cases it wouldn't give an entity a list of

12   people who didn't have phone numbers.  There were some portion

13   of the placements that typically would not be part of that

14   roster, but it wasn't a large number.

15              THE COURT:  Let's say that there is a list of names.

16              THE WITNESS:  Yes.

17              THE COURT:  What is a typical number?

18              THE WITNESS:  For a center, 1500 names per quarter.

19              THE COURT:  So 1500 names.  Is there a hundred percent

20   verification; that is, is each of these names checked?

21              THE WITNESS:  No.

22              THE COURT:  What is the percentage?

23              THE WITNESS:  The methodology was kind of a random

24   sample methodology to get to statistical significance.

25              THE COURT:  What did you consider statistically
```

F4FJUSA5                         Kamath - direct

1  significant?

2          Of 1500 names, how many had to be verified to have

3  statistical significance verified on a random basis, meaning

4  you pick up one or five or whatever it is to make a random

5  selection?

6          THE WITNESS:  I don't know that number offhand, but

7  statistical significance tends to be anything over a hundred,

8  but I don't have the number offhand.  I don't recall.

9          THE COURT:  A hundred over 1500?  Or about 70 percent

10 it?

11         THE WITNESS:  I wouldn't want to use that number.  I

12 don't have the number.  Its statistical significance that holds

13 up to the highest forms of being able to with confident use

14 that random sample as a representative correct sample, to be

15 able to say with 95, 99 percent confidence levels what the rest

16 of the sample looked like.

17         THE COURT:  Who applies that random selection, your

18 agency or somebody else?

19         THE WITNESS:  No.  We would use a third-party entity

20 to do that work.

21 BY MS. BLAIN:

22 Q.  What is the third party entity's name?

23 A.  Charney Research.

24 Q.  Was it your understanding that Charney Research was

25 conducting a statistical sample?

F4FJUSA5                        Kamath - direct

1    A.   Yes.

2    Q.   Did you have any understanding as to whether Charney

3    Research was calling every single person on the list SBS

4    provided to Charney Research?

5    A.   No.   The contract was very, very clear that it was a

6    statistically significant random sample.   So I think it is like

7    the second -- the contract, the first paragraph or the second

8    sentence talks about the statistically significant random

9    sample, so that in my mind pretty clearly means they're not

10   calling every person.

11   Q.   Other than SEEDCO's entries into the Work Source1 database,

12   did SBS require SEEDCO to provide SBS with any other

13   documentation relating to whether or not SEEDCO placed people

14   in jobs?

15   A.   No.

16   Q.   Why not?

17   A.   Again as the system of record, SEEDCO is one of 16 centers,

18   one of six large centers.   We needed to have data integrity,

19   and data integrity comes from one system where the definition

20   of success looks the same for everyone and there is not a big

21   paper chase going across multiple centers.

22          The centers placed thousands of people in jobs, and so

23   again this one system of record with very clear rules and

24   policies and procedures is and was critical to managing the

25   system.

F4FJUSA5                          Kamath - direct

1   Q.  Again with regard to these job placement targets, did you

2   have any understanding as to whether SBS paid SEEDCO for a

3   certain amount for every single placement it made?

4   A.  No.  The way the contract worked, there was the

5   reimbursement piece and there was the kind of what you could

6   earn based on the percentages of jobs that were verified.  So

7   it was never a X placement equals S dollars and cents.  It was

8   more for the body of work that was X percent verified.  You

9   were able to earn the portion of the contract that was subject

10  to performance payments.

11  Q.  At any time during your work at SBS, did you communicate to

12  SEEDCO that if a person came into a center working and then

13  sought to reimburse from SEEDCO, SEEDCO could count that

14  person's current job as a job placement?

15  A.  Never.

16  Q.  Do you know if anybody at SBS communicated that?

17  A.  No.

18  Q.  At any time during your work at SBS, did you communicate to

19  SEEDCO if someone sought services from SEEDCO and that person

20  was not working, SEEDCO could count that person's past job --

21  A.  Never.

22  Q.  -- as SEEDCO placement?

23          THE COURT:  Wait for the question.

24          THE WITNESS:  Sorry.  Sorry.  Pardon me.

25  BY MS. BLAIN:

F4FJUSA5                         Kamath - direct

1   Q.  And the answer was?

2   A.  Never.

3   Q.  Do you know if anybody at SBS communicated that?

4   A.  No.

5   Q.  Let's focus on the Year 2011, if we may.

6           Did there come a point in 2011 when you learned there

7   may be an issue with SEEDCO's job placement target numbers?

8   A.  Yes.

9   Q.  What did you learn?

10  A.  So in August of 2011 there was a New York Times reporter

11  who called up the agency wanting to talk about SEEDCO's job

12  placements.

13  Q.  When did you learn that a New York Times reporter called up

14  SBS?

15  A.  It was I think August 5th of 2011.

16  Q.  Approximately?

17  A.  Approximately.

18  Q.  What did you do after you learned that?

19  A.  So the reporter called our press secretary wanting to speak

20  and asking to speak to individuals who manage the system, and

21  so we took their request.  We called up SEEDCO.  We didn't

22  speak to the reporter.  We just took the request.

23          We called up SEEDCO management, Francine Delgado, and

24  Barbara Gunn, the President, giving them a heads-up what the

25  reporter wanted to talk about and wanting to understand what

F4FJUSA5                          Kamath - direct

1   they knew and what their perspective was.

2   Q.   You mentioned Francine Delgado.   Who was that?

3   A.   She was the vice president kind of executive within SEEDCO

4   who oversaw a number of SEEDCO's contracts, including the

5   SEEDCO of Upper Manhattan, Workforce1 contract.

6   Q.   You mentioned Barbara Gunn.   Who is that?

7   A.   Barbara Gunn is the CEO and president of SEEDCO.

8   Q.   What did Ms. Delgado and Ms. Gunn tell you on that phone

9   call?

10  A.   They didn't believe that the New York Times reporter's

11  allegations of fraudulent placements were correct and that the

12  individual who the reporter was speaking with, a former SEEDCO

13  employee, they believed that he was not a credible individual,

14  that he left SEEDCO with some disciplinary issues and that he

15  was not likely to be telling the truth.

16  Q.   What did you think of that explanation?

17             MR. FUTERFAS:   Objection.

18             THE COURT:   Sustained.

19  BY MS. BLAIN:

20  Q.   What was your conclusion after that phone call?

21             MR. FUTERFAS:   Objection.

22             (Pause)

23             THE COURT:   Sustained.

24  BY MS. BLAIN:

25  Q.   How, if anything, did that phone call affect your

F4FJUSA5                          Kamath - direct

1    ability --

2              THE COURT:  What did you do next?

3              MS. BLAIN:  Yes, your Honor.

4    BY MS. BLAIN:

5    Q.  What did you do next?

6    A.  We took the call with the reporter.  We explained -- we

7    answered his questions -- we explained our perspective on the

8    fraud.  We explained kind of how we work with our contractors,

9    and again it was a very one-way communication because we didn't

10   have all the information that the reporter had.

11             THE COURT:  Let's hold it there.  Counsel.

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

F4FJUSA5                        Kamath - direct

1                  (At the sidebar)

2                  THE COURT:  I don't believe that the communications

3      with the reporter or the investigation that was made because of

4      what the reporter said or anything else is relevant to the

5      case.  What is relevant to the case is whether or not the

6      information supplied was false and whether or not the records

7      were false and whether or not Mr. Saavedra knew that.

8                  THE COURT:  Am I right, Mr. Futerfas?

9                  MR. FUTERFAS:  Your Honor, that is our position.  It

10     has been our position.

11                 THE COURT:  I agree with that.

12                 MS. BLAIN:  Your Honor, the reason it is important

13     under the False Claims Act, we have to prove the information

14     from Work Source1 mattered to SBS and that lies were material

15     to payment.  So I have to show that once SBS learned that there

16     were lies --

17                 THE COURT:  Not according to what was told to the

18     reporter.

19                 MS. BLAIN:  Well --

20                 THE COURT:  You can ask her after you developed the

21     information that was lied, you can try to find materiality, was

22     it important?  Why was it important?  That you can do, not in

23     terms of why you investigated.

24                 MS. BLAIN:  Okay.  I won't ask about the New York

25     Times, but after the Times article came out DOI, New York City

F4FJUSA5                          Kamath - direct

1    itself investigated.

2              THE COURT:  If some government agency finds something

3    important doesn't mean that it is necessarily important.

4              MS. BLAIN:  It is not coming in for its truth for this

5    witness.  This witness will testify about once she learned and

6    what she learned, if that had an impact on her view.

7              THE COURT:  I don't think that is relevant.

8              MS. BLAIN:  It is only relevant because it is material

9    under the statute.

10             THE COURT:  No.  Materiality is proved differently.

11             It is proved by the importance of the material error,

12   omission, misstatement in relationship to the whole.  Now,

13   integrity is material and quantity is material, but the fact

14   that some government agency is interested is not material.

15             MS. BLAIN:  It is not material in and of itself, your

16   Honor, absolutely.  The only question is whether or not once

17   SBS learned of it, it learning there were inaccurate entries

18   into Work Source1 affected whether or not they wanted to

19   continue to pay SEEDCO.  That is something the government has

20   to prove under the statute.

21             The reason that SBS knew there was false information

22   in the Work Source1 is because they heard about it, and so I

23   need to show --

24             THE COURT:  I will release the jury and talk about it

25   and pull this up tomorrow.

F4FJUSA5                           Kamath - direct

1              (In open court)

2              THE COURT:  Members of the jury, we have to discuss

3    this for a few minutes.  We are up to 3:30, and I have got to

4    stop now anyhow.

5              So I will discuss this on my time, not your time with

6    counsel, and we'll be back 10:00 o'clock tomorrow morning.

7    We'll work tomorrow 10:00 o'clock to 5:00 o'clock and then

8    we'll recess until Monday.  Close up your books.  Give them to

9    Brigitte on the way out.  Don't discuss the case.  Keep an open

10   mind.

11             Ms. Blackburn, may I see you for just a moment.

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (At the sidebar)

2           THE COURT:  Mr. Askew is handicapped.  I am afraid

3    when he steps down, he can hurt himself.  I don't want to --

4           JUROR:  We have been trying to watch out for him.

5           THE COURT:  I see when he steps down, that I get a

6    little jump in my heart.  I don't know whether it is gratuitous

7    of us to do anything.

8           JUROR:  We have to move his chair so someone could get

9    down first.

10          THE COURT:  I can have someone come and hold his hand,

11   as simple as that.

12          JUROR:  Even if they're just standing there, it would

13   be smart.

14          THE COURT:  Have someone standing there?

15          JUROR:  Just in case and they could reach out and grab

16   him.

17          THE COURT:  It will be your job, Katie.

18          JUROR:  He is not adverse to a helping hand.  He is

19   very good at that.  I don't want to make him feel as if he

20   needs that.

21          THE COURT:  If you asked him the question and told us,

22   it would be better if you asked the question.

23          JUROR:  I will see if he will.

24          THE COURT:  Thanks.

25          (Continued on next page)

1          (In open court)

2          THE COURT:  Can I excuse the witness?

3          MS. BLAIN:  Yes, your Honor.

4          THE COURT:  Ms. Kamath, be here tomorrow at 10:00

5   o'clock.  Don't talk to anybody about the case while you're a

6   witness.

7          (The witness left the courtroom)

8          THE COURT:  Ms. Blain, how do you prove materiality?

9          MS. BLAIN:  Your Honor, we are intending to prove

10  materiality by showing that once SBS learned of the lies in

11  Work Source1, they decided to stop paying SEEDCO.  Materiality

12  is shown about whether or not anything has the tendency to

13  influence, under the statute, the tendency to influence

14  payment.

15         And false information in Work Source1 had a tendency

16  to influence payment.  We can show that it had a tendency to

17  influence payment because once SBS learned that Work Source1

18  was inaccurate, it stopped paying.

19         THE COURT:  Altogether?

20         MS. BLAIN:  Altogether.

21         THE COURT:  Mr. Futerfas, how do you see the issue?

22         MR. FUTERFAS:  Your Honor, the trouble that we've had

23  with this whole argument that what happens later, how a person

24  reacts to something or how an organization reacts to something

25  proves the question that's a factual question for the jury.  I

1    have always had trouble with it.  It is almost like a Catch-22.

2              THE COURT:  How should they prove it?

3              MR. FUTERFAS:  Well, I think certainly they can put

4    in, as they've done, the nature of the contracts, what the

5    contracts required, put in testimony that they've done about

6    what --

7              THE COURT:  I don't know that there is necessarily a

8    contractual covenant about being honest.  I think one expects

9    honesty in reporting.  So if there is a purposeful

10   misstatement, that almost itself is material.

11             MR. FUTERFAS:  I think, your Honor, that there are

12   contractual violations or contractual things that are not a

13   false claim and there are obviously different remedies under

14   the contract.

15             My problem is, and I think this is what your Honor was

16   thinking about in the last week or so when we addressed this,

17   is that if you look to say okay, an agency learns about

18   something, it takes six or eight months to decide what to do

19   about it, and then six or eight months later it decides oh,

20   we're going to cancel the contract, to say well because six or

21   eight months later they cancel the contract; therefore, it was

22   material, I think is usurping the jury's role.  It is almost

23   like you are using something that happened after the event to

24   prove materiality of the event.

25             THE COURT:  The government agencies are not swift.  So

1    when something comes to some commissioner's attention, they

2    have to staff it and they have to communicate about it and not

3    always make a decision.  Time lapse is a factor, but I don't

4    think is a crucial factor in terms of admissibility of

5    anything.

6           What I am really focused on is why it is necessary to

7    talk about an investigation going on or a New York Times

8    reporter bringing something to someone's attention.  We have

9    what we have so far in the record.  I let it in.  There was no

10   objection.

11          At this point I don't want any more testimony about

12   what a New York Times reporter said or what was said to the New

13   York Times reporter or even about an investigation within the

14   department.

15          What seems to me is we need to deal with what can

16   influence payment under the terms Ms. Blain just gave me or

17   notions of materiality generally.

18          Materiality is affected by honesty.  Honesty generally

19   is expressed in terms of materiality also, so we have a bit of

20   a circular effect.  Quantity is important in relationship to

21   the whole and dependability in terms of being able to depend on

22   the source of the information on the hole.

23          I think Ms. Blain can ask Ms. Kamath -- is that her

24   name?

25          MS. BLAIN:  Kamath.

1            THE COURT:  How do you pronounce it?

2            MS. BLAIN:  She pronounces it Kamath.

3            THE COURT:  You can ask Ms. Kamath what she found, she

4    or her staff at her direction found with regard to information

5    that was found.  You can ask if information of this nature,

6    according to proper business methodology, is sufficiently

7    important to stop payment.

8            MS. BLAIN:  Your Honor --

9            THE COURT:  I am not sure I have it just right.  I

10   don't know if you object to this or not, but I would like to

11   actually consider overnight and I would like you to do it as

12   well, what you may permissibly ask.

13           MS. BLAIN:  I absolutely thank you.  I think there are

14   two issues here.  One is, and they're being folded together,

15   but one is a separate question which is did the fraud happen.

16   That we are trying to prove through witnesses.

17           THE COURT:  You don't need materiality for that.

18           MS. BLAIN:  Right.  The second question is did the

19   fraud matter.  That is materiality.

20           THE COURT:  Yes.

21           MS. BLAIN:  One of the reasons that the fraud matter

22   we are showing through Ms. Kamath is because she learned

23   exactly what happened.  She learned the extent of the fraud,

24   she learned --

25           THE COURT:  How did she learn it?

F4FJUSA5                          Kamath - direct

1              MS. BLAIN:  She was not allowed to do her own

2      investigation because we are saying the Department of

3      Investigation, by law, by statute was doing it.

4              SBS couldn't do it themselves.  They had to rely on,

5      by law, under the charter, New York City charter, DOI's looking

6      into it.  They were told not to look into it while DOI was

7      looking into it.  She only learned about it because of the DOI

8      investigation.  She was told not to do it herself.

9              THE COURT:  Then I've got to give a limiting

10     instruction.

11             MS. BLAIN:  Yes, your Honor.

12             THE COURT:  The instruction would be that the jury

13     can't accept as truth what the DOI found.  It is relevant only

14     on the issue of materiality and the context of what happened

15     next.

16             MR. FUTERFAS:  Your Honor, if I may.

17             What I think is going to happen tomorrow -- and I know

18     it is 3:30 and you have to leave.

19             THE COURT:  Stay with me.

20             MR. FUTERFAS:  The government intends to call --

21             THE COURT:  The ceremony is at 4:00 o'clock for Judge

22     Baer.

23             THE CLERK:  Do you know where you're going?

24             THE COURT:  You'll tell me.

25             MS. SCHOENBERGER:  Your Honor, would it be all right

1    if we excuse Mr. Solomon for today?

2                  THE COURT:  Yes.

3                  (Pause)

4                  MR. FUTERFAS:  We can craft something that will

5    actually save a fair amount of trial time because the

6    government intends to call after Ms. Kamath at some point

7    tomorrow a witness Chanterelle Sung, the DOI, lead DOI

8    investigator, and I think all of that is irrelevant because if

9    the only issue that the government wants to elicit is that SBS,

10   an investigation in the matter occurred and that eventually it

11   wasn't until about March of 2012 the city canceled its contract

12   with SEEDCO, the government can certainly then be free on

13   summation to say look, when SBS learned of whatever happened,

14   they canceled the contract in order to meet materiality.

15                  The problem is the government will try to do tomorrow,

16   and I think it will be a significant issue is they're going to

17   try to have through Ms. Chanterelle Sung, have this witness say

18   DOI conducted an investigation and Ms. Sung, have Ms. Sung come

19   into court, relate conclusions about that investigation.

20                  THE COURT:  Would that be offered under 803 (8)?

21                  MS. BLAIN:  Yes, your Honor, and (6).

22                  MR. FUTERFAS:  That will open up, quite frankly,

23   because I already deposed Ms. Sung.  I deposed her for hours.

24   We can spend hours, and I will have to do it if I have to do

25   it, but we can spend hours taking apart conclusions and taking

1  apart the methodology because even Ms. Sung acknowledged at her

2  deposition that different categories, very large categories of

3  placements that they felt were questionable, they felt were

4  questionable.  Even there were categories they thought were not

5  false placements.

6          THE COURT:  How will you prove falsity?

7          MS. BLAIN:  Putting aside falsity because people have

8  told the jury they entered false information --

9          THE COURT:  In terms of quantity?

10         MS. BLAIN:  We need the DOI investigator.

11         THE COURT:  You depend on 803 (8)?

12         MS. BLAIN:  Yes.

13         THE COURT:  Do you have other evidence?  Have you done

14 your own examination of falsity?

15         MS. BLAIN:  Your Honor, we have.  It really does

16 depend on the DOI investigator and the DOI investigator for one

17 very limited purpose.  DOI wrote an 89 page comprehensive

18 report we are not seeking to introduce.  They found four or

19 five actually different ways that SEEDCO may have committed

20 fraud.

21         Four of them they determined they couldn't definitive

22 determine one way or the other.  They said this may have

23 happened, but we can't really figure it out.  There is one way

24 that they definitively concluded there was fraud, and that was

25 by counting a past or current job as a SEEDCO placement.

1              THE COURT:  What is the quantity that you intend to

2      prove?

3              MS. BLAIN:  They found 528 false placements, 528 job

4      seekers that SEEDCO claimed to help.

5              THE COURT:  Monetize that.

6              MS. BLAIN:  SBS does not pay SEEDCO on a one-to-one,

7      as I just asked Angie, for every job placement it is $500.00.

8              It is not.  It is the scope of the fraud.

9              THE COURT:  You're asking for damages in this case?

10             MS. BLAIN:  Based on two things:

11             One, the contract amount which has nothing to do with

12     how much was put in to Work Source1, really.

13             Number two, civil penalties, and that is based on the

14     number of false claims, and each one of those 528 false

15     placement is a false claim subject to a civil penalty.

16             The 528, your Honor, goes to the scope of the fraud

17     which also goes to materiality because it goes to whether or

18     not, if SEEDCO only entered one false placement, that may not

19     be material.

20             If SEEDCO entered more than one, that goes more to

21     knowledge and goes more to materiality.  It also goes more to

22     Mr. Saavedra's knowledge.  If there were 528 false placements

23     over a period of eight months, that much more --

24             THE COURT:  You are content with your briefs on these

25     issues?

1            MS. BLAIN:  Yes.

2            THE COURT:  Mr. Futerfas?

3            MR. FUTERFAS:  May I respond very briefly?  I know

4    your Honor has to run.  Very, very quickly, SBS conducted a

5    monetization analysis.  They knew that Charney was verifying

6    every one of those placements.  We have e-mails and

7    spreadsheets --

8            THE COURT:  Your theory is damages were zero?

9            MR. FUTERFAS:  They conducted --

10           THE COURT:  The damages are zero?

11           MR. FUTERFAS:  One thing they also showed, your Honor,

12   is that there is not even clear that these 528 were even

13   counted as part of the performance-based compensation which she

14   just testified to.

15           Lastly, your Honor, I would tell you that the 528, the

16   SBS own documents show they placed 6,000 people.  This is less

17   than 10 percent.  My suggestion is this, and I will sit down --

18           THE COURT:  I would like to hear you at 9:30 tomorrow.

19   We'll go over this tomorrow.

20           So let me just give you the time for day two.

21   Continuation of Katz by defendant went from 10:05 to 11:10, for

22   an hour and five minutes.

23           Bryant, by the plaintiff, was 40 minutes, 11:45 to

24   12:20.  By defendant, 12:20 to 12:45, for 25 minutes and from

25   the plaintiff from 12:45 to 12:50, for five minutes.  Nesmith

F4FJUSA5                         Kamath - direct

1    by the plaintiff was 10 minutes, 2:10 to 2:20; by the

2    defendant, 2:20 to 2:30.

3              And Kamath by the plaintiff was between 2:30 and 3:20.

4    We'll continue with Kamath tomorrow.  Those are the times

5    there.  If there is no disagreement, the time will stand.

6              Thank you.

7              (Court adjourned until Thursday, April 16, 2015, at

8    9:30 o'clock am)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                       INDEX OF EXAMINATION

 2    Examination of:                            Page

 3    Cross By Mr. Futerfas . . . . . . . . . . . 110

 4    Redirect By Ms. Schoenberger . . . . . . . 156

 5    ANA YATIZ-BRYANT

 6    Direct By Ms. Blain . . . . . . . . . . . . 171

 7    Cross By Mr. Futerfas . . . . . . . . . . . 200

 8    Redirect By Ms. Blain . . . . . . . . . . . 214

 9    KIMBERLY NESMITH

10    Direct By Ms. Schoenberger . . . . . . . . 218

11    Cross By Mr. Futerfas . . . . . . . . . . . 226

12    ANGIE KAMATH

13    Direct By Ms. Blain . . . . . . . . . . . . 235

14                      GOVERNMENT EXHIBITS

15    Exhibit No.                            Received

16     70    . . . . . . . . . . . . . . . . . . 191

17     5     . . . . . . . . . . . . . . . . . . 196

18     3     . . . . . . . . . . . . . . . . . . 199

19     30 to 44  . . . . . . . . . . . . . . . . 242

20     21    . . . . . . . . . . . . . . . . . . 254

21                      DEFENDANT EXHIBITS

22    Exhibit No.                            Received

23     DDDD  . . . . . . . . . . . . . . . . . . 128

24     SSS   . . . . . . . . . . . . . . . . . . 134

25
```