F4GJUSA1                    Kamath – direct

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES of AMERICA,

4                   Plaintiff,

5            v.                            11 Civ. 6425 AKH

6   ALEX SAAVEDRA,

7                   Defendant.

8   ------------------------------x

9                                         April 16, 2015
                                          9:40 a.m.
10
    Before:
11
                        HON. ALVIN K. HELLERSTEIN,
12
                                          District Judge
13                                         and a jury

14

15                         APPEARANCES

16  PREET BHARARA,
         United States Attorney for the
17       Southern District of New York
    BY:  CARINA HYATT SCHOENBERGER,
18       JENNIFER ELLEN BLAIN,
         Assistant United States Attorneys
19
    LAW OFFICES OF BETTINA SCHEIN,
20       Attorneys for defendant
    BY:  BETTINA SCHEIN, Esq.
21       – and –
    LAW OFFICES OF ALAN S. FUTERFAS,
22  BY:  ALAN SAMUEL FUTERFAS, Esq.
                   Of counsel
23

24  Also Present:
         HARRY SOLOMON, Technical Support USAO
25       MARISA ALBERTI, Defense Paralegal & Technical Support

F4GJUSA1                        Kamath - direct

1              (Trial resumes)

2              (In open court; jury not present)

3              THE COURT:  Be seated.

4         So we've done some digging and researching, and here's

5    the way I think we should proceed.  Then counsel will react.

6    The statute gives a definition of the term materiality as

7    follows:

8              The term material means having a natural tendency to

9    influence or be capable of influencing the pending receipt of

10   money or property.  This is marks the same as the objective

11   standard described by the Supreme Court in Basic versus

12   Levenson and it is not a factual explanation as well as it is a

13   legal explanation.

14             However, the fact that the commissioner decided to

15   suspend payments on the basis of the report of the Department

16   of Investigation is relevant.  At that point the report itself

17   is not relevant.  It provides background for the commissioner's

18   decision, and to the extent that materiality is a question of

19   fact as well as law, it flushes out the issue of materiality.

20             So I rule, first, that the commissioner can testify

21   what she did and what she communicated to SEEDCO on the basis

22   of the Department of Investigation report.  At this point the

23   report itself is not evidence.  It will be marked for

24   identification.

25             In terms of what's communicated, I don't know what the

F4GJUSA1                        Kamath - direct

communication was between the commissioner and SEEDCO, and

there may not be need for any further elaboration depending on

the nature of the communication, but there may also be need to

explain further why it was that payment was suspended.

I think I should have some leeway there, with a

cautionary instruction to the jury that at this point we are

not looking at this examination as whether it is true or not,

but rather how informed the decision was of the commissioner.

That sums up the ruling I propose to make with regard to the

Commission's testimony.

We also researched and thought about the issue of the

report itself.  It is 89 pages, I understand.  It seems to me

that it qualifies under Federal Rule of Evidence 803 (8).  803

(8) provides as follows:

"A record or statement of a public office, if:  A, it

sets out (3) in a civil case factual findings from a legally

authorized investigation.

I take it Ms. Sung, if that is her name, will testify

as to the fact of the legality of the authorized investigation,

presumably by putting into evidence the authorizing orders of

the commissioner and reference from someone else.  I take these

terms from the law itself.

The city charter, New York City Law, Section 801,

establishes a Department of Investigation, the head of which

shall be the commissioner of investigation, specifies the

F4GJUSA1                          Kamath – direct

qualifications of the commissioner and the service of the

commissioner under the mayor.

Section 803 of the New York City law describes the

powers and duties of the Department of Investigation and the

commissioner.  It provides as follows:

The commissioner shall make any investigation directed

by the mayor or the council as authorized and empowered

pursuant to an opinion of the commissioner that it is in the

best interests of the city.  The commissioner can investigate

the affairs, functions, accounts, methods, personnel or

efficiency of any agency.

Subsection (c) requires the preparation of a written

report or statement of findings and requires that the copy of

the report or statement is to be forwarded to the requesting

party, if any.

Then it goes on to give the qualifications and

obligations.  Jurisdiction is wide.  It extends to any agency,

officer or employee of the city or any person or entity doing

business with the city, or any person or entity who is paid or

receives money from or through the city or any agency of the

city.  The commissioner is to forward to the council and to the

mayor a copy of all reports and standards prepared by the

Corruption Prevention & Management Review Bureau upon the

issuance by the commission.

I take it that will be the subject of the testimony

F4GJUSA1                           Kamath - direct

1      of -- what is the witness's name?

2                  MS. BLAIN:  Ms. Sung, your Honor.

3                  THE COURT:  Ms. Sung.  That testimony will be, I

4      think, admissible.  The next question is whether the report

5      itself will be admitted if the predicates are found according

6      to the testimony of Ms. Sung.

7                  In that case, there will be factual findings from a

8      legally authorized investigation, and that will be shown, I

9      assume, and the next criterion is that the opponent does not

10     show that the source of information or other circumstances

11     indicate a lack of trustworthiness.

12                 Has there been adequate pretrial discovery of the

13     issue, Ms. Blain?

14                 MS. BLAIN:  Yes, your Honor.  Defendant's counsel took

15     Ms. Sung's deposition for almost the entire seven hours, and

16     they requested and received multiple documents from DOI itself

17     as well as SBS going into the scope and breadth and details of

18     the investigation.

19                 THE COURT:  Is there any constraint that you needed to

20     do or to open up, Mr. Futerfas?

21                 MR. FUTERFAS:  Your Honor --

22                 THE COURT:  Or was it Ms. --

23                 MR. FUTERFAS:  -- I will deal with the report of Ms.

24     Sung.  Ms. Schein will address the issues to Ms. Kamath.

25                 THE COURT:  What is Ms. Schein doing to do?

1              MR. FUTERFAS:  The issues with respect to Angie

2    Kamath, the Commissioner.  With respect to Ms. Sung and the

3    report, I let the court know the government has proposed to

4    introduce excerpts of the report, and specifically -- I think

5    it is being handed up to your Honor -- and specifically a

6    conclusion that they deem, there is a conclusion there might

7    have been 528 false placements.

8              The reason for that, your Honor, is because throughout

9    the discovery, what we established was the DOI report examined

10   various types of placements, questionable placements.

11             THE COURT:  Yes, but they're not going to add those.

12             They focused on one category which is what was relied

13   on by Ms. Kamath.

14             MR. FUTERFAS:  That's right.

15             THE COURT:  So we're not going to get involved in the

16   other activities except to dismiss them.

17             MR. FUTERFAS:  Right.  The only issue before the court

18   is the government's proposed excerpts of the report's

19   conclusion and with respect to the 528.

20             THE COURT:  I see brackets above various paragraphs

21   here.  Are those the brackets you want me to rule on?

22             MR. FUTERFAS:  I think that is the application before

23   the court, yes.

24             THE COURT:  So let me rule on them.

25             First, on Page 4 describes the investigation initiated

 1    upon receiving the referral from the New York City Department
 2    of SBS regarding an allegation of fraud by SEEDCO.  I see
 3    nothing prejudicial in that.  I rule that is admitted.
 4              The next bracket is at Page 6.
 5              MS. BLAIN:  Your Honor, it is Page 5, I believe, the
 6    entire Page 5 and the very top of Page 6.
 7              THE COURT:  I see.  Thank you.
 8              Paragraph 1, this is all a description of the
 9    investigation and it is necessary because it shows compliance
10    with the law, so the first paragraph talks about subpoenas and
11    various requests for information, interviews, et cetera.  There
12    is nothing prejudicial about that.  There is nothing
13    untrustworthy about that.  Admitted.
14              The second paragraph focuses on the items, the
15    particular relevance, the contract with SEEDCO, policies and
16    procedures of SEEDCO, SEEDCO's CIFs from February 2011 to
17    August of 2011, the available CIFs from an earlier period of
18    September 2010 through May of 2011, a coterminous period as
19    produced to the department by Bill Harper who was the whistle
20    blower.
21              Is Mr. Harper going to testify?
22              MS. BLAIN:  Your Honor, Harper is an unavailable
23    witness.  He lives in Germany, so we provided excerpts of his
24    deposition we plan to proffer into evidence.
25              THE COURT:  Will he explain this part of why he was

1     able to preserve some and not others?

2               MS. BLAIN:  Yes, your Honor.  Well, he will explain

3     how he got some, but it wasn't his job to get others.  So I

4     think it will be clear in the deposition testimony.

5               THE COURT:  We could redact "by Bill Harper" if it is

6     not going to be an issue.

7               MR. FUTERFAS:  Your Honor, we asked Mr. Harper at the

8     deposition where are the CIFs that he said he took from SEEDCO,

9     he testified about 400 of them.  He doesn't know where they

10    are, and we asked the government to produce them, and they

11    haven't done so.

12              MS. BLAIN:  Your Honor, that is actually not what

13    happened.

14              Mr. Harper provided the CIFs to DOI and SBS, the city

15    agencies.  The city agencies gave the government all of the

16    CIFs for this relevant time period, and then we gave

17    defendant's counsel all of the CIFs for this relevant time

18    period.  There is about 1500 CIFs, 10 boxes of documents, they

19    have all of it.

20              THE COURT:  Do you have production numbers?

21              MS. BLAIN:  Yes, your Honor, we provided it to them

22    multiple times.

23              THE COURT:  Do you have production numbers you can

24    refer to now?

25              MS. BLAIN:  I can refer to a few of them.

F4GJUSA1                           Kamath - direct

1                MR. FUTERFAS:  Your Honor, the question is that we did

2       receive a lot of CIFs finally, but from the depositions of

3       Mr. Harper and actually Ms. Sung, the question was where is

4       this 528?

5                In other words, which of the thousands -- in fact, Ms.

6       Sung testified at her deposition that she had 10 boxes of CIFs,

7       and so the question became there's 500 that the DOI is saying

8       are --

9                THE COURT:  I don't think this goes to the reliability

10      of the report.  I don't think we're going to get into this

11      issue.  I will allow to you the possibility of redaction of the

12      phrase, "by Bill Harper" if defendant wishes that and it is not

13      going to make an issue of that.  What do you want?

14               (Off-the-record discussion)

15               MR. FUTERFAS:  I think we'll leave it in, "by Bill

16      Harper."  A lot of his testimony will be read or some portions

17      will be read, and so it is fine.

18               THE COURT:  Then it goes on to say, "All available

19      resumes as produced to DOI by Bill Harper."  We'll leave that

20      in, too.

21               All available job placement data in DSBS electronic

22      Workforce1 database system from January 2010 to August 8, 2011

23      as produced to DOI by DSBS, and that will come in.

24               Then it is e-mail communications, and that will come

25      in.

F4GJUSA1                      Kamath – direct

1           No. 7 is information regarding SEEDCO's internal

2     investigation following bill Harper's allegations against

3     SEEDCO in April 2011 as produced to DOI by SEEDCO.

4           Are we going to have more evidence with regard to that

5     internal investigation?

6           MS. BLAIN:  No, your Honor, not unless the witnesses

7     offer that.

8           THE COURT:  Mr. Futerfas?

9           MR. FUTERFAS:  Well, one moment.

10          (Off-the-record discussion)

11          THE COURT:  You don't have to tell me now.

12          MR. FUTERFAS:  Well, I guess, your Honor, the question

13    is going to be I just don't know how much --

14          THE COURT:  Is your answer is you don't know?

15          MR. FUTERFAS:  I don't know because I don't know --

16          THE COURT:  I accept the answer.

17          Lastly, DOI's verification of SEEDCO's reported job

18    placements through information provided to DOI from employers

19    and job seekers.

20          I think this is admissible, all admissible, and I

21    propose to admit it.  It goes to the adequacy and

22    trustworthiness of the report.

23          The next paragraph reads that DOI's investigation has

24    substantiated the allegation that SEEDCO reported false job

25    placements to DSBS, and it follows the findings.  That

F4GJUSA1                         Kamath - direct

 1    introductory paragraph is admissible.  The 528 false job

 2    placements is its finding and admissible --

 3              MR. FUTERFAS:  Your Honor --

 4              THE COURT:  -- along with the footnote.

 5              MR. FUTERFAS:  I am sorry, your Honor, just so the

 6    record is clear, we have a standing objection to the entire,

 7    all of this, obviously, but I don't want to --

 8              THE COURT:  Well, make your objection because I'm

 9    going to rule.

10              MR. FUTERFAS:  We are objecting to all of it.  We move

11    to exclude it.

12              THE COURT:  I am going into it.  I am telling you it

13    is admissible under 803 (8) subject to your showing that the

14    information lacks trustworthiness.

15              MR. FUTERFAS:  Your Honor, first of all --

16              THE COURT:  That is what I said at the outset.  Fine.

17              MS. SCHEIN:  If I may?

18              THE COURT:  I can't have both of you bouncing up and

19    down.

20              MS. SCHEIN:  I am sorry, your Honor.  If I may?

21              The 528 job placements, the bullet point on Page 5

22    under DOI's investigation as substantiated, we object to the

23    conclusions starting with the paragraph, the middle of Page 5,

24    DOI's investigation has substantiated the allegations on the

25    basis that --

F4GJUSA1                          Kamath - direct

1              THE COURT:  That is the report, and if it is a matter

2      within the order and establishment of DOI, it is a report of a

3      government agency.  If you don't show that there is a lack of

4      trustworthiness, it will come in.

5              MS. SCHEIN:  Your Honor, the three bullet points below

6      that paragraph, we object to those three specific conclusions

7      of the DOI report on the basis that Ms. Sung interviewed at

8      least 28 or more employees.  The government is not calling

9      them.  We have heard just from three individuals who worked

10     there, and this report is based upon the interviews of

11     employees that they're not calling.

12             So it is a summary conclusion based upon information,

13     hearsay that we don't have a chance to cross-examine, hearsay

14     statements the jury will not hear from those witnesses, and

15     that is the basis for a large part of Ms. Sung's DOI report and

16     certainly for those conclusions.

17             THE COURT:  I hold these are factual findings from a

18     legally authorized investigation as provided in Rule 803

19     (8)(a)(3) of the Federal Rules of Evidence.  You had an

20     opportunity during discovery to go behind the factual findings

21     and could make arguments that the factual findings lack

22     trustworthiness as provided in 803 (8)(b), and you have not

23     done so.  Accordingly, all of Page 5 will come in.

24             MR. FUTERFAS:  Your Honor --

25             THE COURT:  And that continues to the top paragraph on

F4GJUSA1                         Kamath - direct

1    Page 6.

2              MR. FUTERFAS:  -- your Honor, can I address

3    specifically two bullets on the bottom of 5?

4              THE COURT:  I can't have you both.  One or the other.

5              MR. FUTERFAS:  I will take it from here.  Sorry, your

6    Honor.

7              THE COURT:  Go ahead, Mr. Futerfas.

8              MR. FUTERFAS:  The bottom two bullet points are very

9    important.

10             THE COURT:  They're all important.  SEEDCO developed?

11             MR. FUTERFAS:  I agree.

12             THE COURT:  The finding is as follows:

13             "SEEDCO developed regular practices to report false

14   placements to DSBS."

15             MR. FUTERFAS:  That implicates directly the issue in

16   this case.  That really goes to the factual, really goes to the

17   factual determination the jury has to make.

18             THE COURT:  That is why it is relevant.

19             MR. FUTERFAS:  But I don't think you can take a report

20   to usurp entirely the jury's function.

21             THE COURT:  It doesn't.

22             MR. FUTERFAS:  It goes to this language which is

23   regular practices and makes it sound like Mr. Saavedra, who is

24   director of that facility, developed regular practices because

25   he was the director.  So it really goes beyond saying we

F4GJUSA1                          Kamath – direct

1    believe there are 528 false placements.  That is a factual

2    determination we can agree or disagree about it.

3           When they start saying things like that, that

4    particular line, just really talking about one line, I think

5    that goes further than the kinds of factual statements under

6    the rule and really goes to the heart of what the jury's

7    actually going to be hearing testifying about Mr. Saavedra's

8    knowledge and intent and the elements of his state of mind.

9           THE COURT:  There has been adequate basis from the

10   testimony developed so far that's consistent with this finding.

11          It is a factual finding made after investigation, and

12   I rule that it is admissible.  It will be an extraordinary long

13   trial if the government had to prove every particular point.

14   If it had to, it would do so.  We can save much time and effort

15   without offending anybody's fair right to representation by

16   allowing this report to come in, and I allow it to come in,

17   including these findings.

18          Mr. Saavedra can still argue all the points he wishes

19   to argue, and I don't at this point rule that any limitation

20   applies.  We are now on Page 16 entitled, "DOI's findings

21   regarding false job placements," and I think the objection will

22   be much the same as already made, and I rule this is

23   admissible.

24          Next is the continuation on Page 17.  It will have the

25   same ruling of admissibility.

F4GJUSA1                        Kamath – direct

 1              The same goes for the finding at the bottom of Page 85

 2      and to 86.  That is another statement here as follows:

 3              Given that CIFs were shredded up until February of

 4      2011, these findings are limited by the data made available to

 5      DOI and do not necessarily represent the total number of false

 6      placements during the reporting period of January 1, 2011 to

 7      August 8, 2011.

 8              Is there any reason I should treat that finding

 9      differently or that limitation qualification as I am and

10      finding differently from others?

11              MS. BLAIN:  No, your Honor.  It actually indicates

12      this report is trustworthy, which I believe is the only

13      question before the court because it indicates the report

14      drafters knew the limitations of the dataset and were very

15      careful in drawing definitive conclusions.

16              As multiple courts have found, including the Second

17      Circuit in 2000, it let in a State Department country report in

18      part because the report itself admitted the limitations of its

19      own knowledge, and they found that was another indicia of

20      trustworthiness.

21              THE COURT:  Mr. Futerfas.

22              MR. FUTERFAS:  Yes, your Honor, the last clause of

23      that sentence suggests there may be other false placements that

24      they haven't found.  I don't think the jury should be permitted

25      to speculate, and so I would object to the words, "do not

F4GJUSA1                        Kamath - direct

1   necessarily represent the total number of false placements."  I

2   don't think the jury should be permitted to speculate beyond

3   the evidence put before them.

4            MS. BLAIN:  Your Honor, it is not a question of

5   speculation; it is a question of trustworthiness.  That is the

6   only issue regarding think DOI report under 803 (8)(a).

7            Mr. Futerfas is welcome to cross-examine Ms. Sung

8   about that statement and make any arguments he wishes on

9   cross-examination.

10           THE COURT:  I propose that we redact the phrase, "and

11   do not necessarily represent the total number of false

12   placements."  You can blacken it out.

13           MS. BLAIN:  Yes, your Honor.

14           THE COURT:  The rest will come in.

15           The finding below on Page 86 is consistent with what

16   is said before, and I rule it is admissible as well as the

17   finding on Page 88.

18           Okay, this extract, does it have a separate exhibit

19   number?

20           MS. BLAIN:  Yes, your Honor, this is Exhibit 13 A, and

21   we have the redacted copy ready, which we are now redacting

22   through Mr. Solomon's magic.

23           THE COURT:  Is there anything else I need to rule on

24   before we get the jury?

25           MR. FUTERFAS:  Your Honor, there may be a portion that

F4GJUSA1                        Kamath - direct

1     we would want to -- if I may have one moment, your Honor.  This

2     is coming in?

3            THE COURT:  When is it going to come in, Ms. Blain?

4     When are you going to offer it?

5            MS. BLAIN:  During Ms. Sung's testimony when we finish

6     Ms. Kamath and have one brief witness and then Ms. Sung.

7            THE COURT:  This afternoon?

8            MS. BLAIN:  Or late this morning, your Honor.

9            MR. FUTERFAS:  We'll look for it, your Honor.  There

10    may be a portion, a portion that we would want to -- actually,

11    I will look for it.  I don't want to take the government's --

12           THE COURT:  Does the government have the transcripts

13    of the Mitchell McClinton tapes?

14           MS. SCHOENBERGER:  Yes, we do, your Honor.  They're

15    still being reviewed by defendant.  We anticipate being able to

16    give them to you at the lunch break.

17           THE COURT:  Is there anything else I have to rule on

18    before we have the jury in?

19           Ms. Blain?

20           MS. SCHOENBERGER:  There is one outstanding issue

21    which is the rulings on the Harper designations.  We put in a

22    color-coded transcript with each side's objections to the

23    various --

24           THE COURT:  When are we reaching that?

25           MS. SCHOENBERGER:  We expect that Mr. Harper will

F4GJUSA1                         Kamath - direct

1    testify by deposition this afternoon.  So I don't think that

2    needs to cut into the jury time this morning, but to the extent

3    we can get a ruling on that today, I think that will be timely.

4              THE COURT:  I'll take a 15 longer lunch break and rule

5    before we come back from lunch or before we go to lunch.

6              Anything else?

7              MR. FUTERFAS:  Yes, your Honor.  We have identified

8    the portion of the report.  If those sections are coming in of

9    the report, we would like to admit, we might as well do it as

10   part of one exhibit, and I can actually hand up to your Honor

11   the page.

12             THE COURT:  Please.

13             MR. FUTERFAS:  The page contained at Page 87 of the

14   DOI report.

15             THE COURT:  Just the bracketed paragraph?

16             MR. FUTERFAS:  Yes, your Honor.

17             THE COURT:  Does the government have any objection?

18             MS. BLAIN:  No, your Honor.

19             THE COURT:  The rest of the page doesn't come in?

20             MR. FUTERFAS:  Just the part I highlighted.

21             MS. BLAIN:  Actually, if that paragraph is coming in,

22   I believe it needs context, which is the second paragraph as

23   well.

24             THE COURT:  The second paragraph is the paragraph that

25   is highlighted.

F4GJUSA1                          Kamath - direct

1          MS. BLAIN:  Contract with monetary values aside.

2          THE COURT:  That is the third paragraph.

3          MS. BLAIN:  Yes, you're right, sorry, the third

4    paragraph, your Honor.

5          MR. FUTERFAS:  We think that is policy language.  We

6    think that is not a factual determination.

7          THE COURT:  One minute, please.

8          MR. FUTERFAS:  Okay.

9          (Pause)

10         THE COURT:  I would propose to limit admissibility to

11   the first two sentences of Paragraph 3.  So you can redact

12   Paragraph 1, you will redact the third sentence in the

13   following Paragraph 3 starting with the goal of DSBS's

14   workforce centers, and we will redact the bottom of the page,

15   policy and procedure recommendations of the DSBS, okay, folks?

16         MS. BLAIN:  Thank you.

17         MR. FUTERFAS:  That is fine, your Honor.  Thank you.

18         THE COURT:  As redacted, the government will include

19   those aspects of Page 87 in its offer.

20         MS. BLAIN:  Thank you.

21         THE COURT:  Anything else before me?

22         MS. SCHEIN:  Yes, your Honor, just one other matter.

23         As to the testimony of Ms. Kamath and her testimony

24   about what the agency did, including canceling the contract, we

25   object to her testifying about that and take an exception to

F4GJUSA1                        Kamath - direct

1    the ruling because it does not go to the materiality under

2    the --

3              THE COURT:  What are you objecting to?

4              MS. SCHEIN:  To her testimony about her conclusion

5    that they --

6              THE COURT:  You'll make your objection when -- she is

7    testifying now -- make your objection as she testifies.

8              MS. SCHEIN:  Very well.

9              THE COURT:  Are you moving to strike the entire

10   testimony?

11             MS. SCHEIN:  No, your Honor.  Just her conclusion

12   as --

13             THE COURT:  I don't know what you're objecting to.  If

14   you want to object, make it to a page and line of the

15   transcript.  Let's bring in the jury.

16             MS. SCHEIN:  Very well.

17             (Jury present)

18             THE COURT:  Good morning, members of the jury.  Be

19   seated.  Good morning, Ms. Kamath, you remain under oath.

20             Members of the jury, am sorry we are 20 minutes late.

21   We started early this morning to deal with some legal issues.

22   We resolved them.  I hope that will speed the efficiency of the

23   trial, but it took us a little longer than we anticipated.

24             Ms. Kamath is on the witness stand.  The direct

25   examination is going on.  Ms. Blain, please continue.

F4GJUSA1                          Kamath – direct

 1   Ms. Kamath is reminded that she remains under oath.

 2    ANGIE KAMATH, resumed.

 3   DIRECT EXAMINATION (Continued)

 4   BY MS. BLAIN:

 5   Q.  Good morning, Ms. Kamath.

 6   A.  Good morning.

 7   Q.  When we left off yesterday, I believe you were testifying

 8   about the relationship between SBS and SEEDCO.

 9   A.  Yes.

10   Q.  Do you remember that?

11          At some point in time did SBS's relationship with

12   SEEDCO change?

13   A.  Yes.

14   Q.  At what point in time?

15   A.  So during the course of 2011, kind of going into 2012,

16   there was a Department of Investigation investigation of the

17   fraud claims against SEEDCO.

18          MS. SCHEIN:  Your Honor, objection.

19          THE COURT:  Overruled.

20   BY MS. BLAIN:

21   Q.  You may continue.

22   A.  Sure.  And so at the release of the Department of

23   Investigation report in March of 2012, there was a change in

24   the relationship between SBS and SEEDCO.

25   Q.  You referred to the Department of Investigation.  What is

F4GJUSA1                      Kamath - direct

1   that?

2   A.   The New York City Department of Investigation is a law

3   enforcement entity that is tasked with investigating claims of

4   fraud or claims against city agencies.

5   Q.   You mentioned a report.  Is that right?

6   A.   Yes.

7   Q.   What report did you mean?

8   A.   There was a report of the findings of the New York City

9   Department of Investigation on allegations of SEEDCO's fraud.

10          The investigation commenced in August of 2011 and

11  ended in March of 2012.  It started, and our city agency,

12  Department of SBS, initiated the investigation two or three

13  days after we got that first call from the New York Times

14  reporter.

15  Q.   When you say your department initiated the investigation,

16  what do you mean?

17  A.   My boss, Commissioner Rob Walsh, called up the commissioner

18  of the New York City Department of Investigation, Rose

19  Gilhearn, and --

20          MS. SCHEIN:  Objection, your Honor.

21          THE COURT:  Overruled.

22  A.   -- and launched an investigation and asked the City

23  Department of Investigation to start an investigation to look

24  into these allegations of fraud.

25  Q.   Did you read the report that DOI issued at the conclusion

F4GJUSA1                          Kamath - direct

1      of its investigation?

2      A.  Yes, I read all 89 pages multiple times.

3                   MR. FUTERFAS:  Objection.

4                   THE COURT:  Let me tell you this, members of the jury.

5                   We are going to be hearing information about a report

6      of the Department of Investigations of New York City.  The

7      report itself at this point is not in evidence, but what

8      Commissioner Kamath did on the basis of the report is in

9      evidence, will come into evidence, and I am overruling the

10     objections of the department on that score.

11                  It comes into evidence to explain what she did and her

12     conduct of what she did, what was the reason for it.  So she'll

13     be able to give you the explanation.  The report may or may not

14     come in later on depending on the foundation that is laid by

15     other witnesses.  At this point you've heard that there was a

16     comment by her boss, then the commissioner of the Department of

17     SBS, to the Commissioner Rose Gilhearn of the Department of

18     Investigations, asking that -- what?

19                  THE WITNESS:  That an investigation be commenced to

20     look into the allegations of fraud by SEEDCO on their contract

21     that they held with the Upper Manhattan Career Centers and

22     Bronx Workforce 1 Career Centers.

23                  THE COURT:  Okay.

24     BY MS. BLAIN:

25     Q.  How did the information in the DOI report -- when I say

F4GJUSA1                         Kamath - direct

1   DOI, do you understand I am referring to the Department of

2   Investigation?

3   A.  Yes.

4   Q.  How did the information in that DOI report affect your

5   views of SEEDCO?

6   A.  The six month or over 7 month investigation --

7           THE COURT:  Change that.  Not your views of SEEDCO.

8   Explain what you did.

9   BY MS. BLAIN:

10  Q.  What did you do next after reading the DOI report?

11  A.  The DOI report presented their findings as fact which laid

12  out --

13          MR. FUTERFAS:  Objection.

14  A.  -- in very clear form --

15          THE COURT:  Who is objecting, Ms. Schein or Mr.

16  Futerfas?

17          MS. SCHEIN:  Pardon me, your Honor.  I am objecting.

18          THE COURT:  Overruled.

19  BY MS. BLAIN:

20  Q.  You may continue, Ms. Kamath.

21  A.  -- the report laid out in clear format nearly, the report

22  laid out in clear format multiple and many ways in which the

23  contract terms that we had been in a relationship with SEEDCO

24  were --

25          MS. SCHEIN:  Objection, your Honor.

F4GJUSA1                          Kamath - direct

1            THE COURT:  This is relevant on the basis of

2     explaining what Ms. Kamath did, and for that reason it is

3     allowed, but not the truth or falsity of what is in the report.

4     You may continue.

5            THE WITNESS:  Thank you.

6            THE COURT:  Do you want to start again, Jerry, please.

7            (Record read)

8            THE COURT:  Continue, please.

9            THE WITNESS:  Sorry.  Let me try this one more time.

10    A.   -- there was a contractual relationship in which our

11    department, SBS was engaged in with SEEDCO.  The report laid

12    out in many and multiple ways clear evidence through text

13    messages, testimony, e-mails --

14           MS. SCHEIN:  Objection, your Honor.

15    A.   -- taped conversations.

16           THE COURT:  I don't want you to get into that.  Did

17    you find the report to be full and thorough?

18           THE WITNESS:  Full and thorough.

19           THE COURT:  Did you feel that the report called upon

20    you to do certain things?

21           THE WITNESS:  Absolutely.

22           THE COURT:  What is it that you did?

23    A.   -- based on what we read in that thorough report, it was

24    clear to ourselves, it was clear to me as deputy

25    commissioner --

1                MS. SCHEIN:  Objection.

2                THE COURT:  Overruled.

3    A.  -- that we had a decision to make in terms of whether to

4    continue business with SEEDCO.  One of the recommendations of

5    the report from the Department of Investigation was, indeed, to

6    look at if the Department of SBS should sever the relationship

7    or continue it.

8    BY MS. BLAIN:

9    Q.  What decision did you make?

10   A.  We chose to sever the relationship with SEEDCO and use one

11   of the contract clauses to assign the contract to another

12   qualified operator to deliver those services.  As a federal set

13   of services, we were obligated to offer and to not have a

14   breakage in services, to offer vital job training and job

15   placement services to all New Yorkers.

16                So it was very important that we were able to take

17   that contract and take the services that were really required

18   and mandated from the federal government, state and city

19   agencies, to continue that and to do that by essentially

20   handing over, "assigning" is the technical term, the contract

21   services to another entity.

22   Q.  Ms. Kamath, if I may direct your attention to Tab 68 in

23   your binder.

24                MS. BLAIN:  This has not yet been received, your

25   Honor.

F4GJUSA1                           Kamath – direct

1            (Pause)

2            THE COURT:  Please continue.

3    BY MS. BLAIN:

4    Q.  Do you recognize this document, Ms. Kamath?

5    A.  I do.

6    Q.  What is this document?

7    A.  This is a letter, dated March 9th, 2012, from Commissioner

8    Rob Walsh, the Commissioner of the Department of Small Business

9    Services, to Barbara Gunn, the President and CEO of SEEDCO,

10   explaining the city's intention, the Department of SBS's

11   intention to assign the contracts from SEEDCO to a different

12   operator based on the --

13   Q.  One second.  I need to ask you a couple of more questions

14   before we get there.  In connection with your role as deputy

15   commissioner of SBS, did you have any role in determining the

16   contents of this letter?

17   A.  Yes.

18   Q.  Did you receive a copy of this document when you were

19   deputy commissioner?

20   A.  Yes.

21   Q.  Was it prepared in the ordinary course of SBS's business?

22   A.  Yes.

23            MS. BLAIN:  Your Honor, the government seeks to

24   introduce Government Exhibit 68.

25            MS. SCHEIN:  I object to the letter.

F4GJUSA1                        Kamath - direct

1              THE COURT:  You object?  Overruled.

2              MS. SCHEIN:  A portion of it as --

3              THE COURT:  Which paragraph?

4              MS. SCHEIN:  The second paragraph, your Honor.

5              MS. BLAIN:  This was the subject to a motion in

6     limine.

7              THE COURT:  May I please read it?

8              MS. BLAIN:  I am sorry.

9              (Pause)

10             THE COURT:  Admitted for the purpose I said before, to

11    explain the conduct of the New York Small Business Services

12    Department.  Objection overruled.

13             (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

F4GNUSA2                        Kamath - direct

1   Q.  Ms. Kamath, can you please now tell the jury what this

2   document is.

3            THE COURT:  Let the jury read it now.

4            MS. BLAIN:  OK.

5   Q.  Can you please read to the jury the first --

6            THE COURT:  The jury can read it to themselves.

7            MS. BLAIN:  OK.  I think there's been a request to

8   make it slightly bigger.

9            THE COURT:  Can we get the jury read it, please,

10  without talking.

11           Can the jurors read it?  Do you want it blown up?

12           JUROR:  Blown up, please.

13           THE COURT:  Blow it up paragraph by paragraph.

14           The first paragraph, blow it up.

15           THE COURT:  Stop at the first paragraph and blow up

16  the second paragraph.

17           Blow up the second paragraph, please.

18           Blow up the third paragraph, please.  If I am going

19  too fast, let me know.

20           That is the fourth paragraph you have blown up.

21           Did you do the third paragraph?

22           MS. SCHOENBERGER:  Yes, your Honor.

23           THE COURT:  Has the jury read the letter?

24           Proceed, Ms. Blain.

25  BY MS. BLAIN:

F4GNUSA2                         Kamath – direct

1    Q.  Ms. Kamath, at the time this letter was mailed, did you

2    have an understanding as to why SBS discontinued its

3    relationship with SEEDCO?

4    A.  Yes.

5    Q.  And what was your understanding?

6    A.  As articulated in the second paragraph of this letter:  The

7    DOI has amply documented in great detail numerous acts of

8    improper reporting and regular practices to report false

9    placements to SBS in violation of contractual provisions and

10   policies."

11   Q.  Does this letter accurately reflect your understanding of

12   why SBS ended its relationship with SEEDCO?

13   A.  Yes.

14              MS. SCHEIN:  Objection.

15              THE COURT:  Overruled.

16              MS. BLAIN:  Thank you.

17              I have concluded the direct examination, your Honor.

18              THE COURT:  Who is doing the cross.

19              MR. FUTERFAS:  I am, your Honor.  Thank you.

20   CROSS EXAMINATION

21   BY MR. FUTERFAS:

22   Q.  Ms. Kamath, the DOI report you mentioned issued in March

23   2012?

24   A.  Yes.

25   Q.  And subsequent to March 2012, did you and your staff at SBS

1    continue to determine whether or not placements deemed false by

2    the DOI had been vetted or verified and submitted for payment

3    to SBS?

4    A.   As of, I believe, August 8, 2011, when we commenced the

5    investigation through the Department of Investigation, the

6    clear guidance from the New York City Department of

7    Investigation was to carry on our business as usual, that as

8    the department of small business our job was not to be

9    conducting investigation, that was the Department of

10   Investigation's job, and that our job was to carry on to make

11   sure that city services to enable job seekers to come to

12   Workforce1 career centers was being kind of upheld and managed.

13          So we continued our regular course of business through

14   the time of the investigation to make sure that goals were

15   being set, goals were being met, the way in which goals were

16   being met and strategy that was being implemented was in

17   accordance to what we wanted to see.  But it was not our job to

18   be investigating.  It was our job to carry on our regular

19   course of business which was to oversee performance.

20          MR. FUTERFAS:  Your Honor, may I have my question

21   reread to the witness.

22          THE COURT:  "And subsequent to March 2012, did you and

23   your staff at SBS continue to determine whether or not

24   placements deemed false by the DOI had been vetted and verified

25   and submitted for payment to SBS?"

1                Did you feel you answered the question?

2                THE WITNESS:  I got confused.  No.

3                THE COURT:  Answer the question.

4     A.  Subsequent to March 2012, yes, we carried on with our

5     process to validate job placements, to determine the

6     performance-based portion of the contract.

7                THE COURT:  With SEEDCO or with someone else?

8                THE WITNESS:  The SEEDCO contracts were assigned

9     within about six weeks of March 2012, and so in order to close

10    out that process we -- to close out the process, to close out

11    the contracts we did what we needed to do to understand the

12    reimbursement basis and the performance basis of that contract.

13               THE COURT:  Well, during those six weeks, before you

14    got someone else to replace SEEDCO, did SEEDCO continue to

15    function under the contract?

16               THE WITNESS:  It did in a ramped-down mode, yes.

17               THE COURT:  What do you mean by ramped-down mode?

18               THE WITNESS:  As a public entity, as a center of

19    public services, we needed to maintain doors open during that

20    time period.  It was important to be able to serve the public.

21    But it was clear that SEEDCO was on its way out and that we

22    were working on get a viable replacement in.

23               So, services were still being offered, but our

24    expectations of the level of performance were certainly

25    tempered because of the circumstances and the time line in

F4GNUSA2                          Kamath - cross

 1    which we were working.

 2                  THE COURT:  Go ahead, Mr. Futerfas.

 3                  MR. FUTERFAS:  Thank you, your Honor.

 4    BY MR. FUTERFAS:

 5    Q.  I want to focus you on the placements that you and your

 6    team continued to examine after the DOI report on March 2012.

 7                  Did you and your team examine whether placements that

 8    the DOI believed were false, did your team go and examine

 9    whether those placements in fact had been verified or not

10    verified by Charney Research for submission for payment by SBS?

11    A.  Can you repeat the question one more time.  I'm trying to

12    understand it.

13                  MR. FUTERFAS:  Your Honor, may I have the reporter

14    repeat it back, please.

15                  THE COURT:  "I want to focus you on the placements

16    that your team, you and your team continued to examine after

17    the DOI report on March 2012.

18                  "Did you and your team examine whether placements that

19    the DOI believed were false, did your team go and examine

20    whether those placements in fact had been verified or not

21    verified by Charney Research for submission for payment by

22    SBS?"

23                  I think you can improve the question, Mr. Futerfas.

24                  MR. FUTERFAS:  I will endeavor to do so, your Honor.

25                  THE COURT:  Sometimes when you read what you have

1    done, you say, "Did I really ask that?"

2              MR. FUTERFAS:  Guidance taken, your Honor.

3    Q.  There was a verification process that SBS had contracted

4    with SEEDCO where a third-party, vendor Charney Research --

5              THE COURT:  Let me try to help you.

6              MR. FUTERFAS:  Very well.

7              THE COURT:  Charney Research was verifying various

8    activities as submitted by SEEDCO's claims, right?

9              THE WITNESS:  Yes.

10             THE COURT:  That had happened before March 2012?

11             THE WITNESS:  Yes.

12             THE COURT:  Did it continue after March 2012?

13             THE WITNESS:  The agency switched, I believe, in

14   January of 2012 the vendor through which we would do the

15   third-party verification.  We switched from, I believe, Charney

16   Research to a company called The Work Number, which again was a

17   third party.

18             THE COURT:  Doing the same job as Charney?

19             THE WITNESS:  Doing the same job, just a different

20   organization that was doing it more cost effectively.

21             THE COURT:  After March '12 did that other

22   organization continue to verify claims submitted by SEEDCO?

23             THE WITNESS:  Yes.

24             THE COURT:  And for what period of time?  Another

25   what?  Six weeks?  Six months?  I forget what you said.

F4GNUSA2                              Kamath - cross

1           THE WITNESS:  That contract I believe is still in

2     place to this day.  So the methodology of using a third-party

3     entity to verify placements --

4           THE COURT:  Before the assignment?

5           THE WITNESS:  Yes.  That took place.

6           THE COURT:  Before the assignment took hold?

7           THE WITNESS:  Yes.

8           THE COURT:  After the assignment some other company

9     took the place of SEEDCO.  Before the assignment SEEDCO

10    continued to function you said for another six weeks.  Did I

11    hear you right?

12          THE WITNESS:  Yes.

13          THE COURT:  During that six-week period, did the

14    third-party verifying agency continue to verify?

15          THE WITNESS:  Yes.

16          THE COURT:  Was SEEDCO continued to be paid on a

17    performance basis as well as a cost basis?

18          THE WITNESS:  The terms of the contract held, yes.

19          THE COURT:  Go ahead.

20          MR. FUTERFAS:  Thank you, your Honor.

21          THE COURT:  I hope I asked your question.

22          MR. FUTERFAS:  It's in where I'm going, your Honor.

23          Thank you.

24          MR. FUTERFAS:  The DOI report concluded there were a

25    certain number of false placements, is that right?

F4GNUSA2                          Kamath - cross

1   A.   Among other things, yes.

2   Q.   OK.  My question to you is, these were false placements the

3   DOI report concluded had occurred before 2012, in the period of

4   certainly 2011, right?

5   A.   Yes.

6   Q.   My question for you is, even after the DOI report which

7   issued in March 2012, did your office endeavor to determine

8   whether any of the placements that the DOI report believed were

9   false, whether any of those placements had actually been

10  verified or not verified for submission to payment to your

11  organization for the performance-based payments?

12              THE COURT:  You got all tangled you up, Mr. Futerfas.

13              MR. FUTERFAS:  I will try to break it down, your

14  Honor.

15              THE COURT:  For the period after March 2012, you said

16  that the third-party verification agency continued to verify?

17              THE WITNESS:  Yes.

18              THE COURT:  Did your agency do anything other than

19  what the verification company did?

20              THE WITNESS:  After the report, in order to prevent

21  improprieties that occurred from reoccurring, we looked at the

22  data to then be able to come up with something so that we would

23  never have those problems happen again, where we could do

24  everything in our power to create procedures and clarifications

25  so that fraud wouldn't happen.  In that context, we certainly

F4GNUSA2                         Kamath - cross

1     looked at the data quite intently.

2               MR. FUTERFAS:  Your Honor, I think if we could just

3     take a break, I must have touched a wire here.

4               THE COURT:  A hot wire.

5               Does anybody have a microphone on the table?

6               THE DEPUTY CLERK:  It is the wire.

7               THE COURT:  It's the wire.

8     Q.  Ms. Kamath, I am trying to ask you a simple question.  The

9     question is this:  The DOI report determined or believed,

10    stated their belief that a certain number of placements were

11    false in 2011.  Yes or no?

12    A.  Yes.

13    Q.  My question to you is, after that report issued, did your

14    office try to determine whether any of those supposedly false

15    placements were included in the number of placements submitted

16    to your agency for payment?

17    A.  Yes.

18    Q.  What did your office do to determine whether those

19    allegedly false placements had been verified or not verified by

20    Charney Research?

21    A.   In the period after March, as we were, again, ramping down

22    the SEEDCO contract and figuring out payments, we were working

23    in very close collaboration with the New York State Department

24    of Labor, the U.S. Department of Labor, the Department of

25    Investigation, to be able to look at the data, understand

F4GNUSA2                          Kamath – cross

 1    ultimately what was to be paid for and what was not to be paid

 2    for.

 3              THE COURT:  Did you try to get any clawbacks, money

 4    that you paid out?

 5              THE WITNESS:  We did, yes.

 6              THE COURT:  Was that your question?

 7              MR. FUTERFAS:  No, it isn't, your Honor.

 8    Q.  Let me show you what will be market for identification as

 9    Defendant's Exhibit F5, or FFFFF.

10              Ms. Kamath, do you have Defendants' Exhibit F5 in

11    front of you.  It should appear on your screen.

12    A.  Not yet.

13    Q.  Do you have it now?

14    A.  I do.  Thank you.

15              THE COURT:  The jury doesn't have it yet.

16              MR. FUTERFAS:  No, they do not, your Honor.

17    Q.  Is this, Defendant's Exhibit F5, an e-mail from someone

18    named Charles Houston to a number of SBS employees, with you

19    cc'ed?

20    A.  Yes.

21    Q.  Is this e-mail dated October 11, 2012?

22    A.  Yes.

23    Q.  Do you recognize this document as being made and sent and

24    reviewed in the ordinary course of SBS business?

25    A.  Yes.

1          MR. FUTERFAS:  Your Honor, we move to admit

2    Defendant's Exhibit F5 and publish it to the jury.

3          MS. BLAIN:  No objection, your Honor.

4          THE COURT:  Received.  You may publish it.

5          (Defendant's Exhibit F5 received in evidence)

6    Q.  So the DOI report, Ms. Kamath, issued in March 2012, right?

7    A.  Yes.

8    Q.  Its findings and its conclusions and everything it says are

9    coming out in March 2012, right?

10   A.  Correct.

11   Q.  Here in October, seven months later, an e-mail is being

12   sent about a certain number of placements, right?

13   A.  Correct.

14   Q.  Who is Charles Houston?

15   A.  Charles Houston headed up the fiscal team.  So he headed up

16   the team that would review invoices, review expenses and work

17   with the fiscal and finance department to determine payments.

18   Q.  It is an e-mail to I guess Kelly Richardson and Sue Lee and

19   someone named Xenon Walcott, right?

20   A.  Yes.

21   Q.  Are those three individuals SBS employees or management

22   staff?

23   A.  Yes.

24   Q.  It says, "Subject:  SEEDCO false placements."

25          And then:

F4GNUSA2                         Kamath - cross

1              "Hi, Kelly.

2              "Of the 425 customers listed in the DOI and have

3      placement between January and March 201," something like that,

4      "24 are not associated with the Charney group sent for

5      validation."

6              What does that mean?

7      A.   So typically in our roster of job placements that is sent

8      to the third-party validator, the data would be -- because

9      there was a call, a phone call methodology to verify

10     placements.  I think what this says is that 24 individuals were

11     not part of the roster sent to the third party, possibly

12     because they didn't have phone contact information.  It's

13     impossible for me to tell from this particular e-mail, but that

14     would be my best guess.

15     Q.   In addition to that, before the roster of placements for

16     Charney to verify was sent to Charney, wasn't there some

17     scrubbing that occurred, duplicates were weeded out, other kind

18     of normal errors were taken into account so that what get sent

19     to Charney was not the raw Worksource1 placement data?

20              MS. BLAIN:  Objection, your Honor.

21              THE COURT:  Overruled.

22     A.   What was sent to Charney was the raw placement data

23     gathered and downloaded from the Worksource1 database, minus a

24     handful of records that were duplicate -- wouldn't need to send

25     the same information on people twice -- and for individuals

F4GNUSA2                            Kamath - cross

1    that simply didn't have a phone number, you wouldn't send

2    information to a calling research methodology if there wasn't a

3    phone number.

4    Q.  So, from the raw Worksource1 data, there was some initial

5    culling to cull out duplicates, to cull out people who you

6    didn't have contact information for, so what got sent to

7    Charney was some smaller number of placements for them to

8    verify, is that right?

9    A.  A slightly smaller number of placements to verify, correct.

10   Q.  So you understand this e-mail to mean, for whatever reason,

11   out of this 424 customers identified by the DOI, 24 were never

12   sent to Charney for validation at all, right?

13   A.  That's what this says.

14   Q.  Have you seen Attachment A to the contract between SBS and

15   SEEDCO?

16              MS. BLAIN:  Objection, your Honor.

17              THE COURT:  Overruled.

18   A.  I'm sorry.  Is it here in one of these binders?

19              MR. FUTERFAS:  I am just asking you.

20              THE COURT:  It is not being tested.  It is a fact

21   question.  Have you seen it?  Do you know what it is?

22              THE WITNESS:  Can you repeat the question?

23              THE COURT:  Do you know what it is, Attachment A to

24   the contract?

25              THE WITNESS:  Without seeing it, I don't know offhand.

1          THE COURT:  That's the answer.

2          MR. FUTERFAS:  Fair enough.

3   Q.  Do you understand that under the contract there is -- I

4   think you testified to this yesterday as a matter of fact --

5   under the contract that before 2011 it was 30 percent, after

6   2011, 20 percent, that a portion of the contract, the payment

7   is based, performance-based payments are based on placement

8   performance, right?

9   A.  Yes.

10  Q.  Before performance-based payments can be made, the

11  placements are sent to Charney Research for validation, right?

12  A.  That's part of the process.

13  Q.  So the answer is yes, they are sent to Charney Research?

14          THE COURT:  She said yes.  Keep going.

15          MR. FUTERFAS:  OK.

16  Q.  Going back to the e-mail, the next clause says, "401 are

17  within the Charney group."  Do you see that?

18  A.  Yes.

19  Q.  What did you understand that clause to mean?

20  A.  401 out of 425 individuals were part of the roster sent to

21  Charney Research for validation.

22  Q.  My question is, did your office endeavor to determine

23  whether or not Charney validated any of the 401?

24  A.  I believe we did.

25  Q.  Endeavor to determine that?

F4GNUSA2                         Kamath - cross

1   A.   Endeavored to understand what happened, for two reasons:

2   To determine payment calculations and really, more importantly,

3   to determine new policies and procedures so that this type of

4   fraud could not happen again, understanding the problem is

5   really particularly important.  So in that context we would

6   have looked at the DOI findings to understand what happened and

7   what that looked like in the system to then create policies and

8   procedures to not have those types of errors and fraud happen

9   again.

10  Q.   Let me ask you this:  Do you understand whether or not the

11  DOI called any customer?

12  A.   They did.  In the report there were several excerpts of

13  conversations.  The 89-page report didn't have the transcript

14  for every conversation, but the report I think highlighted a

15  dozen or so of those conversations as part of their

16  investigation.

17  Q.   So, my question is do you know whether or not the DOI in

18  its investigation physically called all customers that were

19  deemed to be placed by SEEDCO, each and every one?

20  A.   The report said they called many, and enough for them to

21  determine that there were, there was a pattern of fraud.

22          THE COURT:  Listen to the question.  Did you think

23  they called all?

24          THE WITNESS:  I don't believe that the report said

25  they called all, but the report stated that they called enough

F4GNUSA2                          Kamath - cross

1   and saw a pattern of fraud consistently.

2   Q.  Let me ask you this, the next clause says in the e-mail, "I

3   would need additional customer info for any further

4   determination."

5           Do you see that language?

6   A.  Yes.

7   Q.  You know that as part of its investigation DOI collected

8   various kinds of documents, right?

9   A.  Yes.

10  Q.  And they collected CIFs, right?

11  A.  Yes.

12  Q.  You understand that.  They looked at the Worksource1

13  database, right?

14  A.  Correct.

15  Q.  Your office, SBS, did you have access to the same documents

16  that the DOI had access to?

17  A.  Yes.

18  Q.  But it says here that, "I would need additional customer

19  information for any further determination with respect to these

20  401 that were sent to Charney."  Right?

21  A.  I don't read it that way.

22  Q.  Well, let me ask you this:  Were you trying to determine,

23  of the 401 that got sent to Charney Research, were you trying

24  to determine whether Charney either validated or did not

25  validate any of those 401?

F4GNUSA2                    Kamath - cross

```
 1   A.  I read this e-mail to say that further information would be
 2   required for the 24 that were not included.
 3   Q.  Was your office looking to make a determination as to
 4   whether any of those 401 were or were not verified by Charney
 5   Research?
 6   A.  We worked really closely with the Department of
 7   Investigation, a law enforcement agency --
 8            THE COURT:  Just answer.
 9            THE WITNESS:  -- to understand.
10            THE COURT:  Just answer.
11            THE WITNESS:  I am not sure I understand the question.
12            THE COURT:  Then say you don't understand the
13   question.  Don't guess at the question.
14            THE WITNESS:  OK.
15   Q.  I will try to ask it again.  Do you see the number 401?
16   A.  Yes.
17   Q.  That 401 are being submitted to Charney, right?  They are
18   within the Charney group?
19   A.  Yes.
20   Q.  What do the words mean to you, "the 401 are within the
21   Charney group"?
22   A.  They are part of the roster that Department of Small
23   Business Services sent to their third-party validator, and the
24   third-party validator would use that methodology of random
25   sampling.
```

F4GNUSA2                         Kamath - cross

1   Q.  They would use their methodology, right?

2   A.  Yes.

3   Q.  To determine whether any of those 401 could be verified as

4   a placement, right?

5   A.  Correct.

6   Q.  Now, I'm asking you this:  Did your office endeavor to

7   determine whether any of those 401 were, in fact, verified or

8   not verified by Charney?

9   A.  Yes.

10  Q.  Did you make findings?  Are there any findings about that?

11  A.  The Department of Small Business Services wasn't conducting

12  an investigation.  We were working with our investigation

13  agency to then figure out for the purposes of payment what

14  should be included and what should be stripped out.

15          THE COURT:  I think we are jumping around to too many

16  different things.  The phrase "401 within the Charney group"

17  means you said they were part of the roster group submitted to

18  Charney?

19          THE WITNESS:  Correct.

20          THE COURT:  Does Charney in the ordinary course of

21  business verify each one or is statistical sampling sufficient

22  to draw the conclusions?

23          THE WITNESS:  Statistical sampling --

24          THE COURT:  Let me ask the question.

25          THE WITNESS:  I'm sorry.

1           THE COURT:  Statistical sampling you said.

2           THE WITNESS:  Statistical sampling.

3           THE COURT:  Does that mean they call all or just a

4   sufficient number from which they could draw a proper

5   inference?

6           THE WITNESS:  A sufficient number from which they

7   could draw a proper inference.

8           THE COURT:  Can we stop reading this document and go

9   on to something else.

10          MR. FUTERFAS:  Your Honor, I just want to get on to

11  the critical question, a question.

12  BY MR. FUTERFAS:

13  Q.  Did your office determine that Charney verified or didn't

14  verify any number of those 401?

15          THE COURT:  She said that in the ordinary course a

16  sufficient number for statistical sampling, which means not

17  every one.

18          MR. FUTERFAS:  Your Honor, most respectfully, the

19  question is, did Charney, out of the 401 that were submitted to

20  Charney, did your office investigate whether Charney validated

21  401, validated 100, validated 50, validated all 401.

22          THE COURT:  She's answered the question.  She said

23  they took a statistical sample.  Please move on.

24          MR. FUTERFAS:  Your Honor, the question I had, the

25  statistical sampling goes to the validation.  I am trying to

F4GNUSA2                         Kamath - cross

1    find out, did Charney validate any of the 401?

2             THE COURT:  Do you know what validation means?

3             THE WITNESS:  Yes.

4             THE COURT:  What does it mean?

5             THE WITNESS:  It means verifying the veracity, the

6    truthfulness of if someone said they got a job.

7             THE COURT:  Is that calling every one?

8             THE WITNESS:  By calling a statistically significant

9    random sample.

10            THE COURT:  Can we go on, please.

11   BY MR. FUTERFAS:

12   Q.  Did your office ever make a determination about whether

13   Charney Research validated any of these 401 for the purposes of

14   the payment, the compensation-based payment under the contract?

15            THE COURT:  Do you know what that means?  Do you

16   understand the question?

17            THE WITNESS:  It feels like it's the same question.  I

18   don't know how to answer this any differently other than we

19   worked closely with Department of Investigation using

20   validation --

21            THE COURT:  Is there an objection?

22            MS. BLAIN:  Yes, objection, your Honor.

23            THE COURT:  Sustained.

24   BY MR. FUTERFAS:

25   Q.  Let me show you Government Exhibit 34.

F4GNUSA2                        Kamath - cross

1            MR. FUTERFAS:  Let me just check if it's in evidence.

2       Excuse me.

3            MS. BLAIN:  It is.

4            MR. FUTERFAS:  It is, yes.

5  Q.  Ms. Kamath, take a look at Exhibit 34.  Do you recognize

6  that document?

7  A.  I do.

8  Q.  What do you recognize it to be?

9  A.  It is an amendment to the master contract between the

10 Department of Small Business Services and SEEDCO to operate,

11 for their upper Manhattan Workforce1 Career Center.

12 Q.  This amendment is dated -- I know it's light, but it's

13 dated sometime in April 2007?

14 A.  Correct.

15 Q.  If I could turn your attention --

16           MR. FUTERFAS:  Before we get there, if I could have

17 Marissa scroll down a little bit to part B.

18 Q.  Do you see performance-based payments?

19 A.  Yes.

20 Q.  At this point, at this period of time in the contract, 30

21 percent of the payments to SEEDCO would be based on, according

22 to the contract, outcome goals, right?  Certain

23 performance-based outcome goals?

24 A.  Yes.

25 Q.  Did those outcome goals include verified placements, number

F4GNUSA2                          Kamath - cross

1   of verified placements?

2   A.   The outcome goals were job placements, and then we used our

3   verification methodology to determine what portion was indeed

4   obtained.

5   Q.   OK.  We'll go through this contract.  So if I could go to

6   the next page.  One of the outcome goals or one of the elements

7   that would be used to determine the payments would be -- No. 1

8   says total job placements, right?

9   A.   Yes.

10  Q.   No. 2 is general employment retention.  Do you see that?

11  A.   Yes.

12  Q.   3 is employer-specific retention, and 4 is employer

13  fulfillment, right?

14  A.   Yes.

15  Q.   These are all different metrics that SBS would use based on

16  the numbers to determine the amount of performance-based

17  compensation, right?

18  A.   Correct.

19  Q.   Those are called -- in fact, have you heard the term

20  performance milestones?

21  A.   Yes.

22  Q.   What are performance milestones?

23  A.   These are, these four elements.

24  Q.   So performance milestones are targets that SBS has set and

25  that the closer that the vendor -- in this case, SEEDCO -- gets

1    to meeting those targets, that could increase or decrease if

2    they don't meet those targets the amount of their

3    performance-based compensation, right?

4    A.  Correct.

5    Q.  If I could go to Attachment A.  Attachment A, this is part

6    of the contract, right?

7    A.  Correct.

8    Q.  It says on the upper left, "Performance milestones,

9    placements, placements made."

10            It says total placements made 50 percent, right?

11   A.  Yes.

12   Q.  What does the 50 percent mean?

13   A.  It would be half of the total budget amount that was

14   subject to performance.

15            So 30 percent of the overall budget was subject to

16   performance, half of that 30 percent was going to be based on

17   the performance related to placements.

18   Q.  So then effectively 15 percent of the entire contract,

19   right?

20   A.  Correct.

21   Q.  Under that it says "Retention," and there are some -- the

22   language, A, employed after two quarters, 35 percent, 20

23   percent, then employed with the same employer for two quarters.

24            Could you describe what those clauses mean.

25   A.  Sure.  So the Workforce Investment Act, the federal

F4GNUSA2                         Kamath - cross

1    legislation that governed the centers and the contracts, had

2    common measures that were important.  So, flowing down from

3    what the federal government expected of us, one of those

4    measures was around employment retention, basically keeping

5    your job, for two quarters or, i.e., six months after you left

6    the system, after you kind of got employment.

7             So retention, job retention, i.e., keeping your job,

8    was making sure that folks were still employed and the second

9    one, 2B is employed with the same employer for two quarters or

10   six months.

11            MR. FUTERFAS:  Now scroll down a little bit on the

12   page.  Right there.  Perfect.

13   Q.  With respect to the total placements portion, this 50

14   percent portion of the performance-based compensation, it says

15   under sub A, "DSBS shall pay contractor" -- the contractor in

16   this case is SEEDCO, right?

17   A.  Yes.

18   Q.  "DSBS shall pay contractor based on the percentage of its

19   placement target that contractor achieves each quarter."

20            Do you see that language?

21   A.  Yes.

22   Q.  What is the placement target?  Is that the number of

23   verified placements that SBS has set for SEEDCO to try to

24   obtain?

25   A.  The placement target is the annual goal that we would set

F4GNUSA2                        Kamath - cross

1    and negotiate with SEEDCO.

2    Q.  OK.  Then it is divided by quarters.  So it's divided 25

3    percent by quarter?

4    A.  We would negotiate with SEEDCO if they wanted to have an

5    even split, 25/25/25/25, or something different, but it was an

6    annual goal that was set and then appropriately divided amongst

7    the quarters based on negotiation.

8    Q.  Once that is negotiated and set, each quarter has its own

9    placement target based on that quarter, right?

10   A.  Correct.

11   Q.  That placement target was a number of verified placements

12   that SEEDCO had to obtain for the maximum amount that it was

13   entitled to under this component of the contract, right?

14   A.  The placement target was a realtime number that was managed

15   to a daily, weekly, and monthly basis.  The verification would

16   happen one quarter after that -- would happen after that

17   quarter ended to then be paid out several months later after

18   the work of the verification was done.

19        I think there is a distinction to be made in terms of

20   goals and managing performance in realtime versus the

21   accounting and the verification that would happen with a

22   typical three- to six-month lag before the payment would

23   actually be made.

24   Q.  Right.  But payment is determined on verified placements,

25   correct?

F4GNUSA2                          Kamath - cross

1   A.  Correct.

2              MR. FUTERFAS:  If we could scroll down a little bit.

3   Just a little bit further down.  Stop there.  OK.

4   Q.  Do you see in the middle of the page there is a clause, the

5   highlighted word on the left that said "Validation"?

6   A.  Yes.

7   Q.  You see that.  The language is in the contract:  "Charney

8   will survey all placed customers using the Worksource1 roster

9   that includes all placed customers per quarter.  Payment will

10  be adjusted according to the percentage of responding customers

11  who confirm the payment."

12             Do you see that language?

13  A.  I do.

14             THE COURT:  "Confirm the placement."

15             MR. FUTERFAS:  "Placement."

16  Q.  "Confirm the placement."  This is a contract that SBS made

17  with SEEDCO, right?

18  A.  Yes.

19  Q.  Were you involved in the preparation of this contract?

20  A.  I joined the agency in 2006.  The contract started in 2004.

21  But there were many amendments along the way, so I was involved

22  in many aspects of the amendments during the time in which I

23  was in a management position.

24  Q.  So with respect to the document we are looking at now,

25  which is one of the amendments, an amendment dated April of

F4GNUSA2                          Kamath - cross

1   2007 --

2   A.  Yes.

3   Q.  -- were you involved in the preparation of this amendment

4   or the negotiation of this amendment?

5   A.  I was involved from the management team perspective.  In

6   April of 2007 I was an executive director over community

7   partnerships.  My predecessor, Scott Zucker --

8              THE COURT:  Let's stop there.  Try not to complicate

9   the question.

10             THE WITNESS:  Sorry.  OK.

11             THE COURT:  The question is were you involved?  The

12   answer is yes or no or I don't remember.

13             THE WITNESS:  I was involved.

14             THE COURT:  OK.

15             THE WITNESS:  Yes.

16             THE COURT:  Wait for the next question.

17             THE WITNESS:  OK.

18             THE COURT:  Not every answer has to completely answer

19   every possible question.

20             THE WITNESS:  Got it.

21             THE COURT:  Just answer the question put to you.

22             THE WITNESS:  OK.

23   Q.  The first four words that are in the contract, "Charney

24   will survey all placed customers," do you see that language?

25   A.  I do.

1   Q.  Does "all" have a meaning to you?

2           MS. BLAIN:  Objection, your Honor.

3           MR. FUTERFAS:  I didn't touch anything, your Honor.

4           THE COURT:  I think this might be a good time for a

5   recess.  Let's take our recess.

6           We can take a ten-minute recess.

7           Close up your books and leave them on your chairs.

8   Katie will escort you out.  Don't discuss the testimony,

9   please.  Keep an open mind.

10          (Jury not present)

11          THE COURT:  Let's take a break.  It is a quarter past.

12  We'll come back at 25 after.

13          (Recess)

14

15

16

17

18

19

20

21

22

23

24

25

1                THE COURT:  Do you want to get the jury, please.

2                (Jury present)

3                THE COURT:  Be seated, everyone.  You remain under

4       oath.  Mr. Futerfas, you may continue your cross-examination.

5                MR. FUTERFAS:  Your Honor, could I have -- there was a

6       question pending I think when your Honor broke -- so could I

7       have that question read back?

8                THE COURT:  Ask it again.

9                MR. FUTERFAS:  Okay.

10      BY MR. FUTERFAS:

11      Q.  Ms. Kamath, there was a line there that says in highlighted

12      bold, "validation"?

13      A.  Yes.

14      Q.  There were the words Charney survey all placed for

15      customers?

16      A.  Yes.

17      Q.  Do you see that?

18                The question I asked you before the break was what

19      was -- did you have an understanding of what the word "all"

20      meant?

21      A.  In this context, the roster that we would send to Charney,

22      all of those job placements, all of those customers were fair

23      game upon which Charney would use their methodology of

24      statistical random sampling.

25      Q.  You keep using the terms, "random sampling."

1              What is your understanding of, as a deputy

2      commissioner at SBS -- withdrawn.

3              Who hired Charney Research?

4      A.   There was a competitive bid process in 2006 to find an

5      organization who would be willing to --

6              THE COURT:   The question is, who hired them?

7              THE WITNESS:   Who hired them?   My predecessor, Scott

8      Zucker, who at the time was --

9              THE COURT:   The DSBS hired him?

10             THE WITNESS:   DSBS hired them through a competitive

11     bid process, correct.

12     BY MR. FUTERFAS:

13     Q.   And DSBS hired and paid this third-party verification

14     agency, right?

15     A.   Correct.

16     Q.   Do you have an understanding of what they actually did to

17     verify placements?

18     A.   I did.

19     Q.   You've told us about something about a sampling, some kind

20     of sampling.   What is your understanding, as a deputy

21     commissioner, of this sampling that Charney Research did?

22             THE COURT:   The methodology used?   What is the

23     question?

24     BY MR. FUTERFAS:

25     Q.   You used the words -- I'll rephrase it -- you used the

1    words, "random sampling."  Did you use those words?

2    A.  Yes.

3    Q.  What do you understand by those words?

4    A.  By way of example, if there are 100 individuals on a roster

5    that Charney would receive.  They would pick through those 100

6    candidates randomly, so they wouldn't do it in alphabetical

7    order, they wouldn't do it in age order, they wouldn't do it in

8    ORO order, they would do it in a random way to select the

9    number of customers to verify until they got to a

10   sizeable-enough sample upon which they could infer the level of

11   placement validation.

12   Q.  Let me see if I can break that down.

13        Using the sample of a hundred people on the roster,

14   right?

15   A.  Yes.

16   Q.  And the roster was sent to you by SEEDCO?

17   A.  No.

18        THE COURT:  SEEDCO sent --

19        MR. FUTERFAS:  Withdrawn.

20        THE COURT:  -- its data to Charney, right?

21        THE WITNESS:  SEEDCO input its data into Workforce1

22   database.  SBS would download that into SEEDCO --

23        THE COURT:  The way it went was that a document was

24   created by Charney -- sorry -- document was created by SEEDCO,

25   SEEDCO transmitted the information in that document to SBS, SBS

F4GJUSA3                         Kamath - cross

 1    translated that into a format and sent the format and shared

 2    the information with Charney?

 3              THE WITNESS:  Correct, with a small amend, that SEEDCO

 4    would be directly putting their information to a database, but,

 5    yes, yes, in essence.

 6              THE COURT:  What is hard for us to understand is that

 7    paper doesn't have to be exchanged?

 8              THE WITNESS:  Correct.

 9              THE COURT:  People input a lot of information, and

10    that information can be sent electronically to someone else,

11    for use or sharing with a third party?

12              THE WITNESS:  Correct.

13    BY MR. FUTERFAS:

14    Q.  Am I mistaken, SBS had access to Work Source1, right?

15    A.  Correct.

16    Q.  Which is the raw database of input data placements, right?

17    A.  Yes.

18    Q.  You would extract placements, SBS had the ability to

19    extract placements from that database, right?

20    A.  Correct.

21    Q.  Then you or SBS or someone did this little scrubbing we

22    talked about, getting rid of duplicates and things like that,

23    right?

24    A.  Correct.

25    Q.  That kind of scrubbed dataset of placements was then sent

F4GJUSA3                    Kamath - cross

1   to Charney Research, right?

2   A.  Correct.

3   Q.  My question is this:

4           You just mentioned this hypothetical, let's say

5   Charney received a hundred placements for verification.  Do you

6   have an understanding of how many individuals of that hundred

7   Charney would actually call or attempt to call?

8   A.  I don't have the exact number that would reach statistical

9   significance for any sample.

10          THE COURT:  You have answered the question.

11  BY MR. FUTERFAS:

12  Q.  Your understanding, as deputy commissioner overseeing

13  this -- right, you were overseeing this?

14  A.  Yes.

15          THE COURT:  She answered the question.  Move on.

16  BY MR. FUTERFAS:

17  Q.  Did you have an understanding it called 10 percent --

18          THE COURT:  She said she didn't know what was

19  statistically significant.  We don't know the exact number THAT

20  is statistically significant.

21  BY MR. FUTERFAS:

22  Q.  Did you ever learn in your role as deputy commissioner that

23  Charney Research called every single person on the roster?

24  A.  That was not the methodology or ever the stated work that

25  we contracted with Charney Research to perform.

F4GJUSA3                           Kamath - cross

1    Q.  My question is, did you ever learn --

2                THE COURT:  She answered the question.

3                MR. FUTERFAS:  Your Honor, I just want to note she --

4                THE COURT:  In point of fact, did you know if Charney

5    asked every single person?

6                THE WITNESS:  Charney did not ask every single person

7    on the roster if they were, indeed, employed.  That was not the

8    methodology we contracted them to use.

9    BY MR. FUTERFAS:

10   Q.  Do you understand that they endeavored to call every single

11   person?  Do you understand that?

12               THE COURT:  Objection sustained.

13   BY MR. FUTERFAS:

14   Q.  Now, this methodology that you've talked about, do you

15   understand that Charney Research had a questionnaire?

16   A.  Yes.

17   Q.  Did SBS help fashion that questionnaire with Charney

18   Research?

19   A.  Yes.

20   Q.  In fashioning that questionnaire, SBS worked with Charney

21   to determine -- withdrawn.  I'll get there in a minute.

22               If I could turn to the middle of this document, no

23   reconciliation.  Do you see that?

24   A.  Yes.

25   Q.  And it says, "There will be no reconciliation between the

F4GJUSA3                          Kamath - cross

1   Charney validated data and any other data, as the table allows

2   for natural variation in validation efforts."

3        Do you see that?

4   A.  Yes.

5   Q.  What did you understand that to mean?

6   A.  I am trying to find plain language to describe this.  Once

7   Charney came up with their results, they could not, those

8   results could not be contested by SEEDCO or another entity.

9   Q.  Now, you've used the words I think that -- withdrawn.

10       When Charney Research called a customer, okay, did you

11  understand the purpose of that phone call was to verify a

12  placement?

13  A.  Yes, it was to verify that individuals were employed.

14  Q.  Well, not just employed, but employed after receiving

15  services from SEEDCO, correct?

16  A.  Correct.

17  Q.  In fact, that methodology, to make sure it constituted a

18  placement, was part of the questionnaire that Charney used when

19  they called people, right?

20  A.  Correct.

21  Q.  In addition --

22       MR. FUTERFAS:  If we could scroll up to the top of

23  this page.  Perfect.  Stop there.

24  BY MR. FUTERFAS:

25  Q.  -- the questionnaire that Charney developed in conjunction

1    with SBS also asked questions of the customer, the job seeker,

2    relevant to the other metrics employed after six months and

3    employer fulfillment.  Isn't that right?

4    A.  Correct.

5         MR. FUTERFAS:  Now if you can scroll down the page.

6         (Off-the-record discussion)

7    BY MR. FUTERFAS:

8    Q.  Now, once Charney determined -- in fact, under this

9    example, we can use the example that is in the contract, the

10   quarterly -- so we all understand what this means, on the left,

11   on the bottom it says "Quarterly Placement Target," right?

12        And that is the target you've talked about, that's

13   this quarterly target that SBS and with input by SEEDCO have

14   agreed that's the target number of placements that they would

15   like to achieve for the quarter, right?

16   A.  Correct.

17   Q.  And then the next column says "Reported Placements," right?

18   A.  Correct.

19   Q.  And that column or that little column there, Reported

20   Placements, is the total number that were in Work Source1 after

21   this little bit of scrubbing --

22        THE COURT:  This is an example, isn't it?  It is a

23   hypothetical.

24        MR. FUTERFAS:  Yes, your Honor, but it is in the

25   contract.

1           THE COURT:  It is a hypothetical in the contract?

2           THE WITNESS:  Correct.

3           THE COURT:  Basically it means that the same

4   percentage by which the reported placements varied from the

5   target, that would be the same percentage against a certain

6   number?

7           THE WITNESS:  Correct.

8           THE COURT:  If 75 percent of the target is satisfied,

9   75 percent of the amount is satisfied?

10          THE WITNESS:  Yes.

11  BY MR. FUTERFAS:

12  Q.  So that the reported placements is a given number, and that

13  is the number that comes off this scrubbed Work Source1 data

14  that gets sent to Charney to verify, right?

15  A.  Yes.

16  Q.  The milestone amount, the third column, that is the maximum

17  possible amount for the performance-based compensation under

18  the contract for that quarter, correct?

19  A.  Based off the 150.  So in this example in the contract, 150

20  out of a total of 200, so 75 percent of the target was in this

21  example achieved hypothetically, and so the 93,000 is -- you

22  can scroll up -- I am not sure that will show it.

23          MR. FUTERFAS:  Can you scroll up a little higher.

24  BY MR. FUTERFAS:

25  Q.  In the contract -- let me see if I can help you,

F4GJUSA3                        Kamath - cross

1    Ms. Kamath -- in the contract you look at the milestone chart

2    at the top?

3    A.  Ah-huh.

4    Q.  It says, "Total Placements Made"?

5    A.  Right.

6    Q.  And we have already talked about that it is total

7    placements constitutes 50 percent of the amount of

8    performance-based compensation, right?

9    A.  Right.

10   Q.  Next to that it says 374,074, right?

11   A.  Ah-huh.

12   Q.  That's the total yearly maximum milestone amount for total

13   placements, for total performance-based compensation?

14   A.  Correct.

15   Q.  So now if we scroll down --

16   A.  Thank you.

17   Q.  -- now if we scroll down to the bottom of the hypothetical,

18   the third column that says "Milestone Amount," that is 1-4, one

19   quarter of the 374?

20   A.  Correct.

21   Q.  That is the maximum amount?

22   A.  Correct.

23   Q.  That if they hit every metric, you know, possible, that

24   amount is how much they could get under the performance-based

25   compensation, right?

F4GJUSA3                          Kamath - cross

1    A.  Yes, ah-huh.

2    Q.  Now, because the reported placements in the hypothetical is

3    150?

4    A.  Ah-huh.

5    Q.  The target was 200, but the data that got sent to Charney

6    for validation is 150, right?

7    A.  Yes.

8    Q.  So because that's only 75 percent of the target, they take

9    75 percent of the milestone amount, so now the maximum possible

10   payment is 75 percent of the 93,000?

11   A.  Correct.

12   Q.  And that is the number 70,139, correct?

13   A.  Yes.

14   Q.  And then what happens is, the next column, "Percentage

15   Validated," Charney then validates the 150, right?

16   A.  Correct.

17   Q.  150 placements?

18   A.  Through the statistical random sampling.

19   Q.  Ah-huh.

20        By the way, if Charney, if Charney, if Charney called

21   everybody and reached 60 percent of everybody it called, would

22   you still hold that call that a statistical random sampling?

23        MS. BLAIN:  Objection.

24        THE COURT:  Sustained.

25   BY MR. FUTERFAS:

F4GJUSA3                        Kamath – cross

```
 1   Q.  So if we go to the percentage validated that is based on
 2   its validation methods, it comes up that it validates 60
 3   percent, right, in this hypothetical?
 4          THE COURT:  Not that it validates 60 percent.  It is a
 5   60 percent validation.  Validation follows the statistical
 6   sampling.  Not every person is validated.
 7          MR. FUTERFAS:  Right.
 8   BY MR. FUTERFAS:
 9   Q.  So if in the example the reported placement was 150, if
10   Charney validates 60 percent of the 150, then Charney's
11   validating about --
12          THE COURT:  You have it wrong.  We have gone over this
13   a number of times.  Never mind.
14          It is repetitious, unnecessarily repetitious.  Let's
15   move on to another subject.
16          MR. FUTERFAS:  Let me conclude with this, and I
17   absolutely will, your Honor.
18   BY MR. FUTERFAS:
19   Q.  The number of validated placements, the number of validated
20   placements is relevant to the amount of money that can be
21   claimed for payment under the performance-based compensation,
22   true?
23   A.  Yes, both validated and reported placements would factor
24   into the payment received.
25   Q.  Now, do you know, do you have an idea in 2010 how many
```

F4GJUSA3                         Kamath - cross

1   placements were reported by SEEDCO?

2   A.  I don't have that number offhand.

3   Q.  Well, without pulling out a lengthy spreadsheet, do you

4   have a recollection it was about 6,000 reported in 2010?

5   A.  That sounds reasonable.

6   Q.  Now let me talk to you a little bit -- we're done with

7   this -- Oh, one -- sorry.  One last question.

8           Are you aware of whether any false placement was

9   validated by Charney and submitted for payment pursuant to

10  Attachment A we have just been looking at?

11  A.  Based on the DOI report findings, there could have been,

12  and I believe that they were articulated in the DOI report

13  instances where someone who was claimed as a false placement

14  could have, indeed, passed the Charney validation methods.

15  Q.  The best you can do is, "could have"?

16          Did you ever determine definitively?

17  A.  I can be more specific in my language.  The DOI report

18  articulated cases where the falsification was done in a way

19  that would have passed the Charney validation methods.

20  Q.  Did your team --

21          THE COURT:  Which means what, payment was made on the

22  basis of a placement that shouldn't have been claimed?

23          THE WITNESS:  Correct.

24  BY MR. FUTERFAS:

25  Q.  Is that, in fact, in Defendant's Exhibit F5 that I was

F4GJUSA3                        Kamath - cross

1    talking about earlier, the 401?

2            Isn't that, in fact, what your team was trying to

3    determine whether, in fact, a single false placement was

4    verified by Charney and submitted for payment?

5    A.  I am sorry.  I don't recall.

6    Q.  Do you recall questioning this morning about the 401

7    placements that were within the Charney group?  Do you remember

8    that questioning?

9    A.  I do.

10   Q.  Is that -- you do?  You have to answer orally.

11   A.  Yes.

12   Q.  Is that, in fact, what your team was actually trying to

13   determine, whether any of the supposedly false placements were

14   actually verified by Charney and submitted for payment?  Isn't

15   that what you were trying to actually determine?

16   A.  From that e-mail, it was hard for me to --

17           THE COURT:  Of your own knowledge?

18           THE WITNESS:  Of my own knowledge?

19           THE COURT:  If you have a knowledge.

20           THE WITNESS:  So with Department of Investigation and

21   Small Business Services, the way to be able to determine false

22   placements was partly looking at the records, but also looking

23   at individuals, Customer Information Forms which were

24   essentially tampered with in the data entry, looking at resumes

25   that articulated real work experience versus what was actually

F4GJUSA3                        Kamath - cross

1    tampered with and put into the system erroneously.

2              So Charney was the main methodology for a validation,

3    but in the aftermath of the Department of Investigation report,

4    we had to look at the full paper trail on what people said of

5    their work history, what their resumes reflected and what

6    happened to try to piece together the facts.

7    Q.  The Charney report issued in March of 2012, correct?

8              MS. BLAIN:  Objection.

9              THE COURT:  Overruled.

10   BY MR. FUTERFAS:

11   Q.  The Charney report -- the DOI report issued in March 2012,

12   correct?

13   A.  Correct.

14   Q.  I am asking you about an e-mail that is seven months later

15   that says 401 are within the Charney group.  I am asking a

16   simple question.

17             THE COURT:  We have exhausted this.

18   BY MR. FUTERFAS:

19   Q.  Independently of whatever was said by the DOI,

20   independently did your group ever definitively determine that a

21   single false placement went through to Charney verification

22   methods and was submitted for payment after the Charney

23   verification methods pursuant to the performance-based

24   compensation?

25   A.  Can you repeat the question one more time.  I want to make

F4GJUSA3                          Kamath - cross

1   sure I understand it.

2              THE COURT:  Take the DOI findings out of mind.  No DOI

3   findings.

4              Did you yourself -- that is, your agency itself --

5   come across a particular claim which passed through and which

6   was paid but which you now believe was false?

7              THE WITNESS:  Yes.

8              THE COURT:  Is that your question, Mr. Futerfas?  Is

9   that your question?

10             MR. FUTERFAS:  Yes.

11             THE COURT:  Okay.  Follow it up.

12  BY MR. FUTERFAS:

13  Q.  Is there an e-mail or document or anything talking about

14  whether or not any of these false placements was verified by

15  Charney?

16  A.  I assume so, but I cannot recall with specificity.

17             MR. FUTERFAS:  May I have a moment, your Honor?

18             THE COURT:  Yes.

19             (Pause)

20             (Off-the-record discussion)

21  BY MR. FUTERFAS:

22  Q.  Ms. Kamath, during your time as deputy commissioner -- when

23  did you, when did you begin at SBS again, if you can refresh my

24  recollection?

25  A.  January 2006.

F4GJUSA3                         Kamath - cross

1    Q.  So from January 2006 until you left, you worked with SEEDCO

2    and particularly Upper Manhattan Workforce on a number of

3    matters, did you not?

4    A.  Yes.

5    Q.  In fact, Upper Manhattan Workforce had a number of great

6    successes, didn't they?

7    A.  They performed well --

8                MS. BLAIN:  Objection.

9    A.  -- under their contract.

10               THE COURT:  Sustained.

11   Q.  They performed well in --

12               THE COURT:  Objection sustained.

13   BY MR. FUTERFAS:

14   Q.  Let me ask you this.

15               Under the contract, under the contract there was 70

16   percent of the contract you testified yesterday was for

17   operational expenses, right?

18   A.  Yes.

19   Q.  And the 30 percent was for these performance metrics we

20   talked about, right?

21   A.  Yes.

22   Q.  And under the contract, Upper Manhattan was tasked with

23   performing functions of getting people jobs and servicing

24   individuals in the community, correct?

25   A.  Correct.

Q.  And so pursuant to the contract, did you work with SEEDCO
with respect to their fulfilling their duties and functions in
that role?

A.  Yes.

Q.  Do you remember, for example, did you work with Upper
Manhattan with respect to, let's say, large events such as the
East River Plaza, things like that?

A.  Yes.

Q.  Did you work with them on -- withdrawn.

         In fact, were there monthly reports that you made to
SEEDCO, that SBS sent to SEEDCO?

A.  Yes, that we sent to SEEDCO and the entire system.

Q.  In fact, that is one thing I forgot to ask you before, was
that this Charney Research company was not just validating
placements for SEEDCO, but, in fact, was the validator for all
of the workforce centers, right?

A.  Correct.

Q.  Let me show you what has been marked as Defendant's LLL.
Do you recognize that document?

A.  I do.

Q.  What do you recognize it to be?

A.  A monthly center management report.

Q.  That is prepared by SBS?

A.  Yes.

         MR. FUTERFAS:  Your Honor, I move to admit Defendant's

F4GJUSA3                        Kamath – cross

 1  LLL.

 2              MS. BLAIN:  No objection.

 3              THE COURT:  Received.

 4              (Defendant Exhibit LLL received in evidence)

 5              MR. FUTERFAS:  If you could scroll down a little bit.

 6  Stop there, business development.

 7  BY MR. FUTERFAS:

 8  Q.  So this is a report that SBS would do monthly back to your

 9  individual vendors, and in this case SEEDCO, right?

10  A.  Correct.

11  Q.  The report describes successes and areas of improvement and

12  generally describes what the vendors were doing, right?

13              MS. BLAIN:  Objection.

14  A.  Correct.

15              MS. BLAIN:  Objection.

16              THE COURT:  As to the general line?

17              MS. BLAIN:  Yes.

18              THE COURT:  Come up, please.

19              (Continued on next page)

20

21

22

23

24

25

F4GJUSA3                         Kamath - cross

1              (At the sidebar)

2              THE COURT:  What is the relevance, Mr. Futerfas?

3              MR. FUTERFAS:  Your Honor, under the contract, the

4     government is going to argue and has already argued in their

5     opening -- and they argued it with this witness -- they put in

6     the entire value of the contract.  So they haven't limited

7     their questioning and haven't limited their suggestions to the

8     jury about the value of the contract.  They said it is worth 7

9     million, 10 million.  The performance-based compensation

10    numbers are infinitely smaller.

11             THE COURT:  15 percent.

12             MR. FUTERFAS:  The government has not done that.

13             THE COURT:  15 percent of $7 million is a significant

14    number.

15             MS. BLAIN:  Designed to elicit testimony about success

16    of SEEDCO.  This is not the witness to testify about --

17             THE COURT:  I don't see the relevance of this.  This

18    is a waste of time.  Objection sustained.

19             (Continued on next page)

20

21

22

23

24

25

F4GJUSA3                          Kamath - cross

1              (In open court)

2              THE COURT:  Objection sustained to this line of

3              MR. FUTERFAS:  Let me ask you this.

4              THE COURT:  Take down the exhibit.

5    BY MR. FUTERFAS:

6    Q.  Let me ask you this question.

7              In the various functions that SEEDCO had to fulfill to

8    the community, those were part of the responsibilities, if you

9    know, of Mr. Saavedra, right?

10   A.  As center manager, yes.

11   Q.  So as center director, he was responsible for fulfilling

12   the terms of the contract with respect to providing services

13   to, employment services to the community.  Is that right?

14   A.  Yes.

15   Q.  Have you ever heard of a position within SEEDCO called the

16   SOC?

17   A.  Yes.

18   Q.  What is the SOC?

19   A.  Strategic operations coordinator.

20   Q.  What are the duties and responsibilities of a strategic

21   operations coordinator?

22   A.  Broadly speaking, they would be a liaison on technology

23   issues.  They would be a main liaison with the Department of

24   Small Business Services on any and all issues related to Work

25   Source1.  This is records, whether that included data

F4GJUSA3                         Kamath - cross

1   integrity, training issues.

2             We would work with center SOC strategic operations

3   coordinators to help to enhance the database, to make it more

4   useable and helpful and functional so that line staff could be

5   helped by the program, and generally speaking they were meant

6   to help facilitate efficient, orderly operations and service

7   delivery in the centers.

8             The centers would have on a weekly basis a flow of

9   upwards of a thousand people, and so just managing individuals

10  from Point A to Point B in a large operation like that would

11  take an operations coordinator.

12            MR. FUTERFAS:  If I have a moment, your Honor?  I am

13  trying to streamline this.

14            (Pause)

15  BY MR. FUTERFAS:

16  Q.  Have you heard the term "sectors" with respect to the

17  duties and responsibilities at the Workforce Center?

18  A.  Yes.

19  Q.  What are sectors?

20  A.  They're categories and groupings of jobs and employers

21  within different industries, so the food service sector, the

22  hotel sector, the transportation sector, the health care

23  sector.

24  Q.  Did SBS have metrics for the different types of information

25  you could get about these sectors?

F4GJUSA3                          Kamath - cross

           Is my question too broad?

A.   Yes.

Q.   When you were looking at, when SBS was looking at a sector,
let's say the retail sector, what are the kinds of information
that you were looking to understand about odd job employment
opportunities in that sector?

A.   The purpose of the centers and the purpose of understanding
sectors was to find open job opportunities in sectors in New
York City, to understand the number of those jobs, the quality
of the jobs, the wages of the jobs, to then be able to help
that business fill those jobs with job seekers.

           And so the metrics associated often with understanding
sectors and open jobs, where the number of jobs, the pay rates
of those jobs, the hours, hourly requirements of those jobs and
the experience requirements of those jobs in order to recruit
individuals to place them into those jobs.

Q.   Did you have, did SBS have targets or metrics that it
wanted its workforce centers to meet with respect to those
sectors?

A.   Yes, it did.

Q.   Let me show you -- when they were under the contract, I
think you have testified there were the 70 percent that was the
operating expense reimbursement, did you receive monthly
budgets or financial statements from SEEDCO to obtain those
funds?

F4GJUSA3                          Kamath - cross

A.  We would engage in an annual budget-setting process, and

then based upon approved budgets that were done on an annual

basis, we would receive invoices from each center -- SEEDCO, in

this case -- to be reimbursed.

        Sometimes organizations would do it monthly.  Again

that was their own cash flow.  Sometimes they would do it every

two months, sometimes they would submit invoices quarterly.

        (Discussion off the record)

BY MR. FUTERFAS:

Q.  Let me show you what has been marked for identification as

J8.

        MR. FUTERFAS:  It might be easier, with your Honor's

permission, if I could hand a hard copy to her.  It might be

easier for the witness.  Thank your Honor.

        (Pause)

BY MR. FUTERFAS:

Q.  If you could either look through the hard copies that are

in front of you or we could just scroll through the exhibit on

the computer for you, do you recognize, just take a look at

them and see if you recognize those documents?

A.  I do.

Q.  What do you recognize them to be?

A.  These are the invoices, the expense documentation

associated general ledger accounts.

        THE COURT:  The 70 percent of the contract?

F4GJUSA3                        Kamath – cross

1              THE WITNESS:  For expenses made.

2              THE COURT:  Come up, please.

3              (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F4GJUSA3                          Kamath - cross

1            (At the sidebar)

2            THE COURT:  Does the government contend the fraud took

3      place with regard to the expense reimbursements?

4            MS. BLAIN:  Yes, your Honor.

5            THE COURT:  Thank you.

6            MS. BLAIN:  Just to be clear, what I mean by that is

7      if SBS had known about the fraud related to the 30 percent

8      performance-based payments, they would have canceled the

9      contract and so none of the money would have gone out, but

10     there was no fraud, no fraudulent claims based on any cost

11     reimbursement request.  I don't understand the --

12           THE COURT:  I don't know why it is relevant.

13           MR. FUTERFAS:  Your Honor, the fundamental issue is

14     what is the claim for payment and the claim --

15           THE COURT:  The claim, the false claim is alleged with

16     regard to the performance part, and not the expense part.

17           MS. BLAIN:  That's right.

18           MR. FUTERFAS:  If the government is stipulating to

19     that?

20           THE COURT:  She just said it.

21           MR. FUTERFAS:  Okay.

22           (Continued on next page)

23

24

25

F4GJUSA3                         Kamath - cross

1          (In open court)

2          THE COURT:  The objection is sustained.  The document

3     will not come into evidence.

4          Ladies and gentlemen, I sustained the objection

5     because we're not dealing in this case with the 70 percent

6     portion of the contract that reimburses the contractor for

7     expenses.  We're focused only on the questions having to do

8     with the performance criteria which began as a 30 percent

9     portion of the consideration paid by SBS and later came down to

10    20 percent and only a portion of those having to do with

11    placements.

12         So I am confining the evidence.  You have enough to do

13    with those issues.  We don't have to take in other parts of the

14    contract as well.

15         MR. FUTERFAS:  Thank your Honor.  If I may show for

16    identification purposes only --

17         THE COURT:  Sometimes when we're finished, you should

18    be finished.

19         MR. FUTERFAS:  I think after this I will be done, your

20    Honor.

21         Let me show you Defendant's Exhibit T6, six T's for

22    identification.

23         THE COURT:  Give me that number again.

24         MR. FUTERFAS:  T, like Tom, 6.

25    BY MR. FUTERFAS:

F4GJUSA3                        Kamath - cross

1   Q.  Let me -- showing you T6 for identification, do you

2   recognize -- take a look at this.  If you want to take a look

3   at the hard copy if you can.

4            THE COURT:  She can see this.

5            THE WITNESS:  Fine, thank you.

6   BY MR. FUTERFAS:

7   Q.  Take a look at that and let me me know when you've had a

8   chance to review it.

9   A.  (Pause)  Yes.

10  Q.  What do you recognize this set of documents to be?

11  A.  This would be an authorization with back-up that our

12  quality assurance team would have worked with our fiscal team.

13  Jeanette Castro was the individual at the very end of the

14  process that would release payment.

15  Q.  What kind of payments are we talking about in this

16  document?

17  A.  This would be for the 30 percent portion of the budget that

18  was subject to the performance-based payments.

19           MR. FUTERFAS:  Your Honor, I move to admit Defense

20  Exhibit T6.

21           MS. BLAIN:  No objection.

22           THE COURT:  Received.

23           (Defendant Exhibit T6 received in evidence)

24           THE COURT:  What do you want us to know about this

25  document, Mr. Futerfas?

F4GJUSA3                          Kamath - cross

1              MR. FUTERFAS:  I am sorry?

2              THE COURT:  It is a thick document.

3              THE WITNESS:  Yes.

4              MR. FUTERFAS:  There are spreadsheets that go with it,

5   but we only introduced five pages.  We have only introduced a

6   five-page document.

7   BY MR. FUTERFAS:

8   Q.  Very briefly, Ms. Kamath, this is a cover.

9              The first page is a covered e-mail for an

10  authorization for payment outcome and it includes the Charney

11  placement report.  Is that right?

12  A.  That is what it says, yes.

13  Q.  In that sense, who is Naheem Harris?

14  A.  He worked on our quality assurance staff.

15  Q.  You are one of the recipients of this e-mail, correct?

16  A.  Yes.

17             MR. FUTERFAS:  If we can go to the next page.  Then it

18  goes on to the third page.

19             MS. ALBERTI:  Yes.

20             (Off-the-record discussion)

21  BY MR. FUTERFAS:

22  Q.  Anyway, what is reflected on the -- well, let me make it,

23  let me cut to the chase here.

24             In the first column, the total placements column at

25  the top, the horizontal column --

F4GJUSA3                          Kamath - cross

1  A.  Ah-huh.

2  Q.  -- is that reflective of the contractual terms in

3  Attachment A that we saw before?

4          Do you remember the contractual terms?

5  A.  Yes.

6  Q.  That had different, different values?

7  A.  Ah-huh.

8  Q.  That are calculated?

9  A.  Yes.

10  Q.  And then on the far right of that, the top column,

11  horizontal column, it says Charney results.  Do you see that?

12  A.  Yes.

13  Q.  Then there is a calculation done to determine the amount of

14  the performance-based payment, right?

15  A.  Yes.

16  Q.  And then the other columns, horizontal columns below the

17  one in the middle of the page, the one in the bottom of the

18  page, those are for the other metrics that we talked about

19  which were employee fulfillment, employee retention, right?

20          Do you remember those?

21  A.  Yes.

22          MR. FUTERFAS:  And then finally if we can go to the

23  Jeanette Castro memorandum.

24          (Off-the-record discussion)

25          THE COURT:  What do you want us to know about this

F4GJUSA3                        Kamath - cross

1    document, Mr. Futerfas?

2            MR. FUTERFAS:  This document, this is --

3    BY MR. FUTERFAS:

4    Q.  What is this memorandum?

5    A.  This is a memo authorizing --

6            MS. BLAIN:  I don't know that this has been received

7    into evidence.

8            THE COURT:  He just moved it into evidence, and you

9    didn't have any objection.

10           MS. BLAIN:  Not this document.  This is a separate

11   document.

12           MS. ALBERTI:  It is a group of documents.  I have them

13   in separate files.

14           THE COURT:  Let's not have this.

15           MR. FUTERFAS:  Let's not discuss it before the jury.

16           THE COURT:  Come up.

17           MS. BLAIN:  The witness was shown only one page of

18   this document.

19           THE COURT:  Come up.

20           (Continued on next page)

21

22

23

24

25

F4GJUSA3                          Kamath - cross

1           (At the sidebar)

2           THE COURT:  Ms. Schein, I need a binder of exhibits.

3           MR. FUTERFAS:  Can I describe the document?

4           MS. BLAIN:  She has only seen one page of it and there

5    were attachments.

6           THE COURT:  Hold on a minute, will you please!

7           The offer was made of the memorandum and attachments.

8    There is an authorization and attachments.  I am not going to

9    hold you if you didn't realize that when you received it.

10          Do you object to this document, the whole document?

11          MS. BLAIN:  This, yes, she needs to show she has

12   personal knowledge of this memo.  She didn't see this before

13   she said -- only saw the first e-mail.

14          THE COURT:  Is this a natural attachment to the

15   document?

16          MR. FUTERFAS:  Yes.  It is a whole group of documents

17   that come together that constitute the authorization to pay the

18   performance-based payment.

19          MS. BLAIN:  She may be able to testify about it, your

20   Honor.

21          THE COURT:  Stop it!

22          What is the relevance of this?

23          MR. FUTERFAS:  This is the authorization for payment

24   documentation from the performance-based payments.  This shows

25   the actual calculation of the performance-based payments and

F4GJUSA3                          Kamath – cross

1    the authorization for it.

2            THE COURT:  What do you want to bring out?  On March

3    24, 2010 there was authorization to pay $195,000?

4            MR. FUTERFAS:  I want to prove this process.  This is

5    the heart of this case.  This is --

6            THE COURT:  Stop the heart of the case.  It is

7    irrelevant, but I'll let you do it.  Objection overruled.

8            (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F4GJUSA3                         Kamath - cross

1              (In open court)

2              MR. FUTERFAS:  Your Honor, may we proceed?

3              THE COURT:  Yes, you may proceed.

4     BY MR. FUTERFAS:

5     Q.  So you were describing this memorandum, Ms. Kamath.

6              THE COURT:  It is an authorization to pay money for

7     the performance part of the budget.  Is that right?

8              THE WITNESS:  Correct.

9              THE COURT:  In March 2010.  Is that right?

10             THE WITNESS:  Correct.

11             THE COURT:  In the amount of $195,000, approximately?

12             THE WITNESS:  I can't see it, but I presume.

13             THE COURT:  Slow down.

14             THE WITNESS:  Yes.

15    BY MR. FUTERFAS:

16    Q.  And then on the next page --

17             THE COURT:  Anything more we need?

18             MR. FUTERFAS:  Yes, your Honor, the last part of that

19    exhibit.

20    BY MR. FUTERFAS:

21    Q.  Attached to that authorization would be the report from

22    Charney Research, correct?

23    A.  Correct.

24    Q.  You recognize this document, right?

25    A.  Ah-huh, yes.

F4GJUSA3                        Kamath - cross

1    Q.  If this would all come together, there would be a Charney

2    Research report?

3              THE COURT:  You said over and over again each claim

4    was subject to a validation process by Charney Research, right?

5              THE WITNESS:  Correct.

6              THE COURT:  Okay.

7              MR. FUTERFAS:  That was calculated and a memorandum

8    was put together.

9              THE COURT:  We are not going to repeat it.  You have

10   it.  Let's move on.

11   BY MR. FUTERFAS:

12   Q.  All I want to ask is, for each, each of the

13   performance-based compensation requests for money, it would be

14   through this same series of documentation, so I don't have to

15   show you every single quarter?

16   A.  Correct.

17             MR. FUTERFAS:  Your Honor, I have nothing further.

18             THE COURT:  Redirect.

19             MS. BLAIN:  Very briefly.

20   REDIRECT EXAMINATION

21   BY MS. BLAIN:

22   Q.  Ms. Kamath, Mr. Futerfas asked you questions about the

23   Charney Research random sampling methodology, did he not?

24   A.  Yes.

25   Q.  You remember those questions?

F4GJUSA3                       Kamath - redirect

1    A.  I do.

2    Q.  Did you ever discuss Charney's random sampling methodology

3    with anybody at SEEDCO?

4    A.  Yes.

5    Q.  On how many occasions?

6    A.  Multiple occasions in group settings and then in individual

7    settings with SEEDCO management.  I vividly recall the creation

8    of a memo that we crafted for all of our vendors to discuss, to

9    articulate the methodology in 2006 and 2007.  There was a memo

10   that clearly described the validation techniques because there

11   were a lot of questions around it.

12            It was very important for the organizations to

13   understand exactly how they were being held accountable.

14   Vendors had a clear understanding of the questions that were

15   asked of job seekers when they received that call, and it was

16   very clear to all operators of the system, including SEEDCO,

17   what that methodology was.

18   Q.  Are you familiar with Alex Saavedra?

19   A.  I am.

20   Q.  Do you recall if he was at any of those meetings?

21   A.  I do.

22   Q.  On how many occasions do you recall that?

23   A.  We met quarterly every year for the duration of the

24   contract as a small kind of SEEDCO/SBS only team, and then

25   similarly we would meet on a quarterly basis with kind of

F4GJUSA3                          Kamath - redirect

1  groups.  So I believe that the methodology came up in my seven

2  years at SBS five, six times.

3  Q.  Do you recall if Mr. Saavedra was at any of the meetings in

4  those five or six times?

5  A.  He was.

6  Q.  I am sorry?

7  A.  He was.

8          MS. BLAIN:  Thank you.

9          THE COURT:  Thank you very much, Ms. Kamath.  You are

10  excused.

11          (Witness excused)

12          THE COURT:  Next witness.

13          MS. SCHOENBERGER:  Your Honor, the government calls

14  Ernesto Lirag.

15          THE COURT:  Come up here, sir.

16   ERNESTO LIRAG,

17      called as a witness by the Government,

18      having been duly sworn, testified as follows:

19  DIRECT EXAMINATION

20  BY MS. SCHOENBERGER:

21  Q.  Good afternoon, Mr. Lirag.  Are you employed?

22  A.  Good afternoon.  Yes, I am.

23  Q.  Where do you work?

24  A.  I work at the U.S. Department of Labor, Employment &

25  Training Administration at the regional office in Boston.

F4GJUSA3                          Lirag – direct

1    Q.   What region does the regional office cover?

2    A.   The regional office in Boston covers the six New England

3    states of Vermont, New Hampshire, Maine, Massachusetts,

4    Connecticut and also New York, New Jersey, Puerto Rico and the

5    Virgin Islands.

6    Q.   How long have you worked at the U.S. Department of Labor?

7    A.   I've been working with the U.S. Department of Labor since

8    2000 for almost –– that would make it around 14, 15 years.

9    Q.   Is the U.S. Department of Labor a federal agency?

10   A.   Yes, it is.

11   Q.   What does the Employment & Training Administration do?

12   A.   The Employment & Training Administration oversees federal

13   workforce programs and development, so we oversee the issuance

14   of federal grants to various agencies, which may include

15   states, local governments and nonprofits.

16              (Continued on next page)

17

18

19

20

21

22

23

24

25

F4gnusa4                        Lirag – direct

1   Q.   What is a grant?

2   A.   A grant is an agreement between the federal government and

3   an entity.   Primarily, the purpose of the grant is to serve the

4   public.

5   Q.   Does a grant differ from a contract?

6   A.   Yes, it does.   If the federal government enters into a

7   contract, the main beneficiary of the services or the products

8   is the federal government; as opposed to a grant, the

9   beneficiary of the services and products would be the public.

10  Q.   What is your title at Department of Labor?

11  A.   I am the division chief for the Division of Financial

12  Management and Administrative Services.

13  Q.   Does your job include responsibilities related to grants?

14  A.   Yes, it does.

15  Q.   What types of responsibilities?

16  A.   As a division chief I oversee a team of professionals who

17  conducts performance reviews on grantees.   In addition to that,

18  we also provide technical assistance to help grantees perform

19  the objectives of the grant.

20  Q.   How long have you held the position of division chief?

21  A.   I have been division chief for approximately six years.

22  Q.   When did you first become the division chief?

23  A.   2008.

24  Q.   Does the United States Department of Labor have a

25  particular mission?

F4gnusa4                        Lirag - direct

1   A.  Yes, it does.

2   Q.  What is that mission?

3   A.  The U.S. Department of Labor's mission is to promote and

4   help U.S. workers.

5   Q.  You mentioned before workforce programs?

6   A.  Yes.

7   Q.  What are workforce programs?

8   A.  Workforce programs are designed to provide services to job

9   seekers to help them find unsubsidized jobs through training

10  and various services, and also those programs also provide

11  supportive services in case they need those services in order

12  to find those jobs.

13  Q.  In your role as division chief, do you administrate grants

14  that are related to workforce programs?

15  A.  Yes.

16  Q.  What types of grants?

17  A.  We have a menu of grants that we oversee, one of which is

18  the Workforce Investment Act grant.  We also oversee the

19  Wagner-Peyser Act grants, Trade Adjustment Assistance Act

20  grants and various other workforce program grants.

21  Q.  Focusing on the Workforce Investment Act grant, can you

22  please describe for the jury what the Workforce Investment Act

23  is.

24  A.  Certainly.  The Workforce Investment Act establishes and

25  authorizes the establishment of a workforce development system.

F4gnusa4                      Lirag – direct

The workforce development system includes the very important

programs, which is the adult program, the dislocated worker

program, and the youth program.  The Workforce Investment Act

also establishes the career centers, which are the locations or

the places job seekers go in order to access these various

programs.

Q.   What is the purpose of Workforce Investment Act grants?

A.   The purpose of the Workforce Investment Act grant is to

provide federal funds to states which are passed on to the

locals, and to deliver those job training services to job

seekers, and also to fund the various career centers, which are

also called one-stops.

Q.   Do one-stops go by any other names to your knowledge?

A.   Yes, it does.  There are various branding terminologies

used for one-stops.  They are also called career centers, and I

believe here in New York City they go by the term Workforce1

Career Center.

Q.   In your job as division chief at the Department of Labor,

have you become familiar with which states received the

Workforce Investment Act grant?

A.   Yes.

Q.   How have you become familiar with that?

A.   We routinely ask the primary agency who helps administer

these grants, where we issue guidance through training and

employment and guidance letters and on an annual basis, we

F4gnusa4                          Lirag – direct

1    issue training and employment guidance letters which provide

2    the various amounts states receive to operate their Workforce

3    Investment Act grants and programs.

4    Q.  In 2009, 2010 and 2011, did New York State receive federal

5    funds through a Workforce Investment Act grant?

6    A.  Yes, they did.

7    Q.  What were those funds for?

8    A.  Again, those were to operate the various career centers and

9    also to provide adults, dislocated workers, and youth programs

10   to fund those services in order to help job seekers.

11   Q.  Do career centers relate to any particular of the three

12   programs that you have mentioned?

13   A.  Yes.  For New York City primarily it's the adults and

14   dislocated worker programs, services that are accessed through

15   those career centers.

16   Q.  In your role as division chief, did you develop an

17   understanding of what New York State did with its funds under

18   the Workforce Investment Act grant.

19   A.  Yes, I did.

20   Q.  What did it do with those funds?

21   A.  Basically, the state passed on those funds to the 33 local

22   areas that comprise New York State, which includes New York

23   City.

24   Q.  Does your department keep track of what New York City does

25   with the grants that it receives through the Workforce

F4gnusa4                          Lirag - direct

1    Investment Act?

2    A.   Yes, we do.

3    Q.   What is your understanding of what New York City does with

4    the funds that it received in 2009 through 2011?

5    A.   New York City, the funds they received they passed -- the

6    federal funds are passed on to a local New York City agency

7    called SBS, and they, SBS, in turn, establishes the career

8    centers throughout New York City.

9    Q.   Does SBS refer to department of Small Business Services?

10   A.   Yes, it does.

11   Q.   In your job, did you become familiar with a company called

12   SEEDCO?

13   A.   Yes, I did.

14   Q.   How did you become familiar with that company?

15   A.   Sometime in 2010 or thereabouts, we received information of

16   some allegation of incorrect reporting, and when we learned of

17   that, we followed our agency's procedures, which is to file an

18   incident report with the Office of Inspector General, and our

19   DOL national office in Washington, D.C.

20              THE COURT:  That's the federal level?

21              THE WITNESS:  At the federal level, yes, sir.

22   Q.   Just backing up a step, why would a report about SEEDCO go

23   to your office?

24   A.   Any allegations of fraud, waste, or abuse that are reported

25   to us, we follow that procedure regardless of where those

F4gnusa4                         Lirag – direct

1   allegations are coming from.  It could be an article, it could

2   be a phone call.  Whether it's credible or not, we always file

3   an incident report.

4               THE COURT:  Why is the federal government interested

5   in an allegation of fraud by a private company against New York

6   City?

7               THE WITNESS:  Because we want to ensure that all

8   federal funds are expended according to its purpose.

9   Q.  Was it your understanding that the company SEEDCO received

10  federal funds?

11  A.  Yes.

12  Q.  How did they receive federal funds?

13  A.  It was my understanding that they are one of the Workforce1

14  center operators, that SBS has an agreement with SEEDCO to

15  operate at least a couple of Workforce1 career centers within

16  New York City.

17  Q.  Do you have an understanding of how SEEDCO was paid?

18  A.  Um --

19  Q.  I will withdraw the question.  Do you have an understanding

20  of who paid SEEDCO to operate Workforce1 centers?

21  A.  My understanding is that SBS paid SEEDCO.

22  Q.  What was your understanding of where the funds came from --

23  A.  Oh, OK.

24  Q.  -- in order to pay SEEDCO?

25  A.  Basically, the grant funds from WIA that was issued to the

F4gnusa4                         Lirag - direct

1    New York Department of Labor -- to the New York State

2    Department of Labor was then passed on to New York City.

3    Specifically in New York City, it is SBS that is the primary

4    agency who received those WIA grant funds.

5    Q.  What did the state of New York have to do in order to

6    receive the grant money that it would pass down to localities

7    and their divisions?

8    A.  On an annual basis, the governor or his designee, his or

9    her designee, would need to sign a funding agreement with the

10   U.S. Department of Labor.

11   Q.  Mr. Lirag, can you take a look at the binder in front of

12   you.  I believe it's binder No. 1.

13   A.  OK.

14   Q.  Tab No. 22.

15   A.  Number?

16          THE COURT:  Repeat the number.

17          MS. SCHOENBERGER:  22.

18   A.  OK.

19   Q.  What is this document, Mr. Lirag?

20   A.  This is the annual funding agreement which I mentioned that

21   the New York State Department of Labor would need to sign in

22   order to receive WIA grant funds.

23   Q.  Have you become familiar with this document in your role as

24   division chief at the Department of Labor?

25   A.  Yes, I am.

1           MS. SCHOENBERGER:  Your Honor, the government offers

2     Exhibit 22 into evidence.

3           THE COURT:  The defendants?

4           MS. SCHEIN:  No objection, your Honor.

5           THE COURT:  Received.

6           (Government's Exhibit 22 received in evidence)

7     Q.  Mr. Lirag, what time period does this funding agreement

8     cover?

9     A.  This is program year 2008.  So the time period that this

10    particular funding agreement covers, July 1, 2008 until June

11    10, 2009.

12    Q.  What does "program year" mean?

13    A.  Program year is the time period for which the funding

14    agreement is valid.  Basically it coincides with the Department

15    of Education's time period.  So it is a full year that starts

16    in July and ends in June.

17    Q.  Can you please take a look at the paragraph numbered three

18    in this agreement.

19           MS. SCHOENBERGER:  Mr. Solomon, if you could expand

20    that.

21    Q.  Can you please read the first two lines of this provision

22    to the jury.

23    A.  Yes.  "Applicable authority.  Funds provided under this

24    grant agreement must be expended in accordance with all

25    applicable federal statutes, regulations and policies,

1    including those of the Workforce Investment Act."

2    Q.  What does must be "expended in accordance with" mean?

3    A.  It means that every service or product paid for by the

4    federal funds that are issued under this funding agreement must

5    be in compliance with all federal statutes, regulations, and

6    policies that are issued in accordance with this plan.

7    Q.  In your role as division chief, did you consider this to be

8    an important provision of the grant?

9    A.  Yes, I do.

10   Q.  Why was it important?

11   A.  Because our division oversees, again, the 10 jurisdictions

12   of Region 1, and it is our role to ensure compliance with the

13   regulations.  The way we do that is by conducting reviews,

14   on-site reviews to the various jurisdictions or grantees.

15           THE COURT:  Can I see counsel for one moment off the

16   record.

17           (Discussion at sidebar off the record)

18   BY MS. SCHOENBERGER:

19   Q.  Mr. Lirag, can you take a look at the documents behind tabs

20   23, 24, and 25 in your binder.

21   A.  Yes.

22           THE COURT:  These are annual extensions?

23           MS. SCHOENBERGER:  Shall I ask the witness?

24   Q.  Do you recognize the documents that have been marked as

25   Government's Exhibits 23, 24 and 25?

F4gnusa4                         Lirag - direct

1   A.  Yes, I do.

2   Q.  What are these documents?

3   A.  These are the annual funding agreements for program years

4   2009 and 2010.

5         MS. SCHOENBERGER:  Your Honor, the government offers

6   Exhibits 23 through 25 into evidence.

7         MS. SCHEIN:  No objection, your Honor.

8         THE COURT:  Received.

9         (Government's Exhibits 23, 24, and 25 received in

10  evidence)

11        THE COURT:  So that these do the same thing for the

12  years 2009/2010, 2010/2011, 2011/2012?

13        THE WITNESS:  Yes, your Honor.

14        THE COURT:  Finished?

15        MS. SCHOENBERGER:  Yes.

16  Q.  Do each of these agreements contain the same provision

17  regarding the expenditure of funds?

18  A.  Yes, they do.

19  Q.  Can you give an example of an expenditure that would be in

20  accordance with the Workforce Investment Act?

21        THE COURT:  I think we've got it.

22        MS. SCHOENBERGER:  Yes, your Honor.

23        THE COURT:  Any cross-examination.  Did you need more?

24        MS. SCHOENBERGER:  If you would like to break, your

25  Honor, it's only a few more minutes, but I would like to get it

F4gnusa4                    Lirag - direct

1    in.

2              THE COURT:  Go ahead.

3    Q.  If you would provide an example of, perhaps just to

4    streamline, an example of an expenditure that would not be in

5    accordance with the Workforce Investment Act.

6    A.  An expenditure that would not further grant goals, any

7    products or services used to purchase, for example, liquor,

8    lobbying activities, those type of services or products are not

9    available under this grant.

10   Q.  Are there any consequences for making expenditures that are

11   not in accordance with program goals?

12   A.  Yes.

13   Q.  What would those consequences be?

14             MR. FUTERFAS:  I am going to object, your Honor.

15             THE COURT:  Sustained.

16   Q.  You mentioned that at some point your office issued an

17   incident report related to allegations that you learned about

18   SEEDCO, is that correct?

19   A.  That's correct.

20   Q.  Why was that done?

21             MS. SCHEIN:  Objection, your Honor.

22             THE COURT:  Overruled.

23   A.  Because, again, according to, in following our office

24   procedures, any allegations of fraud, waste, or abuse, a report

25   must be filed so that appropriate agency or organization would

F4gnusa4                        Lirag - direct

1    conduct an investigation or any other further actions required

2    if those are deemed to be valid allegations.

3    Q.  Do you recall generally what the allegations were that you

4    filed an incident report about?

5    A.  Yes.

6    Q.  What was your understanding?

7    A.  My recollection is that --

8               MS. SCHEIN:  Objection, your Honor.

9               THE COURT:  I will allow it for the limited purpose of

10   explaining the activity of the United States Department of

11   Labor.

12              You may answer.

13              THE WITNESS:  Thank you, your Honor.

14   A.  My understanding is that there were allegations of false

15   reporting of employment numbers, data.

16   Q.  Did allegations of false reporting matter to you as

17   division chief in the Department of Labor?

18   A.  Yes, it does.

19   Q.  Why?

20   A.  Because it doesn't further the objective of our program or

21   our agency to help job seekers find jobs.

22   Q.  Could there be consequences for such false reporting?

23   A.  Yes.

24   Q.  What could those consequences be?

25   A.  Services provided could be potentially be disallowed if

F4gnusa4                    Lirag – direct

1    those services were not for the purpose of helping job seekers

2    find jobs.

3    Q.  And the final question:  What does it mean to disallow

4    costs?

5    A.  Disallow costs is when the federal government asks,

6    establishes a debt with an organization, and they must --

7              MS. SCHEIN:  Your Honor, objection.

8              THE COURT:  Overruled.

9    A.  And they must pay those funds back to the federal

10   government.

11             MS. SCHOENBERGER:  Thank you, Mr. Lirag.

12             THE WITNESS:  You're welcome.

13             THE COURT:  In other words, if the city doesn't do

14   anything with regard to this allegation that's reported, what

15   happens?  What's the consequence?

16             THE WITNESS:  The consequence is the agency as the

17   Department of Labor may choose to conduct our own investigation

18   and, therefore, disallow those costs ourselves.

19             THE COURT:  You mean take back the grant money you

20   gave to the state?

21             THE WITNESS:  That is correct.

22             THE COURT:  Thank you.  Cross-examination.

23   CROSS EXAMINATION

24   BY MS. SCHEIN:

25   Q.  Good afternoon, Mr. Lirag.

F4gnusa4                    Lirag – cross

1   A.   Good afternoon.

2   Q.   In these grant agreements that the government has shown

3   you, Government Exhibit 22, these agreements contain certain

4   standard assurances, is that correct?

5   A.   That's correct.

6   Q.   Those standard assurances on certain occasions are

7   contained in all the grant agreements that the U.S. Department

8   of Labor issues, is that correct?

9   A.   That's correct.

10  Q.   SBS, the New York City Department of Small Business, was

11  that a vendor partner that the Department of Labor designated?

12  A.   No.

13  Q.   What was the New York City Small Business Services?

14  A.   My understanding of the New York City Small Business

15  Services is a city agency which administrates our job training

16  programs as well as other small business programs the city

17  receives funds for.

18  Q.   If you know, under the Work Investment Act, would the New

19  York City SBS have been designated as to operate as a

20  subrecipient to operate and oversee the career center?

21  A.   SBS being part of New York City, which is a local area, so

22  they are a subrecipient of the Workforce Investment Act grant

23  funds, yes.

24  Q.   When the Department of Labor, as you testified, finds out

25  about some allegation or hears about it, there are a number of

F4gnusa4                        Lirag - cross

1    remedies that you can choose based upon an allegation, correct?

2    A.  Our procedure is to file an incident report with the

3    federal Department of Labor Office of Inspector General.  It's

4    the Office of Inspector General who decides what to do with

5    that incident.

6    Q.  One of the things you can do is reevaluate whether the

7    grantee can be a future participant in Work Investment Act

8    programs, is that correct?

9    A.  To my knowledge, the Office of Inspector General does

10   not --

11   Q.  That's not --

12         THE COURT:  Don't interrupt the witness.

13   Q.  I'm sorry.  Go ahead.

14   A.  My understanding is that the Office of Inspector General

15   does not make that determination.

16   Q.  But does your office make a determination about whether

17   there will be future participation of a vendor in Work

18   Investment Act programs?

19   A.  I do not know the answer to that question.

20         MS. SCHEIN:  OK.  Thank you very much, Mr. Lirag.

21         THE WITNESS:  You're welcome.

22         MS. SCHEIN:  I have no further questions, your Honor.

23         THE COURT:  Thank you.

24         MS. SCHOENBERGER:  No redirect.

25         THE COURT:  You're excused.  Thank you very much.

F4gnusa4                         Lirag - cross

1      Let's stand for the jury please.

2              Jury, close up your books and give them to Ms. Jones

3      on your way out.  They will be returned to you after lunch.

4      We've got some work to do, so come back at 2:20.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F4gnusa4                     Lirag - cross

```
 1              (Jury not present)

 2              (Witness excused)

 3              THE COURT:  Let's take five minutes and then go into

 4     the Harper deposition transcript.

 5              Five minutes, and we'll come back.

 6              (Recess)

 7              THE COURT:  Are you ready for Harper?

 8              MR. FUTERFAS:  Yes, your Honor.

 9              THE COURT:  OK.

10              Who wants to use the deposition?

11              MS. BLAIN:  Your Honor, the government seeks to

12     introduce about three pages of the deposition now, and then I

13     believe that --

14              THE COURT:  What pages.

15              MS. BLAIN:  Starting at page 266.

16              The first objection --

17              THE COURT:  Wait a minute.  Where it's highlighted in

18     yellow?

19              MS. BLAIN:  Right.  Actually, that is missing another

20     color unfortunately, but that starts the government's

21     designation, at 266, line 9.  Again, just the highlighted

22     portions we're seeking to read.

23              The first objection is on page 271.

24              THE COURT:  You don't need 9 through 12 or lines 13

25     through 16.
```

F4gnusa4                    Lirag - cross

1          MS. BLAIN:  OK.

2          THE COURT:  Start with, "On what date did you start

3   working at SEEDCO?"

4          MS. BLAIN:  OK.

5          THE COURT:  Line 18.

6          So through page 269, line 16, there are no objections?

7          MS. BLAIN:  Correct, your Honor.

8          THE COURT:  What else do you want to read after that?

9          MS. BLAIN:  I'm sorry.

10          THE COURT:  After you are finished with 269, line 16,

11   what's next?

12          MS. BLAIN:  Page 271, line 23.

13          THE COURT:  What is Exhibit 1's new number.

14          MS. BLAIN:  Yes, Exhibit 1 is Government's Exhibit 45.

15          THE COURT:  Don't mention 1.  Mention 45.

16          MS. BLAIN:  OK.  Down to 272 --

17          THE COURT:  Just a minute.  You are taking that

18   through 272, line 16.  No objection, right?

19          MS. BLAIN:  There is an objection to speculation.

20          THE COURT:  Objection is overruled.

21          Then you go from 272, line 25.

22          MS. BLAIN:  Correct.

23          THE COURT:  What are Government's 2, 3, 4 and 5?

24          MS. BLAIN:  46, 47 and 48, I believe.  But we're

25   confirming right now.  That's right.

F4gnusa4                          Lirag - cross

1              MS. SCHEIN:  Pardon me, your Honor.

2              THE COURT:  One minute, Ms. Schein.

3              46, 47 and 48.  There are four exhibits.

4              MS. BLAIN:  45 was Government 1.  And Government 2 is

5     46.

6              THE COURT:  OK.

7              MS. BLAIN:  Government 3 is 47, etc.

8              THE COURT:  Those are all in evidence?

9              MS. BLAIN:  Correct, your Honor.  Actually, no, these

10    are not evidence.

11             THE COURT:  None of them is in evidence?

12             MS. BLAIN:  That's right.  That's why we are seeking

13    to read this into the transcript.

14             THE COURT:  Going back to 272, line 16, are you

15    planning to move that into evidence?

16             MS. BLAIN:  Yes, your Honor.

17             THE COURT:  So you are going to offer it into evidence

18    at that point.

19             Ms. Schein, do you object?

20             MS. SCHEIN:  Your Honor, we object, on page 272.

21             THE COURT:  Yes.

22             MS. SCHEIN:  272, line 12 through 16.

23             THE COURT:  Why?

24             MS. SCHEIN:  We object to the conclusion by the

25    answer, which concludes that he utilized, Harper utilized this

F4gnusa4                         Lirag - cross

1    CIF to prove the fraud.

2              THE COURT:  Instead of "prove," read "show."

3              MS. SCHEIN:  Pardon?

4              THE COURT:  Read "show."  When you read that to the

5    jury, instead of reading "prove," say "show."

6              MS. SCHEIN:  We still object.  It's conjecture and

7    speculation that I thought was taking place.

8              THE COURT:  You read as it is, and I will explain to

9    the jury.  I will give a limiting instruction.  So that covers

10   it.

11             MS. SCHEIN:  Thank you, your Honor.

12             THE COURT:  Express your objection at that time.

13             MS. SCHEIN:  Thank you, your Honor.

14             THE COURT:  All right.

15             Going on to 273, any objections?

16             MS. SCHEIN:  No, your Honor.

17             THE COURT:  Is Irwin Traydman going to be identified

18   before this time?

19             MS. BLAIN:  I don't believe so, your Honor, although

20   he's been talked about by prior witnesses.

21             THE COURT:  I will just leave it.

22             When is the next time there is an objection.

23             MS. BLAIN:  Page 278, lines 5 to 25.

24             THE COURT:  Why is this relevant?

25             MS. BLAIN:  It is relevant to show the jury the

F4gnusa4                         Lirag - cross

discrepancy in the document between a CIF and actually the

screen shot of what appears in Worksource1.  That is what these

documents do, and that's what the testimony explains.

        THE COURT:  Isn't this hearsay?

        MS. BLAIN:  No.  This is what he did.  He's saying he

look this up.  He's the strategic operations coordinator

responsible for the database, and he looked into the database

and pulled these screen shots.

        THE COURT:  Why are his findings relevant?

        MS. BLAIN:  They are relevant, number one, to prove

the fraud, that there was actually inaccurate information in

the Worksource1.

        THE COURT:  You are proving that through the

government report?

        MS. BLAIN:  Yes, your Honor.  This is just another

example of it.

        THE COURT:  It is not another example.  It is a

repetitive example.

        MS. BLAIN:  Number two, it goes to explain to the

jury, the jury hasn't ever actually seen the actual Worksource1

database, and these exhibits are a comparison between the CIFs

and the actual screen shot of the database so they can

understand how the process works.  This testimony explains

that.

        THE COURT:  You have had other witnesses do that.

F4gnusa4                      Lirag - cross

1              MS. BLAIN:  No witnesses who could testify about the

2        screen shots, these particular screen shots from the database.

3        We will have an additional witness, the DOI investigator.

4        Should your Honor permit it, the DOI report comes in.

5              THE COURT:  The DOI I've already ruled on that.

6              MS. BLAIN:  Yes, your Honor.

7              THE COURT:  I said it could be admitted.

8              MS. BLAIN:  Right.  So if I could please ask your

9        Honor to look at tab 45, Government's 45.

10             THE COURT:  Put it up.

11             MS. BLAIN:  If you scroll through, the first two pages

12       is a CIF, and then the next few pages, if you go to the next

13       page, are the actual screen shots from Worksource1, where the

14       jury can now see that the job start date on the CIF is

15       different than the job start date in Worksource1.

16             THE COURT:  I will allow that.

17             MS. BLAIN:  Thank you.

18             THE COURT:  But not the conclusion.

19             MS. BLAIN:  OK.  Thank you.

20             I'm sorry.  Which conclusion just so we now how to

21       follow?

22             THE COURT:  The conclusion from the different

23       information.

24             MS. BLAIN:  That would be 278, lines 5 to 25?

25             THE COURT:  Yes.  He says, "I determined that it was

F4gnusa4                         Lirag - cross

1   placed in there as a placement."

2            What is that?

3            MS. BLAIN:  If you look at -- sorry.  If you go --

4            THE COURT:  You are asking him for an opinion about

5   accuracy.

6            MS. BLAIN:  He's explaining the document.  So he's

7   explaining it.  On this page of the document, page 6, it is

8   circled, entered into Worksource1 as a placement.

9            So that's what Mr. Harper is saying.  He's explaining

10  that that document says that this information is a placement.

11  He's not concluding anything.  He's explaining what the

12  document says.

13           THE COURT:  You are using Harper as if he were an

14  accounting expert.  If you were proving this fraud, you would

15  prove it through an accounting expert, who would take all the

16  documents and compare them and then draw a report on the basis

17  of that.

18           In effect that's how you're using Harper, replacing an

19  accountant with someone who, because of his job, has access to

20  the information and knows the information and knows the import

21  of the information.

22           MS. BLAIN:  Your Honor, I'm sorry.  I wasn't clear.

23  We are not using Harper to prove anything through an accounting

24  method.  We are just putting up four more examples of a CIF

25  versus the database.

F4gnusa4                         Lirag - cross

1              We don't need Harper to prove that the fraud was

2       committed and the fraud happened as witnesses have testified

3       and as more testimony comes in.  But this is just a clear

4       example for the jury to have two documents side by side that

5       they haven't seen yet.

6              THE COURT:  I am bothered by your asking opinions and

7       conclusions of Harper rather than just showing the

8       discrepancies, which is all that he should be doing.

9              MS. BLAIN:  Right.

10             THE COURT:  The fact that you are asking this in the

11      form of opinions and conclusions.

12             MS. BLAIN:  Your Honor, this was actually a

13      counterdesignation, the government's counterdesignation to the

14      defendants.

15             THE COURT:  If the defendant doesn't do anything with

16      Harper you don't have to do anything either, right?

17             MS. BLAIN:  That's right.

18             THE COURT:  Start up, Mr. Futerfas or Ms. Shine.  What

19      do you want to use Harper for?  Maybe for nothing.  You won't

20      need Harper.

21             MS. SCHEIN:  There are some parts of Harper's

22      deposition testimony that we did designate that we think are

23      material and relevant to the facts of whether Mr. Saavedra had

24      knowledge, but what we object to is his opinion.

25             THE COURT:  I'm asking you what do you want to use

F4gnusa4                        Lirag - cross

1    affirmatively.  The government is not going to put on Harper in

2    its direct case I gather?

3              MS. BLAIN:  Your Honor, we planned just for practical

4    purposes to have one person sit in the witness stand and read

5    Harper's answers and that that person could be Harper both for

6    government and for the defendant so that the jury wouldn't have

7    to hear from two different harpers.

8              THE COURT:  I am asking you, Ms. Blain, if Ms. Schein

9    did not put anything in from Harper, would you still want to

10   put something in?

11             MS. BLAIN:  Yes.  But only just to show those

12   documents and admit those documents into evidence.  That's it.

13             THE COURT:  I think you should do what you want to do,

14   and then in Ms. Schein's case she will do what she wants to do.

15             MS. BLAIN:  Thank you.

16             THE COURT:  So how much more do you have besides this?

17             MS. BLAIN:  That's it for the government.

18             THE COURT:  We're finished.  OK.

19             MS. SCHEIN:  Your Honor, if I may?

20             THE COURT:  One minute.

21             MS. SCHEIN:  Harper's opinion --

22             THE COURT:  One minute.

23             MS. SCHEIN:  I'm sorry, your Honor.

24             THE COURT:  I don't know how you are going to get

25   around what I'm concerned about, Ms. Blain, that you are asking

F4gnusa4                      Lirag - cross

1   the witness to form opinions and conclusions.  If all he did

2   was to testify as to discrepancies, it would be simple.

3           MS. BLAIN:  Your Honor, we are just asking -- the only

4   portions that we are seeking to read in are the portions that

5   stop before the conclusions.  We are just asking him to

6   authenticate these four documents so that they can be admitted

7   into evidence.  That's the only reason we would call him.

8           THE COURT:  That means you don't need anything on 278?

9           MS. BLAIN:  That's right.

10          THE COURT:  You can offer 45 through 48.

11          MS. BLAIN:  45 through 49, yes.

12          THE COURT:  Yes.  You can offer that when you finish

13  with 278, line 3.

14          MS. BLAIN:  Line 4, yes.

15          THE COURT:  Line 4.

16          MS. BLAIN:  The rest of this is counterdesignations to

17  whatever defendant seeks to introduce.

18          THE COURT:  I will take that up afterwards.  You are

19  stopping at 278, line 4.  You will offer 45 through 48.

20          MS. BLAIN:  Yes, your Honor.  That's what we intended

21  to do.  Thank you.

22          THE COURT:  Over Ms. Schein's objection, I will admit

23  them.  OK.  Ms. Schein.

24          MS. SCHEIN:  Your Honor, we are seeking starting at

25  page 10, line 9 through 11.  Your Honor, I will go right to the

F4gnusa4                          Lirag - cross

1    government's objections.

2              THE COURT:  No.  I want to see what you are doing.

3              MS. SCHEIN:  OK.

4              THE COURT:  You are starting with line 10.  Why are

5    these color marked?

6              MS. BLAIN:  These were color marked, your Honor, in an

7    attempt to make it easier for the Court to identify which

8    portions we party seeks to introduce.

9              THE COURT:  You want to read 9 through 11 on page 10,

10   right?

11             MS. SCHEIN:  Yes, your Honor.

12             THE COURT:  What is next?

13             MS. SCHEIN:  Page 16, lines 4 through 7, lines 10

14   through 25.

15             THE COURT:  OK.  No problem.

16             MS. SCHEIN:  Page 17, lines 2 to 9.

17             THE COURT:  OK.

18             MS. SCHEIN:  11 through 19.

19             THE COURT:  No problem.

20             MS. SCHEIN:  And then through 25.

21             THE COURT:  18, lines 4 through 25.

22             MS. SCHEIN:  Yes.

23             THE COURT:  That's fine.

24             MS. SCHEIN:  Thank you, your Honor.

25             Page 18, 4 through 8.

F4gnusa4                      Lirag - cross

1          THE COURT:  That is fine.

2          MS. SCHEIN:  Page 19, the same without the objections.

3          THE COURT:  That is fine.

4          MS. SCHEIN:  Page 20, lines 12 through 25.

5          THE COURT:  That is fine.

6          MS. SCHEIN:  Page 21, 1 through 25.

7          THE COURT:  That's fine.

8          MS. SCHEIN:  And page 22 without the objections.

9          THE COURT:  That's fine.

10          MS. SCHEIN:  Page 23, lines 7 through 25, without the

11  objections.

12          THE COURT:  I don't think we need 23.  Don't read 23.

13  It is just confusion.  You have the clear answer at line 21,

14  page 22.

15          MS. SCHEIN:  OK.

16          Thank you, your Honor.

17          THE COURT:  Page 24.

18          MS. SCHEIN:  Page 24, line 4.

19          THE COURT:  You don't need any of that.  That is also

20  repetitive.

21          MS. SCHEIN:  OK.  Your Honor --

22          THE COURT:  Let's go down to -- the next thing you

23  should read is page 25, line 8.  Nothing on page 24 should come

24  in.

25          MS. SCHEIN:  Nothing?

F4gnusa4                    Lirag – cross

1          THE COURT:  And 25, 1 through 7 should not come in.

2          They are all redundant and confusing after you got

3     your answer.

4          MS. SCHEIN:  OK.

5          Page 26, lines 10 through 12.

6          THE COURT:  We are OK with that.

7          We are up to 28.

8          MS. SCHEIN:  11 through 14.

9          THE COURT:  28 is OK.

10         29 is OK.  I am looking at the highlighted portions.

11         MS. SCHEIN:  Yes.

12         THE COURT:  I am on page 33.

13         MS. SCHEIN:  Yes.

14         THE COURT:  Through line 23, you're OK.  The objection

15    is sustained to the question on line 23, page 33.  Don't read

16    that.

17         The same with 34, lines 10 to 14.  Objection

18    sustained.

19         MS. SCHEIN:  Your Honor, if I may, the government's

20    witness testified that she sat outside Mr. Saavedra's door and

21    he was there all the time.

22         THE COURT:  She didn't say that.

23         MS. SCHEIN:  Pardon?

24         THE COURT:  She didn't say that.

25         MS. SCHEIN:  That he was there frequently.

F4gnusa4                              Lirag - cross

1              THE COURT:  This is not --

2              MS. SCHEIN:  Mr. Harper, who also sat outside.

3              THE COURT:  Ms. Schein, objection sustained.

4              MS. SCHEIN:  All right.

5              34, strike "Fair enough."

6              start with the question on line 21.

7              MS. SCHEIN:  OK.

8              THE COURT:  36 is OK.

9              37 is OK.

10             On 38, lines 14 to 19, objection sustained.

11             On lines 20 to 23, objection overruled.

12             39 is OK.

13             40 is OK.

14             41 is OK.

15             42 is OK.

16             43, OK.

17             What's next?

18             MS. SCHEIN:  46.

19             THE COURT:  Page 46?

20             MS. SCHEIN:  Right.

21             THE COURT:  47, OK.  48, OK.  49, OK.

22             Where is the next problem?

23             MS. SCHEIN:  The next is page 135, your Honor.

24             THE COURT:  Objection sustained.  What is the next

25    problem?

F4gnusa4                          Lirag - cross

1              MS. SCHEIN:  Page 137.  It is the government's

2     objection.

3              MS. BLAIN:  Your Honor, I'm sorry.  On page 135.

4              THE COURT:  Yes.

5              MS. BLAIN:  The 13 to 18.

6              THE COURT:  Sustained.

7              MS. BLAIN:  That was a counterdesignation of the

8     government.  So the government seeks to introduce that and the

9     defendant --

10             THE COURT:  One minute then.

11             MS. BLAIN:  OK.

12             THE COURT:  Objection sustained.

13             Objection sustained on 137, lines 11 through 24.

14             I don't see the relevance if more or less difficult to

15     place, and I sustain the objections on 138, line 14 through

16     line 12 of 139.

17             Similarly, lines 13 through 16 on 139.  Those are all

18     sustained.

19             What's the next problem?

20             MS. SCHEIN:  151, your Honor, the government's lines

21     14 through 17.  That is their objection.

22             THE COURT:  Objection overruled.

23             Next?

24             152, lines 6 through 10.

25             MS. SCHEIN:  Yes.

F4gnusa4                     Lirag - cross

1              THE COURT:  Overruled.

2              MS. SCHEIN:  Next is 170.

3              THE COURT:  I think I should just make these rulings

4    as we go along.

5              MS. SCHEIN:  OK.  Thank you, your Honor.

6              THE COURT:  They are all of the same nature.  Let's

7    break for lunch.  I will see you at 2:20.

8              (Luncheon recess)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            AFTERNOON SESSION

2            2:30 pm

3            (Trial resumes)

4            (In open court; jury not present)

5            THE COURT:  Who is the next witness?

6            MS. BLAIN:  Your Honor, the government calls

7    Chanterelle Sung.  She is waiting in the hallway.

8            THE COURT:  Bring her in.

9            (Jury present)

10           THE COURT:  Good afternoon.  Please be seated.  The

11   next witness is Ms. Chanterelle Sung.  She will now be sworn as

12   soon as we're all ready and paying attention.

13    CHANTERELLE SUNG,

14        called as a witness by the Government,

15        having been duly sworn, testified as follows:

16   DIRECT EXAMINATION

17   BY MS. BLAIN:

18   Q.  Good afternoon, Ms. Sung.

19   A.  Good afternoon.

20   Q.  Can you please tell the jury your name.

21   A.  Yes, it is Chanterelle Sung.

22   Q.  Ms. Sung, are you currently employed?

23   A.  Yes.

24   Q.  Where are you currently employed?

25   A.  I am employed with the New York State Governor's Office of

F4GJUSA5                         Sung – direct

1   Storm Recovery.

2   Q.  What is the New York State Governor's Office Storm

3   Recovery?

4   A.  It is a program established by the Governor of New York to

5   administer approximately $5 billion of federal funding from the

6   U.S. Department of Housing & Urban Development after Hurricane

7   Sandy as well as Irene storms, Irene and Lee.

8   Q.  What is your position within the Office of Storm Recovery?

9   A.  I am the director of monitoring and compliance.

10  Q.  Where did you work before that?

11  A.  Prior to that, I was an Inspector General with the New York

12  City Department of Investigations.

13  Q.  May I use the term DOI to refer to the New York City

14  Department of Investigation?

15  A.  Yes.

16  Q.  When did you work at DOI?

17  A.  I worked there from July of 2011 until February 2014.

18  Q.  Again what was your title at DOI?

19  A.  Inspector General.

20  Q.  Did that title remain the same throughout your tenure at

21  DOI?

22  A.  Yes, it did.

23  Q.  What were your duties and responsibilities in connection

24  with being an Inspector General?

25  A.  It was a managerial position.  I oversaw a squad of

F4GJUSA5                              Sung - direct

1   approximately 20 or so investigators as well as attorneys and

2   administrative assistants along with two other co-inspector

3   generals, and the way the agency was structured at that time,

4   each squad oversaw a cluster of various city agencies.

5           The squad I was part of oversaw about 9 or 10 or so

6   city agencies mostly having to do with social services, and

7   included in that was the Department of SBS.

8   Q.  Is that also referred to as SBS?

9   A.  Yes.

10  Q.  Where did you work before joining DOI?

11  A.  Prior to that, I was an Assistant District Attorney with

12  the New York County District Attorney's Office.

13  Q.  What prosecuting unit were you assigned to at the D.A.'s

14  Office?

15  A.  At the D.A.'s Office, I was in the trial division and I was

16  assigned to Trial Bureau 70.

17  Q.  How long did you work at the D.A.'s Office?

18  A.  Approximately seven years.

19  Q.  Where did you go to law school?

20  A.  Boston College Law School.

21  Q.  Where did you go to college?

22  A.  I went to Princeton University undergrad.

23  Q.  Are you familiar with a company called SEEDCO?

24  A.  Yes.

25  Q.  How did you become familiar with a company called SEEDCO?

F4GJUSA5                          Sung - direct

A.   So I became familiar with SEEDCO when I was employed at DOI

as an Inspector General, and we had received a referral from

the Department of SBS sometime around the fall, I believe it

was August of 2011, regarding alleged false placement practices

at that non-profit organization, and at that point I was

requested by my supervisors to begin an investigation into

those allegations.

Q.   Who were your supervisors at the time?

A.   At the time I believe it was an associate commissioner

Mustafa, the chief of investigations, John Kantor, and the

commissioner himself at the time, Rose Gilhearn.

Q.   What was your role in connection with that investigation?

A.   So my role was to oversee the investigation, but in

addition, because the allegations were significant and there

was early on evidence of corroboration of those allegations,

the matter was taken seriously and, in addition, the

investigation needed to be conducted pretty quickly.  So I was

asked to be personally involved in the investigation itself.

Q.   So did others beside yourself participate in this

investigation?

A.   Yes.  There were, I would say, two main investigators under

me, and then in addition, we conducted numerous interviews and

a review of a high volume of documents, and so at various times

we brought in other investigators to help.

Q.   Did you report to anybody in connection with this

F4GJUSA5                         Sung - direct

investigation?

A.  Yes.  I remember pretty much daily I reported to John

Kantor, the chief of investigations, and frequently to the

commissioner herself.

            THE COURT:  How do you spell Kantor?

            THE WITNESS:  It is K A N T 0 R.

BY MS. BLAIN:

Q.  What was the focus of this investigation?

A.  So the main allegation was that a number of placements

being reported by SEEDCO had been falsified, in that past jobs

and current jobs of individuals were being used or claimed as

placements, meaning that SEEDCO had assisted these individuals

in obtaining these jobs but, in fact, they had already obtained

those jobs before ever coming to SEEDCO or to workforce center.

Q.  What did you do as a general matter to investigate these

allegations?

A.  So early on we had requested data on the jobs that were

being claimed as placements to SBS, and so we reviewed from

SBS, they had provided what is called Work Source1 database.

They provided a copy of that to us.  That database contained

all of the placements that were claimed by SEEDCO for a given

time period.

            We began reviewing that data, and from there

identified employees at SEEDCO who were associated with those

job placements, and in that way we identified who might be

1   relevant witnesses.  Then we went out and conducted interviews

2   either in the field or back at the office, at the agency.

3   Q.  You mentioned the Work Source1 database.  What did you

4   understand that to be?

5   A.  My understanding at the time was that database was the

6   system of record for job placement data that was being reported

7   by SEEDCO to SBS, and it was mutually accessible by both DOI --

8   I am sorry -- SBS employees and SEEDCO employees.

9   Q.  In connection with this investigation, did you hear the

10  term CIF?

11  A.  Yes.

12  Q.  What did you understand a CIF to be?

13  A.  CIF was Customer Information Form.

14  Q.  Did you and your team review CIFs in connection with this

15  investigation?

16  A.  Yes.

17  Q.  Did you or your team examine any information from Work

18  Source1 in connection with this investigation?

19  A.  Yes, we did.

20  Q.  As a result of your investigation, did you reach any

21  conclusions?

22  A.  Yes.

23  Q.  Are those conclusions reflected in any document?

24  A.  They're reflected in a report that was publicly issued and

25  contains the findings of our investigation.

1    Q.  Who drafted that document?

2    A.  I was the primary drafter and had worked closely with John

3    Kantor and the commissioner at that time, Commissioner

4    Gilhearn, who edited it and reviewed basically every line.

5    Q.  Did you draft this report at or near the time you conducted

6    the investigation?

7    A.  Yes.

8    Q.  Does the report lay out methods by which your team reached

9    its conclusions?

10   A.  Yes.

11   Q.  Are you aware of whether DOI has any legal authorization to

12   conduct investigations?

13   A.  Yes, it does.  So DOI is a law enforcement agency that

14   exists under the Mayor of the City of New York, and its powers

15   are obtained through the New York City Charter specifically

16   which grants the agency jurisdiction over any matters involving

17   the city, city agencies, city employees or any entities that do

18   business with the city, so contractors and employees, employees

19   of contractors as well, wherever there is city money.

20   Q.  Are you aware whether the investigation into SEEDCO was

21   conducted pursuant to that legal authorization?

22   A.  Yes, it was.

23   Q.  Are you aware whether the report you drafted was made

24   pursuant to that legal authorization?

25   A.  Yes, it was.  I believe actually the charter requires DOI

1    to issue either written or oral statement of findings at the

2    conclusion of its investigations that are substantiated.

3    Q.  Are creating reports like these reflecting an

4    investigation's conclusions part of DOI's regular activities?

5    A.  Yes.

6    Q.  Was a report kept as part of DOI's regular activities?

7    A.  Yes.

8             MS. BLAIN:  Your Honor, we offer Exhibit 13 A which is

9    the redacted portion of the report into evidence.

10            THE COURT:  Subject to the defendant's objections

11   which I have overruled in a hearing early today, the document

12   is admitted into evidence and may be publicized to the jury.

13            (Government Exhibit 13 A received in evidence)

14            THE COURT:  What is the exhibit number?

15            MS. BLAIN:  13 A.

16            THE COURT:  Yes, Mr. Futerfas?

17            MR. FUTERFAS:  That is the smaller portion?

18            THE COURT:  It is the excerpted report.

19            MR. FUTERFAS:  Very well.  Thank your Honor.

20            THE COURT:  The report has numbers of discussions and

21   findings that go beyond the issues in this case.  I have

22   limited admissibility to issues in this case.

23   BY MS. BLAIN:

24   Q.  Ms. Sung, do you see a document in front of you yet?

25   A.  Not yet -- yes, I do.

F4GJUSA5                         Sung - direct

1    Q.  Do you recognize this document?

2    A.  Yes.

3    Q.  What is it?

4    A.  This is the DOI report that was drafted pursuant to the

5    investigation into the allegations of SEEDCO's Workforce1.

6    Q.  Ms. Sung, let's focus on Page 5 of the report, please.

7            THE COURT:  One minute, please.

8            (Pause)

9            THE COURT:  Is it 13 A or 21 A?

10           MS. BLAIN:  13 A, your Honor.

11           MR. SOLOMON:  We mislabeled it originally but changed

12   the name during the upload.  The upload still has the wrong

13   number.

14           THE COURT:  The document in evidence will be 13 A?

15           MS. BLAIN:  Yes, your Honor.

16   BY MS. BLAIN:

17   Q.  So again focusing on Page 5 of the report, can you

18   please --

19           THE COURT:  Why don't you start from the beginning and

20   let the jury see the document.

21           MS. BLAIN:  Sure.  Mr. Solomon, if you can please turn

22   to Page 1 of this report.

23   BY MS. BLAIN:

24   Q.  Is this the report that you prepared in connection with

25   your investigation into SEEDCO?

F4GJUSA5                          Sung - direct

```
 1    A.  Yes.
 2              MS. BLAIN:  And now, Mr. Solomon, if you can turn to
 3    Page 5.
 4              THE COURT:  Please change that exhibit reference so it
 5    is 13 A.
 6              MR. SOLOMON:  I cannot do that at the moment.
 7              THE COURT:  Later on.
 8              MR. SOLOMON:  Absolutely.
 9              (Pause)
10    BY MS. BLAIN:
11    Q.  Please focus on the bottom and read to the jury the first
12    of the three bullet points.
13              THE COURT:  Before you go onto that, let's pay
14    attention to the process as well.  Let the witness do the
15    process that was performed.
16              MS. BLAIN:  Sure.
17    BY MS. BLAIN:
18    Q.  Ms. Sung and Mr. Solomon, if we can then start with Page 4
19    of this document.  Can you read to the jury that first
20    sentence.
21    A.   It states, "On August 8th, 2011, the New York City
22    Department of Investigation (DOI) initiated an investigation
23    after receiving a referral on the same date from the New York
24    City Department of Small Business Services DSBS regarding an
25    allegation of fraud by the Structured Employment Economic
```

```
 1    Development Corporation, SEEDCO."

 2    Q.  Does it accurately reflect why New York City Department of

 3    Investigation began investigating SEEDCO?

 4    A.  Yes, it is.

 5    Q.  If we can turn to Page 5, please at the top, and the first

 6    paragraph.  Can you please read to --

 7              THE COURT:  The jury can read for itself.

 8              MS. BLAIN:  Okay.

 9              THE COURT:  That's basically what you did to carry out

10    your investigation, right?

11              THE WITNESS:  Yes.

12              THE COURT:  Let's turn to the second larger paragraph.

13              That gives more details of the nature of the

14    investigation and the methods you used, does it not?

15              THE WITNESS:  Yes, that's correct.

16              THE COURT:  Then at the end you make findings, do you

17    not?

18              THE WITNESS:  Yes.

19              THE COURT:  Go ahead, Ms. Blain.

20    BY MS. BLAIN:

21    Q.  If we can direct your attention then to the bottom of this

22    page starting with DOI's investigation has, the whole bottom of

23    the page.  Thank you.

24              Does this reflect your findings in connection with

25    this investigation?
```

F4GJUSA5                          Sung - direct

1    A.   Yes.

2    Q.   What were your findings?

3              THE COURT:  The jury can read it.  Go on

4    piece-by-piece.  Explain the scope of the investigation from

5    January 1, 2011 and August 8, 2011, a period of 8 months.

6              THE WITNESS:  The --

7              THE COURT:  Seven months.

8              THE WITNESS:  -- sure.  August 8, 2011 was the date I

9    believe of the referral from SBS, and so that is how we

10   determined a cutoff period.  The January date was, if I recall

11   correctly, was the earliest date that the Customer Information

12   Forms, the CIFs, were available; and, therefore, able to be

13   obtained from SBS.

14             Prior to that date, SEEDCO was permitted to shred the

15   CIF information forms, the Customer Information Forms.

16   BY MS. BLAIN:

17   Q.   What did you and your team do to substantiate the finding

18   of the first bullet point of this page?

19   A.   So to substantiate actually the first bullet point and all

20   three, we had, as I mentioned, we interviewed a number of

21   employees at SEEDCO.  We reviewed data in the Work Source1

22   database job placement data, that is.

23             We also reviewed a number of -- and actually all

24   available CIFs.  We also reviewed job seeker's resumes that

25   were available to us.  We interviewed employees from SBS.

F4GJUSA5                          Sung – direct

1   Q.  What did you conclude after reviewing those documents and

2   interviewing those witnesses?

3   A.  We were able -- we, in fact, were able to substantiate a

4   number of false job placements that SEEDCO had reported to SBS.

5          We were also able to determine the manner in which

6   some of these placements were falsified, in that certain

7   employees had taken prior jobs or current jobs of individuals

8   and reported those as SEEDCO job placements.

9   Q.  Is that the process by which you used to conclude that this

10  document says approximately 528 false job placements?

11  A.  Yes.

12         MS. BLAIN:  If we can please turn to the top of the

13  next page, Mr. Solomon.  I'll let the jury read this bullet

14  point.

15         (Pause)

16  BY MS. BLAIN:

17  Q.  Does that bullet point also actually represent one of the

18  findings of this report?

19  A.  Yes.

20         MS. BLAIN:  If we can next turn to the next page in

21  evidence, which is Page 16.  Would you highlight the first two

22  paragraphs, Mr. Solomon.

23         THE COURT:  The dark spots are extraneous.  Don't pay

24  any attention to them.

25         Incidentally, let me tell you this about what it is.

It is a government report, but it doesn't mean that you have to

give it more credibility than you would give any other piece of

evidence.  Like everything else in the trial, you are the

judges.  You don't take anybody else's word for anything except

the law.  When I give you the law, you have to take my word for

it.  Anybody else having to do with the facts, you decide those

for yourself.

You decide whatever extent and credibility you give to

this document, not more, not less, and the fact that the city

did it doesn't mean anything more or less than anybody else.

Please understand that is your decision.

BY MS. BLAIN:

Q.  Ms. sung, does this paragraph actually summarize the method

by which you used to substantiate false placements as well?

A.  Yes.

MS. BLAIN:  Now if we can focus on under A 1 in the

bottom of this document.  I will give the jury a moment to read

that paragraph.

(Pause)

BY MS. BLAIN:

Q.  Ms. Sung, how did you conclude that during the reporting

period of January 1, 2011 to August 8,2011, SEEDCO operated in

Upper Manhattan and Bronx Workforce centers reported a

approximately 528 false job placements to the SBS?

A.  Again this was determined by reviewing the job placement

F4GJUSA5                          Sung - direct

data in Work Source1 and actually comparing it to the available

Customer Information Forms that we had which the job seekers

would fill out at the time that they entered the workforce

center.

They would list on those forms any past or current

jobs that they were employed at and then we would compare that

information that they reported to the jobs that were reported

in Work Source1 by SEEDCO to SBS.

That's where we were able to determine that employees

at SEEDCO were taking either past or current jobs of those

individuals and then claiming them as SEEDCO-assisted jobs or

claiming that SEEDCO had assisted these individuals in

obtaining those jobs when, in fact, they hadn't.

We then also conducted a number of interviews of --

and I might not have mentioned this before, but in addition to

interviewing SBS employees and SEEDCO employees, we interviewed

job seekers as well.  Once we obtained information to

corroborate what we were seeing on the documents, that's how we

made the determination that allegations were substantiated.

Q.  You mentioned that you based these findings in part on

information that job seekers provided on the form.  Is that

right?

A.  Yes.

Q.  What was that form called, do you remember?

A.  Yes, that is the CIF.

F4GJUSA5                          Sung - direct

1    Q.  If I can please direct your attention, Ms. Sung, to Tab 57

2    in the binder in front of you.

3              MS. BLAIN:  Your Honor, this exhibit has been admitted

4    into evidence, so may I publish it to the jury?  It is Exhibit

5    57.

6              THE COURT:  It is in evidence?

7              MS. BLAIN:  Yes.

8              THE COURT:  Yes, you may.

9              (Pause)

10   BY MS. BLAIN:

11   Q.  Do you have the right binder in front of you?

12   A.  Yes.

13             THE COURT:  You can come up and help.

14             THE WITNESS:  Yes, I have the matching document in the

15   screen.

16   BY MS. BLAIN:

17   Q.  What is this document?

18   A.  This is a Customer Information Form that's been filled out

19   by a job seeker.

20   Q.  Would you turn to Page 2 of this document, please.  Does

21   this document provide the date on which the job seeker filled

22   out this form?

23   A.  Yes, it does.  Next to the signature of the job seeker, it

24   is January 24th, 2011.

25   Q.  Is this one of the CIFs that your team looked at in

F4GJUSA5                          Sung - direct

1    investigating SEEDCO?

2    A.  I don't have a specific recollection of this actual

3    document.  However, given the date that it was signed, I do

4    recall that we reviewed all available CIFs during the time

5    period of January 2011 to August of 2011.

6    Q.  Can you please direct your attention to the first page of

7    this document.  Who was this customer?

8    A.  The name is Amy Bursor.

9    Q.  On the second page, please, what does this document provide

10   about where she is working at this time -- well, withdrawn.

11          What does this document provide regarding Ms. Bursor's

12   employment status?

13   A.  It states that she is currently employed.

14   Q.  Where does the CIF say she is working at that time?

15   A.  It looks like Broadway East as a bartender.

16          THE COURT:  What box number?

17          THE WITNESS:  I am referring to information in box 5 D

18   at the top.

19          MS. BLAIN:  Maybe, Mr. Solomon, if we can highlight

20   box D.

21          (Pause)

22   BY MS. BLAIN:

23   Q.  When does the CIF say that she started working as a

24   bartender at Broadway East?

25   A.  It says September 2009.

F4GJUSA5                              Sung - direct

1    Q.  Again looking at the bottom of this document, Mr. Solomon,

2    what is the date on the bottom of this document signify?

3    A.  So this should have been the date that the job seeker first

4    came to SEEDCO, first came to the Work Source1 Center or

5    Workforce1 Center.

6    Q.  Do you know who enters information into Work Source1?

7    A.  Yes, SEEDCO does.

8    Q.  Not the job seeker?

9    A.  No.

10   Q.  I believe you testified that you looked at the information

11   in Work Source1.  Is that right?

12   A.  Yes.

13   Q.  Did you look at the live database of Work Source1 or

14   download of information from that database?

15   A.  My understanding is that what we received was the

16   downloaded version from that database.  We didn't have access

17   to the live database.

18            MS. BLAIN:  Mr. Solomon, if we can please show the

19   witness, just the witness, Exhibit 21, please.

20            (Pause)

21   BY MS. BLAIN:

22   Q.  Do you recognize this document, Ms. Sung?

23   A.  Yes.

24   Q.  What is this document?

25   A.  This looks like a copy of the data in the Work Source1

1  database.

2  Q.  You used this document in the course of your investigation

3  into SEEDCO?

4  A.  Yes.

5         MS. BLAIN:  Your Honor, this document has previously

6  been received.  May we publish it to the jury?

7         THE COURT:  Yes.

8  BY MS. BLAIN:

9  Q.  I will direct your attention, please to the Excel

10  Spreadsheet, Row 368.  What does Row 368 represent?

11  A.  So this is an entry in the Work Source1 database for the

12  job seeker Amy Bursor, and we had requested from SBS the data,

13  the placement data, and what we had received was placement

14  data, so this was a placement that was entered into the Work

15  Source1.

16  Q.  If you can focus on the column job title.  What does that

17  provide under job title for this row?

18  A.  It states, "bartender."

19  Q.  Do you have an understanding as to what that meant?

20  A.  Yes.

21  Q.  What did that mean?

22  A.  That that is the job that Amy Bursor obtained with the

23  assistant of SEEDCO.

24  Q.  If you can focus on the column employer.  What does that

25  say for this row?

F4GJUSA5                              Sung - direct

1   A.  It says, "Broadway East."

2   Q.  Do you have an understanding as to what that meant?

3   A.  Yes.

4   Q.  What did that mean?

5   A.  That this was the job that SEEDCO assisted Amy Bursor in

6   obtaining and this is the employer.

7   Q.  If you could focus on the column job start date, what does

8   that date provide?

9   A.  January 26, 2011.

10  Q.  What does that signify?

11  A.  That that is the date that Amy Bursor started working at

12  Broadway East.

13  Q.  Now if we can please focus on Exhibit 57 again, the CIF.

14          THE COURT:  Is there any way you can split the screen?

15          MS. BLAIN:  That is what we're going to do, your

16  Honor.

17          (Pause)

18          MS. BLAIN:  And Page 2 of the CIF, please, Mr.

19  Solomon.

20  BY MS. BLAIN:

21  Q.  What does the CIF provide about when Ms. Bursor started

22  working as a bartender at Broadway East?

23  A.  It starts she started there September of 2009.

24  Q.  What does the Work Source1 entry say about when she started

25  working as a bartender at Broadway East?

F4GJUSA5                          Sung - direct

1    A.  January 26, 2011.

2    Q.  Is the information between --

3         THE COURT:  What does the next column mean, "Placement

4    data entry date"?

5         THE WITNESS:  So my understanding of that column is

6    that indicates the date the SEEDCO employee would have entered

7    that placement data into Work Source1.

8         THE COURT:  So, in other words, on January 28, 2011,

9    someone at SEEDCO reported for Amy Bursor that she began

10   working for Broadway East as a bartender on January 26, 2011,

11   when the document that Amy Bursor filled out showed that her

12   start date was September-something 2009, and that she was

13   currently employed when she filled out this CIF for SEEDCO?

14        THE WITNESS:  Yes.

15   BY MS. BLAIN:

16   Q.  Is the information in Work Source1 regarding Ms. Bursor's

17   start date at East Broadway different than the --

18        THE COURT:  I think we just did that.

19   Q.  If I could direct your attention, please, Ms. Sung to

20   Exhibit 65 in your binder.  What is this document, Ms. Sung?

21   A.  This is another CIF.

22        MS. BLAIN:  Your Honor, this has also been received so

23   may we publish Exhibit 65 to the jury?

24        THE COURT:  You may.

25        MS. BLAIN:  Thank you.

F4GJUSA5                         Sung - direct

1           (Pause)

2    BY MS. BLAIN:

3    Q.  Who is this customer on this CIF?

4    A.  The name is Dennis Garci, G A R C I.

5           THE COURT:  Spell that for the reporter, please.

6           THE WITNESS:  Yes, the full name is spelled D E N N I

7    S, last name G A R C I.

8           MS. BLAIN:  Please if you could take a look at the

9    second page of the CIF.

10          THE COURT:  This is exhibit what?

11          MS. BLAIN:  65, your Honor.

12   BY MS. BLAIN:

13   Q.  What does this document provide about Dennis Garci's

14   employment status?

15   A.  It states that at the time that this form was filled out,

16   which was February 4th, 2011, he was currently employed at

17   Garcia Floor Covering as a floor installer-sales rep.

18   Q.  Does it say when he began his job with Garcia Floor

19   Covering?

20   A.  Yes.

21   Q.  When did he begin his job with Garcia Floor Covering?

22   A.  June 2, 2000.

23   Q.  If I could direct your attention back to the Excel

24   Spreadsheet and to Line 944.  Do you recognize what this row

25   refers to?

F4GJUSA5                           Sung - direct

1    A.  Yes.

2    Q.  What does this row refer to?

3    A.  It refers to the placement, job placement reported by

4    SEEDCO for Dennis Garci.

5    Q.  Look at the job title column.  What does that provide about

6    Dennis Garci's job?

7    A.  It states that he's a floor installer.

8    Q.  If you could look, please, at the employer, what does Work

9    Source1 spreadsheet reflect is Mr. Garci's employer?

10   A.  Garcia Floor Covering.

11   Q.  If you go to the next column and look at job start date,

12   what is that date?

13   A.  It is February 17th, 2011.

14   Q.  What does that date reflect?

15   A.  That is the reported start date that Dennis Garci began

16   working at Garcia Floor Covering.

17           MS. BLAIN:  If we can try to split the screen.  Thank

18   you, Mr. Solomon.

19   BY MS. BLAIN:

20   Q.  What does does the CIF provide that Mr. Garci started

21   working at Garcia Floor Covering?

22   A.  The CIF states that he started on June 2nd, 2000.

23   Q.  And again is that different than the information in the

24   spreadsheet?

25           THE COURT:  I think we have seen that.  We don't need

F4GJUSA5                              Sung - direct

1    the witness's conclusion.

2    BY MS. BLAIN:

3    Q.  One more, Ms. Sung, if you can turn to Exhibit 66 in the

4    binder before you.

5            MS. BLAIN:  This has also been received into evidence,

6    your Honor, so may we publish?

7            THE COURT:  You may.

8            MS. BLAIN:  Thank you.

9    BY MS. BLAIN:

10   Q.  Ms. Sung, what is this document?

11   A.  This is another CIF.

12   Q.  Who is the customer on this document?

13   A.  It is Melanie Polanco.

14           MS. BLAIN:  Would you turn to the second page of this

15   document, Mr. Solomon.

16   BY MS. BLAIN:

17   Q.  What does this document provide about her employment

18   status?

19   A.  It indicates that at the time she filled out the form on

20   January 22nd, 2011, she was currently employed at Almontel as

21   an IT technician.

22           THE COURT:  As of what date, from what date?

23           THE WITNESS:  As of --

24           THE COURT:  Not as of.  From when?

25           THE WITNESS:  It looks like September 2011, I think.

F4GJUSA5                        Sung - direct

1   BY MS. BLAIN:

2   Q.  Does this date -- the CIF provides that the person is

3   currently working.  Is that right?

4   A.  Yes.

5   Q.  And currently working at Almontel, right?

6   A.  Yes.

7   Q.  So does that mean this person will have this job at

8   Almontel before going into SEEDCO, referring according to this

9   form?

10  A.  Yes.

11  Q.  What date did this person go into SEEDCO, according to this

12  form?

13  A.  January 22nd, 2011.

14  Q.  Now if I could direct your attention, please, to Row 2039

15  in the spreadsheet.

16          THE COURT:  I don't think it is the 22nd.  I think it

17  is January 12.  The person makes a 2 and a 1 very hard to

18  distinguish.

19          THE WITNESS:  Yeah, I can't actually tell, yeah.

20          THE COURT:  It is January --

21          THE WITNESS:  Now it looks like February 22nd, 2011.

22  BY MS. BLAIN:

23  Q.  Is it safe to say this was filled out in 2011?

24  A.  Yes.

25  Q.  And in the first or second month of 2011?

F4GJUSA5                          Sung – direct

1    A.  Yes.

2    Q.  Now if we can please turn to Row 2039.  What does this row

3    represent?

4    A.  This represents the reported placement for Melanie Polanco

5    by SEEDCO to SBS.

6    Q.  What does this document reflect as to her job title?

7    A.  IT technician.

8            THE COURT:  The same, is that the same as the CIF?

9            THE WITNESS:  Yes.

10   BY MS. BLAIN:

11   Q.  What does this document reflect as to her employer?

12   A.  It states that her employer is Almontel Corporation.

13           THE COURT:  The same as the CIF?

14           THE WITNESS:  The same as the CIF.

15   BY MS. BLAIN:

16   Q.  Finally, what does this document reflect about this

17   person's job start date?

18   A.  It says February 22nd, 2011.

19           MS. BLAIN:  Can you split back to the CIF.

20   BY MS. BLAIN:

21   Q.  Again is that before or after this person started Almontel

22   as provided in the CIF?

23   A.  I am having a hard time reading the job start date.  It

24   looks like September 2079, but --

25           THE COURT:  It is not 2079.  I don't know that we have

F4GJUSA5                          Sung – direct

1    the capability here of reading that.

2    BY MS. BLAIN:

3    Q.  Ms. Sung, is it safe to say this person filled out a form

4    at some point in early 2011 providing that she currently works

5    as an IT technician at Almontel?

6    A.  Yes.

7    Q.  And the Work Source1 database provides that person started

8    working at Almontel after filling out this form.  Is that safe

9    to say?

10            THE COURT:  Come up, please.

11            (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F4GJUSA5                        Sung – direct

1              (At sidebar)

2              THE COURT:  I think this is a confusing document

3    because unless it is very carefully presented, it is impossible

4    to read, for us to read the start date.

5              MS. BLAIN:  Okay.  Is it clear that the –– sorry.

6              THE COURT:  And it is impossible to get a good reading

7    of the signature date on the CIF.  All we have is a date of

8    transposition, and you can't make the point of current

9    employment.

10             MS. BLAIN:  That is fine.  I will move on.

11             (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F4GJUSA5                          Sung - direct

1          (In open court)

2          THE COURT:  Members of the jury, with regard to this

3    document, I rule it is not possible for us with any degree of

4    reliability to read the dates on the CIF, Exhibit 66, so we are

5    not going to work on those dates.

6          The only thing that you can see in terms of the

7    difference is the reference to current employment, but with the

8    uncertainty of the date, I think we should exclude this

9    document altogether from your consideration, please, and as if

10   it never was produced.  We really can't use this with any

11   degree of reliability.

12          MR. FUTERFAS:  Your Honor, may I?

13          I do object to excluding the document.  It is actually

14   going to be part of my cross-examination, your Honor.

15          (Continued on next page)

16

17

18

19

20

21

22

23

24

25

F4GJUSA5                        Sung - direct

1           (In open court)

2           THE COURT:  The document itself will not be excluded,

3   and it may come into further discussion and examination, but

4   the date is not reliable because it is not legible.

5   BY MS. BLAIN:

6   Q.  I have just one more of this exercise, Ms. Sung, and we'll

7   stop.  If you can please turn to Exhibit 67 in your binder.

8           MS. BLAIN:  Again, your Honor, this has already been

9   received.  So may we publish?

10          THE COURT:  Yes, you may.

11          (Pause)

12  BY MS. BLAIN:

13  Q.  What is this CIF?

14          THE COURT:  Let's wait until it is put up.

15  Q.  What does this document provide as the customer?

16          THE COURT:  Let's get the screen clear.  What do we

17  have up here, Mr. Solomon?

18          MR. SOLOMON:  Exhibit 67, your Honor.

19          THE COURT:  Okay.

20  BY MS. BLAIN:

21  Q.  Who is this job seeker?

22          THE COURT:  Blow up the top box, please.

23          (Pause)

24          THE COURT:  This is for Damiana Payano?

25          THE WITNESS:  Payano.

F4GJUSA5                          Sung - direct

1          THE COURT:  Living on Jerome Avenue in the Bronx.

2          MS. BLAIN:  Go to Page 2, please Mr, Solomon.

3          THE COURT:  Before you go on Page 2 -- now move on to

4     Page 2.

5     BY MS. BLAIN:

6     Q.  What does this document provide about Ms. Payano's work

7     status?

8     A.  Yes.  This CIF indicates that Damiana Payano was employed

9     as a front desk assistant for Allied Barton from August 2007

10    until April 2009.

11    Q.  If I can please --

12         THE COURT:  One minute, please.

13         (Pause)

14         THE COURT:  The start date is August what?

15         THE WITNESS:  I took that to mean a zero, so I just

16    said August 2007.

17         THE COURT:  Okay.  She continued in that job, job end

18    date until April 2009?

19         THE WITNESS:  Yes.

20         THE COURT:  So almost two years?

21         THE WITNESS:  Yes.

22         MS. BLAIN:  Now if we can refer back, please, to the

23    Excel Spreadsheet.

24         THE COURT:  That is Workforce1?

25         MS. BLAIN:  Correct, your Honor.

1           MR. SOLOMON:  One moment.

2           (Pause)

3           MS. BLAIN:  And to line 1307.  Sorry.  It is actually

4  1970, I think.

5  BY MS. BLAIN:

6  Q.  Ms. Sung, what does this row represent?

7  A.  This represents the placement SEEDCO to SBS for Damiana

8  Payano.

9  Q.  What does this document provide as her job title?

10  A.  Receptionist.

11  Q.  What does Work Source1 data provide as her employer?

12  A.  Allied Barton.

13  Q.  Is that the same employer as on the CIF?

14  A.  Yes.

15  Q.  What does this document provide about her job start date?

16  A.  The job start date is March 22nd, 2011.

17  Q.  Go back to the CIF.  Is that job date different than the

18  dates that appear on the CIF?

19  A.  Yes, it is.

20           MS. BLAIN:  You can take that down.  Thank you, Mr.

21  Solomon.

22           (Pause)

23           MS. BLAIN:  Can you please turn again back to the DOI

24  report and Page 17 and focus on the paragraph under the bullet

25  points at the top of the page, the paragraph under that.  I am

F4GJUSA5                          Sung - direct

1    sorry.  I'll give the jury a moment to read that.

2              (Pause)

3    BY MS. BLAIN:

4    Q.  What did you mean when you wrote, "These findings are

5    limited by the data made available to DOI"?

6              MS. BLAIN:  You can close that down, Mr. Solomon.

7    BY MS. BLAIN:

8    Q.  What did you understand that to mean?

9    A.  Yes, so we did not have all of the available CIFs up until

10   February of 2011 due to the fact that they were permitted,

11   SEEDCO was permitted to shred them up until that date.

12             We did have Work Source1 data prior to that, but that

13   we wouldn't have been able to do the comparison analysis

14   similar to the one we just did here because the corresponding

15   CIF wasn't available prior to February.

16             MS. BLAIN:  If you can turn to Page 5 of the report,

17   and the third bullet point on that page, highlight that.  I'll

18   give the jury a moment.

19             (Pause)

20   BY MS. BLAIN:

21   Q.  How did you determine that as you write here, "Multiple

22   SEEDCO employees processed, directed and/or had knowledge of

23   the reporting of false placements to DSBS"?

24   A.  This was a combination of data and information that was

25   contained within the Work Source1 database that indicated who

F4GJUSA5                          Sung – direct

the SEEDCO employees were that were entering data into Work

Source1 as well as interviews that we conducted of SEEDCO

employees and e-mails.

        I may have mentioned we reviewed hundreds of e-mails

that we had subpoenaed from SEEDCO as well.

Q.  When you reviewed SEEDCO employees, did that include Alex

Saavedra?

A.  Do you mean e-mails from him?

Q.  Sorry.  When you interviewed SEEDCO employees, did that

include Alex Saavedra?

A.  Yes, it did.

Q.  Did you personally interview Alex Saavedra?

A.  Yes, with two other investigators.

Q.  Do you remember whether he gave an explanation for why a

job seeker's past or current employment information could

legitimately be reported as a SEEDCO placement?

        MR. FUTERFAS:  I object, your Honor.  I am going to

object.

        THE COURT:  Are you going to, or you do object?

        MR. FUTERFAS:  I am.

        THE COURT:  Sidebar.

        (Continued on next page)

1            (At sidebar)

2            THE COURT:  Yes.

3            MR. FUTERFAS:  Thank your Honor.

4            Mr. Saavedra was interviewed with the DOI, maybe a

5    seven hour interview that was wide-ranging and covered various

6    topics.  Quite frankly, I wasn't anticipating, based on your

7    Honor's rulings about the report and what is in the report,

8    what the small portion that was redacted, that the government

9    would pick one particular statement.

10           I don't even know what statement it is, but I can tell

11   your Honor that the interview of him, of which I have a

12   transcript at the office, is 250 pages.  So I think we are

13   getting into a -- I don't know what they're going to elicit,

14   but he spoke at length about many, many issues that were --

15           THE COURT:  Admissions against a party are admissible,

16   aren't they, Mr. Futerfas?

17           MR. FUTERFAS:  They are.  The real question is whether

18   it is an admission, and the question is you can't cherry-pick

19   one when you spoke for six or seven hours.  He told them lots

20   of things how the policies worked.

21           THE COURT:  Didn't you have any discovery request

22   having to do with this?

23           MR. FUTERFAS:  We have them.  I just didn't anticipate

24   that the government, with the limited portion of the DOI report

25   they're putting in, I thought they weren't going into the

F4GJUSA5                        Sung - direct

1    content.

2              THE COURT:  Is that your objection?

3              MR. FUTERFAS:  Yes.

4              THE COURT:  Overruled.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (In open court)

2    BY MS. BLAIN:

3    Q.  When you entered viewed Mr. Saavedra in connection with

4    this investigation, did you ask him about some of these false

5    placements you had found?

6    A.  Yes.

7    Q.  Do you recall what some of his answers were to you?

8    A.  Well, I remember that we asked about one pattern we were

9    noticing which was that on a number of CIFs, the date of the

10   CIF came before the start date, the job, the reported start

11   date of the job.  I am sorry.  Came after.

12             I believe to the best of my recollection, he had said

13   that that could be legitimate because there was a delay often

14   in SEEDCO personnel actually having those CIFs filled out by

15   job seekers, and the policy that I recall from SBS was that the

16   CIF is supposed to be filled out the first time that the job

17   seeker entered the workforce center but, in fact, I think he

18   was saying that sometimes job seekers would obtain a job and

19   then after that fact they would go back and have the job seeker

20   fill that CIF out and date it at that point in time.

21   Q.  Did that explanation affect any of the conclusions that

22   your team came to regarding specifically these 528 false

23   placements that you talked about?

24   A.  So we had concluded that there were 528 false placements,

25   and that was determined conclusively.

F4GJUSA5                              Sung - direct

1            We had also reported that there were a number of

2       questionable placements and used the term "questionable" to

3       distinguish between those that we couldn't conclusively state

4       were false for reasons such as the one that I recall

5       Mr. Saavedra had told us versus the ones that we were

6       conclusively able to determine were false.

7            THE COURT:  Can I go back to the question that you put

8       to Mr. Saavedra.  You observed to him a pattern that on a

9       number of CIFs, the date of the CIF came before the start date,

10      the date that the applicant filled out the CIF was before that

11      person started employment?

12           THE WITNESS:  Yes.  I corrected myself.  I meant

13      after.

14           THE COURT:  Reformulate, restate the question put to

15      Mr. Saavedra.

16           THE WITNESS:  I recall that we had asked why the date

17      on the CIF came after the job seeker's start date.

18           THE COURT:  The date the person filled out the CIF

19      came after the person was already working?

20           THE WITNESS:  Yes.

21           THE COURT:  What did he say?

22           THE WITNESS:  What I remember him saying was that

23      there was a backlog of CIFs and that -- again, this is the best

24      of my recollection -- and, therefore, it was quite possibly

25      SEEDCO assisted a job seeker in obtaining a job, but had never

F4GJUSA5                          Sung - direct

1   yet had them fill out the CIF until after they were already

2   employed.

3            THE COURT:  There are two columns on one of the

4   documents we just saw, Ms. Blain.  One was the date the

5   document was filled out.  The other one was the date the work

6   was planning to be started.  Can you show that to the jury.

7            MS. BLAIN:  Sure.  That is a slightly different

8   formulation, but if you can show Exhibit 21.

9            (Pause)

10  BY MS. BLAIN:

11  Q.  I believe on the last two columns here, under Column Y and

12  Column AB, and tell us again what is in Column Y?  What do

13  those dates represent?

14           THE COURT:  Let's wait for the document.

15           THE COURT:  Go to July with Amy Bursor.  Column AB is

16  placement date, entry date.  What does that pertain to on the

17  CIF?

18           THE WITNESS:  Ah --

19           THE COURT:  Or does it pertain to the CIF?

20           THE WITNESS:  It does not.  My recollection is that

21  the placement data entry date is simply the date that the

22  SEEDCO employee entered that information into Work Source1.  It

23  does not correspond to any dates on the CIF.

24           THE COURT:  Thank you.

25  BY MS. BLAIN:

F4GJUSA5                          Sung - direct

1   Q.  So did the explanation Mr. Saavedra gave you about this

2   process satisfy you as to why the date provided by job seekers

3   on the CIF can be different than the information stored into

4   Work Source1?

5              MR. FUTERFAS:  Objection.

6              THE COURT:  Objection sustained.

7   BY MS. BLAIN:

8   Q.  Did his explanation satisfy you?

9              MR. FUTERFAS:  Objection.

10             THE COURT:  Objection sustained.

11             MS. BLAIN:  Thank you, Ms. Sung.

12             THE COURT:  Are you finished questioning?

13             MS. BLAIN:  Yes.

14             THE COURT:  Cross-examination.

15             Is the jury okay or do you want a break?  You want to

16  take a break?  Close up your books and leave them on your

17  chair.  We'll go to 5:00 today, if that is okay?  Don't discuss

18  the case.  Keep an open mind.

19             (Jury excused)

20             THE COURT:  When you get off the stand, don't talk to

21  anyone.

22             THE WITNESS:  Okay.

23             THE COURT:  We'll take 10 and come back at 3:40.

24             (Recess)

25             (Continued on next page)

F4GJUSA5                          Sung - direct

1

1                  THE COURT:  How many more days do you have?

2                  MS. BLAIN:  We have three more witnesses.

3                  THE COURT:  Finish Monday?

4                  MS. BLAIN:  I think, yes.  We are not calling one

5       witness on the list.

6                  THE COURT:  That is OK.  I allow that.

7                  (Witness resumed)

8                  (Jury present)

9                  THE COURT:  Ms. Sung, you remain under oath.

10                  Cross-examination by Mr. Futerfas.

11       CROSS EXAMINATION

12       BY MR. FUTERFAS:

13       Q.  Ms. Sung, good afternoon.

14       A.  Good afternoon.

15       Q.  You stated that you conducted various interviews.  Do you

16       remember testifying to that in connection with your

17       investigation?

18       A.  Yes.

19       Q.  You interviewed individuals at SEEDCO?

20       A.  Yes.

21       Q.  Without telling me what anyone said, just approximately,

22       what number of individuals did you interview at SEEDCO?

23                  THE COURT:  Keep your voice up, please.

24                  MR. FUTERFAS:  Sure.

25       A.  I would have to refresh my memory with the DOI report.

F4gnusa6                         Sung - cross

1              THE COURT:  More than 30?

2              THE WITNESS:  Yes.  Just to clarify, I personally did

3     not conduct all of them, but the investigative team --

4              THE COURT:  Put it this way.  Those interviews you

5     conducted or that were conducted under your supervision,

6     without distinguishing between those, approximately how many.

7     A.  Was your question just SEEDCO employees, or in total?

8     Q.  SEEDCO employees.

9     A.  So it wouldn't have been as high as 30, approximately over

10    10.

11             THE COURT:  OK.

12    Q.  And you said that some CIFs people for a given time are

13    unavailable because they may have been shredded.  Do you

14    remember that testimony?

15    A.  Yes.

16    Q.  I think you said that SEEDCO was permitted to shred CIFs?

17    A.  Yes.

18    Q.  Do you remember saying that?

19    A.  Yes.

20             THE COURT:  What do you mean by that?

21             THE WITNESS:  We had learned during the course of our

22    investigation that SBS had permitted SEEDCO to shred CIFs

23    because they contained confidential information from individual

24    job seekers.  I believe it related to -- again, this is to the

25    best of my recollection -- I believe it related to some

F4gnusa6                          Sung – cross

1    Department of Labor requirement.

2    Q.  My question for you is, in the course of your

3    investigation --

4              THE COURT:  Keep your voice up, please.

5              MR. FUTERFAS:  Yes, your Honor.

6    Q.  Did you learn in the course of your investigation that SBS

7    didn't permit SEEDCO to shred, they required all of the

8    Workforces to shred by SBS policy?

9    A.  I cannot recall if it was a requirement versus they allowed

10   them to do it.

11             THE COURT:  There is no issue about the shredding, is

12   there?

13             MR. FUTERFAS:  I want --

14             THE COURT:  Ms. Blain?

15             MS. BLAIN:  No, your Honor.

16             THE COURT:  There is no issue.

17             Members of the jury, there is no issue about

18   shredding.  It is not anything having to do with this case that

19   there was shredding.  There are other reasons and innocent

20   reasons.

21   Q.  In connection with your interviews of the individuals at

22   SEEDCO, you discussed very briefly an interview you had with

23   Mr. Saavedra, right?

24   A.  Yes.

25   Q.  That interview was a voluntary interview?

F4gnusa6                      Sung - cross

1   A.   Yes.

2   Q.   That interview lasted an entire day, did it not?

3   A.   I don't recall it being an entire day.  I remember it was

4   several hours.

5   Q.   Let me ask you this:  Anything you wished to ask was

6   answered, right?

7           THE COURT:  Did he refuse to answer any questions?

8           THE WITNESS:  I can't recall that.  I remember

9   asking -- we asked questions that were not responsive, where

10  the answers were not responsive to the question.

11  Q.   So he gave you an answer, but you didn't consider the

12  answer responsive to your question?

13  A.   Correct.

14  Q.   Is that what you are saying?

15  A.   Yes.

16  Q.   Aside from that, anything you asked, he sat there and he

17  gave a voluntary interview for hours with you and your team,

18  right?

19  A.   Yes.

20  Q.   Did you endeavor to interview Alan Katz?

21  A.   Yes, we did.

22  Q.   Alan Katz took the Fifth Amendment, right?

23  A.   Yes.

24  Q.   And refused to answer questions, right?

25  A.   Yes.

F4gnusa6                        Sung - cross

```
 1   Q.  Now, I just want to briefly turn to -- I am not sure of the
 2   exhibit number.  It's the exhibit that was just before the
 3   jury.  I will find out the number.
 4           MR. FUTERFAS:  13.
 5           Your Honor, since we don't have an electronic of that
 6   exhibit, since it was just created, can I ask the government to
 7   post 13A.
 8           THE COURT:  Yes.  Mr. Solomon.
 9           MR. SOLOMON:  Publish to the jury?
10           THE COURT:  It is in evidence.
11           MR. FUTERFAS:  Thank you.
12   Q.  With permission, and with Mr. Solomon's assistance, if you
13   could go to page 17 of that document.  I direct your attention,
14   Ms. Sung, to the top two short paragraphs, or bullet points
15   there.  Do you see those, Ms. Sung?
16   A.  Yes.
17           MR. FUTERFAS:  Thank you, Mr. Solomon.
18   Q.  The number 528 that you have told us about, in this section
19   of the report you break that out between the two centers, Upper
20   Manhattan and the Bronx, right?
21   A.  Correct, yes.
22   Q.  What you say was, based on your investigation, 436 of the
23   528 were reported from the Upper Manhattan Workforce Center
24   during the period January 1, 2011 to August 8, 2011, correct?
25   A.  Yes.
```

F4gnusa6                         Sung - cross

1   Q.   That is 436 out of 3,245 placements recorded, right?

2   A.   Yes.

3   Q.   About 10 or 12 percent, something like that, right?

4   A.   I haven't done the math.

5   Q.   OK.   It is a little more than 10 percent of 3,200, right?

6        MS. BLAIN:   Objection.

7        THE COURT:   12 percent.

8        MR. FUTERFAS:   Very well.

9   Q.   The next one underneath that says in the Bronx during that

10  same time period the number of placements that your office

11  believes is false placement is 92 out of 3,824, right?

12  A.   Yes.

13  Q.   That's about 2 percent?

14  A.   Again, I haven't done the math.

15       THE COURT:   It's about 2 percent.   You can do the math

16  quickly.

17       MR. FUTERFAS:   That is all I needed.

18       THE COURT:   Round the numbers up to a hundred.

19  Q.   You understand, Ms. Sung, that in January 1, 2011,

20  Mr. Saavedra moved over and became the director of the Bronx

21  center and ran the Bronx center.   You understand that, right?

22  A.   I remember there came a time when he did.   I don't recall

23  the month or the year at this point.

24  Q.   Your testimony concerned some CIFs that we've seen, right?

25  These CIFs that the government has put into evidence and that

1    we've just viewed for the last 20 or 30 minutes, they have

2    handwriting on them, right?

3    A.  Yes.

4    Q.  Do you understand that that handwriting is the handwriting

5    of the job seeker?

6    A.  Yes.

7    Q.  So those CIFs are being filled out by someone who is

8    possibly looking for a job, right?

9    A.  Yes.

10   Q.  Do you know if they are being filled out at 125th street or

11   at an offsite recruiting event?

12   A.  Are there specific ones that you are referring to?

13   Q.  I am just saying the ones we looked at --

14           THE COURT:  Generally speaking, when you look at a

15   CIF, can you tell where it was filled out?

16           THE WITNESS:  You can't tell from the CIF itself.

17   Q.  But you understand there were things called offsite

18   recruiting events, right?

19   A.  Yes.

20   Q.  So it's possible that one of the CIFs was filled out at an

21   offsite recruiting event --

22           THE COURT:  She said she can't tell.  Let's move on.

23           MR. FUTERFAS:  Fair enough.

24           THE COURT:  Then why do you ask, if it's fair enough?

25           MR. FUTERFAS:  Sorry, your Honor?

F4gnusa6                          Sung - cross

1              THE COURT:  Never mind.

2   Q.  You mentioned the number 528.  Do you have 528 CIFs which

3   correspond to this number 528 that is in your report?

4              THE COURT:  You mean does she have it now?

5              MR. FUTERFAS:  Yes.

6              THE COURT:  Do you have it now?  You don't have

7   anything now, do you?

8              THE WITNESS:  I don't have anything.  I am no longer

9   working at DOI.

10  Q.  Before you left DOI --

11  A.  Yes.

12             THE COURT:  I think the question you want to ask is

13  did you review 528 applications that you considered false, or

14  did that number come about in a different way?

15             THE WITNESS:  So we did a comparison between the

16  Worksource1 data entries and the available CIFs that were

17  provided to us.

18             THE COURT:  So for the seven-month period where you

19  worked you found 528 that were discrepant?

20             THE WITNESS:  Correct.  But I cannot say for sure

21  whether we had a CIF associated with each of those placements,

22  because I do know that we were also looking at résumés of job

23  seekers that were provided to us by Bill Harper, which had

24  revealed, again, that current jobs were being used as

25  placements, being reported as placements.

F4gnusa6                        Sung – cross

```
 1              THE COURT:  So some you compared to the CIFs and found
 2     discrepant, and some you saw discrepancies from documents other
 3     than the CIF?
 4              THE WITNESS:  Yes.
 5              THE COURT:  But always within the same time period of
 6     January to August?
 7              THE WITNESS:  Yes.
 8     Q.  I guess my question is very simple:  The answer is you do
 9     not have for the 528 that your office believes --
10              THE COURT:  She's answered the question.  Don't
11     restate the answer.  She's answered the question.
12              MR. FUTERFAS:  All right, your Honor.
13     Q.  How many CIFs did your office review?
14     A.  I don't have the exact number.  I remember we reviewed 10
15     banker boxes full of CIFs, approximately ten boxes.
16     Q.  In terms of number of résumés, you just mentioned résumés,
17     it was a relatively small group of résumés, wasn't it?
18     A.  Yes.  Much fewer than the number of CIFs that we reviewed.
19     Q.  Did you have 50 résumés?
20     A.  I don't recall the number.
21     Q.  Could it be less than 50?
22     A.  Possibly less than 50.
23     Q.  You understood through your investigation that résumés
24     could be used improperly or properly depending on how they were
25     used, right?
```

F4gnusa6                          Sung - cross

```
 1    A.  What --
 2    Q.  I will rephrase the question.  By Upper Manhattan Workforce
 3    was there a proper use for résumés?
 4    A.  Yes.
 5    Q.  You were looking at the few résumés that you had to
 6    determine whether they were being used improperly, is that
 7    fair?
 8    A.  Yes.
 9              THE COURT:  What does it mean a proper use of résumés?
10    Do you know what that means?
11              THE WITNESS:  Yes.  I believe what counsel is asking
12    is --
13              THE COURT:  Don't do that.
14              THE WITNESS:  Don't?  OK.
15              THE COURT:  If you can't understand the question, say
16    it.  Do you know what a proper use of a résumé is?
17              THE WITNESS:  Yes.
18              THE COURT:  What is it?
19              THE WITNESS:  Job seekers were requested to provide
20    their résumé as part of the job assistance process that was
21    being provided to them by SEEDCO to help them in obtaining a
22    new job.
23    BY MR. FUTERFAS:
24    Q.  Ms. Sung, how many job seekers did the DOI interview in the
25    course of its investigation?
```

F4gnusa6                          Sung - cross

1   A.   Again, I don't recall.  Referring to the DOI report, I

2   remember there are at least four job seeker interviews

3   discussed within that report, but we interviewed more than

4   that.

5   Q.   Did you interview less than 20?

6   A.   I can't recall.

7   Q.   Less than 10?

8            MS. BLAIN:   Objection.

9   A.   I don't recall.

10            THE COURT:   Overruled.

11            MR. FUTERFAS:   OK.

12   A.   Can I add one other thing.  You had earlier asked me how

13   many SEEDCO employees we interviewed?

14   Q.   Yes.

15   A.   I just wanted to make it clear that it was more than ten.

16   Q.   It was closer to 20 you think?

17   A.   It may have been, yes.

18   Q.   Do you think it could have been between 20 and 30?

19   A.   Possibly.

20            MR. FUTERFAS:   May I have a moment, your Honor.

21            (Defense counsel conferred)

22   BY MR. FUTERFAS:

23   Q.   If I could direct you now, Ms. Sung, to some of the CIFs

24   that were just displayed for you before.  I think we would

25   start with Government Exhibit 57.  We will do it in the order

F4gnusa6                         Sung - cross

1    the government did.

2                THE COURT:  That is the one for Amy Bursor.

3                MR. FUTERFAS:  Yes.

4    Q.  If you could turn to the second page of that CIF, where she

5    identifies her occupation as a bartender.  Do you see that?

6    A.  Yes.

7    Q.  There is a wage and salary place.  Do you see an indication

8    for a wage and salary?

9    A.  Yes.

10   Q.  Then it says per hour, per week or month or year.  Then

11   next to that it says how many hours per week.  Do you see that?

12   A.  Yes.

13   Q.  Do you have an understanding that if Ms. Bursor -- who

14   identifies on her form is making $4.50 per hour working ten

15   hours a week -- comes to SEEDCO and after visiting SEEDCO and

16   getting services from SEEDCO gets a job or gets 20 hours a week

17   or gets an increase in salary, that could count as a type of

18   placement?

19   A.  At the time of the investigation, I remember there was some

20   discussion regarding whether a promotion could be counted as a

21   placement.  I don't recall the policy that was in effect at the

22   time.

23   Q.  Let me ask you this:  I don't know if it's necessary to

24   call up the Worksource1 photo, but could you tell either from

25   this CIF or the Worksource1 whether someone had gotten an

F4gnusa6                         Sung - cross

1   increase in either salary or hours worked?

2   A.  At what point in time?

3   Q.  In other words --

4           THE COURT:  At any point in time.

5   A.  You mean after being serviced by SEEDCO?

6   Q.  Yes.

7   A.  That would not be indicated in the CIF.

8           MR. FUTERFAS:  Right.

9           THE COURT:  So you couldn't tell?

10          THE WITNESS:  I could not tell.

11  Q.  Well, you couldn't tell from the CIF?

12  A.  Right.

13  Q.  But is there a way, if you looked at the Worksource1, that

14  maybe you could tell?

15  A.  I believe so.

16          THE COURT:  Let's put it up.  21.

17  Q.  OK.  On the screen in front of us, if we take Ms. Bursor,

18  the hourly wage indicated is on Worksource1 is 4.65, which is

19  just incrementally greater than the $4.50 reported on the CIF,

20  right?

21  A.  Yes.

22  Q.  Is there any indication on the Worksource1 whether her

23  hours increased or did not increase if we scroll to the right?

24          MS. BLAIN:  Objection.

25          THE COURT:  Overruled.

F4gnusa6                         Sung – cross

1    A.   There is no indication in the data that is in front of me

2    currently.

3    Q.   The data in front of you currently is the Worksource1 that

4    you relied upon in conducting your investigation, correct?

5              MS. BLAIN:   Your Honor, I'm sorry.   May I have a

6    sidebar very briefly.

7              THE COURT:   Yes.

8          (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F4gnusa6                         Sung - cross

1              (At sidebar)

2              THE COURT:  I was about to ask this before you asked

3    for the sidebar.  The Workforce document shows that in March

4    she got a different employer at a higher rate of pay.  I was

5    going to ask how that fits into things here.

6              What is your objection?

7              MS. BLAIN:  The way we have it up for the jury, it

8    just has a few columns.  The entire spreadsheet, because the

9    entire spreadsheet is longer than my arm --

10             THE COURT:  Not too long.

11             MS. BLAIN:  That is very true, your Honor.

12             Right now all Ms. Sung can see is about five columns

13   of the 50.  We can expand all the columns, and she can see them

14   all.  It was just harder for the jury to see it.

15             THE COURT:  Do you want that done, Mr. Futerfas?

16             MR. FUTERFAS:  I know what to do with that.  All I am

17   trying to determine is that to really truly determine if

18   something is false, you just have to check these other

19   parameters.  That is all I am going to do with her.

20             THE COURT:  That means you have to show all the

21   parameters.

22             MR. FUTERFAS:  I didn't realize that.  I will make it

23   clear that that chart does not have all the data.

24             MS. BLAIN:  It does have it.  You just have to expand

25   the columns.  All of it is there.  You have to expand the

F4gnusa6                          Sung - cross

 1 | columns.

 2 |              MR. FUTERFAS:  OK.

 3 |              MS. BLAIN:  There's column A, B, C, D, all the way

 4 | through, I think, OOO.  There are many columns.

 5 |              THE COURT:  What are we doing?  Do you know where you

 6 | are going or are you just fishing around?

 7 |              MR. FUTERFAS:  No.  She had testified in her

 8 | deposition --

 9 |              THE COURT:  I know what she testified.

10 |              Do you have some contradiction?  Bring it out.  You

11 | have been around this too long.  What is going on?  Do you want

12 | to look for something?  Look for something.

13 |              MR. FUTERFAS:  I will cut to the chase.

14 |              THE COURT:  Let's do it.

15 |              MR. FUTERFAS:  OK.

16 |              THE COURT:  Answer my question.

17 |              What happened to the second line, the one below it.

18 |              MS. BLAIN:  The second line, where she got an actual

19 | increase?

20 |              THE COURT:  In March.

21 |              MS. BLAIN:  That is an OK placement.

22 |              THE COURT:  The jury should know that.  They see her

23 | name twice.

24 |              MS. BLAIN:  We can certainly do that.  The wrong

25 | placement that we showed was one of the examples of the

F4gnusa6                          Sung – cross

1   placement.

2              THE COURT:  When are you going to show the second row?

3              MS. BLAIN:  Your Honor, we didn't think it was

4   relevant since we were trying to show which placements were

5   false.

6              THE COURT:  Go ahead.

7          (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (In open court)

2           THE COURT:  So the judge has told the lawyers that he

3    is a little bit confused.  They have promised to enlighten me.

4           MR. FUTERFAS:  Both sides.

5           We will do our very best to do that.

6           THE COURT:  I know that.  Somehow I don't feel

7    reassured.

8    Q.  Ms. Sung let me ask you this:  Just for the purposes of

9    determining whether a placement is accurate or not in terms of

10   the records that you reviewed, one of the things that you would

11   look at, is it fair, is comparing whether not only the person

12   has the same job, but do they have the same salary and they

13   have the same number of hours, worked the same number of hours?

14   A.  Yes.

15   Q.  It may be that on the spreadsheet you are looking at, the

16   Worksource1 system was a very large --

17          THE COURT:  Come on.  Let's get to the question.  What

18   do you want to ask?

19          There are two lines here with Amy Bursor.  Can you

20   explain those?  They have the same people ID number.

21          THE WITNESS:  Yes.

22          So I recall the people ID number was like --

23          THE COURT:  Talk to the jury so they can hear you.

24          THE WITNESS:  The people ID number was like an

25   identifying number for an individual.

F4gnusa6                        Sung - cross

1          This would indicate that this is the same Amy Bursor

2     entered twice, so two placements were reported for her.

3          THE COURT:  At one placement she was getting $4.65 an

4     hour and the second placement at $15 an hour?

5          THE WITNESS:  Yes.

6          THE COURT:  And she moved from Broadway East to Bar

7     Italia?

8          THE WITNESS:  Yes.

9          THE COURT:  Are there dates associated with each of

10    these two?

11         THE WITNESS:  Yes.

12         THE COURT:  So what's the significance of the dates?

13         THE WITNESS:  Start date for the Broadway East job was

14    January 26, 2011, and then it looks like she was reported as

15    having then gotten a subsequent job on March 10, 2011 at Bar

16    Italia.

17         THE COURT:  You testified before on direct to a

18    discrepancy in the start date reported on the Workforce1, this

19    particular document, and the CIF as to the Broadway East job.

20    You had no testimony about the Bar Italia job, right?

21         THE WITNESS:  Right.

22         THE COURT:  Was there also supposed to have been a

23    discrepancy, if you know, with the Bar Italia job?

24         THE WITNESS:  That I don't know.  I recall during our

25    investigation we did note multiple, duplicate entries where the

F4gnusa6                        Sung - cross

same exact entry was made, the same exact place of employment.
This was not one of them, because it's two different places of
employment.  So I don't believe this is one that we would have
counted as a duplicate.

          MR. FUTERFAS:  May I ask a question, your Honor?

          THE COURT:  Go ahead.

BY MR. FUTERFAS:

Q.  Just going back briefly to the CIF, Government Exhibit 57,
do you recall, Ms. Bursor on her CIF notes that she's working
ten hours per week, right?

A.  Yes.

Q.  Do you have an understanding that, to be a placement, a
person has to work a minimum of 20 hours per week?

A.  I don't recall that.  It's possible that that was the
policy.  I do remember there having to be a minimum for
something to be counted or considered a placement.  By SBS
definition I believe that there was a requirement for a minimum
salary and minimum number of hours per week.

Q.  You just don't recall if the minimum was 20 or some other
number?

A.  I can't recall.

Q.  If, for example, the Worksource1 system records a placement
a few days later of 20 hours per week, even if it does that,
it's possible that whoever entered that still may have entered
that falsely, right?

F4gnusa6                      Sung - cross

1           MS. BLAIN:  Objection.

2           THE COURT:  Sustained.  It's hypothetical.

3  Q.  Very well.  To determine reliably whether or not Ms. Bursor

4  came in, filled out a CIF, and then subsequently got an

5  increase in salary or hours or something like that, you would

6  call the job seeker and ask them if, in fact, they received an

7  increase in wages or hours, isn't that right?

8           MS. BLAIN:  Objection.

9           THE COURT:  Sustained.

10           You were looking for discrepancies, weren't you?

11           THE WITNESS:  Yes.

12           THE COURT:  That's how you based your findings, on

13  discrepancies?

14           THE WITNESS:  Yes.

15           THE COURT:  Discrepancies between the CIF and the

16  Worksource1 in most cases?

17           THE WITNESS:  Yes.

18           THE COURT:  And in various cases discrepancies between

19  various other kinds of documents and the Worksource1?

20           THE WITNESS:  That's correct.

21           THE COURT:  That's how you based your findings?

22           THE WITNESS:  In addition to that, we also obtained

23  testimony, statements from witnesses, and also reviewed e-mail

24  communications by SEEDCO employees.  In other words, the source

25  of the information or our evidence came from multiple places.

1          THE COURT:  Got you.  OK.

2     BY MR. FUTERFAS:

3     Q.  But you have testified that there are 528 placements that

4     you think were problematic or wrong, right?

5     A.  Yes.

6     Q.  So this Amy Bursor, is she one of them?  This person we are

7     looking at right now, is this one of the 528?

8     A.  Sitting here right now, I would have to make an inference

9     to answer that question.

10    Q.  You don't recall?

11    A.  I don't recall.  I know that we reviewed all of the

12    available CIFs from a given time period and that this was one

13    of them, given that it was dated within that time period.

14    Q.  My question for you is this:  His Honor just raised the

15    issue of you were looking for discrepancies, right?

16    A.  Yes.

17    Q.  All I'm asking you is, if you find a discrepancy in the

18    documentation, to resolve the discrepancy and figured out in

19    fact the placement was false or not false, did you pick up and

20    call the job seeker and ask the job seeker whether or not in

21    fact they got a raise or got more hours or got more employment?

22          MS. BLAIN:  Objection.

23          THE COURT:  Overruled.

24    A.  We called job seekers as part of our investigation.  I

25    can't say whether we called this particular job seeker.

F4gnusa6                          Sung - cross

1    Q.  And the number of job seekers you called was about what?

2    Four or five?

3    A.  I believe I stated more than that earlier.  I stated that

4    there were approximately four that were outlined in the DOI

5    report, if I remember correctly, and that we had interviewed

6    more than that.

7    Q.  How many more did you interview besides when you called?

8    A.  I can't remember that.  I believe it would be in my earlier

9    testimony.

10   Q.  Was it less than five?

11   A.  No, it was more than five.

12   Q.  Maybe ten?

13           MS. BLAIN:  Objection.

14           THE COURT:  Overruled.

15   A.  It could be approximately -- I don't remember what I said

16   probably like ten minutes ago.  It would be in the transcript.

17           THE COURT:  What is your best recollection?  Ten?

18           THE WITNESS:  Probably more than ten.

19           THE COURT:  Fifteen?

20           Some order of magnitude below 25?

21           THE WITNESS:  Probably.

22           THE COURT:  OK.

23   BY MR. FUTERFAS:

24   Q.  If we could turn to Government Exhibit 65, which is the CIF

25   of Dennis Garci.

1            MR. FUTERFAS:  Your Honor, could we have a one-second

2    sidebar.  I am asking the government to do it because the

3    copies we have are not redacted.  That is the issue.  If

4    government doesn't mind doing the exhibits, I'm happy to use

5    them.  But that's the reason.

6            THE COURT:  Do it.

7            MR. FUTERFAS:  Thank you.

8            MR. SOLOMON:  Was that 65?

9            THE COURT:  I thought we cleared that up.

10   Q.  We can go to the second page.  On the second page for

11   Mr. Garci we see actually on this form that the wage and hours

12   and all that is blank, right?

13   A.  Yes.

14   Q.  Ms. Sung, in the course of your investigation, did you come

15   to learn or understand that many of these job seekers maybe

16   they don't speak English that well or have varying degrees of

17   education, things like that?

18           MS. BLAIN:  Objection.

19           THE COURT:  Sustained.

20   Q.  With respect to the CIFs and the filling out of the CIF,

21   this is not filled in, right, you acknowledge that, on

22   Government Exhibit 65, wages and the hours worked.?

23           THE COURT:  What is this?

24   Q.  Do you recall what, if anything, you did with respect to

25   this CIF to determine whether the Worksource1 placement

F4gnusa6                          Sung - cross

1   information constituted greater hours or greater wages or

2   anything like that?

3   A.  On this specific one?

4   Q.  Yes.

5   A.  I can't recall.

6          MR. FUTERFAS:  Now if we could turn to Government

7   Exhibit 67.

8   Q.  Directing your attention, Ms. Sung, to the second page of

9   Government Exhibit 67, here it appears that Mrs. Payano reports

10  working at a salary of $12 an hour at 40 hours per week.  Do

11  you see that?

12  A.  Yes.

13  Q.  If we could, again, with the appreciation of Mr. Solomon,

14  if he could call up the Worksource1 No. 1970.  On Worksource1

15  it indicates an hourly wage of $15.38 per hour.

16          Do you see that?

17  A.  Yes.

18  Q.  And do you have any recollection of whether your

19  investigators contacted Mrs. Payano to determine whether she

20  was rehired by the company at that wage?

21  A.  Specifically as to this job seeker, I don't recall.

22          MR. FUTERFAS:  I think that is all I have with the

23  government exhibits.

24          Thank you, Mr. Solomon.

25          Your Honor, I have nothing further.  Thank you.

F4gnusa6                          Sung – cross

1                  THE COURT:  Thank you.

2                  Redirect?

3                  MS. BLAIN:  Yes.  Thank you, your Honor.

4       REDIRECT EXAMINATION

5       BY MS. BLAIN:

6       Q.  Good afternoon, Ms. Sung.  Just a few questions.

7                  In the course of your investigation did you determine

8       that false wage data was also input into Worksource1?

9       A.  I recall that was something that we looked at wage data.

10      We also had discussions with SBS as to what could be counted as

11      a placement.  And, again, as I had mentioned on

12      cross-examination, there was a policy as to whether or not

13      promotions could be counted as placements.

14                 THE COURT:  You have to speak louder.

15      A.  I recall there was an SBS policy that spoke to whether

16      promotions could be counted as placements or not.  I remember

17      there came a point where they were not allowed to be counted as

18      placements.  But I do not believe that we had, if we reported

19      or determined that a placement was false, it was not because of

20      wage information.  It was because of the employer information.

21      Q.  You need to call a job seeker in order to determine that a

22      discrepancy between a job start date and Worksource1 and a job

23      start date in the CIF was actually a discrepancy?

24      A.  We didn't call every single job seeker.  There were some

25      that were so obviously -- where the discrepancy was so obvious

F4gnusa6                        Sung - redirect

1    that we didn't actually then call that job seeker associated

2    with that placement.  But we did -- as I had mentioned, the

3    interviewer called a number of job seekers.  I can't remember

4    how many.  But the purpose of that was to confirm that our

5    analysis was in fact correct, or our conclusion that the

6    placement was false.

7            MS. BLAIN:  Thank you, Ms. Sung.

8            MR. FUTERFAS:  Nothing further, your Honor.

9            THE COURT:  Thank you.

10           You are excused.

11           THE WITNESS:  Thank you.

12           (Witness excused)

13           THE COURT:  Next witness?

14           MS. BLAIN:  Your Honor, the government calls Ron Kirk.

15           MR. MILLMAN:  Your Honor, I'm counsel to Mr. Kirk.

16           Is it OK -- thank you.

17           THE COURT:  Identify yourself for the record.

18           MR. MILLMAN:  For the record my name is Claude

19   Millman.

20           THE COURT:  Introduce yourself to the jury and smile

21   nicely.

22           MR. MILLMAN:  My name is Claude Millman.  I'm counsel

23   to the witness.

24    RONALD KIRK,

25        called as a witness by the Plaintiff,

F4gnusa6                         Sung - redirect

1          having been duly sworn, testified as follows:

2     DIRECT EXAMINATION

3     BY MS. BLAIN:

4              MS. BLAIN:  May I begin, your Honor?

5              THE COURT:  You may.

6              MS. BLAIN:  Thank you.

7              THE COURT:  This is Ms. Blain.

8     Q.  Good afternoon, Mr. Kirk.

9     A.  Good afternoon.

10    Q.  Could you please tell the jury your name.

11    A.  My name is Ronald Kirk.

12    Q.  Mr. Kirk, do you currently work for a company called

13    SEEDCO?

14    A.  Yes, I do.

15    Q.  When did you start working at SEEDCO?

16    A.  October of 2010.

17    Q.  What was your position when you joined SEEDCO?

18    A.  I was the vice president of budgets and contracts.

19    Q.  What is your position now?

20    A.  Vice president and controller.

21    Q.  When did you receive the title of vice president and

22    controller?

23    A.  October of 2013.

24    Q.  Was that a promotion?

25    A.  Yes.

F4gnusa6                          Kirk – direct

1    Q.  What were your duties and responsibilities in connection

2    with being a vice president of budgets and contracts?

3    A.  My staff and I were responsible for developing SEEDCO's

4    annual operating budget, revenue and expenses.  We were also

5    responsible for invoicing, and we were doing all the financial

6    reporting to all of our funders.

7    Q.  Are your duties and responsibilities the same now that you

8    are vice president and controller?

9    A.  They are the same, but I have additional responsibilities.

10   Q.  What are those additional responsibilities?

11   A.  I am also responsible for the general accounting, the audit

12   of the organization, accounts receivable, accounts payable, and

13   payroll.

14   Q.  Does SEEDCO have an accounting system?

15   A.  Yes.

16   Q.  Has that accounting system been in place since you started

17   at SEEDCO?

18   A.  Yes.

19   Q.  Do you work with that accounting system in the regular

20   course of your job at SEEDCO?

21   A.  Yes.

22   Q.  Are you familiar with an agency called the New York City

23   Department of Small Business Services?

24   A.  Yes.

25   Q.  What do you understand that to be?

F4gnusa6                    Kirk - direct

1   A.  It is an organization that we had contracts with for

2   Workforce1 centers and Business Solutions centers.

3   Q.  If I use SBS, will you understand that I am referring to

4   the New York City Department of Small Business Services?

5   A.  Yes.

6   Q.  You mentioned Workforce1 centers?

7   A.  Uh-huh.

8   Q.  What are those?

9   A.  They are centers where people who are looking for

10  employment would come in, and we would help them, help place

11  them in jobs.

12  Q.  In connection with your work at SEEDCO, did you become

13  familiar with the Workforce1 contracts between SEEDCO and SBS?

14  A.  Yes.

15  Q.  How did you become familiar with those contracts?

16  A.  We were responsible for submitting the monthly financial

17  reports to SBS with the expenses that we incurred.

18  Q.  What did those contracts generally require SEEDCO to do?

19  A.  They required SEEDCO to operate the centers and help

20  people, help place people in employment and try to keep them

21  employed.

22  Q.  Did you have any role in monitoring whether SBS paid SEEDCO

23  money under those contracts?

24  A.  Yes.

25  Q.  Sitting here today, do you have an understanding regarding

F4gnusa6                          Kirk - direct

1   how much SBS paid SEEDCO under those contracts for certain

2   years?

3   A.   Yes.

4   Q.   What is the basis of your understanding?

5   A.   I have information from our accounting system that shows

6   the cash receipts from SBS for those periods.

7   Q.   How much did SBS pay SEEDCO under those contracts in 2009?

8   A.   Approximately $3.5 million.

9   Q.   How do you know that?

10  A.   I pulled the information from our accounting system.

11  Q.   Are you confident in --

12          THE COURT:  Do you perhaps have a schedule?

13          MS. BLAIN:  I'm sorry?

14          THE COURT:  Do you perhaps have a schedule?

15          MS. BLAIN:  I have a schedule I can use to refresh the

16  witness's recollection, but not one that we prepared to put

17  into evidence, your Honor.  But we certainly can if the Court

18  would prefer that.

19          THE COURT:  I think it would be easier.  It is hard to

20  remember numbers without a piece of paper.

21          How does the defendant feel about it?

22          MR. FUTERFAS:  We haven't seen it, your Honor.

23  Q.   Do you happen to have it, Mr. Kirk, the spreadsheet that

24  you prepared?

25  A.   Mr. Millman has it.

F4gnusa6                          Kirk - direct

1             MR. MILLMAN:  I'm right here.

2             THE WITNESS:  Sorry.

3             MS. BLAIN:  May I retrieve it from Mr. Millman, your

4     Honor?

5             THE COURT:  If Mr. Millman will give it.

6             MR. MILLMAN:  Yes.

7             THE COURT:  Why don't you show it to both sides.

8             MR. MILLMAN:  It's the folder.

9             THE COURT:  Mr. Millman take a few minutes, go into

10    the first or second row with counsel for both sides.

11            MR. MILLMAN:  Thank you.

12            THE COURT:  Explain the number.  I'm hoping at the end

13    of this we can stipulate to the piece of paper and excuse

14    Mr. Kirk.

15            MS. BLAIN:  Thank you, your Honor.

16            (Government counsel, defense counsel, and Mr. Millman

17    conferred)

18            THE COURT:  Let me see you at sidebar, please.

19         (Continued on next page)

20

21

22

23

24

25

F4gnusa6                         Kirk - direct

 1            (At sidebar)

 2            THE COURT:  Can we stipulate to the spreadsheet?

 3            MS. BLAIN:  Yes.

 4            MS. SCHEIN:  Yes.  We have no objection to it.

 5            THE COURT:  So is Kirk here for anything else?

 6            MS. BLAIN:  Yes.  There is another spreadsheet that we

 7    have also stipulated to.

 8            MS. SCHEIN:  I have questions for him, your Honor.

 9            THE COURT:  All right.  We will mark this for

10    introduction into evidence, and I will read it to the jury, or

11    you read it to the jury.

12            MS. BLAIN:  Whatever you prefer, your Honor.

13            THE COURT:  You read it.  Do you have a copy for me?

14            MS. BLAIN:  I just have one copy, your Honor.  I'm

15    sorry.  I didn't expect this.

16            THE LAW CLERK:  I can run it upstairs.  It will be on

17    the Elmo.

18            THE COURT:  It will be on the Elmo?

19            MS. BLAIN:  Yes.

20            THE COURT:  Let's do it.

21            (Continued on next page)

22

23

24

25

F4gnusa6                          Kirk - direct

1                    (In open court)

2                    THE COURT:  Success.

3                    Let's mark it first.

4                    MS. BLAIN:  Your Honor, I am showing the witness

5      what's been marked as Government's Exhibit 73 for

6      identification.

7                    THE COURT:  GX 73 is a spreadsheet prepared by or at

8      the direction of Mr. Kirk.

9                    Right, Mr. Kirk?

10                    THE WITNESS:  That's correct.

11                    THE COURT:  It shows what?  Quarterly receipts from

12     SBS?

13                    THE WITNESS:  Annual, your Honor.

14                    THE COURT:  Annual receipts.

15                    THE WITNESS:  Yes.

16                    THE COURT:  For SBS?

17                    THE WITNESS:  Yes.

18                    THE COURT:  For what years.

19                    THE WITNESS:  For 2009, 2010 and 2011.

20                    THE COURT:  Do you have those numbers?

21                    MS. BLAIN:  Yes, your Honor.

22                    THE COURT:  Here we are.

23                    Members of the jury, we will admit it into evidence on

24     consent.

25                    MS. SCHEIN:  Yes, your Honor.

F4gnusa6                         Kirk – direct

1          (Government's Exhibit 73 received in evidence)

2          THE COURT:  It's broken down from Manhattan and the

3     Bronx for 2011, and just for Manhattan in 2009 and 2010.

4          It is about three and a half million dollars in 2009,

5     $3.8 million in 2010, $5.4 million in 2011, and in total

6     $12,800,000 in total for the three years.

7          MS. BLAIN:  May we publish it to the jury?

8          THE COURT:  The jury is already viewing it as I read

9     it.

10          No?  You don't have it?

11          Please publish it.

12     Q.  Those are the numbers that the Court just read, correct,

13     Mr. Kirk?

14     A.  Yes.

15          THE COURT:  Leave it up for the jury to read.

16          When they're finished with it, then we will move on to

17     another subject.

18          OK.  Move on to another subject.

19          MS. BLAIN:  I am marking Government's Exhibit 74 for

20     identification.

21     Q.  Mr. Kirk, can you please tell the Court what this document

22     is.

23     A.  This Mr. Saavedra's monthly salary for 2009, 2010, and

24     2011.  It shows the total salary for each month and the amount

25     that was charged to the Workforce1 Center contracts.

F4gnusa6                        Kirk - direct

1              MS. BLAIN:  Your Honor, the government moves Exhibit

2      74 into evidence.

3              THE COURT:  Any objection?

4              MS. SCHEIN:  No objection, your Honor.

5              THE COURT:  Received.

6              (Government's Exhibit 74 received in evidence)

7      BY MS. BLAIN:

8      Q.  Mr. Kirk, what does it say for the 2009 total?

9      A.  The total was approximately $103,000.

10     Q.  And what does it say for the 2010 total?

11     A.  Approximately $111,000.

12     Q.  And what does it say for the 2011 total?

13     A.  Approximately $97,000.

14             MS. BLAIN:  Thank you, Mr. Kirk.

15             I have no further questions, your Honor.

16             THE COURT:  This Exhibit was 74?

17             MS. BLAIN:  Yes, your Honor.

18             THE COURT:  Was Mr. Saavedra's salary tied to any

19     performance levels of the company?  Do you know?

20             THE WITNESS:  I don't, your Honor.

21             THE COURT:  You just took the numbers off the books,

22     that's it?  That is the extent of your knowledge?

23             THE WITNESS:  Yes, sir.

24             THE COURT:  Cross-examination.

25             MS. SCHEIN:  Thank you.

F4gnusa6                          Kirk – direct

CROSS EXAMINATION

BY MS. SCHEIN:

Q.  Good afternoon, Mr. Kirk.

A.  Good afternoon.

Q.  On an annual basis SBS would approve of SEEDCO's annual

budget, is that correct?

A.  Yes.

Q.  And SEEDCO's annual budget, you just testified about it,

was for 100 percent of its operating costs, is that correct?

A.  I am not sure I understand the question.

Q.  You prepared a budget that SBS approved, correct?

A.  For the SBS programs.

Q.  Well, when you say the SBS programs, you're referring to

the Workforce1 centers?

A.  Yes.  And the Business Solutions centers.

Q.  Because SEEDCO has other programs?

A.  Yes.  That's correct.

Q.  OK.  Thank you.  So for the annual budget for the Workforce

programs that you testified that SBS approves, that budget is

for the operating expenses of running the Workforce centers, is

that correct?

A.  That's correct.

Q.  The budget is to cover 100 percent of the operating costs,

correct?

F4gnusa6                        Kirk - cross

1    A.   The budget is -- yes.

2    Q.   And there are line-by-line items in the budget?

3    A.   That's correct.

4    Q.   Since SEEDCO is a not-for-profit, the budget for the

5    Workforce center they never receive anything more than the

6    operating expenses, correct?

7            THE COURT:   The budget is not what they are receiving.

8    The budget is what they are paying.

9            MS. SCHEIN:   What they are paying.   Thank you, your

10   Honor.

11   A.   I'm sorry.   Repeat the question.

12   Q.   Withdrawn.

13           The operating costs that SBS pays to SEEDCO for the

14   operating expenses, there's nothing above that that they

15   receive?

16   A.   That's correct.

17   Q.   Do you know whether in 2009 SEEDCO received 100 percent of

18   the operating costs for the workforce center?

19           THE COURT:   Don't mix up.

20           MS. SCHEIN:   Pardon?

21           THE COURT:   You are mixing up your receipts.   You are

22   mixing up a cash flow statement and a budget statement.

23           MS. SCHEIN:   I will rephrase.   Thank you, your Honor.

24           THE COURT:   Am I right?

25           THE WITNESS:   Yes, your Honor.

F4gnusa6                        Kirk - cross

1           THE COURT:  The budget only has to do with how much

2     money you need for expenses?

3           THE WITNESS:  That's correct.

4     Q.  The question I'm asking is about the expenses, the

5     operating expenses for the workforce center.

6           In 2009, did SEEDCO receive -- were they paid by SBS a

7     hundred percent of their operating expenses?

8     A.  Yes, I believe so.

9     Q.  Do you know if they were paid 100 percent of their

10    operating expenses in 2010 or something less than 100 percent?

11    A.  I believe it was less.

12    Q.  What about in 2011?  Did they receive 100 percent of their

13    operating expenses or something less?

14    A.  I believe it was also less.

15    Q.  The SEEDCO budget that you oversee, that is broken down,

16    the budget to run the workforce center, that is broken down

17    into a percentage-based -- out of the 100 percent, 70 percent

18    of the operating expenses is received from SBS, and 30 percent

19    can be received based upon performance-based milestones?

20    A.  Yes.

21    Q.  And the performance-based --

22          MS. SCHEIN:  Could we have Defendant's Exhibit E,

23    please.  It is in evidence.  It is currently in evidence as

24    Government Exhibit 34.  Can we publish it.

25    BY MS. SCHEIN:

F4gnusa6                         Kirk - cross

1   Q.   While that exhibit is being published, Mr. Kirk, in 2011,

2   do you know whether the 70/30 percentage basis changed to 80

3   percent and 20 percent?

4   A.   Yes.

5   Q.   Could you just tell us what that means.

6   A.   It means that they would reimburse us for our expenses up

7   to 80 percent of the value of the contract, and the other 20

8   percent would be held until they could determine we met our

9   targets.

10  Q.   When you say they would reimburse us, to whom are you

11  referring?

12  A.   SBS.

13          MS. SCHEIN:  It is U.S. 231 Bates stamped, Attachment

14  A.

15  Q.   Mr. Kirk, let me ask you a question about that while they

16  are pulling that document up.  The document is attached to the

17  contract.  It's called "Performance Milestones."  You're

18  familiar with the performance milestones, Mr. Kirk?

19  A.   Yes.

20  Q.   The performance milestones are the part of the contract

21  that concerns the 30 percent -- withdrawn.  The contract

22  between SBS and SEEDCO to pay their operating expenses had a 30

23  percent component up until 2010, correct?

24  A.   Yes.  It was 30 percent.

25  Q.   Attachment A, which is entitled "Performance Milestones,"

F4gnusa6                         Kirk - cross

1   refers to the 30 percent component of the contract, correct?

2   A.  Yes.

3   Q.  Do you know what percentage of the 30 percent concerns a

4   metric about placements from looking at that document?

5   A.  It says 50 percent.

6   Q.  50 percent.  So of the 30 percent of the operating costs,

7   50 --

8            THE COURT:  You are just repeating information, Ms.

9   Schein.  Do you need to do this?

10           MS. SCHEIN:  If I may, your Honor?

11           THE COURT:  You may.  But I am observing that it's

12   pure repetition.

13           MS. SCHEIN:  Just a few questions, if the Court would

14   permit me.

15           THE COURT:  I said I would.

16           MS. SCHEIN:  Thank you.

17   Q.  30 percent is the performance-based milestones, correct?

18   In terms of the performance-based milestones according to

19   Attachment A, the placement aspect of the performance-based

20   milestones are based upon validation of placements, correct?

21   A.  I believe so, yes.

22           MS. SCHEIN:  We can take that exhibit down.

23   Q.  I show you what's been marked Defense Exhibit H8.

24           THE COURT:  What is going on, folks?

25           MS. SCHEIN:  I am asking the witness about Defense

F4gnusa6                          Kirk - cross

1    Exhibit H8.

2              THE COURT:  All right.  So ask.

3              MS. SCHEIN:  H8.

4    Q.  Mr. Kirk, do you see Exhibit H8?  If we could turn to the

5    fourth page.  It is from the Department of Small Business

6    Services, SBS, entitled "Memorandum."

7              MS. SCHEIN:  Your Honor, can we show the witness page

8    4 of Defense Exhibit H8.

9              THE COURT:  Is this in evidence?

10             MR. FUTERFAS:  Not yet, your Honor.

11             THE COURT:  Show him anything you want.  Show him your

12   copy, Ms. Schein.  Let's move on, please.

13             MS. SCHEIN:  Yes.

14   Q.  Take a look at that.

15             THE COURT:  Do you know anything about this?

16             Have you seen this document before, Mr. Kirk?

17             THE WITNESS:  I have not, your Honor.

18             THE COURT:  Come on, Ms. Schein.

19             MS. SCHEIN:  All right.  We'll move on.

20             If I could just have one moment?

21             THE COURT:  No.  Take back the document.  You cannot

22   have one moment.  Let's finish up.  Mr. Kirk is here for a

23   limited purpose, and you're going beyond his direct.

24             MS. SCHEIN:  Your Honor, then I have no further

25   questions of Mr. Kirk.

F4gnusa6                          Kirk - cross

1              Thank you.

2              THE COURT:  Thank you, Mr. Kirk.

3              THE WITNESS:  Thank you, your Honor.

4              (Witness excused)

5              THE COURT:  You have 15 minutes.

6              Next witness?

7              MS. SCHOENBERGER:  Your Honor, the next witness is

8    Bill Harper, being called by deposition.

9              THE COURT:  Let's do it.

10             MS. SCHOENBERGER:  The government calls Bill Harper.

11             THE COURT:  So what we are going to do now is hear the

12   witness Bill Harper.  Mr. Harper does not live within the

13   subpoena power of this Court.  He does not live in New York

14   State.  Accordingly, under the law, his testimony taken before

15   trial, if relevant, can be read.  It's to be taken by you just

16   as if he were here, except you can't really judge every aspect

17   of his credibility.

18             Who is this gentleman.

19             THE WITNESS:  Louis Pellegrino, your Honor.

20             THE COURT:  Who is Mr. Pellegrino?

21             MS. BLAIN:  Mr. Pellegrino has kindly agreed to read

22   into the record for the jury Mr. Harper's answers.

23             THE COURT:  If he a professional reader?

24             MS. BLAIN:  He may be after today, your Honor.

25             THE COURT:  So we have someone who will make believe

F4gnusa6                          "Harper"

1   he is the witness who is not the witness.  He will just read

2   the transcript as we will read the transcript, and Ms. Blain

3   will ask the questions and he will give the answers.  And I may

4   rule on objections.  That is the exciting thing that we will do

5   for the next 15 minutes.

6         MS. BLAIN:  Please turn to page 266.  I am going to

7   start on line 18, 266:

8   "Q. On what date did you start working at SEEDCO?

9         MR. PELLEGRINO:  Sorry?

10         MS. BLAIN:  It's line 18.

11         MR. PELLEGRINO:  Oh.

12   "A. April 5, 2010.

13   "Q. What was your position on that date?

14   "A. Strategic operations coordinator for the Upper Manhattan

15   Workforce.

16   "Q. And how long did you hold that title?

17   "A. Until December 31, 2010.

18   "Q. And what were your duties and responsibilities in

19   connection with being a strategic operations coordinator?

20   "A. I was responsible for the day-to-day functioning of the

21   Workforce Worksource1 system, which is the data system for the

22   center.  I was responsible for initiating change initiatives

23   that SBS would put out regarding the changes in policy, new

24   programs, new features in their systems, things of that nature,

25   training and being up to date.  I was responsible for reporting

F4gnusa6                    "Harper"

metrics.  I was responsible for becoming subject matter expert

around the Worksource1 system and around the way the different

teams in Workforce1 interact with each other.  And I was

responsible for coordinating with the City on operations

issues.

"Q. What was your next title after strategic operations

coordinator?

"A. I was the deputy director of the upper Manhattan Workforce1

career center.

"Q. On what date did you become deputy director?

"A. January 1, 2011.

"Q. Where was that located?

"A. At Upper Manhattan on 125th Street in Harlem.

"Q. That is also where you were the strategic operations

coordinator as well, correct?

"A. Yes.

"Q. And what were your duties and responsibilities in

connection with being deputy director?

"A. I was responsible for the day-to-day running of the center.

I directly supervised, I think, four department staff and was

responsible for insuring that the center ran properly and

correctly, and that all of the teams interacted with each

other.  At that point I was also responsible for helping the

new strategic operations coordinator to come up on speed on all

of her duties.

F4gnusa6                          "Harper"

1    "Q. And who was that person?

2    "A. Lisa Frantzen, F-r-a-n-t-z-e-n.

3    "Q. And when you were a deputy director to whom did you

4    directly report?

5    "A. Rick Green.

6    "Q. And to whom, if you know, did Rick Green directly report?

7    "A. Alex Saavedra.

8    "Q. Did anybody directly report to you?

9    "A. Yes.

10   "Q. Who were they?

11   "A. The head of the intake department, Felicia Brezba; the head

12   of the single-stop contracts, I do not remember her name; the

13   head of the fatherhood contracts, it was another contract, I

14   don't remember his name right now; and intake, somebody else.

15   Maybe that was it.  Newton that was his name.  I liked him a

16   lot, too.  Yeah.

17   "Q. Now, please turn to page 271.

18           Mr. Harper, I'm handing you what's been marked as

19   Government's Exhibit 45?"

20           THE COURT:  Line 23.

21           MS. BLAIN:  Thank you, your Honor.  Line 23.

22   "Q. Mr. Harper, I'm handing you what's been marked as

23   Government's Exhibit 45.

24           "Do you recognize this document?

25   "A. Yes.

F4gnusa6                        "Harper"

1   "Q. Do you recognize this type of document?

2   "A. Yes.

3   "Q. What type of document is this?

4   "A. This is the customer information form, also known as a CIF.

5   "Q. Do you recall ever seeing this particular document before?

6   "A. Yes.

7   "Q. In what context have you seen this particular document

8   before?"

9           MS. SCHEIN:  Objection, your Honor.

10           THE COURT:  Overruled.

11   "A. This is one of the CIFs that I utilized to prove the fraud

12   that I thought was taking place in upper Manhattan."

13           THE COURT:  What Mr. Harper wants to prove or not to

14   prove is not binding on you.  Mr. Harper has been identified as

15   the whistleblower, so he made various kinds of conclusions and

16   assumptions based on what was before him, but what he found is

17   not your business.  This is just to explain how it came about

18   and to note any additional pieces of evidence by way of

19   discrepancies.  But you have to make your own findings and

20   evaluations.  You can't rely on Mr. Harper one way or the

21   other.  Not for him for what he says; not against him for what

22   he says.

23           Proceed.  Are you moving off of Exhibit 45?

24           MS. BLAIN:  No, your Honor.  I thought you wanted me

25   to offer all of these at the end.  I can offer these now.

1           THE COURT:  Objection?

2           MR. FUTERFAS:  No, your Honor.

3           THE COURT:  Received.  Publish it.

4           (Government's Exhibit 45 received in evidence)

5           THE COURT:  Publish it.  Can the jury see it.

6           MS. BLAIN:  There are a few pages to this exhibit,

7    your Honor, so can I show the jury the pages?

8           THE COURT:  You can go one by one.

9           MS. BLAIN:  The next page, Mr. Solomon.

10          THE COURT:  Let's look together.

11          His name is Arturo Diaz.  Other personal details we

12   don't need to note.

13          Let's turn to page 2.

14          Arturo Diaz says his occupation is an instructor, and

15   he set down his wage and salary.  He says he started his job,

16   the start date is September 1996.  And it gives his employer's

17   name.  He doesn't have a job end date.

18          He describes his job as teaching engineering,

19   building-related subjects.

20          This document was filled out January 20, 2010.  There

21   is an overwriting at the end, but I think it's 2010.

22          So we see here that the start date in September 1996

23   was approximately thirteen and a half years before anybody

24   filled out this form.  OK.

25          MS. BLAIN:  Next page, please, Mr. Solomon.

F4gnusa6                    "Harper"

1              THE COURT:  This is page 3.

2              What do you want the jury to note here?  We don't need

3     the Social Security number.  There is nothing here.

4              MS. BLAIN:  Next page, Mr. Solomon.

5              THE COURT:  There's nothing here.

6              MS. BLAIN:  The next page, Mr. Solomon.

7              The next page, Mr. Solomon.

8              THE COURT:  There is nothing in the rest of the

9     document, is there?

10             MS. BLAIN:  This is the page that's relevant, your

11    Honor.

12             THE COURT:  OK.

13             So what it has here is his job data entry date of

14    February 4, 2011, and the job start date as December 8, 2010,

15    which is the same date, is it, as he filled it out?  A

16    different date?  What was the date he filled it out?

17             MS. BLAIN:  He stopped having this job I believe in

18    2009, according to the CIF.

19             THE COURT:  Let's look.

20             MS. BLAIN:  Sorry, 1996.

21             THE COURT:  January 20, 2010.

22             Thank you.  Let's gee on.

23    "Q. Mr. Harper, I'm handing you what's been marked as

24    Government Exhibits 46, 47, 48, and 49.  If you could look at

25    Government's 46, please?

F4gnusa6                          "Harper"

1   "A. OK.  I need to correct myself on government --

2             MR. PELLEGRINO:  Is it 45?

3             MS. BLAIN:  45.

4   "Q. Sure.

5   "A. So the first two pages of this is a customer information

6   form.  The remaining pages are printouts and screen shots from

7   Worksource1.

8   "Q. And did you gather these screen shots?

9             THE COURT:  Let us understand this.

10            The first two pages are the CIF, and the remaining

11  pages come from Worksource1, which has been identified as a

12  document that's created by SBS and shared with Charney, right?

13            MS. BLAIN:  And SEEDCO, your Honor.

14            THE COURT:  And SEEDCO, right.  OK.

15  "Q. And did you gather these screen shots from the Workforce1

16  as well?

17  "A. I did.

18  "Q. And how did you come to gather this CIF and the screen

19  shot?

20  "A. The CIF was one of the CIFs that I located in Irwin

21  Traydman's desk and in file cabinets.  And the screen shots are

22  from where I looked them up in Worksource1 and then printed the

23  page.

24  "Q. Do you recall on what date you located the CIF on Irwin

25  Traydman's desk?

F4gnusa6                          "Harper"

1    "A. I do not.

2    "Q. Do you recall in what year you located the CIF on Irwin

3    Traydman's desk?

4    "A. I did it twice in 2011.

5    "Q. And do you recall what month that was?

6    "A. The first time would have been in or -- late March, early

7    April, before I went and met with Francine Delgado.  The second

8    time would have been in June of 2011, before I left.

9    "Q. And do you recall, looking at Government's Exhibit 45, if

10   this is a CIF that you pulled the first time you went to his

11   desk or the second time?

12   "A. I am unsure if I pulled it the first time.  I know that I

13   pulled it the second time.

14   "Q. Why are you sure that you pulled it the second time?

15   "A. Because when I pulled it, the only CIFs that I provided to

16   the government are ones that I pulled the second time.  I

17   provided all the CIFs for the first time and provided those to

18   SEEDCO.

19   "Q. If you now turn to Government's Exhibit 46.

20          "Do you recognize this particular type of document?

21   "A. Yes.

22   "Q. What is it?

23   "A. The first two pages are a CIF form, customer information

24   form.  The remaining pages are screen shots from Worksource1.

25   "Q. And do you recognize this particular CIF and Worksource1

F4gnusa6                          "Harper"

1   screen shots?

2   "A. Yes.

3   "Q. What are they?

4   "A. They are the ones -- they are ones that I received, I

5   pulled from Irwin Traydman's desk or file cabinets and then

6   pulled the CIF, the job seeker profile information, and

7   provided it to the government.

8   "Q. Thank you.  Turning your attention to government's 47, do

9   you recognize this particular type of document?

10  "A. Yes.

11  "Q. What is this particular type of document?

12  "A. Customer information form, the first two pages.  The

13  remaining are screen shots from Worksource1.

14  "Q. And do you recognize this particular CIF and screen shot?

15  "A. Yes.

16  "Q. How do you recognize this?

17  "A. It is from the -- where I pulled them from Irwin Traydman's

18  desk and then pulled the individual screen shots and provided

19  them to the government.

20  "Q. Turning your attention to Government's 48, again, do you

21  recognize this type of document?

22  "A. Yes.

23  "Q. What type of document is this?

24  "A. The first two pages are customer information forms, and the

25  last pages are screen shots from Worksource1 regarding this

F4gnusa6                          "Harper"

1   customer.

2   "Q. And do you recognize this particular CIF and screen shot?

3   "A. Yes.

4   "Q. Why do you recognize this?

5   "A. I think it's one that I pulled from Irwin Traydman's desk

6   and file cabinet, and then I pulled the screen shots and

7   provided to the government.

8   "Q. Turn finally to government's 49.  Do you recognize this

9   type of document?

10  "A. Yes.

11  "Q. What type of document is this?

12  "A. This is a customer information form.

13  "Q. And the last four pages?

14  "A. The last four pages are screen shots from Worksource1.

15  "Q. Do you recognize this particular CIF and screen shoots?

16  "A. Yes.

17  "Q. What is this?

18  "A. This is one that I pulled from Irwin Traydman's desk and

19  file cabinet and then pulled the screen shots and provided to

20  the government.

21  "Q. In connection with your duties and responsibilities at

22  SEEDCO either as a strategic operations coordinator or deputy

23  director, did you have reason to look at customer information

24  forms?

25  "A. Yes.

F4gnusa6                        "Harper"

1    "Q. And in connection with your duties and responsibilities as

2    strategic operations coordinator and deputy director, did you

3    have occasion to look at the Workforce1's database?

4    "A. Yes."

5              MS. BLAIN:  Thank you.

6              Your Honor, the government moves to introduce

7    Government's Exhibits 46, 47, 48 and 49.

8              THE COURT:  Objection?

9              MS. SCHEIN:  No objection, your Honor.

10             THE COURT:  Received.

11             (Government's Exhibits 46, 47, 48 and 49 received in

12   evidence)

13             THE COURT:  Members of the jury, it's 5 o'clock.  If

14   you want to spend another ten minutes, we can go over these

15   documents now, or we can save it for Monday morning.  My

16   suggestion is that you should be satisfied with today's work,

17   and we will do it Monday morning.  If you want to do it now, we

18   can do it now.  If you have burning curiosity and you are not

19   going to sleep the next few nights, we will do it now.

20             Shall we wait?

21             JURORS:  Yes.

22             THE COURT:  I want you to promise me something:  No

23   discussions of the case with anybody.  No talking to each other

24   than about the case.  Just put it out of your mind.  Have a

25   really great weekend.  Relax.  The weather, I hope will be

F4gnusa6                    "Harper"

1    nice.  If it's not nice, relax anyhow.  We'll see you Monday at

2    10 o'clock.

3            (Continued on next page)

F4gnusa6                          "Harper"

 1              (Jury not present)

 2              THE COURT:  You can step down.

 3              Thanks, everybody.

 4              Can we say goodbye for the weekend or do we have some

 5    business for the judge?

 6              MS. SCHEIN:  No, your Honor.  Thank you very much.

 7              MS. SCHOENBERGER:  Just one second.

 8              THE COURT:  Ms. Schoenberger has one thing.

 9              MS. SCHOENBERGER:  Very quick.

10              We anticipate playing the audio recordings on Monday.

11    I just wanted to find out if --

12              THE COURT:  Sit down.  I have something to talk to you

13    about.

14              MS. SCHOENBERGER:  OK.

15              THE COURT:  I took a peek at the excerpts of what

16    Mr. Saavedra said.  I don't believe it will be meaningful in

17    any way, not for either side.  All it will do is just confuse

18    the jury.  Possibly if it were in question-and-answer form,

19    which it's not, it might have some meaning.  It might show some

20    evasion of questions or some unwillingness to answer questions.

21    It might show some dynamic between the questions and the

22    answers.  But in this form I don't think it shows anything and

23    it just is confusing.

24              Is Mr. Saavedra going to be a witness?  Can you tell

25    me?

F4gnusa6                      "Harper"

1          MS. SCHEIN:  We were planning on calling him, your

2     Honor.

3          THE COURT:  Why doesn't the government save the

4     information for cross-examination, where it might be more

5     meaningful.

6          MS. SCHOENBERGER:  That's something we can consider,

7     your Honor.  Is it something we can take up again Monday

8     morning?

9          THE COURT:  I think it's important to know it now, but

10    if you can't tell me, I'll have to wait.  You think for

11    yourself.  I don't think it's going to do anything for your

12    case.  It is not going to enhance it, and it's not going to

13    weaken it.  It is going to be waste of time.  That's all.

14         MS. SCHOENBERGER:  We certainly don't want to waste

15    time, your Honor.  I just want to make sure that we have a

16    chance to reflect and do what's best for the case.

17         THE COURT:  OK.  Reflect.  You may want to talk to

18    your superiors.  Sure.

19         MS. SCHOENBERGER:  If we could come back to you on

20    Monday morning.

21         THE COURT:  I will tell you what you should do.  By

22    tomorrow noon, give Mr. Futerfas a call and tell him what you

23    are going to do.

24         MS. SCHOENBERGER:  We will certainly do that, your

25    Honor.

F4gnusa6                         "Harper"

1              THE COURT:  OK.

2              MS. SCHOENBERGER:  Thank you.

3              THE COURT:  Anything else?

4              MS. SCHEIN:  No, your Honor.

5              MR. FUTERFAS:  No, your Honor.

6              THE COURT:  Have a pleasant weekend.

7              MS. SCHEIN:  Thank you.

8              MR. FUTERFAS:  You, too.

9              THE COURT:  I have some work to do here.  You can just

10   go back to your offices.

11              Ms. Blain, what was Exhibit 46?  45 was Arturo Diaz?

12              MR. SOLOMON:  46 --

13              THE COURT:  Mr. Solomon.

14              MR. SOLOMON:  Would you like me to put on it your

15   screen for you?

16              THE COURT:  Just tell me the name.  We are going to

17   see it Monday.

18              MR. SOLOMON:  Andy Domas or Damas.  Andy, D-A-M-O or

19   A -- I'm not sure -- s.

20              THE COURT:  OK.

21              MR. SOLOMON:  If I may, I remember seeing it typed out

22   in the database, which would give clarification to the correct

23   spelling of the name.

24              THE COURT:  How is it spelled?

25              MR. SOLOMON:  I will look it up.

F4gnusa6                        "Harper"

1             THE COURT:  With an O or an A.

2             MR. SOLOMON:  It is Damas.

3             THE COURT:  Thanks.

4             Do you want your time?

5             MR. SOLOMON:  Yes, please.

6             THE COURT:  Day three of trial.

7             Kamath:  Plaintiff went from 10:20 to 10:35, 15

8  minutes; defendant went from 10:35 to 11:20 and from 11:35 to

9  12:05, a total of 75 minutes; plaintiff went from 12:25 to

10 12:30, five minutes.

11            Lirag:  Plaintiff went from 12:30 to 12:50, 20

12 minutes; the defendant went from 12:50 to 12:55, 5 minutes.

13            Sung:  The plaintiff went from 2:30 to 3:25, 55

14 minutes; the defendant from 3:40 to 4:15, 35 minutes, the

15 plaintiff 4:15 to 4:20, 5 minutes.

16            Kirk:  The plaintiff went from 4:20 to 4:35; the

17 defendant went from 4:35 to 4:40.

18            And Harper:  The plaintiff went from 4:45 to 5:00.

19            MR. SOLOMON:  Thank you, your Honor.

20            MS. SCHEIN:  Thank you, your Honor.

21            THE COURT:  The best I can do.

22            (Adjourned to Monday, April 20, 2015, at 10 o'clock

23 a.m.)

24

25

```
 1                         INDEX OF EXAMINATION

 2   Examination of:                            Page

 3   ANGIE KAMATH

 4   Direct By Ms. Blain . . . . . . . . . . . . 306

 5   Cross By Mr. Futerfas . . . . . . . . . . . 315

 6   Redirect By Ms. Blain . . . . . . . . . . . 376

 7   ERNESTO LIRAG

 8   Direct By Ms. Schoenberger . . . . . . . . . 378

 9   Cross By Ms. Schein . . . . . . . . . . . . 392

10   CHANTERELLE SUNG

11   Direct By Ms. Blain . . . . . . . . . . . . 412

12   Cross By Mr. Futerfas . . . . . . . . . . . 452

13   Redirect By Ms. Blain . . . . . . . . . . . 477

14   RONALD KIRK

15   Direct By Ms. Blain . . . . . . . . . . . . 479

16   Cross By Ms. Schein . . . . . . . . . . . . 488

17                       GOVERNMENT EXHIBITS

18   Exhibit No.                            Received

19    22   . . . . . . . . . . . . . . . . . . 387

20    23, 24, and 25 . . . . . . . . . . . . . 389

21    13 A   . . . . . . . . . . . . . . . . . 419

22    73   . . . . . . . . . . . . . . . . . . 486

23    74   . . . . . . . . . . . . . . . . . . 487

24    45   . . . . . . . . . . . . . . . . . . 499

25
```

1    46, 47, 48 and 49   . . . . . . . . . . . . 505

2                      DEFENDANT EXHIBITS

3    Exhibit No.                              Received

4    F5   . . . . . . . . . . . . . . . . . . 324

5    LLL   . . . . . . . . . . . . . . . . . . 360

6    T6   . . . . . . . . . . . . . . . . . . 369

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25