F4FJUSA1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES of AMERICA,

4                   Plaintiff,

5            v.                          11 Civ. 6425 AKH

6   ALEX SAAVEDRA,

7                   Defendant.

8   ------------------------------x

9                                        April 14, 2015
                                         10:15 a.m.
10
    Before:
11
                        HON. ALVIN K. HELLERSTEIN,
12
                                         District Judge
13                                         and a jury

14

15                       APPEARANCES

16  PREET BHARARA,
         United States Attorney for the
17       Southern District of New York
    BY:  CARINA HYATT SCHOENBERGER,
18       JENNIFER ELLEN BLAIN,
         Assistant United States Attorneys
19
    LAW OFFICES OF BETTINA SCHEIN,
20       Attorneys for defendant
    BY:  BETTINA SCHEIN, Esq.
21       – and –
    LAW OFFICES OF ALAN S. FUTERFAS,
22  BY:  ALAN SAMUEL FUTERFAS, Esq.
                    Of counsel
23

24  Also Present:
         HARRY SOLOMON, Technical Support USAO
25       MARISA ALBERTI, Defense Paralegal & Technical Support

F4FJUSA1

| | |
|---|---|
| 1 | (In open court) |
| 2 | (Case called) |
| 3 | THE COURT:  In response to the three letters of last |
| 4 | night, we have added the two names to the witness list.  I note |
| 5 | the government's withdrawal of counts involving payment under |
| 6 | mistake and common law fraud, they're necessarily duplicative, |
| 7 | and I would have asked they be withdrawn anyhow. |
| 8 | I want to add one more to be withdrawn and that is the |
| 9 | unjust enrichment count which is the flip side of the fraud. |
| 10 | If you have a fraud, you get money you shouldn't have, you |
| 11 | shouldn't have a special charge.  It just complicates things |
| 12 | unnecessarily. |
| 13 | MS. SCHOENBERGER:  The government has no objection to |
| 14 | withdrawing that claim. |
| 15 | THE COURT:  Good.  We have the false claims and the |
| 16 | false records.  With regard to the admissions, they're |
| 17 | relevant.  They show intent and they come in.  I would like to |
| 18 | see the transcripts, though.  In openings the government should |
| 19 | not be playing any records.  It can tell the jury what it |
| 20 | expects to prove by way of admissions and tell the jury they'll |
| 21 | be able to hear it if you want to do that, but they will not be |
| 22 | played. |
| 23 | Are there any other demonstrative pieces of evidence |
| 24 | that will be shown to the jury by either side? |
| 25 | By the government? |

F4FJUSA1

1            MS. BLAIN:  Not from the government, your Honor.

2            THE COURT:  By the defense?

3            MS. SCHEIN:  No, your Honor.

4            THE COURT:  Good.  You know that your time is limited

5     to 20 hours a side.  Each side knows that?

6            MS. BLAIN:  Yes, your Honor.

7            THE COURT:  Ms. Shine?

8            MS. SCHEIN:  Yes, your Honor.

9            THE COURT:  Mr. Futerfas?

10            MR. FUTERFAS:  Yes, your Honor.

11            THE COURT:  Ms. Jones will keep the time and you

12     should compare your notes at the end of each day.

13            The transcripts?

14            MS. SCHOENBERGER:  If we may provide transcripts a

15     little later in the week.  We don't anticipate presenting this

16     evidence until the end of our witness lineup, and the

17     government and the defendant are still discussing which

18     excerpts will be played.

19            THE COURT:  Why does the government need the defense's

20     consent to play admissions?

21            It is a matter of four minutes, I am told?

22            MS. SCHOENBERGER:  That's right.  We don't believe we

23     need any consent.  It is our understanding the defendant would

24     also like to play certain excerpts, and I believe by Thursday

25     we can provide transcripts for your Honor.

F4FJUSA1

1          THE COURT:  Very well.  Anything else anybody needs?

2          Thanks.

3          MS. SCHEIN:  Your Honor, just one question with regard

4     to the voir dire.  We reviewed the questions for each juror

5     that your Honor has to give to the jury, but also we submitted

6     some questions.

7          THE COURT:  Also what?

8          MS. SCHEIN:  We submitted some questions.

9          THE COURT:  I know you did.

10         MS. SCHEIN:  We would like to know whether those

11    questions will be asked of the prospective jurors?

12         THE COURT:  I'll give you a chance to object or add

13    before we get to this part.

14         MS. SCHEIN:  Thank you.

15         THE COURT:  You'll have a chance to object or to add.

16    I tried to incorporate whatever is relevant without the

17    buttering-up questions.  Mr. Futerfas knows what I mean by the

18    buttering-up questions.

19         MR. FUTERFAS:  Yes.

20         (Off-the-record discussion)

21         THE COURT:  Ms. Jones wants each of you to keep the

22    time as well in case she is drawn off into something else to

23    do.

24         (Pause)

25         MS. BLAIN:  Your Honor, just a quick question for

F4FJUSA1

1      clarification purposes?

2                  THE COURT:  Yes.

3                  MS. BLAIN:  In the opening can we refer to quotes from

4      the tapes that we intend to play to the jury?  We just can't

5      play the tapes?  Is that your Honor's ruling?

6                  THE COURT:  You can use the quotes, yes.

7                  MS. BLAIN:  Okay, thank you.

8                  THE COURT:  Ms. Schein, how do you pronounce your

9      client's name?

10                 MS. SCHEIN:  Mr. Saavedra, Alex Saavedra.

11                 THE COURT:  Saavedra?

12                 MS. SCHEIN:  Yes.

13                 MR. FUTERFAS:  Your Honor, I have one other

14     housekeeping matter.  The letter we sent your Honor was just

15     that for the purposes of during the trial, our two associates,

16     Ms. Resnick and Matthew McCann may from time to time join us

17     during the trial, and we wanted them here just for jury

18     selection so the jury can eyeball them.

19                 THE COURT:  They will be identified.

20                 MR. FUTERFAS:  Thank you.

21                 THE COURT:  Ms. Schoenberger and Ms. Schein, shouldn't

22     we refer to the case as United States against Saavedra?

23                 MS. SCHOENBERGER:  Yes, your Honor.

24                 THE COURT:  Shouldn't we reform the caption?  The jury

25     does not need to know about any other defendant or what

F4FJUSA1

1    happened to any other defendant.

2              MS. SCHEIN:  Yes, your Honor.

3              THE COURT:  I will give them an instruction it is not

4    their business.

5              MS. SCHEIN:  Thank you.

6              MS. SCHOENBERGER:  That's right, your Honor.

7              THE COURT:  The caption is reformed to read the United

8    States versus -- what is Mr. Saavedra's first name?

9              MS. SCHEIN:  Alex.

10             THE COURT:  Alex Saavedra?  His full name?

11             MS. SCHEIN:  Alexandro Saavedra.

12             THE COURT:  A L E X A N D R 0, right?

13             MS. SCHEIN:  Yes.

14             MS. SCHOENBERGER:  Your Honor, we agree that is an

15   appropriate change for the caption.  Some of our witnesses are

16   former defendants in this case.  Is there any problem with them

17   saying they're former defendants in this case?

18             THE COURT:  If you don't ask them, I am sure Ms.

19   Schein will, so I am sure the answer is no.  Is that okay, Ms.

20   Schein, or would you prefer they not be mentioned by title?

21             MS. SCHEIN:  Your Honor, that is fine.

22             (Off-the-record conversation)

23             (Jury voir dire was reported and can be found under

24   separate cover)

25             (Continued on next page)

F4dnusa2

1                   (A jury of eight persons was duly selected and sworn)

2                   THE COURT:  So let me go over the claims again and

3          give you a few remarks, excuse you for lunch, and we'll start

4          the trial with openings this afternoon after lunch.

5                   The plaintiff has made two distinct allegations

6          against the defendant Alexander Saavedra.  The first allegation

7          is that the defendant knowingly presented or caused to be

8          presented false and fraudulent claims for payment to the United

9          States or its affiliate.  It doesn't have to go directly to the

10         United States.  It can go indirectly to the United States for

11         funds going back to the United States.

12                  The defendant denies that false and fraudulent claims

13         for payment were presented to the United States or its agent or

14         affiliate.

15                  The defendant further denies, if false and fraudulent

16         claims were presented for payment, that he had any knowledge of

17         them.

18                  There's two broad issues:  Whether the claims were

19         false, and the defendant had knowledge or what amounts to the

20         same thing, willfully closing your eyes to the knowledge.

21                  That's the first set of allegations.

22                  The second set of allegations is that the defendant

23         Saavedra knowingly caused false records or statements to be

24         made which were material or important to a false or fraudulent

25         claim to the United States or its affiliate.

F4dnusa2

1          The defendant denies that false records or statements

2     were made which were material to a false or fraudulent claim to

3     the United States or its affiliate.

4          The defendant also denies that, if false records and

5     statements were made, he had any knowledge of them.  So, first,

6     were there false records or statements?  Were they important

7     for getting money?  Did defendant know about it?  Three sets of

8     issues.  Two broad claims, two or three sets of issues with

9     each.

10          Those issues will be decided by you according to the

11     instructions I give you at the end of the case and the evidence

12     that's presented.

13          Evidence comes from witnesses.  What lawyers say, what

14     I say is not evidence.  They will give you opening statements

15     of what they intend to prove.  That's not evidence.  They are

16     going to give you summations at the end of the case of what

17     they think they proved.  That's not evidence.

18          The evidence is what the witnesses say and what the

19     documents that are admitted into evidence say and whatever

20     inferences you can take from those.  That's going to be your

21     job and only your job.

22          I will give you guidance and instructions, but you

23     have to make up your minds about the evidence.  That's why it's

24     so important that you be fair and impartial and keep an open

25     mind until the very end of the case.

F4dnusa2

1          Broadly speaking, there are two kinds of evidence:

2     Direct evidence and circumstantial evidence.  Direct evidence

3     is what a witness sees or hears.  That's direct.

4     Circumstantial evidence is that what is unique to reason from

5     to get to a point.  There's no rule that makes one more

6     important than the other or says one is a better kind than

7     another.  Each category of evidence has its strengths and its

8     weaknesses.  Your job is to take and consider all the evidence

9     in the case, decide under my instructions who has the burden of

10    proof, and ask yourself, has that party satisfied the burden of

11    proof.

12          The burden of proof is by a preponderance of the

13    evidence.  If you keep in mind as an example the weights on a

14    scale, if they are tipped so slightly, that is a preponderance

15    of the evidence.

16          A lot depends, of course, on whether you believe

17    witnesses, the issues of credibility.  Is the witness telling

18    the truth or trying to shade the truth in some way?  Testifying

19    in court with some kind of agenda or purpose, or candidly and

20    openly, as best the witness saw or heard?

21          I will give you instructions on that and all other

22    issues.  That's your charge, to find the truth, who's telling

23    you the truth.  Keep an open mind.  Don't discuss the case

24    amongst yourselves or with anyone else.  Keep an open mind, as

25    many times as I repeat that, that will be important.  No

F4dnusa2

private research, no newspapers accounting for this case, no

radio, only what the witnesses and the documents say.

Don't ask any relatives or friends to come see the

trial.  It's not a showpiece.  It is a serious business that we

are asking you to do.

We will be giving you notebooks and pens.  Those of

you who wish to take notes, please feel free to do so.  At the

end of the case and at each recess, we will take back the

notes.  We will keep them for you during the case.  At the end

of the case we will destroy all the notes.

The notes are there to help you pay attention, to help

you remember during the case.  But they are not to be used to

prove a point to anyone else.  They are not for any

recollection or souvenir.  They are there to help you.  They

are here to help you remember.  If you need to remember what a

witness said more accurately or what I said more accurately,

you ask for a readback, and we'll get it back to you.

So the notes are to help a person who takes the notes.

Don't feel compelled to take notes.  Note-taking is an art.

Some people do better just by listening; others do better by

trying to take notes of whatever people say, and you do it to

whatever degree you want to.

We will start each day at 10 o'clock or, if there's

something up, I'll let you know.  Otherwise, it is a 10 o'clock

start.

F4dnusa2

1          We cannot start unless each and every one of you is

2     here.  If you're late, everyone has to wait.  That goes for the

3     lawyers, it goes for each juror, it goes for me.  I would like

4     to be starting on time and finishing on time and being

5     efficient and fair in running this case.

6          There will be no sidebars unless I need it.  If a

7     lawyers asks for a sidebar, chances are I won't give it to him.

8     It's the lawyer's job to bring to me the issues that need to be

9     discussed before you are around so we don't take up your time.

10          The trial will go smoothly.  If the lawyer has an

11     objection, the word is "objection," no explanations.  If I need

12     any explanation, I will ask for it.  If I don't need it, I

13     won't ask for it.  The lawyers will not make speeches to you.

14          They will be timed.  They each have 20 hours to

15     present their case or to cross-examine in support of their

16     case.  When they get up, the time runs.  So they will be

17     efficient, too.

18          I promise you a good trial and a fair trial.

19     Ms. Jones will come in to the jury room with you.  She will

20     tell you what number to call if you're held up in some fashion

21     so we know what is going on.  You will have our number, and we

22     will have your numbers.

23          It is now 12:30.  Let's start at a quarter to 2.  Come

24     back at quarter to 2, and we'll start with the openings.  The

25     government will start first.  Who is going to do it?

F4dnusa2

1              MS. BLAIN:  I am, your Honor.

2              THE COURT:  Ms. Blain.

3              Who is going to do it for the defendant?

4              MS. SCHOENBERGER:  I will, your Honor.

5              THE COURT:  Ms. Schein.  They have no time limits, but

6    the time they take is used against them.  What they will say is

7    what they intend to prove.  It's not going to be a summation.

8    It's not going to be an argument.  It's going to be giving you

9    an outlook of what they intend to prove so you are going to

10   have context about the case.

11             After the openings we go into the evidence.  The

12   openings themselves are not evidence.  They are what the

13   lawyers think they will be able to prove with the evidence.

14             All right.

15             Any further questions?

16             JUROR:  Do we come here each morning?

17             THE COURT:  Yes.  Come back and assemble in the jury

18   room.  Don't linger in the lobbies.

19             JUROR:  In here?

20             THE COURT:  As soon as you come in, you come in, we'll

21   try to have coffee for you, and wait in the jury room itself.

22             JUROR:  The jury room downstairs?

23             THE COURT:  Here.

24             THE DEPUTY CLERK:  I will tell them everything.

25             THE COURT:  Ms. Jones will tell you everything.

F4dnusa2

1              You're excused.

2              JUROR:  Is it going to be easier for us to get past

3       the screening when we come in?  Quicker?

4              THE COURT:  No, you don't get any special excuse for

5       the screening.  But leave time.  You can't count on public

6       transportation or private transportation.  Give yourself time.

7              (Jury not present)

8              (Luncheon recess)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F4dnusa2

```
 1                    A F T E R N O O N    S E S S I O N

 2                           (1:50 p.m.)

 3             MS. SCHOENBERGER:  Your Honor, I had one question

 4   before the jury enters.

 5             THE COURT:  Everybody, please be seated.

 6             MS. SCHOENBERGER:  The government's first witness will

 7   be Alan Katz.  Alan Katz is a former defendant in the case.  I

 8   anticipate asking him if he is a former defendant, how his case

 9   ended, and if he admitted wrongdoing as part of his settlement

10   to end the case.  I just wanted to make sure that that didn't

11   run counter to anything that the judge ruled with respect to

12   the case caption this morning.

13             THE COURT:  I don't remember.  Ms. Schein?

14             MS. SCHEIN:  No, your Honor, it does not.  Thank you.

15             MS. SCHOENBERGER:  Your Honor, just a practical

16   matter.  We have two binders of exhibits.  These are not all

17   for one witness, but I was just wondering if I could put them

18   up on the witness box before the witness gets there.

19             THE COURT:  Yes.

20             MS. SCHOENBERGER:  Thank you.

21             THE COURT:  Do we have copies?

22             MS. SCHOENBERGER:  Yes, on the front ledge there.

23             THE COURT:  Are you going to display them also?

24             MS. SCHOENBERGER:  Yes.  And we are going to display

25   them electronically.  We have provided a set for the defense
```

F4dnusa2

1   table as well.

2          THE DEPUTY CLERK:  Are you ready, Judge?

3          THE COURT:  Ready.

4          (Jury present)

5          THE COURT:  Ms. Blain, will now deliver her opening.

6          MS. BLAIN:  Thank you, your Honor.

7          Good afternoon, ladies and gentlemen, and may it

8   please the Court.  My name is Ellen Blain.  I am an assistant

9   United States Attorney here in the Southern District of New

10  York.  And I, along with my colleague Carina Schoenberger and

11  our assistant Harry Solomon, represent the United States.

12         This is a case about lies.  It is about one company

13  lying over and over and over again in order to get money from

14  the federal government.

15         It's about the man in charge, the man who knew about

16  these lies, the man who encouraged the employees he supervised

17  to lie, the man who let the lies continue.

18         As you will hear, the defendant, Alex Saavedra, was a

19  director at a company called SEEDCO, as the Court already

20  explained.  SEEDCO stands for Structured Employment Economic

21  Development Corporation.  SEEDCO got millions of dollars from

22  the federal government, almost $12 million to help New Yorkers

23  find jobs or find better jobs.

24         And what did the government get in return?  Lies.

25  Lies about the number of people SEEDCO helped.  Lies designed

F4dnusa2                         Opening – Ms. Blain

1    to inflate the number of people SEEDCO helped so that SEEDCO

2    could get more money from the federal government, lies that the

3    defendant knew about and encouraged.

4           That's why we are here today, ladies and gentlemen.

5    The money in this case came from the federal government and

6    then it went to New York State and then it went to New York

7    City, and when it came to New York City it went to an agency

8    called the New York City Department of Small Business Services,

9    SBS.  When SBS got that money, it gave it to companies like

10   SEEDCO to help people find jobs.

11          SEEDCO ran career centers.  You will hear that the

12   number-one purpose of these career centers was to help people

13   find jobs or find better jobs.  Alex Saavedra was the director

14   of two of these career centers, one up in Harlem and one

15   further up in the Bronx.

16          Unemployed New Yorkers went to these career centers

17   for help getting jobs or help getting better jobs.  Again, that

18   was the number-one purpose of these centers.

19          Here's how the process was supposed to work.  A New

20   Yorker would come into the center, fill out a form, list his

21   name, where he works or where he last worked, and a SEEDCO

22   staff member would take that information and put it into an

23   electronic database called Worksource1.  Later, if SEEDCO

24   helped that person get a job or a better job, a SEEDCO staff

25   member would fill out another form with the new job

F4dnusa2                          Opening – Ms. Blain

1    information, the new job, or the better job, and also enter

2    that information into the database called Worksource1.  That

3    counted as a job placement.  Job placements were important to

4    SEEDCO because that's why SEEDCO got paid.

5              (Continued on next page)

1          SBS, that New York City agency, required SEEDCO to

2     place a certain number of people in jobs every quarter or every

3     three months.  In the end each of these three months SBS would

4     look into that database and total the number of people SEEDCO

5     claimed they had helped and pay SEEDCO in part based on that

6     number.  That is how the process was supposed to work, and

7     here's what the evidence will show about how it actually

8     worked.

9          SEEDCO employees lied.  You will hear witnesses on the

10    stand tell you that they just lied about the number of people

11    SEEDCO helped and they did this by taking information that jobs

12    seekers first gave to SEEDCO and changing it by entering fake

13    information into that database, the Workforce1 database.

14         You will hear witnesses tell you when a job seeker

15    cake into SEEDCO, SEEDCO staff reported to SBS through

16    Workforce1 that that person's last job, the job the person

17    doesn't have any more, the job the person got way before going

18    to SEEDCO for help, was actually that person's current job and

19    that SEEDCO helped them get it.  That is a lie.

20         You will also hear witnesses tell you that when job

21    seekers came into SEEDCO, SEEDCO staff reported that that

22    person's current job the person also got before going to SEEDCO

23    for help to get a better job was actually a job that SEEDCO

24    helped them get.  So that is another lie.

25         And you will hear witnesses on the stand tell you that

F4FJUSA3                          Opening - Blain

they did this a lot, that almost half of the job placements

they reported were fake, and the evidence will show that the

defendant, the boss, the man in charge knew about this, that he

knew that his employees were submitting fake information into

Workforce1 to the government.

You may hear defendant say that he didn't actually

know what his employees were doing, that he was too busy to pay

any attention, but here is what the evidence will show.  You

will hear from members of his staff, you will hear first from

Alan Katz later today.  Alan Katz reported directly to the

defendant, and you will hear Mr. Katz tell you that he, Alan

Katz, directed his team to lie, and that he talked about those

lies openly in SEEDCO career centers.

You will then hear from Ana Yatiz-Bryant, who will

tell you she actually entered that fake information into

Workforce1 and that she did that a lot, almost half again of

those entries she will tell you were fake.

You will hear from Kimberly Nesmith, who was

Mr. Saavedra's administrative assistant, and Ms. Nesmith will

tell you the defendant had her also enter fake information into

Workforce1.

You will hear from Mitchell McClinton.  Mitchell

McClinton also reported directly to the defendant, and you will

hear Mr. McClinton tell you that the defendant told him to

deceive SBS, to deceive that New York City agency, and you will

F4FJUSA3                        Opening – Blain

1   hear audio recordings of Mr. Saavedra telling Mitchell

2   McClinton to deceive SBS, to quote, tell Mr. McClinton to take

3   an acting class because Mr. McClinton was, quote, very honest

4   and had to learn to, quote, finesse the art of bullshit.

5          You will see the defendant received e-mails that lied

6   about job placement as openly as possible.  You will see

7   evidence and hear testimony the defendant attended meetings and

8   led meetings in which the process was openly discussed.  You

9   will see e-mails and hear testimony the defendant was extremely

10  focused on hitting those numbers and hitting those targets in

11  any way possible.

12         You will hear evidence and see e-mails that he

13  constantly pressured his staff to do it.  So, ladies and

14  gentlemen, the evidence will show that the defendant knew what

15  his staff was doing, what was going on in his centers, on his

16  watch, under his nose.  Even though he knew about this rampant

17  practice going on in his centers, on his watch, under his nose,

18  he simply looked the other way.

19         You will hear when New York City found out about it,

20  they ended its relationship with SEEDCO because the government

21  cares about truthful, accurate reporting from companies like

22  SEEDCO who were supposed to help New Yorkers in need.

23         Now, let me be clear about one more thing.  We expect

24  you'll hear evidence about a company called Charney Research.

25  The defendant may say that he didn't know that his staff was

F4FJUSA3                          Opening – Blain

1    entering that fake information into the database because this

2    other company, Charney Research, was calling every single

3    person who SEEDCO claimed to help out.  That is what you may

4    hear the defendant say, but here's what the evidence will show.

5         First, it doesn't matter whether this other company, a

6    company hired by SBS failed to discover the lies because the

7    lies actually happened.  You will know that the lies actually

8    happened because you will hear people tell you that they lied.

9         Second, the evidence will show that Charney Research

10   didn't actually call every single person that SEEDCO claimed to

11   have helped, and the defendant knows that.

12        Finally, whatever this other company was doing doesn't

13   change the fact that SBS needed that information, that

14   information from Workforce1 to be accurate, to be true, that

15   SBS cared and that that information mattered.

16        The evidence will show that the defendant knew about

17   these lies.  He was the supervisor.  He was the director.  He

18   was the boss.  He cared more about meeting those numbers on

19   paper than he did in real life because the more people SEEDCO

20   claimed to help, the more money it got.  While defendant's

21   company was lying to the federal government, the federal

22   government paid SEEDCO millions of dollars.

23        Before I sit down, ladies and gentlemen, I just want

24   to thank you.  Thank you for your service, which we all

25   appreciate it.  I know it is a sacrifice, so we thank you for

F4FJUSA3                        Opening - Blain

1  being here today.

2         As the court told you, the United States has brought

3  this case against the defendant under the False Claims Act.  As

4  you listen to the evidence and go through the trial, we ask

5  that you do three things:

6         First, please listen carefully to the witnesses as

7  they testify and pay close attention to the other evidence as

8  it comes in.  The evidence, as you know, will come in one

9  exhibit at any time and the witnesses will testify one at a

10 time, so it may not come in in chronological order.  At the

11 end, we will get a chance to come up again and tell you and put

12 it altogether.

13        Second, please pay close attention to the court's

14 instructions.  At the end of the evidence you will deliberate,

15 and the judge will give you detailed instructions, as he

16 already told you, on what you're supposed to do.  We ask that

17 you just listen carefully to those instructions.

18        Finally, we ask that you just use your common sense,

19 the same common sense you use every day, and that is the most

20 important asset you can bring to your service today and in the

21 days to follow as a juror.

22        If you do these three things, at the end of the

23 evidence you will see that SEEDCO lied to the government and

24 that Alex Saavedra knew about it.  At that time we'll stand up

25 before you again and request that you return a verdict that is

F4FJUSA3                          Opening - Blain

1   consistent with the evidence you will have heard in this case,

2   a verdict that the defendant is liable.

3                Thank you.

4                THE COURT:  Ms. Schein.

5                MS. SCHEIN:  Yes, thank you.  May I address the jury

6   from here?

7                THE COURT:  Yes.

8                MS. SCHEIN:  May it please the court.  My name is

9   Bettina Schein, and I along with Alan Futerfas and Marisa

10  Alberti, who is assisting us, represent the defendant Alex

11  Saavedra.  You heard the government give a preview of our case.

12  Now I am going to give you a preview of what the evidence will

13  show on behalf of Alex Saavedra.

14               Alex Saavedra was raised in Albuquerque, New Mexico, a

15  modest home, and came to New York in 1992 to attend Columbia

16  University on a full scholarship.  He earned his masters degree

17  in public planning and in 2001 he was hired by SEEDCO.

18               SEEDCO, as you heard, is -- I want to get this right,

19  Structured Employment Economic Development Corporation.  It is

20  a not-for-profit.  It began as an antipoverty think tank which

21  designed innovative programs to assist people and businesses in

22  economically disadvantaged areas.  Mr. Saavedra was hired as a

23  program associate, and his job at the time was to assist in

24  writing antipoverty programs to assist people and also to write

25  grants to fund these programs.

F4FJUSA3                         Opening - Schein

1           One example of a program, just to give you a brief

2   example of one of the programs he designed, was a program that

3   provided for federal funding for people who were working at low

4   wage jobs, to be able to get to their jobs in an industrial

5   park in Brooklyn which no subway or bus reached.

6           In 2004, SEEDCO was awarded the contract to run the

7   Upper Manhattan Workforce1 Center.  SEEDCO offered the position

8   of directorship of that center to Alex Saavedra.  He accepted

9   the offer, and he was then opening the center, instituting all

10  the programs required by the investment act, and Workforce1

11  center was funded, as you heard the government tell you, by the

12  United States pursuant to the Work Investment Act.

13          That Act, the Act of 1988, that Act, the evidence will

14  show, was for the creation of a One-Stop center which would

15  provide all of the federally funded programs under one roof.

16  That is whay it was called One-Stop.

17          You'll hear testimony that the purpose of the

18  Workforce Investment Act is to provide workforce investment

19  activities that increased employment, retention and earnings of

20  participants and increase the occupational skill attainment,

21  thereby improving the quality of the workforce, reducing

22  welfare dependency and enhancing the productivity of the United

23  States.

24          In accordance with the Workforce Investment Act and

25  the contract, the SEEDCO contract, you'll learn that

F4FJUSA3                         Opening - Schein

 1    Mr. Saavedra's responsibilities encompassed implementation and

 2    management of all the programs in the workforce center.  You

 3    heard from the government Mr. Saavedra knew about the entry of

 4    false placements.

 5           What the credible evidence will show is that

 6    Mr. Saavedra had no knowledge about the entry of false

 7    placements into the Workforce1 data system at SEEDCO, and the

 8    evidence will show Mr. Saavedra worked very, very hard managing

 9    the Workforce1 center, and he built it into a very productive,

10    successful and highly regarded workforce center.  That is what

11    the evidence will show.

12           In 2007, while Mr. Saavedra remained the director of

13    the workforce center, he was asked by SEEDCO to become the vice

14    president there.  His responsibilities increased and he was

15    also charged with overseeing some of SEEDCO's citywide

16    antipoverty programs as well as continuing to be the director

17    of the Upper Manhattan Workforce.

18           You'll hear testimony as well that after 2007, 2008,

19    2009, 2010, that he continued his work as director and also

20    directed his efforts at building strong relationships with the

21    community-based organizations and community stakeholders in the

22    area.  These stakeholders included local council members,

23    elected officials, community-based organizations, CUNY and

24    Borough of Manhattan Community College, and also the

25    development of the very large shopping mall on the East River

F4FJUSA3                        Opening – Schein

 1   drive called the East River Project.

 2           Mr. Saavedra's responsibilities also included

 3   overseeing the Upper Manhattan Workforce Center.  At that

 4   center you will hear evidence that the Upper Manhattan

 5   Workforce Center in 2010 alone helped 6,000 people find jobs.

 6   The evidence will show in 2010 alone, 6,000 people.  You will

 7   hear about that.

 8           Some of the programs that Mr. Saavedra oversaw as

 9   director of the Upper Manhattan Workforce Center were programs

10   called the Earned Benefits Program, and this program assisted

11   people who were in minimum wage jobs and it helped them have

12   access to public assistant stipends.  Some of these stipends

13   provided for extra money for heating bills, for child care and

14   also for supplemental nutrition assistance programs.

15           Mr. Saavedra also -- and that was in order to help

16   people who were working at these low wage jobs make ends

17   meet -- Mr. Saavedra oversaw also the Individual Training Grant

18   Program.  There this program paid for the tuition of people who

19   were taking special courses at some of the community, city

20   community colleges so that they could qualify for jobs in

21   certain sectors such as the health care center and medical

22   technician care.  There were also workshops for people who were

23   seeking promotions and raises at work.

24           When a person first walked into the Upper Manhattan

25   Workforce Center, they'd go to the intake department.  They'd

F4FJUSA3                          Opening – Schein

1    get an orientation and then they would fill out a customer

2    information form, you heard the government talk about those,

3    and then they would be sent to one of three departments.  They

4    would either be sent to the Earned Benefits Department if they

5    needed assistance, financial assistance to make ends meet.

6    They would be sent to the Career Advisement Department.  That

7    department would provide them with interview skill help, resume

8    drafting and computer workshops and things of that nature to

9    help build their skills to find work.

10           If the person had skills, they would be sent to -- and

11   there was a job opening for them -- they would be sent to a

12   place called the Recruitment & Placement Department.  That

13   department recruited salespeople.  People in the Recruitment &

14   Placement Department sold -- when I say "sold," there was no

15   cost to the employers, but they offered the staffing services

16   of SEEDCO to different employers.

17           To do that, if an employer, large employer, wanted the

18   assistance of SEEDCO, they would organize, advertise and

19   conduct pre-screening services at SEEDCO to pre-screen people

20   who came in to see if they were suitable for the job openings

21   at these large employer's companies.  Some of the large

22   employers who used the staffing services of SEEDCO were

23   companies such as Fairway, Century 21, the Panco TBN as well as

24   a large market called Italy.

25           In fact, the company Italy which is located in

1    Manhattan, a large restaurant and marketplace, they used the

2    services of SEEDCO in developing the market before it opened,

3    and SEEDCO assisted them in finding staff to work in all the

4    marketplaces and restaurants there so they could open on time.

5            In addition to all these responsibilities, you'll also

6    hear testimony that in 2010 Mr. Saavedra was also responsible

7    for and tasked with writing up requests for proposal along with

8    a group of people at the SEEDCO headquarters downtown to

9    operate the workforce center in the Bronx.  They did that.

10   SEEDCO was awarded the contract, and Mr. Saavedra was given the

11   responsibility of opening the Bronx workforce center.  He did

12   so in merely four months so that as the contract required, the

13   center could open January 1st, 2011.

14           You'll hear witnesses testify about entering improper

15   placements into the workforce database.  You will hear no

16   credible evidence from any witness that Mr. Saavedra knew that

17   anyone intentionally entered falls placements into the work

18   source database.  You will also hear a recording that someone

19   made of Mr. Saavedra and you'll hear some salty language in

20   that recording, but you will hear that the recording has

21   absolutely nothing to do with the entry of false placements.

22           You will also hear testimony that SBS entered into a

23   contract with Charney Research.  You'll hear testimony that not

24   only did Mr. Saavedra have no knowledge about the entry of any

25   false placements, you will hear that Mr. Saavedra knew that

F4FJUSA3                        Opening - Schein

1   each and every placement that was entered into the work source

2   roster was verified by Charney Research.  The testimony you

3   will hear will show that each and every placement was verified.

4   If the placement was not verified, it was not considered by SBS

5   and put into the calculations for the performance-based metric

6   that was then turned into the claim for payment.  All of the

7   placements were verified, and Mr. Saavedra knew that the

8   placements were verified.

9       You will hear testimony that the contract that SBS

10  entered into with Charney Research provided -- this is SBS, the

11  city contract provided that Charney Research will call everyone

12  on the work source roster, the data of the people who were

13  entered into as placed, called everyone.  In fact, you will

14  hear they called the numbers.  If they couldn't reach them the

15  first time, they called them, you will hear the testimony,

16  twelve times, and that it was only after Charney verified the

17  placements that the number of job placements would then be

18  calculated and put into the verified placement metrics that SBS

19  had created.

20      SBS created a formula where they put in that metric,

21  verified placements, and that was how they determined what the

22  amount of the claim you'll hear about for performance-based

23  payments, and that was the part of the contract you'll hear

24  testimony about that, that concerned placements, and those

25  placements were verified previously by Charney.

F4FJUSA3                         Opening – Schein

1             Based on all the evidence that you'll hear, I am

2    confident that at the end of the case when the defense gets up

3    to give you our summation, after you hear all of the witnesses

4    testify and viewed all of the evidence that is put in, you will

5    find that Alex Saavedra worked tirelessly to help people, that

6    he had no knowledge that any staff member entered false

7    placements into the work source 1 data system and that you will

8    return a verdict for Mr. Saavedra of not liable of the two

9    claims the United States Government has brought against him.

10            THE COURT:  Thank you, Ms. Schein.

11            MS. SCHEIN:  Thank you for your attention and your

12   service.

13            THE COURT:  The government's first witness is Alan

14   Katz.

15    ALAN STEPHEN KATZ,

16        called as a witness by the Government,

17        having been duly sworn, testified as follows:

18   DIRECT EXAMINATION

19   BY MS. SCHOENBERGER:

20   Q.  Good afternoon, Mr. Katz.

21   A.  Good afternoon.

22   Q.  Mr. Katz, did you ever work for an organization called

23   Structured Employment Economic Development Corporation?

24   A.  Yes.

25   Q.  Was that called SEEDCO for short?

F4FJUSA3                          Katz - direct

1     A.  Yes.

2     Q.  When did you work at SEEDCO?

3     A.  From August 2009 to October 2011.

4     Q.  What kind of work did SEEDCO do?

5     A.  It helped disadvantaged individuals with work supports and

6     family supports and helped them achieve self-sufficiency.

7     Q.  When you started at SEEDCO in 2009, what was your role?

8     A.  My role was senior account manager.

9     Q.  What were your responsibilities as a senior account

10    manager?

11    A.  It was to oversee the recruitment and placement team, team

12    of recruiters and account managers.

13    Q.  What did it mean to oversee that team?

14    A.  To supervise the team.

15    Q.  What did the team do?

16    A.  They assisted candidates in securing job opportunities

17    throughout Manhattan, throughout the city.

18    Q.  Who did you report to at that time?

19    A.  I reported to Alex Saavedra.

20    Q.  Did you report directly to him?

21    A.  Yes.

22    Q.  What was Mr. Saavedra's role at that time?

23    A.  He was the vice president, center director of the Upper

24    Manhattan Workforce1 Career Center.

25    Q.  What is a Workforce1 Career Center?

F4FJUSA3                         Katz – direct

1   A.   Workforce1 Career Center are centers throughout the city,

2   throughout the city overseen by the Department of Small

3   Business Services that assist individuals within the

4   communities with various work supports and help them connect

5   them with employment.

6   Q.   You mentioned the Department of Small Business Services.

7   Is that known also as SBS?

8   A.   Yes.

9   Q.   Do you have an understanding of what SBS was?

10  A.   They oversaw each of the Workforce1 career centers within

11  the boroughs, within all the boroughs, so they awarded

12  contracts to the different vendors.

13  Q.   In October 2009 when you started at SEEDCO, how many

14  Workforce1 centers did SEEDCO operate?

15  A.   I started in August 2009.

16  Q.   Where was that located?

17  A.   Upper Manhattan, 125th Street.

18  Q.   How many people worked at that Workforce1 Career Center at

19  the time?

20  A.   Approximately 40, 45.

21  Q.   How many people did you oversee as senior account manager?

22  A.   Initially, six recruiters, six recruiters and a couple of

23  operations assistants.

24  Q.   What is a recruiter?

25  A.   Account management for fulfillment.  They meet with

F4FJUSA3                          Katz – direct

1    candidates, they screen job seekers that come through the

2    center and refer them to job opportunities.

3    Q.   What is an operations assistant?

4    A.   It is an administrative assistant that supports the

5    recruitment placement team.

6    Q.   Did your title ever change while you were at SEEDCO?

7    A.   It did, it changed, but it was the same job, so it was a

8    senior account manager and then a business services manager.

9    Q.   When did you get the title of business services manager?

10   A.   Some time in 2010.

11   Q.   Did your job responsibilities change at all when you became

12   the business services manager?

13   A.   No.

14   Q.   Who did you report to when you were the business services

15   manager?

16   A.   Alex Saavedra.

17   Q.   Was his role the same?

18   A.   Yes.

19   Q.   What was his role?

20   A.   The vice president, center director Upper Manhattan.

21   Q.   Was there anyone with a higher managerial level at the

22   Upper Manhattan career center than Mr. Saavedra?

23   A.   No.

24   Q.   Did your location of where you worked change at any time?

25   A.   It did in 2011, 1-1-2011.

F4FJUSA3                          Katz - direct

1    Q.  January 1, 2011?

2    A.  Yes.

3    Q.  Where did your location change to?

4    A.  The Bronx Workforce1 Career Center.

5    Q.  At that point how many Workforce1 career centers did SEEDCO

6    operate?

7    A.  We operated two centers, two large centers.

8    Q.  Did SEEDCO still operate the Upper Manhattan center?

9    A.  Yes.

10   Q.  And also the Bronx center?

11   A.  Yes.

12   Q.  Who did you report to in the Bronx?

13   A.  To Alex Saavedra for nine months, my tenure there in the

14   Bronx, and then Tage Chandarpaul the last couple of months.

15   Q.  When you were in the Bronx and reported to Mr. Saavedra,

16   was he the highest level manager in the center?

17   A.  In the Bronx, yes.

18   Q.  Why did you leave SEEDCO in October of 2011?

19   A.  I was terminated.

20   Q.  Do you have an understanding as to why you were terminated?

21   A.  Yes.

22   Q.  What is your understanding?

23   A.  My involvement in improper placements throughout the

24   workforce center in Manhattan and the Bronx.

25   Q.  Can you explain a little more what you mean by that.

F4FJUSA3                        Katz - direct

1    A.  Sure.  There was an investigation.  There was a whistle

2    blower that came forward with claims of improprieties at the

3    Workforce1 center, and that spawned an investigation into

4    hiring practices and placement practices throughout the center.

5    Q.  Before we get to that, let me ask you, in your job at

6    SEEDCO, did you become familiar with the term "placement

7    targets"?

8    A.  Yes.

9    Q.  What does the term "placement target" refer to?

10   A.  They're quarterly placement goals that the recruitment

11   placement team needs to attain.

12   Q.  Do you know where the targets came from?

13   A.  From SBS.

14   Q.  How do you know that?

15   A.  Each quarter we were given targets through SBS.

16   Q.  How were those targets communicated to you?

17   A.  I don't recall how they're communicated to us, the e-mail

18   or -- I am not sure.

19   Q.  Did you have an understanding as to the purpose of having a

20   job placement targets?

21   A.  Would you repeat the question.

22   Q.  Did you have an understanding as to the purpose of having

23   job placement targets?

24   A.  The purpose, yes.

25   Q.  What was your understanding?

F4FJUSA3                          Katz - direct

1    A.  We need to exceed these targets every quarter, so each

2    center throughout the city was given targets that they had to

3    meet on a quarterly basis, and we just had to place a certain

4    number of job applicants into positions.

5    Q.  Do you recall approximately what a job placement target

6    would be for a quarter?

7    A.  1200 towards the end of my tenure there, 1200, 1300.

8    Q.  Was achieving placement targets a significant part of your

9    job?

10   A.  It was my job.  Yes, that was my job.

11   Q.  Did SEEDCO keep track of its job placements?

12   A.  Yes, yes.

13   Q.  How did it do that?

14   A.  We kept track of job placements through a system called the

15   Work Source1 System.

16   Q.  What is the Work Source1 System?

17   A.  It is an applicant system that tracks job seekers or anyone

18   for that matter who comes into the Workforce1 Career Center.

19          So everyone that comes through the doors, they're

20   registered with the career center so they can obtain free

21   services such as career advisement, recruitment.  They can

22   utilize the computer labs throughout the whole city.

23   Q.  Do you have an understanding as to who had access to the

24   Work Source1 database?

25   A.  Yes.  SBS had access and our operations assistants.

F4FJUSA3                          Katz – direct

1   Q.  Were these operations assistants that you managed?

2   A.  Yes.

3   Q.  Was information regarding job placement provided to SBS?

4   A.  The placements were, yes.

5   Q.  Do you have an understanding of how that information was

6   provided to SBS?

7   A.  Through reports.  They can run reports based on placement

8   numbers and accounts, but also through verbal communication

9   with each of the centers.

10  Q.  When you say "run reports," what do you mean?

11  A.  They oversaw the Work Source1 System, so they can run

12  placement reports and metrics off of entry, data entry that we

13  placed in there.

14  Q.  Were placement numbers discussed within SEEDCO when you

15  worked there?

16  A.  Yes.

17  Q.  By whom?

18  A.  Mostly by me, but also by managers.  We've had regular

19  meetings, whether it was within management team within the

20  career center, whether it was with SEEDCO higher-ups that work

21  within the center, with SBS had daily meetings with the

22  recruitment and placement team.  It was almost constant.

23  Q.  Who were you referring to when you referred to the

24  management team?

25  A.  The coordinators within the center, so Alex, Rick Greene,

F4FJUSA3                        Katz – direct

1    Tage, Shandell, Monique.  Who else?

2              We had a advance at work supervisor Cody was his name,

3    so we had those weekly management meetings within the center.

4    Q.  Were you part of the management team at SEEDCO?

5    A.  Yes, within the career center, within the Workforce1 Career

6    Center, yes.

7    Q.  Did any SEEDCO employees ever communicate any expectations

8    to you regarding placement targets?

9    A.  No.  The communication was that we needed to hit and exceed

10   our targets constantly.  So those were open conversations and

11   constant conversations within the center and just where we were

12   with our targets.

13   Q.  Mr. Katz, if you can take a look at one of the binders in

14   front of you, it is marked as Binder No. 1 and turn to the tab

15   marked 7.  This is a document that is marked as Government

16   Exhibit 7.

17             Mr. Katz, do you know what this document is?  Just one

18   minute.  We are going to make sure that it comes up on

19   everybody's screen.

20             MS. SCHOENBERGER:  Does your Honor have the exhibit in

21   front of him?

22             THE COURT:  7.

23   BY MS. SCHOENBERGER:

24   Q.  Mr. Katz, do you know what this document is?

25   A.  Yes.

F4FJUSA3                          Katz - direct

1    Q.  What is this document?

2    A.  It is an e-mail.

3    Q.  Were you a participant in this e-mail?

4    A.  Yes.

5    Q.  Did you receive it as part of your job at SEEDCO?

6    A.  Yes.

7            MS. SCHOENBERGER:  Your Honor, the United States

8    offers Government Exhibit 7 as evidence.

9            MR. FUTERFAS:  No objection.

10           THE COURT:  Received.

11           (Government Exhibit 7 received in evidence)

12           MS. SCHOENBERGER:  Your Honor, may we publish received

13   exhibits to the jury?

14           THE COURT:  You may.

15           When a document is received in evidence, members of

16   the jury, it is displayed to you, and since it is received in

17   evidence, it is evidence.  You can read it and remember it for

18   what it is worth.

19   BY MS. SCHOENBERGER:

20   Q.  Mr. Katz, we are going to start on Page 2 of this document.

21   If you can look at the one e-mail on that page that includes a

22   table.  Mr. Katz, who sent this e-mail?

23   A.  Lisa Frantzen.

24   Q.  Who is Lisa Frantzen?

25   A.  She is a strategic operations coordinator.

F4FJUSA3                          Katz - direct

1    Q.   Is that a position at SEEDCO?

2    A.   It is a position within each of the Workforce1 career

3    centers.  She was a SEEDCO employee and she was our strategic

4    operations coordinator, I believe, in the Bronx.

5    Q.   What is the date of this e-mail?

6    A.   February 167, 2011.

7    Q.   Did you receive this e-mail?

8    A.   Yes.

9    Q.   Did Alex Saavedra also appear on the "to" line of this

10   e-mail?

11   A.   Yes.

12   Q.   What is the "subject" line here?

13   A.   Workforce1 daily performance, COB February 15, 2011.

14   Q.   Do you have an understanding of what daily performance

15   refers to?

16   A.   Yes.

17   Q.   What does that refer to?

18   A.   Placements.

19   Q.   Do you have an understanding of what information this chart

20   shows?

21   A.   Yes.

22   Q.   What information does the chart show?

23   A.   It shows our overall total placements and the percentage of

24   our goal to date.

25   Q.   What does "total placement" mean?

F4FJUSA3                         Katz - direct

1   A.   They're total placements, direct placements and indirect

2   placements.

3   Q.   What is a direct placement?

4   A.   A direct placement is account manager or recruiter

5   interviews a job seeker, refers to employer, job seeker gets

6   the job, that is a placement.  That is a direct placement.

7            An indirect placement would be candidates that came

8   through the Workforce1 Career Center doors and we've given them

9   any variations of work support.  Maybe a candidate comes

10  through our doors and they're not exactly -- maybe they don't

11  have a resume, maybe they're not sure, maybe they're not sure

12  how to interview.

13           They weren't referred to a job by one of the

14  recruitment placement account managers, but they found a job on

15  their own outside of the service, the actual referral from

16  SEEDCO, so maybe we gave them that confidence to interview on

17  their own.  They found a position on their own, we would call

18  to say Joe Smith, what is your job status?  They found a

19  position on their own.  We didn't refer them directly, but they

20  found it on their own, but we take credit for placement right

21  there.  That is indirect.

22  Q.   Could both direct and indirect placements be counted toward

23  the total placements?

24  A.   Yes.

25  Q.   Other than calling individuals after they've come to the

F4FJUSA3                            Katz - direct

1    center, was there any other way to find out if someone actually

2    got a job after they received services?

3    A.  Maybe they came back to the center and told us they found a

4    job, so we could count that as a placement as well.

5    Q.  Did you receive a daily performance e-mail every day?

6    A.  Yes.

7    Q.  Who were the daily performance e-mails sent to?

8    A.  For the most part the managers, but also sent to the folks

9    within the center.

10   Q.  Can you turn to Page 1 of this document.  Focus your

11   attention on the bottom e-mail.  Who sent this e-mail?

12   A.  Tage Chandarpaul.

13   Q.  Who was Tage Chandarpaul?

14   A.  At this point, she was the deputy director in the Bronx

15   Workforce1 Center.

16   Q.  Do you know who she reported to?

17   A.  She reported to Alex.

18   Q.  Can you please read the second paragraph of Ms.

19   Chandarpaul's e-mail to the jury.

20   A.  "Going forward, we have to continue to stay ahead of our

21   target to ensure we do not get any red light.  So by the end of

22   this week it is expected that we are at 874 placements for 60

23   percent of our placement goal, which means we need another 124

24   placements by close of business Friday."

25   Q.  Are you familiar with the phrase, "red light"?

F4FJUSA3                          Katz - direct

1    A.  Yes.

2    Q.  What does "red light" mean?

3    A.  You do not, you don't meet your target goal, you don't meet

4    your placement goal.

5    Q.  Did you become familiar with a light system while you were

6    at SEEDCO?

7    A.  Yes.

8    Q.  What is the light system?

9    A.  There are three tiers of placements.  Green light means

10   you're exceeding your placement goal.  Yellow, you're just

11   barely at goal.  And red, you have a lot of work to do.

12   Q.  Can you tell what day of the week this e-mail is sent.

13   A.  Wednesday.

14   Q.  Can you take a look now at the top e-mail on this page.

15   What day of the week was this e-mail sent?

16   A.  Thursday.

17   Q.  Is that the same week as the previous e-mail?

18   A.  Yes.

19   Q.  Who is this e-mail from?

20   A.  It is from Tage Chandarpaul.

21   Q.  Who did this e-mail go to?

22   A.  All staff in the Workforce1 Center in the Bronx.

23   Q.  Who would that have included?

24   A.  All management, all SEEDCO employees in the Bronx including

25   management support employees.

F4FJUSA3                        Katz - direct

1    Q.  Would that have included you as well?

2    A.  Yes.

3    Q.  What is the subject line of this e-mail?

4    A.  "Need another 83 placements."

5    Q.  Can you please read Ms. Chandarpaul's e-mail to the jury.

6    A.  Sure.  "Dear all, as of this morning we are at 764

7    placements; we need another 83 by close of business tomorrow to

8    be at 60 percent.  Please ensure you are doing everything to

9    get us to our target by tomorrow."

10   Q.  Would it have been unusual for you to receive e-mails

11   regarding placements two days in a row?

12   A.  No, not unusual.

13   Q.  Would it be unusual for you to receive a reminder from the

14   deputy director about the exact number of placements that were

15   needed?

16   A.  No.

17   Q.  Mr. Katz, can you please turn to Tab 2 in your binder.

18   This is 2, Government Exhibit 2.

19           Mr. Katz, do you know what this document is?

20   A.  Yes, it is an e-mail.

21   Q.  Is this an e-mail that you received?

22   A.  Yes.

23   Q.  Did you receive it as part of your job at SEEDCO?

24   A.  Yes.

25           MS. SCHOENBERGER:  Your Honor, the government offers

F4FJUSA3                          Katz – direct

1    Exhibit 2 into evidence.

2              MR. FUTERFAS:  Without objection.

3              THE COURT:  Received.

4              (Government Exhibit 2 received in evidence)

5              THE COURT:  You may publish.

6    BY MS. SCHOENBERGER:

7    Q.  Mr. Katz, is Exhibit 2 an e-mail from Alex Saavedra?

8    A.  Yes.

9    Q.  Who was it sent to?

10   A.  Sent to all staff, Upper Manhattan Workforce1 Career

11   Center.

12   Q.  That would have included you again?

13   A.  Yes.

14   Q.  What is the date of this e-mail?

15   A.  Wednesday, April 28th, 2010.

16   Q.  Would you please read the 5th paragraph down to the jury.

17   A.  "It is particularly critical that we meet our current

18   progress and exceed it, especially since Bronx and Queens are

19   already at levels that far surpass others in the system."

20   Q.  At the time that you received this e-mail, did you have an

21   understanding of what "levels" referred to?

22   A.  Yes.

23   Q.  What did "levels" refer to?

24   A.  Placements.

25   Q.  The next paragraph reads:

1            "Rick is going to ask every one of the teams to step

2    it up in ways you are already used to and in some ways you are

3    not used to.  We can have not have a slip this quarter, we

4    absolutely cannot."

5            Do you know who Rick is, Mr. Katz?

6    A.  Yes.

7    Q.  Who is Rick?

8    A.  Rick Greene, the deputy director in Upper Manhattan

9    Workforce1.

10   Q.  Who did Mr. Greene report to?

11   A.  He reported to Alex.

12   Q.  Mr. Katz, when you worked at SEEDCO in the Workforce1

13   centers, did you ever instruct employees to report false job

14   placements to SBS?

15   A.  Repeat the question.

16   Q.  Sure.

17           When you worked in the Workforce1 centers, did you

18   ever instruct employees to report false job placements?

19   A.  Yes, but not in those verbatim terms, but, yes.

20   Q.  Can you explain how you gave those instructions.

21   A.  Sure.  I told them that we needed to secure placements by

22   any means necessary.  So any, any job seeker that walked

23   through our center that went through our intake program, our

24   intake team, I would collect CIFs, and so those were from

25   candidates that were currently working.

F4FJUSA3                          Katz - direct

1          I've deployed staff to new hire orientations, to

2    employers such as T.J. Maxx, Century 21, Ricky's.  So any high

3    volume employers I would send, send our recruiters with CIFs to

4    these events, with the goal that they would come back with

5    those CIFs completed so we can enter those into our Work

6    Source1 System as a placement even though we really didn't do

7    much work to secure that placement.

8          So to answer your question, I didn't say verbatim go

9    get me improper placements, "get me placements" meant

10   legitimate placements and illegitimate placements.  We needed

11   numbers, and that was always the goal.

12   Q.  I will ask you a few questions about --

13          THE COURT:  Is there anything in that, this document,

14   Exhibit 2, that reflects this?

15          THE WITNESS:  No.

16   BY MS. SCHOENBERGER:

17   Q.  Mr. Katz, a couple of questions about some of the

18   terminology that you used.  First, what is intake?

19   A.  When intake candidates come through for the first time

20   through our center, they are given orientation from our intake

21   staff.  So those are generally the first staff members of the

22   Workforce1 Center that new candidates would meet if they were

23   coming in off the street.

24   Q.  Did you oversee the intake team?

25   A.  I did not.

1   Q.  What is a CIF?

2   A.  It is a Customer Information Form.

3   Q.  Can you turn to Tab 57 which is actually in the second

4   binder there.

5   A.  Okay.

6   Q.  Mr. Katz, do you know what this document is?

7   A.  Yes, it is a Customer Information Form, CIF.

8   Q.  Is this the type of document that you referred to in your

9   last answer?

10  A.  Yes.

11  Q.  Did you become familiar with documents like these when you

12  worked at SEEDCO?

13  A.  Yes.

14  Q.  Who entered the handwriting on these types of documents?

15  A.  The job seekers.

16  Q.  Were documents like this regularly collected as part of

17  SEEDCO's business?

18  A.  It was, yes.

19          MS. SCHOENBERGER:  Your Honor, the United States

20  offers Government Exhibit 57 into evidence.

21          MR. FUTERFAS:  No objection.

22          THE COURT:  Received.

23          (Government Exhibit 57 received in evidence)

24          THE COURT:  You may publish Exhibit 57 to the jury.

25  BY MS. SCHOENBERGER:

F4FJUSA3                          Katz - direct

1    Q.  I'll also have you look at -- pardon me -- yes, I'll have

2    you look at Tab 65, please.

3            THE COURT:  Why don't you explain 57 so the jury

4    understands it.

5            MS. SCHOENBERGER:  Yes, your Honor.

6    BY MS. SCHOENBERGER:

7    Q.  When would a job seeker fill out a CIF like this one?

8    A.  They'd fill this out when they came through our Workforce1

9    Career Center or when they met, when they met members of the

10   team.  If they weren't registered in the workforce, in a

11   Workforce1 system, they were handed a Customer Information

12   Form.

13           So they have been through our intake team, it could

14   have been through our recruitment placement team, career

15   advisers and were really connected within the center, can

16   ideally give Customer Information Forms to new candidates, but

17   it was the majority of intake staff and recruitment placement

18   staff.

19   Q.  Can you tell the jury what the first two sections of this

20   form ask from a job seeker.

21   A.  Sure.  The first section is just basic candidate

22   information, name, address, number, e-mail.

23           Section 2, is their education, highest level of

24   education, whether they're enrolled in school, like a job

25   application essentially.

F4FJUSA3                          Katz - direct

1              MS. SCHOENBERGER:  Mr. Solomon, would you please

2     expand the Part C of the form.

3     BY MS. SCHOENBERGER:

4     Q.  Mr. Katz, what type of information does Part C of this

5     provide?

6     A.  Current employment status.

7     Q.  If you can turn to the second page of the CIF.  How many

8     pages long are these forms?

9     A.  Two pages, generally front and back.

10    Q.  Do you see Section D of the form?

11    A.  Yes.

12    Q.  What type of information is sought in Section D?

13    A.  Work history.

14    Q.  What type of information about work history is asked for?

15    A.  Their working past or are they currently looking, what

16    types of positions have they worked in the past.

17    Q.  If you can take a look at the very last section of this

18    form, Section E.  What is the purpose of this section of the

19    form?

20    A.  This is a verification information that the job seeker

21    would sign off and date.

22    Q.  Do you know what that date signifies?

23    A.  The date, that day that they signed the document and

24    completed the form.

25    Q.  I'll now have you take a look at the document behind Tab

F4FJUSA3                            Katz – direct

1   65.  Do you know what this document is?

2   A.  Yes.

3   Q.  What is this document?

4   A.  This is a CIF.

5   Q.  Is this different than the CIF in the previous Exhibit 57?

6   A.  No.  It is the same.

7   Q.  Does it contain different information?

8   A.  Yes.

9          MS. SCHOENBERGER:  Your Honor, the government offers

10  Exhibit 65 into evidence.

11         MR. FUTERFAS:  No objection.

12         THE COURT:  Received.

13         (Government Exhibit 65 received in evidence)

14  BY MS. SCHOENBERGER:

15  Q.  Can you please take a look at the document behind Tab 66.

16  What is this document?

17  A.  It is also a CIF.

18         MS. SCHOENBERGER:  Your Honor, the government offers

19  Exhibit 66 into evidence.

20         MR. FUTERFAS:  No objection.

21         THE COURT:  Received.

22         (Government Exhibit 66 received in evidence)

23  BY MS. SCHOENBERGER:

24  Q.  And one more, if you can take a look behind Exhibit Tab 67,

25  Government Exhibit 67, what is this document?

F4FJUSA3                            Katz - direct

1    A.  It is a CIF.

2             MS. SCHOENBERGER:  The government offers Exhibit 67

3    into evidence.

4             MR. FUTERFAS:  No objection.

5             (Pause)

6             MS. SCHOENBERGER:  Is this exhibit received, your

7    Honor?

8             THE COURT:  Received.

9             (Government Exhibit 67 received in evidence)

10   BY MS. SCHOENBERGER:

11   Q.  During your time at the Workforce1 Center, did you become

12   familiar with the term CIF'g?

13   A.  Yes.

14   Q.  What is CIF'g referring to?

15   A.  Candidates, having candidates complete CIF forms.

16   Q.  For what purpose?

17   A.  To enroll them into our center with the overall goal of

18   placement.  That was always the goal why you would CIF someone.

19   Q.  Were you CIF'g people that received SEEDCO services?

20   A.  Yes.

21   Q.  Earlier you referred to new hire orientations.  Is that

22   right?

23   A.  Yes.

24   Q.  What is a new hire orientation?

25   A.  Employers would conduct an intro of their employment to a

1    new hire, to a new employee of their organization, they would

2    attend an orientation to go over the policies and the

3    positions.

4    Q.  What role did new hire orientations have in generating

5    placements?

6    A.  We would send account managers to these orientations

7    because the understanding was that anyone that was invited, or

8    a job seeker that attended these new hire orientations were

9    hired through the employer.  So we have a new hire orientation

10   that may have 50 individuals that attend, the goal is to CIF

11   folks that you may not have met in the past in your career

12   center.

13   Q.  Were those people then counted as placements?

14   A.  Yes.

15   Q.  Had SEEDCO helped get them those jobs?

16   A.  No.

17   Q.  Did you know that at the time?

18   A.  Yes.

19   Q.  Did the recruiters that you sent to those orientations know

20   that at the time?

21   A.  Yes.

22   Q.  How many times was this done when you worked in Workforce1

23   career centers?

24   A.  As many times as we could.  I couldn't put a number on it.

25   It would really depend on if we managed those accounts, if we

1   managed the relationship, so it really depended, but as much as

2   we can attend those, we attended.

3   Q.  How many different employees did you send to new hire

4   orientations to gather CIFs?

5   A.  One, maybe two at the most.

6   Q.  Was that per orientation session or total?

7   A.  Just in general, two events -- well, to orientation, one to

8   two.  It would be the person that managed the account and like

9   an operations assistant could accompany them to help with the

10  CIF collection and completion.

11  Q.  Was there anyone on your team that you didn't send at one

12  time or another to one of these new hire orientations to gather

13  CIFs?

14  A.  No, no.  Irwin Trademan.

15  Q.  Over the course of your little over two years at SEEDCO,

16  how many different people were on your team?

17  A.  14 at the max, 14 were the recruitment placement account

18  managers, the business development account managers, the

19  community-based organization supervisor reported up to me and

20  three operations assistants.

21  Q.  Does that number refer to the size of your team at one time

22  or the total number of employees that you supervised over your

23  time at -- over the course of your time at SEEDCO?

24  A.  No.  That was at full capacity at one time.  I have managed

25  more than that in the Bronx and Upper Manhattan.

F4FJUSA3                          Katz – direct

1    Q.  Can you tell me about how many total?

2    A.  Just different folks that I've managed.  Total?

3    Q.  Correct.

4    A.  20, 25.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F4enusa1                        Katz - direct

1   Q.  Of those 25, how many did you send to new-hire orientations

2   to gather CIFs?

3   A.  I managed 25, 22.

4   Q.  I believe you mentioned that you worked with an intake team

5   to generate placements, is that right?

6   A.  Yes.

7   Q.  How did that work?

8   A.  I would go to the intake area and collect CIFs, would have

9   the intake team or specifically the intake supervisor pull CIFs

10  or hold them to the side of individuals that were currently

11  working so I can collect them.

12  Q.  When you say currently working, what do you mean?

13  A.  Candidates that come to the Workforce1 Center and they were

14  currently employed in a job.

15  Q.  Did you or your team count those as placements?

16  A.  Yes.

17  Q.  How was that done?

18  A.  Our operations assistant would enter the employee or the

19  candidate information into the Worksource system, but would

20  omit the current job that the employee was working at that

21  moment, with the goal to go back in -- I don't know when, a

22  couple of days later or whatever -- to enter placement

23  information in so we can count it as an indirect placement.

24  Q.  Was the information about current employment changed at all

25  in order to be counted as a placement?

F4enusa1                        Katz - direct

1    A.  Well, it was not entered in when they entered the new

2    customer information in, but the start date would change.

3    Q.  What do you mean that it would change?

4    A.  For us to count it as a placement that we gave them a

5    service, we reengaged them or we didn't reengage them, but you

6    would have to enter the date, the start date after the day they

7    came in the Workforce1 Career Center.

8            So, in this example, if this person came in and signed

9    the CIF on March 22, 2011 and they were currently working, we

10   couldn't enter their start date, like for this person,

11   August -- I don't know what that says, but it says like August

12   2007.  They put 2007.  Obviously we did not help them secure

13   that position.  So the goal was, you came in, you got the

14   service through us, and then you went out on your own and got

15   this position, but your start date doesn't reflect what your

16   actual start date was.

17   Q.  Other than working with intake to get CIFs and going to

18   new-hire orientations, were there any other practices that you

19   used in order to generate placements during your time at

20   SEEDCO?

21   A.  Yes.  We had access to résumé search through Career Builder

22   and I believe Monster.

23           So one of the tools to -- the résumé search through

24   Career Builder and entering the upper Manhattan Workforce1 zip

25   code and do a search in a 25-mile radius to folks that may be

F4enusa1                        Katz – direct

1    currently employed with the goal that they have somehow been

2    into our center.  At some point, we can say, oh, OK, let me

3    print out Mike Smith's résumé.  He's currently working.  Mike

4    Smith's been here.  He lives in this area.  He is currently

5    working wherever.  We can enter that placement in as we've, you

6    know, kind of like we have engaged the person.

7    Q.  Was this ever done for anyone that did not come into SEEDCO

8    for services?

9    A.  I believe so, yes.

10   Q.  Any other practices besides the ones you've talked about

11   that were used to generate placements?

12   A.  We have had a working relationship with Business Solution

13   Center, that was also operated by SEEDCO.  They had different

14   targets and metrics that they had to meet, such as business

15   development, helping small businesses, but also part of their

16   metric was also developing positions for the recruitment and

17   placement team that I managed to send candidates to.  So we

18   worked with them as well to, you know, bring placements back at

19   some points.

20   Q.  Were those placements for people that SEEDCO had actually

21   helped get jobs?

22   A.  No.  Some of them -- if I could backtrack, yes, some of

23   them.  But there were also folks that we've never seen that

24   would have been sprinkled in.

25   Q.  Of the number of placements that your team entered into

F4enusa1                         Katz - direct

1    Worksource1, do you have an understanding of how many of them

2    were placements for people that SEEDCO had actually helped

3    versus placements for people that SEEDCO had not helped?

4    A.  No.  I'm not sure what the breakdown was.

5    Q.  Do you know how frequently you or members of your team

6    entered placements for people that had not received services at

7    SEEDCO?

8    A.  Often.  It was part of getting the number.  So whether it

9    was legitimate entry of referrals or capturing legitimate

10   placements versus, you know, any of these practices I

11   mentioned, those were just common to make sure that we had the

12   high volume to meet our goals.  So frequent I would say.

13   Q.  Mr. Katz, did you try to hide any of the practices that

14   your team used to generate placements?

15   A.  No.

16   Q.  Did you discuss them at work?

17   A.  Yes.

18   Q.  With whom?

19   A.  Just with -- outward with everyone.  Just everyone within

20   the center, within meetings, whether it was providing

21   updates -- I may not have used the word improper placements,

22   but orientation meant legitimate and high volume.  So it was

23   common, just open speak within the center.

24   Q.  Who would participate in the meetings that you are

25   referencing?

F4enusa1                    Katz - direct

A.  We had weekly center-wide meetings.  Everyone at some point

during the week participated in these meetings.  It consisted

with every day meeting the recruitment and placement team every

single day for update.  Once a week we had a management

meeting, so internally SEEDCO managers in the Workforce1 Center

met.  I met with the business solutions centers, with their

management and our management attending as well.  SBS meetings.

Towards the end of my tenure those were much more frequent.  So

almost every day there was some sort of communication of

updates.

Q.  At the time that you discussed the practices that you are

talking about, did you have an expectation as to whether the

people you were talking to would understand whether you were

talking about legitimate or illegitimate job placements?

A.  It is just focused on numbers.  So whether they were -- you

know, whether I meant, you know, illegitimate or legitimate,

just my communication was how to get the high-volume number.

        So, at some points, of course, you know, it was just

normal speak within the center of going to the intake team and

outward -- you know, we are open floor plan -- saying, "Ana, I

went to the intake team and I have 15 CIFs that were collected

for the last couple of days.  Enter these in."

        So I wasn't exactly discreet.

Q.  Who is Ana?

A.  Ana was an operations assistant, an admin within the

F4enusa1                          Katz - direct

1    recruitment placement team.

2    Q.  Was she a part of the intake team?

3    A.  No, not when I got there.  I believe she worked as part of

4    that team prior to my arrival at some point.

5    Q.  Would there be any reason for Ana to have CIFs from the

6    intake team?

7    A.  Yes.

8    Q.  What was that reason?

9    A.  Well, for her to enter the placements.  She was really our

10   go-to admin when it came to the administrative piece of

11   entering placements into Worksource.  She knew the system

12   really well.

13   Q.  Can we turn back to Exhibit 57 and take a look at those two

14   pages.  Again, is this a customer information form, or a CIF?

15   A.  Yes.

16   Q.  Is there anything on this form that asks for a placement

17   made by SEEDCO?

18   A.  No.

19   Q.  Mr. Katz, can you please turn to tab 10.  This is

20   Government's Exhibit 10.

21          Do you know what this document is?

22   A.  It is an e-mail, yes.

23   Q.  Was this an e-mail that you participated in?

24   A.  Yes.

25   Q.  Did you participate in it as part of your job as SEEDCO in

F4enusa1                              Katz - direct

1    2010?

2    A.  Yes.

3              MS. SCHOENBERGER:  Your Honor, the government offers

4    Government's Exhibit 10 into evidence.

5              MR. FUTERFAS:  No objection.

6              THE COURT:  Received.

7              (Government's Exhibit 10 received in evidence)

8    Q.  Mr. Katz, did you send the top e-mail on this page with the

9    subject line, "Indirect Placements CIF"?

10   A.  Yes.

11   Q.  Who did you send it to?

12   A.  The top e-mail to Anna Marchany and Giselle Rodriguez.

13   Q.  And who are Anna Marchany and Giselle Rodriguez?

14   A.  They are both operations assistants on our team.

15   Q.  Did you send the e-mail at the bottom of this page, which

16   is dated April 13, 2010?

17   A.  Yes.

18   Q.  Who did you send this e-mail to?

19   A.  To Monique Tarry.

20   Q.  Was Monique Tarry a SEEDCO employee?

21   A.  She was.

22   Q.  What was her role?

23   A.  At this time she was the intake coordinator, supervisor.

24   Q.  Can you please read your e-mail to Monique.

25   A.  Sure.

F4enusa1                          Katz – direct

Q.  "Hi, Monique.  A gentle reminder to let the team know that
if they see anyone that is currently working they can give the
CIF to Ana to enter as an indirect placement.  We shouldn't
enter the CIF into Worksource, as we cannot capture the
placement once the work history is inputted.  Let me know if
you have any questions.

          "Thanks to you and your team for your efforts.

          "Alan."

Q.  Can you explain what you meant by this e-mail.

A.  Yes.  I didn't want her team to enter CIFs into Worksource
of folks that were currently working.  I wanted them to put it
to the side so Ana can enter the placement so she would -- so
Ana can enter the CIF and a couple of days later enter a
placement for us.

Q.  Was it part of the job of Monique Tarry's team to enter
information from CIFs into Worksource1?

A.  Yes.

Q.  Were you asking her team not to do their job?

A.  I was asking -- yes, I was asking them to put CIFs that we
could potentially get placements for, so, yes.

Q.  Why wouldn't you capture the placement once the work
history is inputted?

A.  Because if it's already inputted, and the date, the date
that they started is before the date that they sign their CIF,
we couldn't capture any direct placement.

F4enusa1                          Katz - direct

1   Q.  Can you take a look at Ms. Tarry's response to you, which

2   is the next e-mail up?

3          THE COURT:  Number?  It's part of 10?

4          MS. SCHOENBERGER:  It is Exhibit 10, yes, your Honor,

5   the second e-mail on the page.

6   Q.  Can you read the first two sentences of Ms. Tarry's e-mail

7   to the jury.

8   A.  "Hi, Alan.

9          "I spoke to Ana and Giselle about this.  As far as I

10  know, there were only a few EIF's submitted where staff forgot

11  to not enter work history.  I also spoke to my team to

12  reinforce that they do not add work history for indirect

13  placements."

14  Q.  What is an EIF?  Do you know what an EIF is?

15  A.  I do.

16  Q.  What is an EIF?

17  A.  I am not exactly sure what the acronym -- but it is a form

18  that we completed once we found out that candidates were

19  placed.  We would complete this EIF form with the placement

20  information.

21  Q.  Typically would an EIF be filled out before or after a CIF?

22  A.  After.

23          THE COURT:  The customer fills out the CIF?  Is that

24  right?

25          THE WITNESS:  Yes, your Honor.

F4enusa1                        Katz - direct

1             THE COURT:  And the staff fills out the EIF, is it?

2             THE WITNESS:  Correct, yes.

3             THE COURT:  And then the information flows to where?

4             THE WITNESS:  The information flows into the

5    Worksource system, into our --

6             THE COURT:  A report that captures that?

7             THE WITNESS:  Yes.

8             THE COURT:  What is that called?

9             THE WITNESS:  Worksource1 report, placement report.

10   There are many different reports that we can run.

11            THE COURT:  We saw a job placement report earlier, GX

12   7 I think, Exhibit 7.

13            I'm just trying to let the jury understand the flow.

14            So it starts with the customer filling out something,

15   and then the staff fills out something, the EIF.  The

16   information flows into a job placement report.  Is that

17   generally how it goes?

18            THE WITNESS:  That's correct.

19   Q.  At the time that you had this e-mail exchange with

20   Ms. Tarry, did you have a view as to whether it was important

21   that work history not be entered for indirect placements?

22   A.  It was extremely important, yes.

23   Q.  Why was that?

24   A.  We wouldn't be able to capture a placement if the work

25   history was already entered into the Worksource1 system.

F4enusa1                         Katz - direct

1  Q.  And was that a true placement or a false placement?

2  A.  It was a false placement.

3  Q.  Do you know who was on Ms. Tarry's team that she says that

4  she spoke to about this?

5  A.  I don't remember the name.  Israel Polanco maybe was on her

6  team.  I can't recall the names.

7  Q.  Do you remember how many people were on Ms. Tarry's team?

8  A.  Five maybe.

9  Q.  Do you know who Ms. Tarry reported to?

10 A.  I believe she reported -- yes.

11 Q.  Who did she report to?

12 A.  I believe she reported to Rick Green.

13 Q.  Who did Rick Green report to?

14 A.  To Alex.

15 Q.  What was Rick green's role at the time that Ms. Tarry

16 reported to him?

17 A.  He was the deputy director of the upper Manhattan

18 Workforce1 center.

19 Q.  Were there any managers in the hierarchy between the deputy

20 director, Rick Green, and the director, Alex Saavedra?

21 A.  No.

22 Q.  Did you forward your e-mail exchange with Monique Tarry to

23 Ana Marchany and Giselle Rodriguez?

24 A.  Yes.

25 Q.  Why did you do that?

F4enusa1                          Katz - direct

1    A.  Just to give them a heads-up, just to give them the

2    heads-up that the conversation was had for the intake team to

3    put the work history CIFs to the side.

4    Q.  Can you please turn to tab 6.

5            THE COURT:  How are you doing members of the jury?

6            Still awake?

7            MS. SCHOENBERGER:  Your Honor, this is a fine --

8            THE COURT:  Do you want to water.  Slog through?

9            Keep going.

10   Q.  Mr. Katz, if you can look at what's been marked as

11   Government's Exhibit 6.  Do you know what this document is?

12   A.  Yes.

13   Q.  What is this document?

14   A.  This is an e-mail.

15   Q.  Did you send this e-mail?

16   A.  Just me.  I was in the wrong exhibit.  Excuse me.

17   Q.  Pardon me.  Exhibit 6.

18   A.  Yes.

19   Q.  I will just start again.  What is Exhibit 6?

20   A.  It is an e-mail.

21   Q.  And did you participate in this e-mail?

22   A.  Yes.

23   Q.  Did you participate in this e-mail as part of your job at

24   SEEDCO in 2010?

25   A.  Yes.

1           MS. SCHOENBERGER:  Your Honor, the government offers

2   Government Exhibit 6 into evidence.

3           MR. FUTERFAS:  No objection.

4           THE COURT:  Received.

5           (Government's Exhibit 6 received in evidence)

6   Q.  Mr. Katz, did you send the e-mail at the top of the page

7   with the subject line, "Need More Indirect Placements" with

8   three exclamation points?

9   A.  Yes, I did.

10  Q.  Can you please read your e-mail to the jury starting with

11  "This e-mail serves"?

12  A.  Sure.

13          "This e-mail serves as a reminder to continue to

14  collect indirect placement.  If you have résumés in your area

15  or receive résumés from customers, please check to see if the

16  customer is currently working, which should be noted as

17  'present' on the résumé.  We've been hitting the green light on

18  a weekly basis due to your assistance so it is greatly

19  appreciated.  Let me know if you have any questions.

20          "Thanks.

21          "Alan."

22  Q.  Can you please explain what you meant regarding résumés in

23  this e-mail?

24  A.  Sure.  If they had regular résumés in their area, they were

25  instructed to check the most current position, generally in the

F4enusa1                        Katz - direct

1    top of résumé, to make sure there was no end date to that

2    employer.  If they were currently working, it should say

3    present, and they should put that to the side so we can enter

4    and figure out how to enter that in for a placement.  So that's

5    an indirect as well.

6    Q.  Would that refer to a placement that SEEDCO had assisted a

7    job seeker in obtaining?

8    A.  No.

9    Q.  Who did you send this e-mail to?

10   A.  To the whole center in upper Manhattan.

11   Q.  And would that have included Alex Saavedra?

12   A.  Yes.

13   Q.  Did you have any concerns about including Mr. Saavedra on

14   an e-mail that discussed a practice that resulted in false

15   placement?

16   A.  No.

17   Q.  Why not?

18   A.  It just wasn't thinking about as -- my focus was how we

19   were going to stay out of a yellow light or below.  I just

20   cared about our numbers.

21   Q.  Do you recall whether Mr. Saavedra responded to this

22   e-mail?

23   A.  I don't recall.

24   Q.  Do you recall whether he ever asked you any questions about

25   this e-mail?

F4enusa1                          Katz – direct

```
 1   A.  No.
 2   Q.  Can you please turn to Exhibit 8.  That is behind tab 8.
 3           Do you know what this document is?
 4   A.  Yes.
 5   Q.  What is this document?
 6   A.  It is an e-mail regarding indirect placements.
 7   Q.  Is this an e-mail that you participated in?
 8   A.  I was on the e-mail, so yes.
 9   Q.  Was it sent to you?
10   A.  Yes.
11   Q.  Was it sent to you as part of your job at SEEDCO in 2011?
12   A.  Yes.
13           MS. SCHOENBERGER:  Your Honor, the United States
14   offers Government's Exhibit 8 into evidence.
15           MR. FUTERFAS:  No objection, your Honor.
16           THE COURT:  Received.
17           (Government's Exhibit 8 received in evidence)
18   Q.  What is the subject of this e-mail, Mr. Katz?
19   A.  Indirect placements for Ana.
20   Q.  Can you please look at the second e-mail in this string.
21   That's the line in the middle of the page.
22           Do you know who sent this e-mail?
23   A.  Tage Chandarpaul.
24   Q.  Do you know what her role was at the time?
25   A.  She was the deputy director in the Bronx.
```

F4enusa1                        Katz - direct

1    Q.  Who was the director in the Bronx at that time?

2    A.  Alex.

3    Q.  And who did Ms. Chandarpaul address her e-mail to?

4    A.  She addressed it to Deborah Stephenson, who is the intake

5    coordinator in the Bronx, she addressed it to myself, and to

6    Ana Marchany.

7    Q.  Did Ms. Stephenson's role differ from Ms. Tarry's?

8    A.  No.

9    Q.  Were they intake coordinators at the same career center?

10   A.  No.  Deborah was the intake coordinator in the Bronx.

11   Monique in 2010 was the intake coordinator in upper Manhattan.

12   Q.  Do you know who Ms. Stephenson reported to?

13   A.  I am not exactly sure, but it could have been Tage

14   Chandarpaul.

15   Q.  Can you please read Ms. Chandarpaul's e-mail to

16   Ms. Stephenson to the jury.

17   A.  Sure.

18            "Hi, Deborah.

19            "We are unable to enter the placement info for the

20   indirects today.  You have to let you staff know not to enter

21   any CIFs for customers that are working.  Leave them for Ana to

22   enter.  If we do not follow this process, the indirect will not

23   be counted."

24   Q.  Do you have an understanding as to what Ms. Chandarpaul

25   meant by her e-mail?

F4enusa1                        Katz - direct

1    A.  Yes.

2    Q.  What was your understanding?

3    A.  That they should not enter work history of folks who came

4    in for the first time currently working into Worksource.  They

5    should put those to the side for Ana Marchany to enter.

6    Q.  Would those placements be true placements or false

7    placements?

8    A.  False placements.

9              THE COURT:  Let me ask you something.  You mentioned

10   direct placements and indirect placements.

11             What are direct placements.

12             THE WITNESS:  Direct placements, recruitment and

13   placement team interviewed candidates, they interviewed job

14   seekers in the center and they send them, they refer them to

15   employers such as T.J. Maxx.  I meet someone in the center, I

16   feel they are the right fit for the position, I send them to an

17   employer for the interview.  They interview with the employer,

18   and they secure the job.

19             THE COURT:  That goes to satisfaction of your target?

20             THE WITNESS:  Yes.

21             THE COURT:  How long does a person have to work in

22   order to satisfy your target?

23             Suppose he comes in for a day and doesn't show up the

24   next day?  Does that count?

25             THE WITNESS:  If they secured the job and didn't show,

F4enusa1                        Katz - direct

```
 1    it shouldn't count.
 2              THE COURT:  It should not count?
 3              THE WITNESS:  It should not count.
 4              THE COURT:  But, normally speaking, when you place
 5    somebody and he goes to work, it counts?
 6              THE WITNESS:  Correct.
 7              THE COURT:  That is a direct placement?
 8              THE WITNESS:  Yes.
 9              THE COURT:  What is an indirect placement?
10              THE WITNESS:  It's job seekers that came in to our
11    center that we meet with, maybe we didn't refer them to T.J.
12    Maxx but we gave them some, you know, some advice on how to
13    interview, how to reword their résumé, and then they found a
14    job on their own.  They left the center, and they -- you know,
15    this person went down the street to Checkers, you know, the
16    fast food place.  They interviewed, they did really well on the
17    interview, and they got the job on their own, without us
18    referring them.  So we --
19              THE COURT:  Those indirect placements go to satisfying
20    your targets?
21              THE WITNESS:  Yes.
22              THE COURT:  It makes no difference whether it's direct
23    or indirect?
24              THE WITNESS:  For the overall target, correct.
25              THE COURT:  So what makes for an indirect placement?
```

F4enusa1                          Katz – direct

1  How much effort do you have to go through?

2            THE WITNESS:  We've had to touch them at some point

3  within the center.  How much effort --

4            THE COURT:  Suppose they fill out the form and they

5  disappear and then you find out a month later they have a job?

6  Do you count it?

7            THE WITNESS:  And they came through our center?

8            THE COURT:  They dropped in, they filled out a form

9  and they left.  That is all you know.  They end up having a

10 job.  Is that an indirect placement?

11           THE WITNESS:  It's an indirect placement.

12           THE COURT:  So anything you touch, the person gets a

13 job, it goes to satisfying your targets?

14           THE WITNESS:  Anything we touch.

15           THE COURT:  You define it.

16           THE WITNESS:  Yes.  So if we have the conversation

17 with them and they found the job on their own, yes, we would

18 count that as an indirect placement and that applied to our

19 target.

20           In my orientation team if I sent one of my staff

21 members to a new-hire orientation, we touched the person

22 saying, "Here fill this CIF out.  I met you for the first time,

23 fill the CIF out."

24           If it doesn't work out here, the message was you can

25 always come to our center and we have plenty of opportunities.

F4enusa1                        Katz - direct

1            You are working right now in that orientation.  We

2      didn't touch you.  In your example, we touched them by speaking

3      with them for a couple of minutes to make them aware of us, but

4      that is not an indirect placement -- that is an indirect

5      placement that we --

6            THE COURT:  It goes to satisfy the targets?

7            THE WITNESS:  Right.

8            THE COURT:  So if the person is working already, even

9      though you may process some claim from him, you can't count it?

10           THE WITNESS:  Right.  Exactly.

11           So in the work history example, yes, they came in for

12     the very first time, but they are already employed.  Maybe they

13     are not happy with their job, we don't know, but they're

14     already employed, we met them for the first time, that should

15     not apply to our placement target.

16           THE COURT:  If you introduce them to some other

17     employer and they go to the other employer, you can count them.

18           THE WITNESS:  Yes.

19           THE COURT:  But if he doesn't change his job, you

20     can't count him, is that right?

21           THE WITNESS:  Correct.  Exactly right.

22           THE COURT:  Are is there any other categories that I

23     missed, Ms. Schoenberger?

24           MS. SCHOENBERGER:  I don't believe so, your Honor.

25           THE COURT:  OK.

F4enusa1                        Katz – direct

1    BY MS. SCHOENBERGER:

2    Q.  Just to finish up with looking at Exhibit 8 here, Mr. Katz.

3    Did Ms. Stephenson respond to Tage Chandarpaul's e-mail?

4    A.  She did, yes.

5    Q.  What did she say?

6    A.  She just typed, "Done."

7    Q.  Do you know how many people were on Ms. Stephenson's staff

8    at this time?

9    A.  About six, seven.  The intake folks also oversaw like the

10   front desk staff as well.  So, yeah, six, seven.

11   Q.  And as of the date of this e-mail, January 19, 2011, where

12   were you located?

13   A.  I was in the Bronx:

14   Q.  And where was Ms. Chandarpaul located?

15   A.  She was in the Bronx.

16   Q.  And where was Ms. Stephenson and her team located?

17   A.  In the Bronx.

18   Q.  Who was the director of the Bronx center at that time?

19   A.  Alex.

20   Q.  Can you turn to Exhibit 1, please, under tab 1.  What is

21   this document, Mr. Katz?

22   A.  It is an e-mail.

23   Q.  And was this an e-mail sent during your time that you

24   worked at SEEDCO?

25   A.  Yes.

1  Q.  It was sent within SEEDCO?

2  A.  Yes.

3            MS. SCHOENBERGER:  Your Honor, the government offers

4  Government's Exhibit 1 into evidence.

5            MR. FUTERFAS:  Without objection, your Honor.

6            THE COURT:  Received.

7            (Government's Exhibit 1 received in evidence).

8  Q.  Mr. Katz, can you please take a look at the e-mail at the

9  bottom of this page and tell us who it is from.

10  A.  From Irwin Traydman.

11  Q.  Who is Irwin Traydman?

12  A.  He was operations assistant in upper Manhattan.

13  Q.  Who was this e-mail sent to.

14  A.  It was sent to the upper Manhattan Workforce1.

15  Q.  Can you please read the first two sentences of

16  Mr. Traydman's e-mail.

17  A.  Sure.

18            "This is just a friendly reminder that if you come

19  across any customers who are employed, please capture their

20  placement information and bring it over to me.  We are

21  currently at 164 total placements.  We need to be at 441

22  placements by the end of the month to achieve a green light for

23  January."

24  Q.  What were Mr. Traydman's responsibilities as an operations

25  assistant, if you know?

F4enusa1                         Katz - direct

1   A.  When I first started, he was more of a phone banker.  He

2   was the reengagement person who would, you know, reach out to

3   folks based on reports of people that had been into the center.

4   Then his responsibilities increased with -- when SEEDCO

5   operated the Bronx center.  Ana came to the Bronx, so Irwin

6   stayed in upper Manhattan in the same responsibilities as Ana.

7   Q.  Did Mr. Saavedra respond to Mr. Traydman's e-mail?

8   A.  Yes.

9   Q.  Is that the e-mail at the top of this page?

10  A.  Yes.

11  Q.  Can you please read Mr. Saavedra's response to the jury?

12  A.  "Thanks, Irwin.

13          "I would like to emphasize that it is important to be

14  at par with the rest of the system.  We're also digging in here

15  in the Bronx to capture as many placements as possible."

16  Q.  Who was this e-mail sent to?

17  A.  It was sent to the Workforce1 Career Center in upper

18  Manhattan.  I'm not sure if it was also to the Bronx, but also

19  copying his manager.

20  Q.  Who was Alex's manager?

21  A.  Francine Delgado.

22  Q.  Did Ms. Delgado work in a Workforce1 Career Center?

23  A.  No, she didn't work in the center.

24  Q.  Where did she work?

25  A.  She worked at SEEDCO headquarters.

F4enusa1                    Katz - direct

1   Q.  Where was SEEDCO headquarters located?

2   A.  19th street, Flatiron District, in that vicinity.

3   Q.  Was that outside of the Workforce1 Center?

4   A.  Yes.

5   Q.  Can you please turn to tab 71 -- sorry.  That is in the

6   second binder there.

7        Mr. Katz, what is the document that's been marked as

8   Government's Exhibit 71.

9   A.  It is an e-mail.

10  Q.  Did you participate in this e-mail?

11  A.  Yes.

12  Q.  Was that as part of your job at SEEDCO in 2011?

13  A.  Yes.

14       MS. SCHOENBERGER:  Your Honor, the government offers

15  Government Exhibit 71 into evidence.

16       MR. FUTERFAS:  Without objection.

17       THE COURT:  Received.

18       (Government's Exhibit 71 received in evidence)

19  Q.  If you could look at the e-mail that is in the center of

20  the page, the middle of the string from Tage Chandarpaul,

21  please.

22       What was Ms. Chandarpaul's role at this time?

23  A.  She was the deputy director of the Workforce1 Center in the

24  Bronx.

25  Q.  At this time, April 2011, do you know who the director of

F4enusa1                          Katz – direct

1   the Bronx was?

2   A.   It was Alex, yes.

3   Q.   Can you please read Ms. Chandarpaul's e-mail to the jury?

4   A.   "Hey, guys.  What is our plan for this week to ensure we do

5   not get a red light?  We're behind everyone."

6   Q.   Would it have been unusual for Ms. Chandarpaul to check in

7   on your plan for getting placements?

8   A.   No, it wouldn't be unusual.

9   Q.   How frequently would you receive that kind of check-in?

10  A.   Frequently, whether it was e-mail or verbally or in

11  passing.

12  Q.   Did you respond to Ms. Chandarpaul's e-mail?

13  A.   Yes.

14  Q.   How soon after she sent her e-mail.

15  A.   Seven minutes.

16  Q.   Can you please read the first point on your e-mail.

17  A.   Tage, the team is following up on all referrals.

18  Q.   What does that refer to?

19  A.   Following up with employees or candidates that we referred

20  to jobs.

21  Q.   What would be the result of such follow-up?

22  A.   It would result in direct placements.

23  Q.   Would that be a true or false placement?

24  A.   A true.

25  Q.   Can you please read the second point on your e-mail.

F4enusa1                         Katz - direct

1   A.  "We've implemented a system in that the career coaches are

2   attending our recruitment events and directing all working

3   candidates to their colleagues for services.  They're going to

4   enter all of the CIFs into Worksource, and we'll capture the

5   placement."

6   Q.  Can you explain what you meant by this point in your

7   e-mail?

8   A.  Yes.  One second.  Yes.  Our career coaches were looking

9   out for CIFs that had employees or candidates, excuse me, that

10  were working, and they would be referred within the center so

11  we can get the placement.

12  Q.  Would that refer to a true placement or a false placement?

13  A.  A false placement.

14              THE COURT:  Let's look at its terms.

15              The career coaches, who were they?

16              THE WITNESS:  They were individuals within the center

17  who assisted with résumé workshops.

18              THE COURT:  Employees of SEEDCO?

19              THE WITNESS:  Yes.

20              THE COURT:  So these coaches are coaching somebody.

21  They are going to recruitment events and directing working

22  candidates.

23              What do you mean by working candidates?

24              THE WITNESS:  To candidates that were currently

25  working.

F4enusa1                          Katz - direct

1            THE COURT:  That had jobs?

2            THE WITNESS:  That had jobs, correct.

3            THE COURT:  And these career coaches are directing

4   these people who are working to their colleagues.

5            Who are the colleagues?

6            THE WITNESS:  They are colleagues, the recruitment and

7   placement team to the other career coaches within the center

8   for their types of services.

9            THE COURT:  All employed at SEEDCO?

10           THE WITNESS:  Yes, correct.

11           THE COURT:  And giving more services to these working

12  candidates?

13           THE WITNESS:  Correct.

14           THE COURT:  Then it goes on to say, "They're going to

15  enter" --

16           Who is they?

17           THE WITNESS:  It would be my team, Ana.

18           THE COURT:  Employees of SEEDCO?

19           THE WITNESS:  Employees of SEEDCO, yes.

20           THE COURT:  "All the CIFs."

21           Whose CIFs are they, the working candidates?

22           THE WITNESS:  Yes.

23           THE COURT:  So each of the people who are working on

24  some other job already are filling out CIFs that go into the

25  SEEDCO system.  Is that what is going on?

F4enusa1                          Katz – direct

1                    THE WITNESS:  Correct.

2                    THE COURT:  And the CIFs, "are they being entered into

3      the WS?"  What is the WS?

4                    THE WITNESS:  Worksource.

5                    THE COURT:  Is that a report of some kind?

6                    THE WITNESS:  That's the system that we used within

7      the all the Workforce1 Centers to enter candidate information,

8      job seeker or anyone that came through the doors for services.

9                    THE COURT:  Only working candidates or?

10                   THE WITNESS:  Everyone.

11                   THE COURT:  Everybody?

12                   THE WITNESS:  Yes.

13                   THE COURT:  Everybody for whom you are looking for

14     credit?

15                   THE WITNESS:  Yes.  That's always the call, yes.

16                   THE COURT:  "And we will capture the placement,"

17     meaning SEEDCO will capture the placement, is that right?

18                   THE WITNESS:  Yes.

19                   THE COURT:  What does it mean, capture the placement?

20                   THE WITNESS:  We will enter the placement.

21                   THE COURT:  And count it as progress towards the goal

22     set by the SBS?

23                   THE WITNESS:  Yes.

24                   THE COURT:  Regardless of whether the person is

25     getting a new job or staying in his old job?  Is that what you

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F4enusa1                    Katz – direct

1    mean.

2              THE WITNESS:  That's what I mean.  Correct, yes.

3    BY THE COURT:

4    Q.  Mr. Katz, who besides SEEDCO employees had access to the

5    Worksource1 system?

6              THE COURT:  Louder.  Don't let your voice drop.

7    Q.  Who besides SEEDCO had -- SEEDCO employees had access to

8    the Workforce1 system?

9    A.  The Department of Small Business Services, SBS.

10   Q.  Can you take a look at the third point on your e-mail?

11             THE COURT:  What do you mean by that?  I don't

12   understand that question.  Let me get the question.

13             Who besides SEEDCO had access to the Workforce1

14   system?

15             MS. SCHOENBERGER:  Pardon me.  The Worksource1 system.

16             THE COURT:  What?

17             MS. SCHOENBERGER:  The Worksource computer system.

18             THE COURT:  The WS that you referred to?

19             MS. SCHOENBERGER:  Correct, your Honor.

20             THE COURT:  You said the SBS?

21             THE WITNESS:  Had access to WS, yes.

22             THE COURT:  How did they have access to that?

23             THE WITNESS:  They can view metrics, placement totals

24   through each enter, through each center that they oversaw the

25   referrals --

F4enusa1                    Katz – direct

1          THE COURT:  If you capture information in the WS

2     system, based on a CIF filled out by somebody who already was

3     working, does the system make a distinction between that person

4     who is already working and someone who is going to get a new

5     job?

6          THE WITNESS:  Yes, yes.  Because the date, the date

7     that they started their job is entered into the Worksource

8     system from the CIF.  So essentially everything that they

9     include on the CIF, including their current job, legitimately

10    is entered into the Worksource1 system with their current

11    employer, the day they started that job.

12         THE COURT:  But nobody will know from that whether

13    it's a job that you got or a job they already had, is that

14    right?

15         THE WITNESS:  Yes.

16         THE COURT:  Proceed.

17         When you ask questions try to keep the same terms of

18    reference as in the document that you're working with.

19         MS. SCHOENBERGER:  Yes, your Honor.

20    Q.  Mr. Katz, if could you read the third point in your e-mail

21    to the jury.

22    A.  "Intake is giving all CIFs to us."

23    Q.  How does intake giving all CIFs to us respond to

24    Ms. Chandarpaul's question of how you are going to ensure that

25    you don't get a red light?

F4enusa1                        Katz - direct

1   A.  Because those folks that we get from intake that are

2   currently working, we're going to -- you know, we hope that all

3   of them that came in are currently working, so we can enter it

4   in as an indirect placement at some point.

5   Q.  Did you send this e-mail to Alex Saavedra?

6   A.  Yes.

7   Q.  Did Alex Saavedra respond to your e-mail?

8   A.  He responded, but I'm not sure if he was addressing this

9   e-mail.

10  Q.  Do you see a response from him on this page?

11  A.  Yes.

12          MR. FUTERFAS:  Objection.

13          THE COURT:  Overruled.  Is his response on the page?

14          THE WITNESS:  Yes.

15          THE COURT:  Where?

16          THE WITNESS:  On the top.

17          THE COURT:  It's not evident here.  You mean in the

18  caption?

19          MS. SCHOENBERGER:  Perhaps if I can take a step back.

20          THE COURT:  I will see counsel, one from each team.

21  Mr. Futerfas, you might as well come up.

22          (Continued on next page)

23

24

25

F4enusa1                        Katz – direct

1           (At sidebar)

2           THE COURT:  What is the basis of the objection?

3           MR. FUTERFAS:  The characterization of it as a

4    response.  As the witness testified, the e-mail that he

5    received from Mr. Saavedra was not in response to the prior

6    e-mails.  It was an e-mail, but it was not in response.

7           THE COURT:  There is no objection that it wasn't from

8    Saavedra?

9           MR. FUTERFAS:  Correct.

10          THE COURT:  Objection overruled.

11        (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F4enusa1                         Katz - direct

1           (In open court)

2     Q.  Mr. Katz, we're looking at Mr. Saavedra's response at the

3     top of the page here.  Can you please read his e-mail to the

4     jury.

5     A.  "I will have to speak with you about something that has

6     come to light."

7     Q.  At the time that you received this e-mail, did you have an

8     understanding of what Mr. Saavedra meant?

9     A.  Not exactly, no.

10    Q.  Did you later develop an understanding of what he meant?

11    A.  Yes.

12    Q.  How?

13    A.  Through a phone call with Alex, Tage, and myself.

14    Q.  When did that phone call take place?

15    A.  If not that day, the next day.

16    Q.  Other than you and Mr. Saavedra and Ms. Chandarpaul, was

17    anyone else on the call?

18    A.  No.

19    Q.  Where were you during that phone call?

20    A.  I was in the Bronx, and we were in Tage's office.

21    Q.  And was Mr. Saavedra also in the Bronx?

22    A.  He was working in the Bronx, but he wasn't in the Bronx

23    that day.

24    Q.  Do you know where he was that day?

25    A.  He was in New Mexico.

F4enusa1                          Katz - direct

1    Q.  What was said on the phone call?

2    A.  It was a very short call.  He said whatever -- a

3    whistleblower has come forward, and whatever is going on in,

4    whatever is going on needs to stop.

5              THE COURT:  What is a whistleblower?

6              THE WITNESS:  An individual within the organization

7    that brought these allegations to light.  I suppose within

8    SEEDCO and SBS.

9    Q.  Did he say anything else besides that there was a

10   whistleblower and that whatever was going on has to stop?

11   A.  No.

12   Q.  Did you say anything on the call?

13   A.  I did.  I asked who the whistleblower was.

14             THE COURT:  I can't hear you?

15             THE WITNESS:  I asked him who the whistleblower was.

16   Q.  Did Mr. Saavedra ask you if the whistleblower's allegations

17   were true?

18   A.  No.

19   Q.  At any point after that call did Mr. Saavedra ask you if

20   the whistleblower's allegations were true?

21   A.  No.

22   Q.  Mr. Katz, were you ever a defendant in this lawsuit?

23   A.  Yes.

24   Q.  Are you still a defendant in this lawsuit?

25   A.  No.

F4enusa1                         Katz - direct

1    Q.  Why not?

2              THE COURT:  Stop there.

3              You are trying the case against Mr. Saavedra only.

4    You are to put out of your mind whatever happened to other

5    people or companies who may also have been defendants.  What

6    happened to them is of no concern to you.  You have enough

7    business with this particular case alone, and so let's focus

8    only on the case against Mr. Saavedra.

9              MS. SCHOENBERGER:  Your Honor, may the witness respond

10   to the question.

11             THE COURT:  No.  We can talk about it some more after

12   the jury is excused for the day.

13             MS. SCHOENBERGER:  Thank you, your Honor.  I have no

14   further questions at this time.

15             THE COURT:  Cross-examination.

16             JUROR:  Your Honor, can we have a two-minute break.

17             THE COURT:  Sure.  Before you get up, I have another

18   matter that I have scheduled for 4 o'clock.  I'm going take it

19   at 4:30.  So we are going to go until 4:30, and then we will

20   resume at 10 o'clock tomorrow.

21             Five-minute break.  Don't discuss the case, please.

22   Those of you with books can leave them on your chairs.

23             (Continued on next page)

24

25

F4enusa1                         Katz – direct

1          (Jury not present)

2          THE COURT:  Mr. Katz, while you are a witness, you are

3     not to talk to anybody about the case.

4          THE WITNESS:  OK.

5          THE COURT:  Did you hear the instruction?

6          MS. SCHOENBERGER:  Yes.

7          THE COURT:  Five minutes.

8          (Recess)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F4FJUSA5                          Katz - cross

1              (In open court; jury present)

2    ALAN STEVEN KATZ, resumes

3    CROSS-EXAMINATION

4              THE COURT:  Be seated, everybody.  Mr. Katz, you

5    remain under oath.  Cross-examination by Mr. Futerfas.

6              MR. FUTERFAS:  Thank your Honor.

7    BY MR. FUTERFAS:

8    Q.  Good afternoon, Mr. Katz.  How are you?

9    A.  I'm good.  Thank you.

10   Q.  Mr. Katz, I wanted to start somewhere in the midst of your

11   examination.

12             Are you suggesting by your testimony that you and the

13   others in your department and at SEEDCO did not obtain

14   legitimate placements and place people in jobs?

15   A.  I am, yes.

16   Q.  You're maintaining that no one at SEEDCO ever placed people

17   in real jobs?

18   A.  No.  Excuse me.

19   Q.  All right.  My question was unclear?

20   A.  Yes.

21   Q.  I'll rephrase it for you.

22             In fact -- I'll phrase it in the converse -- in fact,

23   you and people in your team and people at SEEDCO did, in fact,

24   place people in real jobs at SEEDCO.  Isn't that right?

25   A.  Correct.

F4FJUSA5                           Katz - cross

1   Q.  In fact, you work hard to do that, didn't you?

2   A.  Yes.

3   Q.  And other people on your team worked hard to do that,

4   right?

5   A.  Yes.

6   Q.  We are talking about legitimate jobs, legitimate

7   placements, correct?

8   A.  Correct.

9   Q.  Can you tell me the hours that you worked on a typical day

10  at SEEDCO?

11  A.  Initially 9:00 to 6:00, and towards the end of my tenure,

12  9:00 to 8:00.

13  Q.  Did you have a sense that -- let me ask you this.

14          Did you work hard to get people real jobs at SEEDCO?

15  A.  Yes.

16  Q.  Do you feel that the people under your guidance as part of

17  your team, that they worked hard, too?

18  A.  Yes.

19  Q.  What about your sense of the other people at SEEDCO, did

20  you get a sense they all worked hard, too, to try to get jobs

21  for people in the community?

22  A.  Yes.

23  Q.  Now, have you ever seen the contract between SBS and

24  SEEDCO?

25  A.  No.

F4FJUSA5                       Katz - cross

1   Q.  Then I won't read it to you.

2            As part of your duties at SEEDCO, there were projects

3   that, employment projects that SEEDCO tried to fulfill and

4   tried to find employees for.  Is that right?

5   A.  Yes.

6   Q.  Like big stores, Century 21 or the Fairway chain, things

7   like that, right?

8   A.  Correct.

9   Q.  And part of your duties and responsibilities as managing

10  your team was to try to find those job opportunities and fill

11  those job opportunities, right?

12  A.  Yes.

13  Q.  Sometimes those opportunities -- withdrawn.

14           Sometimes I think you testified on direct about these

15  off site recruiting events.  Do you remember that?

16  A.  Yes.

17  Q.  And sometimes there would be an employer who would want to

18  have an employment fair or an employment-gathering on premises

19  at the store.  Is that right?

20  A.  Correct, yes.

21  Q.  You're well aware of that, right?

22  A.  Yes.

23  Q.  Did you attend some of those?

24  A.  Yes.

25  Q.  Certainly people on your team attended?  There were people

F4FJUSA5                        Katz - cross

1   actually tasked to go to those, right?

2   A.  Yes.

3   Q.  And employers knew, because you were working with those

4   employers, employers knew you or members of your team would be

5   there to help them fulfill their staffing or employment needs.

6        Is that right?

7   A.  Yes.

8   Q.  Well, for example, do you remember in 2010 a project called

9   East River Plaza?

10  A.  Yes, it was 2009.

11  Q.  2009?

12  A.  Yeah.

13  Q.  Do you remember the grand opening, the actual ribbon

14  cutting was on July 20th, 2010.  Do you recall that?

15  A.  I recall the ribbon cutting.  I am not sure when.

16  Q.  You were there?

17  A.  Yes.

18  Q.  The Mayor of New York was there?

19  A.  He was.

20  Q.  And city council persons were there?

21  A.  Yes.

22  Q.  And that project, was Mr. Saavedra there?

23  A.  I don't remember if he was there.

24  Q.  That project, for instance, you recall that started

25  sometime in 2009?

F4FJUSA5                          Katz - cross

1   A.  Yes.

2   Q.  Do my questions at all refresh your recollection of the

3   official opening being sometime in the summer of 2010?

4   A.  Yes, it could have been that time.

5   Q.  That was a very substantial employment project, wasn't it?

6   A.  It was, yes.

7   Q.  Did that take up maybe for a time 50 percent of your time?

8   A.  Yes, it is safe to say.

9   Q.  That project, did SEEDCO work with other community-based

10  organizations to staff the East River Plaza?

11  A.  Yes.

12  Q.  What are some of those organizations?

13  A.  Off the top of my head Strive was the main community

14  partner that we worked with.

15  Q.  That undertaking, the East River Plaza, that was

16  effectively a large mall on the East River Drive at about 125th

17  Street or so.  Is that right?

18  A.  Yes.

19  Q.  It had numerous stores, Costco, and many different big box

20  stores, right?

21  A.  Yes.

22  Q.  Do you recall that the total employment fulfillment was

23  almost a thousand people for that mall?

24  A.  In total of all the stores combined?

25  Q.  Yes.

F4FJUSA5                          Katz - cross

1    A.  It could have been, sure.

2    Q.  You viewed that as a pretty big undertaking, didn't you?

3    A.  Yes.

4    Q.  To staff that one project alone, were events held,

5    recruiting events held at SEEDCO at 125th Street?

6    A.  They were, yes.

7    Q.  Go ahead, finish your sentence.

8    A.  They were also held at Strive.  That was the main, the main

9    recruitment events occurred in Strive since they were in the

10   East Harlem neighborhood, so they were really the main driver

11   of the project.

12   Q.  You worked with Strive to fulfill this employment, this

13   very large employment event, right?

14   A.  Yes.

15   Q.  Now, these recruitment events, whether they were held at

16   125th Street or at Strive, this would be SEEDCO personnel

17   interviewing potential job candidates, right?

18   A.  Yes.

19   Q.  I would like to spend a few minutes on the process, if I

20   could.

21       If, for example, the recruitment event was off site,

22   let's say at Strive or at a store location, right, the SEEDCO

23   individual employee would bring the CIF forms we have seen on

24   the screen, right?

25   A.  Yes.

F4FJUSA5                          Katz - cross

1    Q.  The reason for that -- and following up a bit some of the

2    court's questions -- the reason for that is that when these

3    forms are filled out by the job seeker, right, the form is

4    taken back to SEEDCO at 125th Street, right?

5    A.  Yes.

6    Q.  And then at that point someone will input the information

7    on the form into this Work Source1 System, right?

8    A.  Yes.

9    Q.  So at that point that's not a placement, correct?

10   A.  It is not a placement, correct.

11   Q.  That is simply the registration of the job seeker into the

12   Work Source1 System?

13   A.  Yes.

14   Q.  Now, we saw some of these CIF forms that the government

15   showed us.  That handwriting is the handwriting of the

16   customer, right?  The customer fills out the form?

17   A.  Yes.

18   Q.  And the customer puts down their social security number,

19   right?

20   A.  Yes.

21   Q.  And all their contact information?

22   A.  Yes.

23   Q.  Identifying information, right?

24   A.  Yes.

25   Q.  Does the customer also have to show ID like a driver's

F4FJUSA5                         Katz - cross

1    license or something like that to verify who they are?

2    A.  Yes.

3    Q.  Then, in addition to all that personal information, they

4    then have to sign the form, right?

5    A.  Yes.

6    Q.  So you understand that the signatures on those forms that

7    were shown to you by the government over the last hour or two

8    are the signatures of the actual job seekers, right?

9    A.  Yes.

10   Q.  Verifying that the information on that form is true and

11   correct?

12   A.  Correct.

13   Q.  And so then that form is taken back to your office, someone

14   inputs that data on that CIF form into the system, right?

15   A.  Yes.

16   Q.  Now, you were asked questions about something called an

17   EIF.  Do you remember that?

18   A.  Yes.

19   Q.  That is a different form, right?

20   A.  Right.

21   Q.  Someone completes an EIF form when they're actually going

22   to enter a placement into Work Source1, right?

23   A.  Right.

24   Q.  So just so we're clear on the process, the CIF information

25   is entered, and all that does is register the person in Work

1  Source?

2  A.  Right.

3  Q.  And that's relevant for something called re-engagement

4  calls.  Do you remember that?

5  A.  Yes.

6  Q.  We'll talk about that in a little bit.

7          The person is registered through the CIF?

8  A.  Correct.

9  Q.  Now, typically when a person comes into SEEDCO, who walks

10 into 125th Street, they will get some services when they're

11 there filling out the form.  Isn't that right?

12 A.  Yes.

13 Q.  That is typical, correct?

14 A.  Correct.

15 Q.  And so, for example, they would see someone and someone

16 will ask them do you have a current resume, right?

17 A.  Right.

18 Q.  What's your job experience, and they will kind of assess

19 the needs of that individual where they are.  Is that fair?

20 A.  That's fair, yes.

21 Q.  And some people come into SEEDCO at 125th Street and

22 they're, they're not in good circumstances, they may have prior

23 criminal matters, they may have addiction issues.  There are

24 people who come in who have a hard time getting a job.

25          Is that fair?

F4FJUSA5                          Katz - cross

1    A.   That is fair.

2    Q.   And there are other people who come into SEEDCO who are

3    more readily employable because maybe they've got a pattern of

4    working, or they've got a degree or they've got a decent skill

5    set or maybe a resume.  Am I accurately recounting things

6    there?

7    A.   Yes, that makes sense, yes.

8    Q.   And so now when they come in, depending on their skill set

9    and depending on these circumstances, they will then be seen by

10   people to help them out, right?

11   A.   Yes.

12   Q.   If someone comes in who is readily employable, the

13   individual at intake will see the person, right, and give them

14   the CIF form will then be able to direct them and say oh, this

15   person has worked in the food industry, I know so and so at

16   SEEDCO needs 10 jobs at a restaurant, looking for people in the

17   food industry, Mr. Jones, I am going to send you over here,

18   right?  Is that essentially the process?

19   A.   That is essentially the process.

20   Q.   That goes on hundreds of times a day, right?

21   A.   Yes.

22   Q.   In fact, how many people over the course of a week, could

23   you see three or four hundred people at SEEDCO?

24   A.   Yes.

25   Q.   Now, when you're off site at a recruitment event, you're at

F4FJUSA5                         Katz - cross

1    a Fairway or, for example, the East River Project, if you're at

2    some off site event where people have gathered to try to find

3    employment, they're encountering SEEDCO people there, too,

4    right?

5    A.  Yes.

6    Q.  Now, was there a policy whereby SEEDCO couldn't tell people

7    that they were SEEDCO, they had to say they were from

8    Workforce1?  Do you remember anything like that?

9    A.  Yes.  We were NYC Business Solutions, operating under that

10   brand name.  So, yes.

11             THE COURT:  That is yes?  What is yes, yes?  What is

12   the question that you answered yes?

13             THE WITNESS:  SEEDCO employees, did we operate under a

14   different name as opposed to being SEEDCO employees when we met

15   with candidates at these events.

16             THE COURT:  Why is that?

17             THE WITNESS:  Branding in the city from SBS.

18             THE COURT:  The city wanted you to use a different

19   name, is that what you're saying?

20             THE WITNESS:  Yes.

21             THE COURT:  What was your different name?

22             THE WITNESS:  We were NYC Business Solutions.  In all

23   of the centers, not just SEEDCO, but all the other vendors that

24   operated these other Workforce1 centers in all the boroughs

25   operated as NYC Business Solutions as opposed to the contractor

F4FJUSA5                        Katz - cross

1    they worked for.

2              THE COURT:  Okay.

3    BY MR. FUTERFAS:

4    Q.  So another question on that topic.

5              If someone contacted a job seeker and said were you

6    seen by a SEEDCO employee at Fairway, the person would have no

7    idea they were actually seen by a SEEDCO employee because the

8    name they would be given would be this business solutions or

9    New York City Business Solutions, something like that, right?

10   A.  Yes, correct.

11   Q.  You understand that that was a directive that came down

12   from SBS to Workforce1?

13   A.  Yes.

14   Q.  Yes?

15   A.  Yes.

16   Q.  Now, at these off site events that you've talked about a

17   little bit on your direct examination, would your staff and

18   your team sometimes -- withdrawn.

19             Would your staff and your team advertise for

20   recruitment events?

21   A.  Yes.

22   Q.  Where would you advertise?

23   A.  Craig's List.

24   Q.  So you would spend SEEDCO money putting ads in newspapers

25   or as you said on Craig's List, right?

F4FJUSA5                          Katz - cross

1   A.  Correct.

2   Q.  To get people to recruitment events for employers, right?

3   A.  Yes, whether they were off site or within the center, yes.

4   Q.  How often within the center were there recruitment events?

5   A.  Often.  Maybe a little less than us going out to -- no.

6   Excuse me.  They were as often as us actually going out to the

7   employer siters.

8   Q.  Did you have -- I didn't want to cut you off -- did you

9   have something else you wanted to add?

10  A.  Yeah, because part of the benefit for us to employers was

11  for us to say you can come and use our space free of charge,

12  come to us and we will have the candidates there, we'll

13  advertise and we'll vet the candidates and you can use our

14  rooms.  Events occurred on site and off site.

15  Q.  Just picking a number, I am certainly not going to hold you

16  to it, but were there five recruitment events a week, 10

17  recruitment events a week at 125th Street?  Can you ballpark it

18  when you were there?

19  A.  Can you clarify your question regarding recruitment events.

20          THE COURT:  Mr. Futerfas wants to know generally how

21  many recruitment events you had to go to?

22          THE WITNESS:  We went to off site?

23          THE COURT:  In a typical week?

24          THE WITNESS:  On site?  Off site?  Five, perhaps.

25          THE COURT:  Five a week?

F4FJUSA5                          Katz – cross

1           THE WITNESS:  It could be more, it could be less.

2           THE COURT:  How about a month, how long a period?

3           20, 25 a month?

4           THE WITNESS:  Give or take, 20, approximately.

5           THE COURT:  Would you have people go to it from both

6     your Bronx and Manhattan offices or only from one of those?

7           THE WITNESS:  From both, from both.

8           THE COURT:  Where were your offices in Manhattan?

9           THE WITNESS:  We're on 125th and Frederick Douglas I

10    believe is the cross street.

11          THE COURT:  125th and 8th Avenue?

12          THE WITNESS:  By the Apollo, yes.

13          THE COURT:  By the Apollo Theater?

14          THE WITNESS:  Yes.

15          THE COURT:  It might urge you to go to the Apollo

16    Theater.

17          THE WITNESS:  We held a recruiting event there.

18          THE COURT:  Some good jazz, too, maybe.  What your

19    office in the Bronx?

20          THE WITNESS:  We were on 149th, right near Lincoln

21    Hospital.

22          THE COURT:  Okay.  The events you go to were all over

23    the city?

24          THE WITNESS:  They were all over the city as well as

25    within our centers.

F4FJUSA5                          Katz - cross

1    BY MR. FUTERFAS:

2    Q.  Picking up, do you remember that your team and SEEDCO did a

3    recruitment for the hotel in Harlem called the Aloft Hotel?

4    A.  Yes.

5    Q.  Was that, in fact, recruitment event was actually held at

6    the Apollo Theater, right?

7    A.  It was, yes.

8    Q.  How many people showed up for that recruitment event?

9    A.  A hundred, perhaps.

10   Q.  At these off site -- for the purpose of our discussion, can

11   we call these the off site events when you're not at the 125th

12   location street at SEEDCO, they're at some other location?

13   A.  Can I ask?

14   Q.  Please.

15   A.  When I think recruitment events, we have held recruitment

16   events at our center that employers didn't come, we didn't

17   attend.

18         We would advertise recruitment events on Craig's List

19   for a new location opening, say, T.J. Maxx and folks would come

20   to meet with the SEEDCO staff only.  I am lumping that as a

21   recruitment event.  I want to make the distinction.

22         Are you referring to a recruitment event with an

23   employer present?

24   Q.  I am making that assumption.

25   A.  The number can be --

1            THE COURT:  I don't know that it makes any difference.

2    It doesn't make any difference.  Mr. Futerfas, he wants to know

3    generally how many of these recruit events you went to.  Now

4    that we have that information, why don't we call it a day and

5    continue tomorrow at 10:00 o'clock.

6            Tomorrow we have to stop at about 3:30, maybe a little

7    bit longer, but we have to stop.  There is a program in the

8    courthouse celebrating the career of one of our former

9    colleagues, Harold Baer, Jr.  He was a distinguished judge and

10   no longer alive, but we are going to celebrate his life.

11           See you at 10:00 o'clock tomorrow.  Leave your books.

12   Ms. jones will collect them.  Don't discuss the case.  Come

13   back fresh and with an open mind.

14           (Jury excused)

15           THE COURT:  See you tomorrow at 10:00.  Don't discuss

16   the case with anyone, not even any of the lawyers.

17           THE WITNESS:  Okay.

18           THE COURT:  We will recess till tomorrow.  One more

19   thing.  Ms. Blain opened at 1:55 pm and finished at 2:05 pm.

20           Ms. Schein began at 2:05 and ended at 2:20.  Then Ms.

21   Schoenberger questioned Mr. Katz from 2:20 until 3:50, and Mr.

22   Futerfas began at 4:05 and ended at 4:20.

23           MR. FUTERFAS:  That is what we have, your Honor.

24           THE COURT:  We'll add it up.

25           (Court adjourned until Wednesday, April 15, 2015)

```
 1                    INDEX OF EXAMINATION

 2    Examination of:                          Page

 3    ALAN STEPHEN KATZ

 4    Direct By Ms. Schoenberger . . . . . . . . . . .30

 5    Cross The Court  . . . . . . . . . . . . . 92 by

 6                    GOVERNMENT EXHIBITS

 7    Exhibit No.                            Received

 8      7   . . . . . . . . . . . . . . . . . . . .39

 9      2   . . . . . . . . . . . . . . . . . . . .45

10     57   . . . . . . . . . . . . . . . . . . . .48

11     65   . . . . . . . . . . . . . . . . . . . .51

12     66   . . . . . . . . . . . . . . . . . . . .51

13     67   . . . . . . . . . . . . . . . . . . . .52

14     10   . . . . . . . . . . . . . . . . . . . .62

15      6   . . . . . . . . . . . . . . . . . . . .68

16      8   . . . . . . . . . . . . . . . . . . . .70

17      1   . . . . . . . . . . . . . . . . . . . .77

18     71   . . . . . . . . . . . . . . . . . . . .79

19

20

21

22

23

24

25
```